# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
In re:                                    :
                                          :    Chapter 11
                                          :
LBI MEDIA, INC., et al.,                  :    Case No. 18– _____ (      )
                                          :
        Debtors.¹                         :    (Joint Administration Requested)
                                          :
------------------------------------------------------------ x
```

## MOTION OF DEBTORS FOR (I) AUTHORITY TO (A) OBTAIN POSTPETITION SENIOR SECURED FINANCING, (B) USE CASH COLLATERAL, (C) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (D) GRANT LIENS AND SUPERPRIORITY CLAIMS, (E) MODIFYING THE AUTOMATIC STAY, AND (II) RELATED RELIEF

LBI Media, Inc. ("**LBI Media**") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or "**LBI**"), respectfully request entry of an interim order in the form attached hereto as **Exhibit A** (the "**Interim Order**") and a final order (the "**Final Order**," and together with the Interim Order, collectively, the "**DIP Orders**"): (i) authorizing the Debtors to (a) enter into that certain *Superpriority Senior Secured Debtor-In-Possession Credit Agreement*, a final form of which is attached hereto as **Exhibit B** (the "**DIP Credit Agreement**," and, together with the schedules and exhibits thereto and all Loan Documents (as defined in the DIP Credit Agreement), the "**DIP**

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LBI Media, Inc. (8901); Liberman Broadcasting, Inc. (8078); LBI Media Holdings, Inc. (4918); LBI Media Intermediate Holdings, Inc. (9635); Empire Burbank Studios LLC (4443); Liberman Broadcasting of California LLC (1156); LBI Radio License LLC (8905); Liberman Broadcasting of Houston LLC (6005); Liberman Broadcasting of Houston License LLC (6277); Liberman Television of Houston LLC (2887); KZJL License LLC (2880); Liberman Television LLC (8919); KRCA Television LLC (4579); KRCA License LLC (8917); Liberman Television of Dallas LLC (6163); Liberman Television of Dallas License LLC (1566); Liberman Broadcasting of Dallas LLC (6468); and Liberman Broadcasting of Dallas License LLC (6537). The Debtors' mailing address is 1845 West Empire Avenue, Burbank, California 91504.

**Documents**")[2] to obtain postpetition financing ("**DIP Financing**"), including with respect to an interim borrowing of up to $10 million, and (b) use Cash Collateral (as such term is defined in Section 363(a) of the Bankruptcy Code); (ii) granting adequate protection as provided herein; (iii) modifying the automatic stay; (iv) scheduling a hearing to consider the relief requested herein on a final basis (the "**Final Hearing**"); and (v) granting related relief.

In support of the Motion, the Debtors submit: (i) the declaration of Ronen Bojmel, Senior Managing Director at Guggenheim Securities, LLC ("**Guggenheim Securities**"), the Debtors' proposed investment banker, attached hereto as **Exhibit C** (the "**Bojmel Declaration**") and (ii) the *Declaration of Brian Kei in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.  The Debtors' initial budget with respect to the DIP Facility is attached hereto as **Exhibit D** (the "**DIP Budget**").

## Preliminary Statement

1.     By this Motion, the Debtors seek authorization to obtain DIP Financing under a multiple-draw super-priority senior secured term loan facility in an aggregate principal amount not to exceed $38 million (the "**DIP Facility**") agented by HPS Investment Partners, LLC ("**HPS**," and in such capacity, the "**DIP Agent**").  The Debtors seek interim authority to draw up to $10 million under the DIP Facility.

2.     The Debtors' estates will suffer immediate and irreparable harm if the relief requested is not granted.  The Debtors are entering chapter 11 with minimal cash on hand. Access to DIP Financing and the use of Cash Collateral is thus critical to ensure the Debtors' smooth entry into chapter 11 and their ability to prudently operate their business during the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Documents.

pendency of these chapter 11 cases.  The Debtors believe the commencement of these chapter 11 cases will place increased demands on liquidity due to, among other things, the costs of administering these chapter 11 cases and potential acceleration or elimination of trade terms. The relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the vital liquidity that would be provided through their proposed interim borrowings.  The DIP Financing has been market tested and evaluated by the Debtors' committee of independent directors formed to lead and oversee the Debtors' restructuring efforts (the "**Restructuring Committee**").    The DIP Financing will provide sufficient liquidity to fund these chapter 11 cases and the Debtors' operations and will allow the Debtors to send a strong message to their vendors, customers, and employees that the Debtors are well-capitalized and well positioned for a successful reorganization.

3.    The Debtors negotiated the DIP Financing and the adequate protection proposed herein in good faith and at arm's length.  The terms of the DIP Facility are reasonable and the best that could be obtained under the totality of the circumstances.

## Jurisdiction

4.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    Pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this

3

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

6.     By this Motion, the Debtors request the following relief in the DIP Orders:

- **DIP Financing:** authority to enter into the DIP Credit Agreement and related documents providing for a $38 million DIP Facility that will be drawn up to $10 million on an interim basis and up to an additional $28 million on a final basis that, together, will provide the liquidity needed to ensure the Debtors are able to continue operating their business without disruption during the pendency of these chapter 11 cases.

- **DIP Interest and Fees:** authority to pay:

  - an interest rate of, at LBI Media's option, (i) the Base Rate plus 8.0% *per annum*; or (ii) the three-month Eurocurrency Rate, plus 9.0% *per annum*;

  - default interest at 2.50% *per annum*; and

  - certain additional fees and expenses, including, an upfront fee, unused commitment fee, and an exit fee.

- **DIP Liens and Claims:** authority to grant, in each case subject to the Carve-Out (as defined below):

  - first priority priming security interests and liens on, and security interests in, all prepetition and postpetition assets of the Debtors; and

  - superpriority administrative expense claims.

- **Cash Collateral:** authority to use Cash Collateral within the meaning of section 363(a) and 363(c) of the Bankruptcy Code.

- **Adequate Protection:**  approval of the form and manner of adequate protection to be provided to the Prepetition Secured Parties (as defined below), including:

  - with respect to the First Lien Noteholders (as defined below):

    - all accrued and unpaid fees and disbursements owed under the First Lien Indenture (as defined below), including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals incurred prior to the Petition Date;

    - when due, current payment of all fees and reasonable and documented out-of-pocket expenses payable to the First Lien Trustee (as defined below) or the First Lien Noteholders; and

4

- allowed superpriority claims to the extent of diminution in the value of their collateral.

o with respect to both the First Lien Noteholders and Second Lien Noteholders (as defined below):

- replacement or, if applicable, new continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the DIP Collateral (as defined below); and

- customary prepetition secured lender protections, including (i) 506(c) and 552(b) waivers (in each case, subject to entry of the Final Order); and (ii) stipulations as to the liens and claims held by such parties, among other things.

- **Modification of the Automatic Stay**: modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders.

- **Immediate Effectiveness**: waiver of any applicable stay, including (to the extent applicable) under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order.

- **Final Hearing**: scheduling a date for a hearing on the Motion to consider entry of the Final Order no later than thirty (30) days after entry of the Interim Order.

<u>**Concise Statement and Highlighted Provisions**</u>

7.      Pursuant to Bankruptcy Rules 4001(b), (c) and (d), and Local Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Documents and DIP Orders:[3]

| Term | Summary | Reference |
|------|---------|-----------|
| **Borrower**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | LBI Media, Inc. (the "**Borrower**") | DIP Credit Agreement, Preamble |
| **Guarantors**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Existing and future, direct and indirect subsidiaries of Borrower (the "**Guarantors**," and collectively with the Borrowers, the "**Credit Parties**") | DIP Credit Agreement, "Guarantors" Definition |
| **DIP Lenders**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Funds and/or accounts managed, advised or controlled by HPS Investment Partners, LLC or a subsidiary/affiliate of any of the foregoing (the "**DIP Lenders**") | DIP Credit Agreement, Preamble |

---

[3] This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

| Term | Summary | Reference |
|---|---|---|
| **DIP Agent**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | HPS Investment Partners, LLC | DIP Credit Agreement, Preamble |
| **DIP Facility**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | A multiple draw super-priority senior secured term loan facility in an aggregate principal amount not to exceed $38,000,000 (the "**DIP Commitments**"). | DIP Credit Agreement, Recitals; Interim Order, ¶ A. |
| **Borrowing Limits**<br>Fed. R. Bankr. P. 4001(c)(1)(B);<br>Local Rule 4001-(2)(a)(ii) | The initial draw on the DIP Facility will be $10,000,000.  Each subsequent draw shall be in a minimum amount of $2,500,000 and a maximum amount of $5,000,000 (the "**Draw Cap**"), subject to certain exceptions. | DIP Credit Agreement, § 2.1; Interim Order, ¶ A. |
| **DIP Budget**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | A copy of the DIP Budget is attached hereto as **Exhibit D**.  The DIP Budget shall be updated by the Borrower every four weeks for the subsequent 13-week period. The Borrower shall deliver on a bi-weekly basis to the DIP Agent a variance report for the immediately preceding rolling four-week period together with a statement certifying compliance with the permitted variance and explaining in reasonable detail all material variances. | DIP Credit Agreement, "DIP Budget" definition, §§ 5.1(c), 6.1(d) |
| **Interest Rates**<br>Fed. R. Bankr. P. 4001(c)(1)(B);<br>Local Rule 4001-2(a)(ii) | All amounts outstanding under the DIP Facility will bear interest, at the Borrower's option, as follows: (i) at the Base Rate, plus 8.0% *per annum*; or (ii) at the three-month Eurocurrency Rate, plus 9.0% *per annum*. After the occurrence and during the continuance of an event of default, all overdue amounts will bear interest at a rate equal to 2.50% *per annum*, plus the otherwise applicable rate. | DIP Credit Agreement, § 2.13 |
| **Maturity Date / Termination Date**<br>Fed. R. Bankr. P. 4001(c)(1)(B);<br>Local Rule 4001-2(a)(ii) | The Loan matures six (6) months after the Closing Date; provided that the DIP Facility may be terminated upon the earliest to occur of:<br>(a)  the effective date of any chapter 11 plan for the reorganization of the Borrower or any other Debtor;<br>(b)  the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to Bankruptcy Code section 363;<br>(c)  the date of the acceleration of the DIP Loans; and<br>(d)  35 days after the date of entry of the Interim Order (or such later date as agreed to by the Required Lenders, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date. | DIP Credit Agreement, "Maturity Date" and "Stated Maturity" Definitions |
| **Material Conditions to Closing**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The initial funding of the DIP Loans under the DIP Facility is subject to the following conditions precedent:<br>(a)  execution and delivery of the DIP Credit Agreement, Loan Documents, and other ancillary deliverables;<br>(b)  HPS and the Debtors entering into a mutually agreed restructuring support agreement ("**RSA**");<br>(c)  filing of UCC-1s in appropriate filing offices of each relevant jurisdictions<br>(d)  entry of the Interim Order;<br>(e)  delivery of the DIP Budget;<br>(f)  all proposed "first day orders" entered in form and substance reasonably acceptable to the Required Lenders;<br>(g)  all orders entered by the Bankruptcy Court pertaining to cash management and adequate protection are in form and substance reasonably acceptable to the Required Lenders; and<br>(h)  all fees, expenses (including, without limitation, legal fees and expenses) payable under the DIP Credit Agreement or RSA or otherwise to be paid to the DIP Agent, the DIP Lenders, or the RSA Parties on or before the Closing Date shall have been paid. | DIP Credit Agreement, §§ 5.1, 5.2 |

| Term | Summary | Reference |
|------|---------|-----------|
| **Events of Default**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Events of default include: non-payment of obligations; defaults under covenants, for the avoidance of doubt, and without limitation, an unfavorable variance beyond the Permitted Variance under the then-applicable DIP Budget or failure to meet any of the Milestones set forth below, judgment defaults, failure to comply with ERISA rules and regulations, appointment of a bankruptcy trustee or examiner, invalidity of collateral documents, dismissal or conversion of these chapter 11 cases, certain adverse motions or Bankruptcy Court orders, termination of the Interim Order or the Final Order, as applicable, lifting of the stay to allow certain pre-petition litigation to be continued outside of the Bankruptcy Court, allowance of a claim under section 506(c) of the Bankruptcy Code, filing of an unacceptable chapter 11 plan or disclosure statement, termination of the use of Cash Collateral, termination of the RSA, and an unapproved sale of the assets. | DIP Credit Agreement, § 8.1 |
| **Carve-Out**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(F) | The Carve-Out is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee plus interest at the statutory rate; (ii) all reasonable fees and expenses incurred by a chapter 7 trustee in an amount not to exceed $50,000; and (iii) (A) all paid and unpaid claims for fees, costs, disbursements and expenses to the extent allowed at any time, whether by interim order, final order, procedural order or otherwise of persons or firms retained by the Debtors or any official committee of unsecured creditors in the Chapter 11 Cases (collectively, the "**Professional Fees**") incurred at any time on or prior to the Trigger Date, plus (B) Professional Fees incurred after the Trigger Date in an amount not to exceed $1,000,000 of professionals retained by the Debtors. | Interim Order, ¶ 8(b) |
| **Priority and Collateral**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(i) | All obligations of the Borrowers and the Guarantors to the DIP Lenders and to the DIP Agent, including, without limitation, all principal, accrued interest, costs, and fees (collectively, the "**DIP Obligations**") shall constitute claims entitled to the benefits of Bankruptcy Code section 364(c)(1), having a super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever, including, without limitation, the superpriority claims granted to the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties under the Interim Order and the Final Order, and administrative expenses, subject only to the Carve-Out, in accordance with the following:<br><br>(a) **First Lien on Unencumbered Property**.  A valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition property of the Credit Parties, that is not subject to a valid, perfected and non-avoidable lien (other than the Avoidance Actions, but including, subject to the entry of a Final Order, the Avoidance Proceeds);<br><br>(b) **Priming Liens on Prepetition Collateral**.  A valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and postpetition property subject to the Prepetition Liens, which lien shall be senior in all respects to such Prepetition Liens; and<br><br>(c) **DIP Liens Junior to Certain Other Liens**.  A valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all tangible and intangible pre- and postpetition property of each Credit Party subject to valid, binding, and unavoidable liens that are otherwise senior to the Prepetition First Lien Notes Liens as of the Petition Date (the "**Senior Liens**"), if any. | Interim Order, ¶¶ 8(a), 9(a)-(d)] |

| Term | Summary | Reference |
|------|---------|-----------|
| **Use of DIP Proceeds and Cash Collateral**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | The proceeds of the DIP Loans under the DIP Facility and Cash Collateral will be used for the following payments:<br>(a)  working capital and other general corporate purposes in accordance with the DIP Budget;<br>(b)  adequate protection payments;<br>(c)  the professional fees and expenses of administering these chapter 11 cases; and<br>(d)  other purposes as expressly set forth in the Interim Order, the Final Order, or the DIP Budget, or as approved by the DIP Agent or Required Lenders. | DIP Credit Agreement, § 4.21; Interim Order, ¶ 6(b) |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv) | The Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties have an interest in Cash Collateral, and shall be provided the following adequate protection:<br><br>(a)  **Replacement Liens**. Replacement or, if applicable, new continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the DIP Collateral.<br><br>The following adequate protection shall also be provided to the Prepetition First Lien Secured Parties:<br><br>(a)  **Superpriority Claims.**  Allowed superpriority claims to the extent of diminution in the value of their collateral;<br>(b)  **Prepetition Expenses.**  All accrued and unpaid fees and disbursements owed under the Prepetition First Lien Indenture, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Prepetition First Lien Trustee or the First Lien Noteholders incurred prior to the Petition Date;<br>(c)  **PostPetition Expenses.**  When due, current payment of all fees and reasonable and documented out-of-pocket expenses payable to the Prepetition First Lien Trustee or the First Lien Lenders; and<br>(d)  **Information Rights**.  The Debtors shall provide the Prepetition First Lien Trustee with any written financial reporting and other periodic reporting that is actually provided to the DIP Agent or the DIP Lenders under the DIP Credit Agreement. | Interim Order, ¶ 14(a)-(d) |
| **Debtors' Stipulations**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii) Local Rule 4001-2(a)(i)(B) | The Debtors stipulate to, among other things, the following:<br>(a)  Prior to the Petition Date, the Credit Parties were indebted to the Prepetition First Lien Notes Parties in the aggregate principal amount of not less than $233,000,000 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for under the Prepetition First Lien Notes Documents, or incurred in connection therewith, including but without duplication, the Applicable Premium (as defined in the Prepetition First Lien Indenture).<br>(b)  The Prepetition First Lien Notes Liens are: (i) valid, binding, perfected, enforceable, liens, and security interests; (ii) not subject to recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim; and (iii) as of the Petition Date are subject and subordinate only to certain valid, perfected, and unavoidable liens permitted under the Prepetition First Lien Notes Documents.<br>(c)  Prior to the Petition Date, the Credit Parties were indebted to the Prepetition Second Lien Notes Parties in the aggregate principal amount of not less than $262,433,363 plus all accrued but unpaid interest, fees, expenses, and all other obligations expressly provided for under the Prepetition Second Lien Notes Documents, or incurred in connection therewith. | Interim Order, ¶ 5(a)-(j) |

| Term | Summary | Reference |
|------|---------|-----------|
| **Waiver or Modification of the Automatic Stay** Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The automatic stay of section 362(a) of the Bankruptcy Code is modified to the extent necessary to: <br> (a)  permit the DIP Agent and the DIP Lenders to enforce all of their rights under the DIP Documents and (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further Commitment and (B) all Obligations to be immediately due and payable, and (ii) to the extent provided for under the DIP Credit Agreement, upon the occurrence of an Event of Default and the giving of five (5) business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) via email to counsel to the Debtors, counsel to any official committee of unsecured creditors appointed in connection with the Chapter 11 Cases, and the U.S. Trustee to (A) withdraw consent to continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law; *provided that* in any hearing regarding any exercise of rights of remedies under the DIP Documents, the only issue that may be raised by the Debtors and the Prepetition Secured Parties in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing; and <br> (b)   implement and effectuate the terms of the DIP Documents. | Interim Order, ¶¶ I, 10(d), 18(b) |
| **Waiver or Modification of Right to File a Plan** Fed. R. Bank. P. 4001(c)(1)(B)(v) | An Event of Default will occur under the DIP Credit Agreement if a plan of reorganization is confirmed or filed by any Credit Party that is not acceptable to the DIP Lenders or an order is entered dismissing any of these chapter 11 cases that does not provide for termination of the DIP Facility and indefeasible payment in full of the DIP Obligations. | DIP Credit Agreement, §8.1(r)(viii) |
| **Milestones** Fed. R. Bank. P. 4001(c)(1)(B)(vi) | The DIP Credit Agreement provides for the following milestones (the "**Milestones**"): <br> (a)  no later than five business days after the Petition Date, the Bankruptcy Court shall enter the Interim Order; <br> (b)  no later than 35 days after entry of the Interim Order, the Bankruptcy Court shall enter the Final Order; <br> (c)  no later than 90 days after the Petition Date, the Bankruptcy Court shall have approved a disclosure statement reasonably acceptable to the Prepetition First Lien Secured Parties; <br> (d)  no later than 150 days after the Petition Date, the Bankruptcy Court shall have entered an order confirming a chapter 11 plan reasonably acceptable to the Prepetition First Lien Secured Parties; and <br> (e)  no later than 180 days after the Petition Date, the effective date of the chapter 11 plan shall have occurred. | DIP Credit Agreement, § 6.14. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to DIP Liens** Fed. R. Bankr. P. 4001(c)(1)(B)(vii) | All of the DIP Liens shall be effective and perfected upon entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements or similar undertakings. | Interim Order, ¶¶ 10(a), 14(a) |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The Debtors' stipulations, admissions, and agreements are binding, subject to the Challenge Period.  Specifically, any party in interest with standing to challenge must commence a Challenge, by no later than: <br> (a)  with respect to parties in interest with requisite standing other than the Creditors' Committee, 75 calendar days after entry of this Interim Order; <br> (b)  with respect to the Creditors' Committee, 60 calendar days after the | Interim Order, ¶ 22 |

| Term | Summary | Reference |
|------|---------|-----------|
| | appointment of the Creditors' Committee, if any;<br>(c) any such later date as has been agreed to, in writing, by the Prepetition First Lien Trustee (with the consent of the Required Holders (as defined in the Prepetition First Lien Indenture)) or the Prepetition Second Lien Trustee, as applicable; or<br>(d) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph such parties. | |
| **Indemnification**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | Each DIP Lender agrees to indemnify and hold harmless the DIP Agent. | DIP Credit Agreement, § 9.8 |
| **Section 506(c) Waiver**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(x)<br>Local Rule 4001-2(a)(i)(C) | The Interim Order provides for a waiver of section 506(c) upon entry of the Final Order with respect to the DIP Liens. | Interim Order, ¶ G, 11 |
| **Liens on Avoidance Actions**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(xi)<br>Local Rule 4001-2(a)(i)(D) | The DIP Collateral includes, subject to entry of a Final Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions. | Interim Order, ¶ 9 |
| **Section 522(b) Waiver**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(H) | Subject only to and effective upon entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition First Lien Notes Parties. | Interim Order, ¶ 10(d) |

## **Prepetition Capital Structure**

## I.     **Prepetition Indebtedness**

8.     The Debtors' prepetition capital structure includes approximately $530 million in total funded debt as of the date of commencement of the Petition Date, comprised of:

(a)     10% Senior Secured Notes issued by LBI Media pursuant to the First Lien Indenture (as defined below) and currently maturing in 2023 (the "**First Lien Notes**", the holders of which are referred to as the "**First Lien Noteholders**"), with a principal amount of approximately $233 million outstanding;

(b)     11½ / 13½ PIK Toggle Second Priority Secured Notes due April 15, 2020 issued by LBI Media (the "**Second Lien Notes**", and the holders of such

10

notes, the "**Second Lien Noteholders**"), with a principal amount of approximately $262 million outstanding;

(c)     11% PIK Unsecured Senior Notes due April 30, 2022 (the "**Intermediate HoldCo Notes**," and the holders of such notes the "**Intermediate HoldCo Noteholders**") issued by Debtor LBI Media Intermediate Holdings, Inc. ("**Intermediate HoldCo**"), with a principal amount of approximately $28 million outstanding; and

(d)     11% Unsecured Senior Notes due April 30, 2017 (the "**HoldCo Notes**," and the holders of such notes, the "**HoldCo Noteholders**") issued by Debtor LBI Media Holdings, Inc. ("**HoldCo**") with a principal amount of approximately $7 million outstanding.

The Debtors' prepetition indebtedness can be summarized as follows:

**A.     Secured First Lien Notes**

9.      On March 18, 2011, certain of the Debtors entered into that certain *Indenture* (as amended, modified, or otherwise supplemented from time to time, the "**First Lien Indenture**"),[4] dated as of March 18, 2011, by and among LBI Media, as issuer, each of the guarantors named therein (each of LBI Media's direct and indirect subsidiaries, the "**Debtor Guarantors**"), and Wilmington Savings Fund Society, FSB, as indenture trustee (the "**First Lien Trustee**," and together with the First Lien Noteholders, the "**First Lien Secured Parties**"). The obligations under the First Lien Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by first-priority liens in substantially all of the assets (other than certain excluded assets) of LBI Media and its direct and indirect subsidiaries (the "**Common Collateral**").  As of the date hereof, the aggregate amount outstanding under the First Lien Indenture is approximately $233 million in principal amount, plus any unpaid interest, fees, expenses or other amounts due thereunder or incurred in connection therewith, including

---

[4] The First Lien Indenture was supplemented by that certain *Supplemental Indenture* dated as of December 31, 2012, by that certain *Second Supplemental Indenture* dated as of December 23, 2014, by that certain *Third Supplemental Indenture* e dated as of April 17, 2018, by that certain *Fourth Supplemental Indenture* dated as of April 17, 2018, and by that *Fifth Supplemental Indenture* dated as of October 26, 2018.

but without duplication, the Applicable Premium (as defined in the First Lien Indenture) (collectively, the "**First Lien Notes Obligations**").

### B.    Secured Second Lien Notes

10.    On December 23, 2014, certain of the Debtors supplemented that certain Indenture dated as of December 31, 2012 by and among LBI Media, as issuer, the Debtor Guarantors, and U.S. Bank National Association ("**U.S. Bank**"), as indenture trustee (the "**Second Lien Trustee**," and together with the Second Lien Noteholders, the "**Second Lien Secured Parties**"), and entered into that certain Series II Indenture, among the same parties (collectively, as amended, modified, or otherwise supplemented from time to time, the "**Second Lien Indenture**").  The Second Lien Notes have accrued payment-in-kind interest since their issuance, and as of the date hereof, the aggregate amount outstanding under the Second Lien Indenture is approximately $262 million in principal amount, plus any unpaid interest, fees, or other amounts due thereunder.

11.    The Second Lien Notes are jointly and severally and fully and unconditionally guaranteed by the Debtor Guarantors and  secured by the same Common Collateral as the First Lien Notes.  Pursuant to the Second Lien Indenture, the Indebtedness (as defined in the Second Lien Indenture) evidenced by the Second Lien Notes is subordinated in right of payment to the prior payment in full of all Senior Debt (as defined in the Second Lien Indenture), including, without limitation, the First Lien Notes Obligations.  Pursuant to that certain *Amended and Restated Intercreditor Agreement*, dated as of December 23, 2014 (the "**Intercreditor Agreement**"),[5] by and among LBI Media, the Debtor Guarantors, Credit Suisse AG Cayman Islands Branch, in its capacity First Priority Lien Collateral Trustee, and U.S.

---

[5] A copy of the Intercreditor Agreement is annexed hereto as **Exhibit E**.

Bank, in its capacity as Second Priority Collateral Agent, any lien on the Common Collateral securing the First Lien Notes Obligations held by or on behalf of the First Lien Trustee or any First Lien Noteholders shall have priority over and be senior in all respects and prior to any lien on the Common Collateral securing any Second Lien Notes.

### C.    Unsecured HoldCo Notes

12.    On August 4, 2017, certain of the Debtors entered into that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**Intermediate HoldCo Indenture**"), dated as August 4, 2017, by and among Intermediate HoldCo as issuer, HoldCo, as guarantor, and TMI Trust Company, as trustee, pursuant to which Intermediate HoldCo issued approximately $24.3 million of unsecured payment-in-kind notes. The obligations under the Intermediate HoldCo Indenture are irrevocably and unconditionally guaranteed by HoldCo.  As of the date hereof, the aggregate amount outstanding under the Intermediate HoldCo Indenture is approximately $28 million in principal amount, plus any unpaid interest, fees, or other amounts due thereunder.  Further, HoldCo is party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**HoldCo Indenture**"), dated as of December 31, 2012, by and among HoldCo, as issuer and U.S. Bank, as trustee, pursuant to which HoldCo issued the unsecured HoldCo Notes.  As of the date hereof, the aggregate amount outstanding under the HoldCo Indenture is approximately $7 million in principal amount, plus any unpaid interest, fees, or other amounts due thereunder.

### D.    Intercreditor Agreement

13.    The relative rights, positions, and priorities of the First Lien Secured Parties and the Second Lien Secured Parties (together, the "**Prepetition Secured Parties**") with respect to the Common Collateral are set forth in the Intercreditor Agreement.  Pursuant to the

Intercreditor Agreement, the First Lien Secured Parties have the benefit of a first-priority interest in the Common Collateral, while the Second Lien Secured Parties are the beneficiaries of second-priority interest in the Common Collateral.   Under the Intercreditor Agreement, the Second Lien Secured Parties are prohibited from, among other things, (i) objecting to LBI obtaining debtor-in-possession financing or to LBI's provision of adequate protection to the First Lien Noteholders or Second Lien Noteholders; or (ii) challenging the validity of the liens of the First Lien Indenture Trustee.

14.    The Intercreditor Agreement further provides, among other things, that while the Second Lien Secured Parties maintain unsecured creditor rights, the Second Lien Secured Parties may not exercise such rights in a manner that conflicts with certain express provisions of the Intercreditor Agreement, including the provisions described in this paragraph (§ 5.4).  Pursuant to section 8.21 of the Intercreditor Agreement, the Second Lien Secured Parties have agreed to pay reasonable attorneys' fees, costs, and expenses incurred by any First Lien Secured Parties that arise out of actions by the Second Lien Secured Parties that are prohibited by or otherwise inconsistent with any provision of the Intercreditor Agreement.

15.    A table summarizing the key provisions of the Intercreditor Agreement related to DIP Financing is set forth below:

| Key Provisions of Intercreditor Agreement[6] | |
|---|---|
| **Subordinated Lien Secured Parties' Ability to Object to DIP Financing or Provision of Adequate Protection** | The Subordinated Lien Secured Parties:<br><br>(a) (1) *may not* contest the use of cash collateral or object to LBI obtaining DIP Financing from HPS or a third-party, or to relief related thereto, (2) *may not* request adequate protection, and (3) are required to subordinate their liens to such DIP Financing and any carve-out authorized by the Bankruptcy Court (§ 6.1(a)); and<br>(b) *may not* contest the provision of adequate protection to the First Priority Lien Secured Parties, but are entitled to replacement liens if the First Priority Lien Secured Parties are granted replacement liens as adequate protection (§ 6.3). |

---

[6] All capitalized terms listed in this table shall have the meanings ascribed to such terms in the Intercreditor Agreement.

| Subordinated Lien Secured Parties' Ability to Assert Impairment of, Object to, or Otherwise Contest First Priority Lien Secured Parties' Liens | (a) Notwithstanding the date, time, manner or order of execution, delivery, filing or recordation of any document or instrument or grant, attachment or perfection of any Liens granted to the Subordinated Lien Secured Parties, any Lien on the Common Collateral securing any First Priority Claims shall have priority over and be senior in all respects and prior to any Lien on the Common Collateral securing any Subordinated Lien Claims (§ 2.1). All rights, interests, agreements and obligations of First Priority Lien Secured Parties shall remain in full force and effect irrespective of any lack of validity or enforceability of any First Priority Lien Debt Documents (§ 7.3(a)). <br><br> (b) If any Subordinated Lien Secured Party shall hold any Lien securing any Subordinated Lien Claims that are not also subject to a First Priority Lien, such Lien shall be deemed to be assigned to the First Priority Lien Collateral Trustee for the benefit of the First Priority Lien Secured Parties (§ 2.3). <br><br> (c) Until the discharge of the First Priority Claims, the Subordinated Lien Secured Parties *may not*: <br><br> 1) contest the validity, perfection, priority, extent or enforceability of a Lien securing any First Priority Claims held (or purported to be held) by or on behalf of the First Priority Lien Collateral Trustee (§ 2.2(a)); or <br><br> 2) oppose, object to or contest the determination or the extent of any Liens held by any of the First Priority Lien Secured Parties (§ 6.9(a)). |
|---|---|

### Debtors' Liquidity Needs and Marketing Efforts

## I. The Debtors Have an Immediate Need to Use Cash Collateral and Obtain DIP Financing

16.     The Debtors require access to DIP Financing and the authority to use Cash Collateral to ensure that they have sufficient liquidity to operate their business and administer their estates. The Debtors are entering chapter 11 with minimal cash on hand, and will not generate sufficient cash to fund their ongoing operations and expenses attendant to these chapter 11 cases. The commencement of bankruptcy proceedings will increase the demands on LBI's liquidity due to, among other things, administrative costs and potential unforeseen impacts on its operations resulting from the filing.

17.     The DIP Facility will provide the Debtors with the liquidity needed to, among other things, pay their workforce and satisfy their other working capital and general corporate requirements, including critical payments to vendors, providers of essential copyrights, and on-air talent, many of which may be unfamiliar with the chapter 11 process. Further, the DIP Facility will allow LBI to pursue confirmation of their proposed value-maximizing chapter

15

11 plan.  Absent the ability to access the DIP Facility, even for a limited period of time, there is a

substantial risk LBI will be unable to continue operating its businesses, resulting in a

deterioration of value to the Debtors' estates.

## II.      Marketing and Negotiation of the DIP Financing

18.      Leading up to the Petition Date, the Debtors, with the assistance of their

professionals, explored potential sources of postpetition financing.  At the outset of this process,

the Debtors were cognizant of the challenges presented by their capital structure and the fact that

substantially all of their assets are encumbered by liens granted in connection with LBI's

obligations under the First Lien Indenture and Second Lien Indenture, such that any potential

third-party investor would have to either provide unsecured financing, junior secured financing,

or "prime" the Debtors' existing secured lenders' prepetition liens on their collateral.  The

Debtors were also aware that HPS, holders of 100% of their First Lien Notes, would not consent

to being primed by third-party DIP Financing, which made obtaining third-party DIP Financing

impracticable for the reasons further stated below.

19.      Accordingly, the Debtors began discussions with HPS to provide DIP

Financing.  To ascertain whether a third-party may be willing to provide the Debtors with

unsecured, junior secured, or priming DIP Financing on better terms, the Debtors also launched a

parallel marketing process.  In particular, Guggenheim Securities, on behalf of the Debtors,

solicited eight potential third-party lenders, of which three executed non-disclosure agreements

to evaluate the opportunity.[7]  None of the third parties were willing to provide DIP Financing on

---

[7] The Debtor did not solicit a proposal from the Second Lien Noteholders because the Second Lien Noteholders did not engage with the Debtors in restructuring discussions in the period leading up to the Petition Date, and section 6.1(b) of the Intercreditor Agreement provides that the Second Lien Noteholders may not propose or provide any DIP Financing to the Debtors without the consent of the First Lien Noteholders.

16

either an unsecured or junior secured basis.  Ultimately, the Debtors only received one third-party proposal that would seek to prime the Prepetition Secured Parties.

20.     At the same time, the Debtors engaged in parallel-track good faith and arm's length negotiations with HPS over the terms of potential financing, resulting in HPS improving the terms of its initial proposal.  The Debtors, with the aid of their advisors and under the direction of the Restructuring Committee, scrutinized the financing proposals received from HPS and the third-party financing source, taking into account the risk of costly and protracted litigation associated with third-party financing with respect to Cash Collateral and adequate protection.  The Debtors also compared the amount, pricing, and fee structure of each proposed facility, and asked each party to improve on their terms.

21.     After careful consideration of each proposal, the Restructuring Committee, in consultation with its advisors, determined that the DIP Facility proposed by HPS provided superior terms to the proposal from the third-party financing source.  Specifically, the third-party proposal would have required the incurrence of more debt than HPS' proposal on account of adequate protection payments to Prepetition Secured Parties, resulting in a higher quantum of fees and interest.  Moreover, the third-party proposal carried significant litigation risk stemming from the non-consensual priming of the Prepetition Secured Parties and use of Cash Collateral.  Accordingly, the Debtors determined that HPS' proposal was the best available option and entered into definitive documentation with HPS.

### Basis for Relief Requested

**I.    The Debtors Should Be Authorized to Obtain Secured, Superpriority DIP Financing**

    **A.    Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment**

        22.    Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  *See e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility "reflect[ed] sound and prudent business judgement"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment.").

        23.    In determining whether the Debtors have exercised sound business judgment in selecting DIP Financing, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs*., 340 B.R. 222, 239 (Bankr. D. Del. 2006).   Here, the Debtors' determination to secure DIP Financing was a business decision guided by the Debtors' financial and restructuring needs.

Specifically, the Debtors, with the advice and counsel of their advisors, determined that the Debtors will require immediate liquidity to smoothly transition into chapter 11 and additional liquidity through their restructuring process in order to continue operating.  Indeed, without immediate additional liquidity, the Debtors would be unable to preserve their business or maximize value, to the detriment of the Debtors' customers, creditors, employees, vendors, and other parties in interest.

24.    Bankruptcy courts will not generally second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513 (Bankr. D. Utah 1981) (footnote omitted).  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc*., Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

25.    Here, under the auspices of their independent Restructuring Committee, the Debtors determined that the Debtors will require immediate additional liquidity to continue operating while completing their restructuring process.  The Debtors, with the assistance of their advisors, carefully reviewed each of their options with respect to DIP Financing and carefully weighed the advantages and disadvantages of the proposals.  The Debtors ultimately selected HPS' proposal only after determining it was the best option reasonably available under the totality of the circumstances.

26.     Accordingly, the Debtors submit that entry into the DIP Financing is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.

**B.     The Debtors Should be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis**

27.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [or]
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

28.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the

20

necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

29.    As set forth above, the Debtors, through Guggenheim Securities, solicited eight potential third-party financing sources in addition to HPS. Despite their good faith efforts, the Debtors did not receive any proposals for unsecured financing or financing secured by junior liens. The only third-party proposal received was for financing that primed Prepetition Secured Parties. Moreover, HPS is only willing to extend DIP Financing to the Debtors on a senior secured basis. Accordingly, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

### C.    The DIP Facility Provides for Consensual Priming and Cash Collateral Use

30.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected. *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) of the Bankruptcy Code provides:

21

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

31.     When determining whether to authorize a debtor to obtain credit secured by senior liens as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.  Courts consider a number of factors, including:

- whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids, or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, Case

No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10.

The DIP Financing satisfies these factors.

32.     <u>First</u>, though the DIP Facility primes the First Lien Noteholders' and Second Lien Noteholders' prepetition liens on the Common Collateral, such priming is being done on a consensual basis—the First Lien Noteholders have consented to such priming and are providing the DIP Facility.  Further, where the Second Lien Noteholders' interests in the DIP Collateral are being primed as well, the Second Lien Noteholders are deemed to have consented pursuant to the Intercreditor Agreement (§ 6.3).  As a result, the DIP Facility will permit the Debtors to avoid potential costly and protracted litigation with respect to adequate protection and the use of Cash Collateral.  The third-party proposal required non-consensual priming of both the First Lien Noteholders' and Second Lien Noteholders' liens and, moreover, was more expensive than the proposal provided by HPS.

33.     <u>Second</u>, the DIP Facility will provide the Debtors with the immediate access to capital necessary to consummate their marketing and plan process, and will provide them the financial flexibility required to effectively and efficiently administer these cases.  Also, although there are milestones set forth in the DIP Facility, such milestones are not burdensome to the Debtors' restructuring efforts, and allow the Debtors to pursue confirmation of a value-maximizing chapter 11 plan or alternative transaction at a reasonable and measured pace.  Further, the DIP Budget provides the flexibility needed for the Debtors to run their operations in the ordinary course.  Collectively, the features of the DIP Facility provide substantial benefits to the Debtors that would not otherwise be available from any other party.

34.     <u>Third</u>, the financial terms proposed under the DIP Facility are customary and usual terms for debtor-in-possession financings of this type.  Specifically, the contemplated

upfront fee, exit fee, unused commitment fee, interest rate, default rate, and other economic terms of the DIP Facility were all negotiated for at arms' length and are in the aggregate generally consistent with the cost of debtor-in-possession financings in comparable circumstances.

35.     Ultimately, the DIP Facility is the best and only viable option available to the Debtors.  The DIP Facility was negotiated in good faith and at arms' length and the Debtors' entry into the DIP Documentation is an exercise of sound and reasonable business judgment. Absent access to the DIP Financing and use of the Cash Collateral, the Debtors will be unable to operate their businesses or prosecute their chapter 11 cases, which will immediately threaten the Debtors' going concern value.  Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is in the best interest of the Debtors and their stakeholders.

### D.     The Prepetition Secured Parties Are Adequately Protected

36.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if "the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.,* 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection

24

of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

37.    The proposed DIP Lenders and the Debtors propose granting to the First Lien Noteholders adequate protection in accordance with the following, subject to the Carve-Out:

- accrued and unpaid fees and disbursements owed under the Prepetition First Lien Indenture, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Prepetition First Lien Trustee or the First Lien Noteholders incurred prior to the Petition Date;

- current payment of all fees and reasonable and documented out-of-pocket expenses payable to the Prepetition First Lien Trustee or the First Lien Noteholders;

- allowed superpriority claims to the extent of diminution in the value of their collateral; and

- financial reporting and other reports and notices delivered under the DIP Facility.

38.    The First Lien Secured Parties have consented to the proposed adequate protection.    Further, section 6.3 of the Intercreditor Agreement restricts the Second Lien Noteholders from seeking or being granted adequate protection with respect to their interests in the Common Collateral, or proceeds thereof, except with respect to the granting of replacement liens.    Accordingly, with respect to both the First Lien Noteholders and Second Lien Noteholders, the Debtors also propose to provide replacement or, if applicable, new continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the DIP Collateral.    Additionally, subject to entry of the Final Order, the Debtors propose to provide the Prepetition Secured Parties with customary lender protections,

including 506(c) and 552(b) waivers and stipulations in respect of the validity of prepetition liens and obligations, among other things.

39.     The Debtors submit that their provision of adequate protection to the Prepetition Secured Parties is fair and reasonable, is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code, and, in any event, is permitted by virtue of the Intercreditor Agreement.

## II.    The Debtors Should be Authorized to Use Postpetition Collateral, Including Cash Collateral

40.     Section 363 of the Bankruptcy Code places certain restrictions on a debtor's use of Cash Collateral.  Specifically, section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

41.     The Debtors submit that the requirements of sections 363(c)(2) and (e) are met here, and the Debtors should be authorized to use the Cash Collateral.  First, the Prepetition Secured Parties have consented to the use of Cash Collateral, including the "Second Lien Secured Parties" who are deemed to consent to the use of Cash Collateral pursuant to the Intercreditor Agreement.  In addition, and as more fully discussed above, the Debtors are providing the Prepetition Secured Parties with adequate protection that is fair and reasonable,

sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code, and permitted under the terms of the Intercreditor Agreement. Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### III.    The DIP Fees Are Reasonable and Should be Approved

42.    As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders and DIP Agent (collectively, the "**DIP Fees**") in exchange for their providing and/or agenting the DIP Facility, as applicable. The DIP Fees include (i) an upfront fee in an amount equal to 2.50% of the DIP Commitments, payable in cash at closing; (ii) an unused commitment fee equal to 0.50% *per annum* on the actual daily amount of unused DIP Commitments, payable on a monthly basis; (iii) an administrative agent fee of $50,000, payable in cash at closing; and (iv) an exit fee of 2.00% percent of the DIP Loans paid or prepaid and/or the DIP Commitments terminated, as applicable, payable upon the payment or prepayment of any DIP Loans or the termination of any DIP Commitments.

43.    The DIP Fees, together with the other provisions of the DIP Documents, represent the most favorable terms the DIP Lenders or any other potential investor would agree to make the DIP Facility available to the Debtors. The Debtors considered the DIP Fees when determining in their sound business judgment whether the DIP Documents constituted the best terms on which the Debtors could obtain sufficient DIP Financing necessary to continue their operations and prosecute their chapter 11 cases. Paying the DIP Fees in order to obtain such DIP Financing is in the best interests of the Debtors' estates, creditors and other parties in interest. Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

## IV.    The DIP Lenders Should be Deemed Good Faith Lenders

44.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  11 U.S.C. § 364(e).  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

*Id*.

45.    Here, the Debtors believe the DIP Documents embody the most favorable terms on which the Debtors could obtain DIP Financing.  All negotiations regarding the provision of the DIP Facility were conducted in good faith and on an arm's length basis.  The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Facility other than as disclosed herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## V.    Scope of Carve-Out Is Appropriate

46.    The DIP Liens are subject to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.

28

*See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").   The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out ensures that assets will be available for the payment of fees of the Clerk of the Bankruptcy Court or the U.S. Trustee and professional fees of the Debtors and an unsecured creditors committee, if one is appointed.   Accordingly, the Carve-Out is necessary and appropriate, and should be approved.

## VI.    Automatic Stay Should Be Modified on a Limited Basis

47.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the DIP Liens.   Specifically, the DIP Facility contemplates modifying the automatic stay so as to (i) permit the creation and perfection of the DIP Liens, and (ii) provide for the automatic vacation of such stay to permit the DIP Agent to enforce its rights with respect to the DIP Collateral in the event of an Event of Default under the DIP Facility, subject to five business days' written notice to counsel to the Debtors, counsel to the Creditors' Committee, and the U.S. Trustee.

48.    Stay modifications of this kind are ordinary and standard features for DIP Financing, and in the Debtors' business judgment, are reasonable and fair under the present circumstances. *See, e.g.*, *In re The NORDAM Group, Inc.*, Case No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018); *In re Golfsmith Int'l Holdings, Inc.*, Case No. 16-12033 (LSS) (Bankr. D. Del. Sep. 16, 2016); *In American Apparel, Inc*., Case No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2,

29

2015); *In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) (Bankr. S.D.N.Y Oct. 16, 2018);

*In re Westinghouse Electric Co. LLC,* Case No. 17-10751 (MEW) (Bankr. S.D.Y.Y May 26,

2017); *In re Breitburn Energy Partners LP*, No. 16-11390 (SMB) (Bankr. S.D.N.Y. August 19,

2016); *In re Aeropostale, Inc*., No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 13, 2016).

## Bankruptcy Rule 6003(b) is Satisfied

49.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to

avoid immediate and irreparable harm, a bankruptcy court may approve "a motion to use, sell,

lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay

all or part of a claim that arose before the filing of the *petition*" prior to twenty-one (21) days

after the Petition Date.  Fed. R. Bankr. P. 6003(b).

50.     The Debtors anticipate that the commencement of these chapter 11 cases

will significantly and immediately increase the demands on their liquidity as a result of, among

other things, the costs of administering these chapter 11 cases, implementing critical

restructuring initiatives, and addressing key constituents' concerns regarding the Debtors'

financial health and ability to continue operations in light of these chapter 11 cases.

Accordingly, the Debtors have an immediate need for access to liquidity to, among other things,

continue the operation of their business, maintain important relationships with customers, meet

payroll and obligations to their on-air talent, procure goods and services from vendors and

suppliers, and otherwise satisfy their working capital and operational needs, all of which are

required to preserve and maintain the Debtors' going concern value for the benefit of all parties

in interest.  The Debtors would suffer immediate and irreparable harm if the relief sought herein

is not promptly granted.  Accordingly, the Debtors submit that the relief requested herein is

necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Bankruptcy Rules 6004(a) and (h) Should be Waived

51.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

### Request for a Final Hearing

52.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no later than thirty (30) days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and approval of the relief requested in this Motion on a final basis.

53.     The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

## Notice

54.    Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19899 (Attn: David L. Buchbinder, Esq.); (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel for the DIP Agent, the DIP Lenders, and the Consenting First Lien Noteholders, (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Paul M. Basta, Esq., Jeffrey D. Saferstein, Esq., and Sarah Harnett, Esq.) and (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn: Pauline K. Morgan, Esq. and M. Blake Cleary, Esq.); (iv) (a) Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019 (Attn: Jonathan I. Levine, Esq.), and (b) Ashby & Geddes, P.A., 500 Delaware Avenue, 8th Floor, Wilmington DE, 19801 (Attn: William P. Bowden); (v) counsel to Credit Suisse AG, as Collateral Trustee for the First Lien Notes, Locke Lord LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402 (Attn: Juliane M. Dziobak, Esq.); (vi) counsel to the Second Lien Noteholders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn: Rachel Strickland, Esq.); (vii) counsel to U.S. Bank National Association, as Indenture and Collateral Trustee for the Second Lien Notes, Maslon LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402 (Attn:  Brian J. Klein, Esq.); (viii) TMI Trust Company, as Trustee for the Intermediate HoldCo Notes, 1100 Abernathy Road NE, Suite 480, Atlanta, GA 30328 (Attn: Kathy Knapp); (ix) U.S. Bank National Association, as Trustee for the HoldCo Notes, 1420 Fifth Avenue, 7th Floor, Seattle, WA 98101 (Attn: Corporate Trust Services); (x) counsel to the HoldCo Noteholders, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, P.O. Box 2087,

Wilmington, DE 19899 (Attn: Matthew B. McGuire, Esq.); (xi) the Securities and Exchange

Commission; (xii) the Internal Revenue Service; (xiii) the United States Attorney's Office for the

District of Delaware; (xiv) the Banks;[8] (xv) any parties known after reasonable inquiry to have

asserted a lien against the Debtors' assets; and (xvi) any other party entitled to notice pursuant to

Local Rule 9013-1(m) (the "**Notice Parties**").

        55.    The Debtors respectfully submit that no further notice is required.  No

previous request for the relief sought herein has been made by the Debtors to this or any other

court.

---

[8] The term "**Banks**" shall have the meaning ascribed to such term in the *Motion of Debtors for Entry of Interim and Final Orders Granting (I) Authority to Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Implement Ordinary Course Changes to Cash Management System, (C) Continue Intercompany Transactions, (D) Provide Administrative Expense Priority for Postpetition Intercompany Claims and (II) Granting Related Relief*, filed contemporaneously herewith.

33

WHEREFORE the Debtors respectfully request entry of the DIP Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  November 21, 2018
          Wilmington, Delaware

/s/ Daniel J. DeFranceschi
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C.
Garrett A. Fail
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

Proposed Attorneys for Debtors
and Debtors in Possession

34