**Exhibit B**

**DIP Credit Agreement**

**SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

effective as of

November [  ], 2018

among

**LBI MEDIA, INC.**,
as the Borrower, a Debtor and
Debtor-In Possession under Chapter 11 of the Bankruptcy Code

**THE GUARANTORS PARTY HERETO**,

**THE LENDERS PARTY HERETO**,

and

**HPS INVESTMENT PARTNERS, LLC**,
as Administrative Agent

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS**................................................................................................**1**

   1.1    Defined Terms ........................................................................................1

   1.2    Classification of Loans and Borrowings.................................................22

   1.3    Terms Generally ...................................................................................22

   1.4    Accounting Terms; GAAP ....................................................................22

**ARTICLE 2 THE CREDITS**..............................................................................................**23**

   2.1    Term Loan Commitments and Term Loans..............................................23

   2.2    [Reserved].............................................................................................23

   2.3    Borrowings, Conversions and Continuations ........................................23

   2.4    [Reserved].............................................................................................25

   2.5    [Reserved].............................................................................................25

   2.6    [Reserved]............................................................................................25

   2.7    [Reserved].............................................................................................25

   2.8    [Reserved]............................................................................................25

   2.9    Mitigation Obligations; Replacement of Lenders....................................25

   2.10   Repayment of Loans; Evidence of Debt ................................................26

   2.11   Prepayment of Loans ...........................................................................26

   2.12   Fees ....................................................................................................28

   2.13   Interest ................................................................................................28

   2.14   Alternate Rate of Interest .....................................................................29

   2.15   Increased Costs....................................................................................30

   2.16   Break Funding Payments ......................................................................31

   2.17   Taxes ...................................................................................................32

   2.18   Payments Generally: Pro Rata Treatment; Sharing of Set-Offs ............34

   2.19   Priority and Liens; No Discharge .........................................................36

   2.20   Payment of Obligations .......................................................................39

**ARTICLE 3 GUARANTEE BY GUARANTORS**..............................................................**39**

   3.1    The Guarantee.....................................................................................39

   3.2    Obligations Unconditional ...................................................................39

   3.3    Reinstatement .....................................................................................40

# TABLE OF CONTENTS

## (continued)

Page

3.4 Subrogation ....................................................................................................40

3.5 Remedies .......................................................................................................40

3.6 Continuing Guarantee ....................................................................................41

3.7 Rights of Contribution ...................................................................................41

3.8 General Limitation on Guarantee Obligations ...............................................41

3.9 Waivers ..........................................................................................................42

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES....................................................42**

4.1 Organization; Powers .....................................................................................42

4.2 Authorization; Enforceability ........................................................................42

4.3 Governmental Approvals; No Conflicts .........................................................43

4.4 No Material Adverse Change, Financial Statements ......................................43

4.5 Properties .......................................................................................................44

4.6 Litigation and Environmental Matters ...........................................................44

4.7 Compliance with Laws and Agreements .........................................................45

4.8 Investment and Holding Company Status ......................................................45

4.9 Taxes ..............................................................................................................46

4.10 ERISA ............................................................................................................46

4.11 Disclosure ......................................................................................................46

4.12 Ownership and Capitalization ........................................................................46

4.13 Subsidiaries ....................................................................................................46

4.14 Indebtedness, Liens and Agreements .............................................................47

4.15 Permits and Licenses ......................................................................................47

4.16 Federal Reserve Regulations ..........................................................................49

4.17 Labor and Employment Matters .....................................................................49

4.18 Perfection and Priority of Security Interests..................................................49

4.19 Patriot Act ......................................................................................................49

4.20 Valid Liens .....................................................................................................49

4.21 Use of Proceeds .............................................................................................49

**ARTICLE 5 CONDITIONS .....................................................................................................50**

5.1 Conditions to Effectiveness ............................................................................50

5.2 Each Extension of Credit ................................................................................52

# TABLE OF CONTENTS

## (continued)

Page

**ARTICLE 6 AFFIRMATIVE COVENANTS** ........................................................................**53**

6.1    Financial Statements and Other Information ....................................................53

6.2    Notices of Material Events ...............................................................................55

6.3    Existence; Conduct of Business........................................................................56

6.4    Payment of Obligations ....................................................................................56

6.5    Maintenance of Properties; Insurance ..............................................................57

6.6    Books and Records; Inspection Rights .............................................................57

6.7    Fiscal Year ........................................................................................................58

6.8    Compliance with Laws, Maintenance of FCC Licenses...................................58

6.9    Use of Proceeds ................................................................................................58

6.10   Certain Obligations Respecting Guarantors and Collateral Security ...............58

6.11   ERISA ...............................................................................................................59

6.12   Environmental Matters; Reporting ...................................................................59

6.13   [Post-Closing Matters .......................................................................................60

6.14   Certain Case Milestones ...................................................................................60

6.15   First and Second Day Orders ............................................................................60

**ARTICLE 7 NEGATIVE COVENANTS**...........................................................................**61**

7.1    Indebtedness .....................................................................................................61

7.2    Liens .................................................................................................................62

7.3    [Reserved] .........................................................................................................64

7.4    Fundamental Changes; Asset Sales ..................................................................64

7.5    Investments; Hedging Agreements ...................................................................65

7.6    Restricted Junior Payments and Prepayments of Indebtedness.........................66

7.7    Transactions with Affiliates..............................................................................66

7.8    Restrictive Agreements.....................................................................................67

7.9    [Reserved] .........................................................................................................67

7.10   Financial Covenant ...........................................................................................67

7.11   Lines of Business; Restrictions on the Borrower .............................................67

7.12   [Reserved] .........................................................................................................67

7.13   [Reserved] .........................................................................................................68

7.14   [Reserved] .........................................................................................................68

# TABLE OF CONTENTS

## (continued)

Page

7.15 [Reserved] ....................................................................................68

7.16 License Subsidiaries .....................................................................68

**ARTICLE 8 EVENTS OF DEFAULT** .........................................................69

8.1 Events of Default ..........................................................................69

8.2 Remedies Upon Event of Default .................................................73

**ARTICLE 9 THE ADMINISTRATIVE AGENT** ......................................74

9.1 Appointment and Authorization ...................................................74

9.2 Administrative Agent's Rights as Lender.....................................74

9.3 Duties As Expressly Stated...........................................................75

9.4 Reliance By Administrative Agent ...............................................76

9.5 Action Through Sub-Agents .........................................................76

9.6 Resignation of Administrative Agent and Appointment of Successor Administrative Agent................................................................................76

9.7 Lenders' Independent Decisions...................................................77

9.8 Indemnification .............................................................................77

9.9 Consents Under Other Loan Documents .......................................78

**ARTICLE 10 SPECIAL PROVISIONS GOVERNING COLLATERAL**............................78

10.1 Right to Enforce Agreement .........................................................78

**ARTICLE 11 MISCELLANEOUS** ..............................................................79

11.1 Notices ..........................................................................................79

11.2 Waivers; Amendments...................................................................79

11.3 Expenses; Indemnity; Damage Waiver .........................................81

11.4 Successors and Assigns .................................................................82

11.5 Survival .........................................................................................85

11.6 Counterparts; Integration; References to Agreement; Effectiveness....................85

11.7 Severability ...................................................................................85

11.8 Right of Setoff ..............................................................................85

11.9 GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS....................86

11.10 WAIVER OF JURY TRIAL; JUDICIAL REFERENCE ...............87

11.11 Headings .......................................................................................88

**TABLE OF CONTENTS**

**(continued)**

**Page**

11.12  Release of Collateral and Guarantees ................................................................88

11.13  Confidentiality .............................................................................................88

11.14  USA Patriot Act...........................................................................................88

## SCHEDULES & EXHIBITS

| | |
|---|---|
| Schedule 2.1 | List of Lenders and Term Loan Commitments |
| Schedule 4.3 | Governmental Approvals |
| Schedule 4.5(a) | Intellectual Property Registered Rights |
| Schedule 4.5(b) | Intellectual Property |
| Schedule 4.5(c) | Real Property Assets |
| Schedule 4.6 | Litigation and Environmental Matters |
| Schedule 4.7 | Compliance with Laws and Agreements |
| Schedule 4.9 | Taxes |
| Schedule 4.12 | Organization; Capitalization; Subsidiaries |
| Schedule 4.14(a) | Material Indebtedness |
| Schedule 4.14(b) | Liens |
| Schedule 4.14(c) | Material Contracts |
| Schedule 4.15 | FCC Licenses |
| Schedule 5.1 | Legal Opinions |
| Schedule 6.13 | Post-Closing Matters |
| Schedule 7.1 | Permitted Indebtedness |
| Schedule 7.2(b) | Permitted Liens |
| Schedule 7.5 | Investments |
| Schedule 7.7 | Transactions with Affiliates |
| Schedule 7.8 | Restrictive Agreements |
| Schedule 7.16 | License Subsidiary Indebtedness |
| | |
| Exhibit A | Form of Committed Loan Notice |
| Exhibit B | Form of Term Loan Notes |
| Exhibit C-1 | Pledge Agreement |
| Exhibit C-2 | Security Agreement |
| Exhibit D | [Reserved] |
| Exhibit E | [Reserved] |
| Exhibit F | [Reserved] |
| Exhibit G | [Reserved] |
| Exhibit H | Form of Assignment and Acceptance |
| Exhibit I | [Reserved] |
| Exhibit J | Budget Variance Report |
| Exhibit K | Interim Order |
| Exhibit L | DIP Budget |

## SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION
## CREDIT AGREEMENT

This SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT effective as of November [  ], 2018 (this "Agreement"), is among LBI MEDIA, INC. (the "Borrower") and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the GUARANTORS PARTY HERETO, the LENDERS PARTY HERETO and HPS INVESTMENT PARTNERS, LLC, as Administrative Agent.

## RECITALS

WHEREAS, on November [  ], 2018 (the "Petition Date"), the Borrower and certain of its controlled Subsidiaries (the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the cases of each of the Borrower and each other Debtor, each a "Case", and collectively the "Cases", together with any cases of parent entities of any Debtor, the "Combined Cases") and have continued in the possession of their assets and the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, the Borrower has requested that the Lenders provide a multiple draw super-priority senior secured delayed draw term loan facility denominated in Dollars in an aggregate principal amount not to exceed $38,000,000 (the "Term Facility") and, with all of the Borrower's obligations under the Term Facility to be guaranteed by each Guarantor, and the applicable Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein.

WHEREAS, the priority of the Term Facility with respect to the Collateral shall be as set forth in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court, and in the Collateral Agreements.

WHEREAS, all of the claims and the Liens granted under the Orders and the Loan Documents to the Administrative Agent and the Lenders in respect of the Term Facility shall be subject to the Carve-Out.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE 1

## Definitions

1.1    **Defined Terms**.  As used in this Agreement, the following terms have the meanings specified below:

"Acceptable Plan of Reorganization" means a plan of reorganization for the Combined Cases, in form and substance reasonably satisfactory to the Required Lenders, that provides for, among other things, (i) the termination of the Commitments and either the indefeasible payment in full in cash and full discharge of the Obligations (other than contingent indemnification or

reimbursement obligations not then due) under the Term Facility, or the conversion of the Obligations under the Term Facility into a senior secured first priority exit facility, in form and substance acceptable to the Required Lenders, upon the Consummation Date with respect to such plan of reorganization and (ii) provides for releases for the Administrative Agent, the Lenders, the Existing First Lien Indenture Trustee and the Existing First Lien Indenture Holders and, in each case, their Related Parties.

 "Acquisition" means any transaction, or any series of related transactions, consummated prior to or after the Closing Date, by which (i) any Credit Party  acquires the business of, or all or substantially all of the assets of, any firm or corporation which is not a Credit Party, or any division or station of such firm or corporation, located in a specific geographic area or areas, whether through purchase of assets, purchase of stock, merger or otherwise or (ii) any Person that was not theretofore a Subsidiary of a Credit Party becomes a Subsidiary of a Credit Party.  Notwithstanding anything herein to the contrary, no Relocation shall be deemed to be an Acquisition.

"Adjusted Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a three-month Interest Period plus 1%.  Any change in the Adjusted Base Rate due to a change in the Prime Rate the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

"Adjusted LIBO Rate" means, with respect to any LIBOR Borrowing for any Interest Period, an interest rate per annum equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means HPS, in its capacity as administrative agent for the Lenders hereunder and any successors appointed pursuant to Section 9.6.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent, if any.

"Affiliate" means, with respect to a specified Person, another Person that Controls or is Controlled by or is under common Control with the Person specified.

"Annual Financial Statements" means the audited consolidated statement of financial position of the Credit Parties  as of each of December 31, 2015, 2016 and 2017, and the related consolidated statement of profit and loss, changes in equity and consolidated cash flow statement for the Credit Parties  for the fiscal years then ended.

"Applicable Margin" means, for any Type of Loans:

Applicable Margin (% per annum)

| Loans | Base Rate Loans | LIBOR Loans |
| --- | --- | --- |
| Term Loans | 8.00% | 9.00% |

"Applicable Percentage" means with respect to any Lender in respect of any indemnity claim under Section 11.3 arising out of an action or omission of the Administrative Agent under this Agreement, the percentage of the total Commitments or, in the event the Commitments are terminated, Loans hereunder represented by the aggregate amount of such Lender's Commitment or, in the event the Commitments are terminated, Loans hereunder.

"Applicable Recipient" has the meaning set forth in Section 2.18(d).

"Approved Fund" means, with respect to any Lender that is a fund that invests in commercial loans, any other fund that invests in commercial loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Assignment and Acceptance" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 11.4(b)), and accepted by the Administrative Agent, in the form of Exhibit H.

"Bankruptcy Code" means Title 11 of the United States Code, as amended, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"Base Rate" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted Base Rate.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means LBI Media, Inc., a California corporation.

"Borrower's knowledge" or any "Credit Party's knowledge" or any similar phrase or words when used in connection with a statement, representation or warranty means to the knowledge of Jose Liberman or Lenard Liberman, the Chief Financial Officer of the Borrower or such Credit Party, as applicable, or any responsible executive officer (as defined in Rule 3b-7 promulgated under the Exchange Act), of the Borrower or such Credit Party, as applicable, after reasonable good faith inquiry made to ascertain the accuracy of the statement, representation or warranty.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date

"Broadcast Stations" has the meaning assigned to such term in Section 4.15(b).

"Budget Variance Report" means a report certified by a Financial Officer of the Borrower, in the form attached hereto as Exhibit J and otherwise reasonably acceptable to the Required Lenders, delivered in accordance with Section 6.1(d), showing (a) (i) the actual total operating receipts to budgeted total operating receipts and (ii) actual total operating disbursements to budgeted total operating disbursements, in each case, for such immediately preceding rolling four-

week period as of the end of the week immediately preceding the week during which such Budget Variance Report is delivered and (b) commencing with the third Business Day of the fifth week following the week during which the Petition Date occurs, the variance, expressed as a percentage, of the actual (i) total operating receipts to budgeted total operating receipts and (ii) total operating disbursements to budgeted total operating disbursements, in each case, for such immediately preceding rolling four-week period of the Borrower (and without giving effect to the making of any Loans or prepayments of any Loans), from the corresponding anticipated amount therefor set forth in the most recent DIP Budget (each a "Variance").

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Los Angeles, California or New York City are authorized or required by law to remain closed; *provided* that, when used in connection with a LIBOR Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in U.S. Dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, the sum for the Credit Parties (determined on a consolidated basis without duplication in accordance with GAAP) of the aggregate amount of expenditures (including the aggregate amount of Capital Lease Obligations incurred during such period) made to acquire or construct fixed assets, plant and equipment (including renewals, improvements and replacements, but excluding expenditures for repairs that do not extend the useful life of the asset) during such period computed in accordance with GAAP; *provided* that such term shall not include (i) any such expenditures in connection with any replacement or repair of Property affected by a Casualty Event, (ii) any such expenditures in connection with a Relocation with the exception of cash expenditures not subject to the reimbursement obligations of a Person other than a Credit Party, (iii) for each broadcast station received in any Voluntary Relocation, up to $4,000,000 in such expenditures but only to the extent paid from the cash proceeds received in such Voluntary Relocation which are used to upgrade or improve such broadcast station or (iv) for each broadcast station received in any Involuntary Relocation, any such expenditures paid from the cash proceeds received in such Involuntary Relocation which are used to upgrade or improve such broadcast station.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" has the meaning specified in the Interim Order or the Final Order, as applicable.

"Cases" has the meaning specified in the introductory paragraph hereto.

"Cash Collateral" has the meaning specified in the Interim Order or the Final Order, as applicable.

"Cash Equivalents" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United

States Government, (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (1) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (2) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (1) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (2) has net assets of not less than $500,000,000, and (3) has the highest rating obtainable from either S&P or Moody's, or (c) other cash equivalent investments agreed to from time to time between the Borrower and the Administrative Agent.

"Casualty Event" means, with respect to any Property of any Person, any loss of or damage to, or any condemnation or other taking of, such Property for which such Person or any of its Subsidiaries receives insurance proceeds, or proceeds of a condemnation award or other compensation; *provided* that an Involuntary Relocation shall not be a Casualty Event.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of or compliance by any Lender (or for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means

(a)    Media Holdings shall cease to own, directly or indirectly, 100% of the Borrower's outstanding capital stock and Total Voting Power,

(b)    Holdings shall cease to own, directly or indirectly, 100% of Media Holdings' outstanding capital stock and Total Voting Power,

(c)    Jose and Lenard Liberman (together with their spouses, lineal descendants or heirs and devisees and any trusts controlled by them) (together, the "Principal Investors") shall cease to

collectively own, directly or indirectly, more than 50% of the economic interests in the outstanding equity securities of Holdings or more than 50% of the Total Voting Power of Holdings,

(d)    [reserved], or

(e)    a majority of the seats (other than vacant seats) on the board of directors of Holdings shall be occupied by Persons who were not (i) approved by the board of directors of Holdings or by one or more of the stockholders described in clause (c) above nor (ii) appointed or elected by a majority of the members of the board of directors of Holdings who are described in any of subclauses (i), (ii) or (iii) of this clause (e) nor (iii) appointed or elected by a vote of the stockholders of Holdings in which Jose or Lenard Liberman or either of their respective spouses (or any trust controlled by any of them) voted to approve the appointment or election of such Person or in which a majority of the Total Voting Power of the stockholders described in clause (c) above voted in favor of the appointment or election of such Person.

"Closing Date" means the first date that all the conditions precedent in Section 5.1 and Section 5.2 are satisfied or waived in accordance with Section 5.1 and Section 5.2 and on which the initial Borrowing is made.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means, collectively, all of the Property (including capital stock and other equity interests) in which Liens are purported to be granted pursuant to the Collateral Agreements, the Interim Order or the Final Order, as security for any of the obligations of the Credit Parties hereunder.

"Collateral Agreements" means the Security Agreement, the Pledge Agreement and all other agreements, instruments or documents delivered by any Credit Party or any shareholder of a Credit Party pursuant to this Agreement or any of the other Loan Documents in order to grant, or purport to grant, to the Administrative Agent, on behalf of the Lenders, a Lien on any real, personal or mixed property of that Credit Party or shareholder as security for any of the obligations of the Credit Parties hereunder.  The Collateral Agreements shall supplement, and shall not limit, the security interests granted pursuant to the Orders.

"Committed Loan Notice" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of LIBO Rate Loans, pursuant to Section 2.3, which shall be substantially in the form of Exhibit A.

"Commitments" means, without duplication, the Term Loan Commitments.

"Communications Act" means the Communications Act of 1934, as amended.

"Confirmation Date" has the meaning specified in Section 6.14.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consummation Date" means the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of an Acceptable Plan of Reorganization that is confirmed pursuant to an order of the Bankruptcy Court; provided, that for purposes hereof the Consummation Date of the plan of reorganization shall be no later than the "effective date" thereof.

"Control" means the possession, directly or indirectly, through one or more intermediaries, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Event" has the meaning set forth in Section 5.2.

"Credit Parties" means the Borrower and the Guarantors.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 4.6.

"DIP Budget" means a statement of the Borrower's budgeted total operating receipts and budgeted total operating disbursements, in each case on a weekly basis for the period of thirteen weeks commencing with the calendar week during which the Petition Date occurs containing line items of sufficient detail, including the anticipated uses of the Loans for each week during such period, and in substantially the form of Exhibit L hereto.  As used herein, "DIP Budget" shall initially refer to Exhibit L and, thereafter, the most recent DIP Budget delivered by the Borrower and approved or deemed approved by the Required Lenders in accordance with Section 6.1(d).

"Disposition" means any sale, sale-leaseback, assignment, conveyance, exchange, long-term lease accorded sales treatment under GAAP, transfer or other disposition (including by means of a merger, consolidation, amalgamation, joint venture or other substantive combination) of any assets, business or property (whether now owned or hereafter acquired) by any Credit Party to any Person other than a Credit Party, including any Relocation but excluding (a) the granting of Liens expressly permitted hereunder, (b) any sale, assignment, transfer or other disposition of (i) any property sold, leased or disposed of in the ordinary course of business, (ii) any property that is obsolete or no longer used or useful in the business of the Credit Parties  (excluding any such disposition of operations or division discontinued or to be discontinued) and (iii) any Collateral under and as defined in the Collateral Agreements pursuant to an exercise of remedies by the Administrative Agent thereunder, (c) leasing or licensing of any property in the ordinary course of business, (d) the sale of marketable securities, including "margin stock" within the meaning of Regulation U, liquid investments and other financial instruments in connection with the ordinary course cash management of the Credit Parties, (e) [reserved], (f) the surrender or waiver of contractual rights of the settlement, release or surrender of contracts or tort claims in the ordinary course of business, (g) the nonexclusive licensing of patents, trademarks and other intellectual property rights granted by any Credit Party  in the ordinary course of business, and (h) leases of interests in real property entered into in the ordinary course of business, (i) disposition of cash and Cash Equivalents, and (j) any abandonment, cancellation, dedication to the public, failure to

maintain, allowing to lapse or other disposition of any IP Collateral that is obsolete or no longer used or useful in the business of the Credit Parties, and (k) other sale, assignment, transfer or other disposition in the ordinary course of business in an amount not to exceed $500,000.

"Domestic Subsidiary" means any Subsidiary that is organized and existing under the laws of the United States of America or any state or commonwealth thereof or under the laws of the District of Columbia.

"Draw Cap" shall have the meaning set forth in Section 2.1.

"Eligible Assignee" means (a) any Lender, any Affiliate of any Lender and any Approved Fund with respect to any Lender; and (b) (i) any commercial bank organized under the laws of the United States or any state thereof; (ii) any savings and loan association or savings bank organized under the laws of the United States or any state thereof; (iii) any commercial bank organized under the laws of any other country or a political subdivision thereof; *provided* that (1) such bank is acting through a branch or agency located in the United States or (2) such bank is organized under the laws of a country that is a member of the Organization for Economic Cooperation and Development or a political subdivision of such country; and (iv) any other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act of 1933, as amended) that extends credit or buys loans as one of its businesses including insurance companies, mutual funds, hedge funds, financing companies and lease financing companies; *provided* that no Credit Party or any Affiliate of any Credit Party shall be an Eligible Assignee.

"Environmental Laws" means all applicable laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Credit Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Rights" means, with respect to any Person, any subscriptions, options, warrants, commitments, preemptive rights or agreements of any kind (including any stockholders' or voting trust agreements) for the issuance or sale of, or securities convertible into, any additional shares of capital stock of any class, or partnership or other ownership interests of any type in, such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer within the meaning of Section 414(b), (c), (m)

or (o) of the Code.  Notwithstanding the foregoing, for purposes of any liability related to a Multiemployer Plan under Title IV of ERISA, the term "ERISA Affiliate" means any trade or business that together with the Borrower is treated as a single employer within the meaning of Section 4001(b) of ERISA.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to any Pension Plan, (b) the existence with respect to any Pension Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan or (f) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Section 8.1.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) Taxes imposed on (or measured by) its net income, franchise Taxes, or branch profits Taxes imposed by a jurisdiction under the laws of which such recipient is organized or in which its principal office is located or that are Other Connection Taxes, (b) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 2.9(b)), any United States federal withholding Tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from a Credit Party pursuant to Section 2.17(a), (c) Taxes attributable to such Lender's failure to comply with Section 2.17(e) or (f), and (d) any withholding Taxes imposed as a result of a Lender's failure to comply with FATCA.

"Existing First Lien Indenture" means that certain Indenture, dated as of March 18, 2011, as supplemented by the First Supplemental Indenture, dated as of December 31, 2012, the Second Supplemental Indenture, dated as of December 31, 2014, the Third Supplemental Indenture, dated as of April 17, 2018, the Fourth Supplemental Indenture, dated as of April 17, 2018 and the Fifth Supplemental Indenture, dated as of October 26, 2018 among the Borrower, the guarantors party thereto, HPS Investment Partners, LLC as Lead Holder and the Existing First Lien Indenture Trustee.

"Existing First Lien Indenture Trustee" means Wilmington Savings Fund Society (as successor to U.S. Bank National Association), together with its successors and assigns.

"Existing First Lien Indenture Documents" means the "Secured Debt Documents" as defined in the Existing First Lien Indenture.

"Existing First Lien Indenture Holders" means the "Holders" as defined in the Existing First Lien Indenture.

"Existing Second Lien Indenture" means those certain Indentures, (x) dated as of December 31, 2012 and (y) dated as of December 23, 2014, in each case among the Borrower, the guarantors party thereto and the Existing Second Lien Indenture Trustee.

"Existing Second Lien Indenture Trustee" means U.S. Bank National Association, together with its successors and assigns.

"Fair Market Value" means the value determined by the senior management of the Borrower in a certificate of a Financial Officer delivered to the Administrative Agent.

"FATCA" means Section 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreements implementing any of the forgoing, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any of the foregoing.

"FCC" means the Federal Communications Commission or any governmental authority succeeding to any of its functions.

"FCC Licenses" means all radio, broadcast or other licenses, permits, certificates of compliance, franchises, approvals or authorizations granted or issued by the FCC to any Credit Party that are necessary for the broadcast or other operations of the Borrower or any Subsidiary.

"FCC Regulations" means the Communications Act, and all regulations and written policies promulgated from time to time by the FCC under or in connection with or pertaining to the Communications Act.

"FCPA" has the meaning assigned to such term in Section 4.23.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Final Order" means an order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory in form and substance to the Required Lenders) as to which no stay has been entered and which has not been reversed, vacated

or overturned, except as the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) may otherwise specifically agree in writing.

"Financial Officer" means the chief executive officer, the president, the executive vice president, chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary of a Credit Party that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government and the National Association of Insurance Commissioners.

"Government Official" means (i) an executive, official, employee or agent of a governmental department, agency or instrumentality, (ii) a director, officer, employee or agent of a wholly or partially government-owned or -controlled company or business, (iii) a political party or official thereof, or candidate for political office or (iv) an executive, official, employee or agent of a public international organization (e.g., the International Monetary Fund or the World Bank).

"Guarantee" means a guarantee, an endorsement, a contingent agreement to purchase or to furnish funds for the payment or maintenance of, or otherwise to be or become contingently liable under or with respect to, the Indebtedness, other obligations, net worth, working capital or earnings of any Person, or a guarantee of the payment of dividends or other distributions upon the stock or equity interests of any Person, or an agreement to purchase, sell or lease (as lessee or lessor) property, products, materials, supplies or services primarily for the purpose of enabling a debtor to make payment of such debtor's obligations or an agreement to assure a creditor against loss, and including causing a bank or other financial institution to issue a letter of credit or other similar instrument for the benefit of another Person, but excluding endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder).   The terms "Guarantee" and "Guaranteed" used as a verb shall have a correlative meaning.

"Guaranteed Obligations" has the meaning assigned to such term in Section 3.1.

"Guarantors" means all Subsidiaries of the Borrower and all Debtors.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature in each case regulated or subject to regulation pursuant to any Environmental Law.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Hedging Agreement" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Holding Company" means each of (i) Holdings, (ii) Media Holdings and (iii) any other holding company formed after the Closing Date, which directly or indirectly owns all the equity interest of the Borrower and all of whose equity interests is directly or indirectly owned by Holdings.

"Holdings" means Liberman Broadcasting, Inc., a Delaware corporation, and the sole shareholder of Media Holdings.

"HPS" means HPS Investment Partners, LLC.

"Indebtedness" means, for any Person, without duplication: (a) obligations created, issued or incurred by such Person for borrowed money; (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, which purchase price is (i) due more than six months from the date of incurrence of the obligation in respect thereof or (ii) evidenced by a note or similar written instrument, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts are payable within 180 days after the date of the respective goods are delivered or the respective services are rendered or otherwise are payable in accordance with customary practices; (c) Capital Lease Obligations of such Person; (d) obligations of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (f) the net obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including, any Hedging Agreement, and (g) Indebtedness of others of the kinds referred to in clauses (a) through (f) above Guaranteed by such Person. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means all (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interest Payment Date" means each Monthly Date.

"Interest Period" means with respect to any LIBOR Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is three months thereafter; *provided*, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing. Notwithstanding the foregoing, if any Interest Period for any Borrowing would otherwise end after the Maturity Date, such Interest Period shall end on the Maturity Date.

"Interim Order" means an interim order of the Bankruptcy Court, in the form set forth in Exhibit K, (i) authorizing, on an interim basis, the Term Facility in the amount and on the terms set forth herein and the use of Cash Collateral, (ii) granting the Superpriority Claim status and other Collateral and Liens referred to herein and in the other Loan Documents, (iii) approving the payment by the Borrower of the fees provided for herein and (iv) providing for other customary matters, with only such modifications as are satisfactory to the Required Lenders.

"Interpolated Rate" means, in relation to the LIBOR Loans for any Loan, the rate which results from interpolating on a linear basis between: (a) the rate appearing on Reuters Screen LIBOR01 Page (or otherwise on the Reuters screen) for the longest period (for which that rate is available) which is less than the Interest Period and (b) the rate appearing on Reuters Screen LIBOR01 Page (or otherwise on the Reuters screen) for the shortest period (for which that rate is available) which exceeds the Interest Period, each as of approximately 11:00 A.M., London time, two Business Days prior to the commencement of such Interest Period.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of capital stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale) or (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding 180 days representing the purchase price of goods or services sold by such Person in the ordinary course of business or otherwise are payable in accordance with customary practices). Notwithstanding the foregoing, Relocations (other than promissory notes or debt or equity securities acquired in connection with any Relocation) shall not be deemed

"Investments" for the purposes hereof. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto minus the amount of any return of capital with respect to such Investment, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Involuntary Relocation" means with respect to any television Broadcast Station, any Relocation described in clause (2) of the definition of the term Relocation.

"IP Collateral" means, collectively, any Collateral which is intellectual property of a Credit Party.

"Lenders" means the Persons listed on Part II of Schedule 2.1 and any other Person that shall have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"LIBO Rate" means, with respect to any Borrowing of LIBOR Loans for any Interest Period, a rate per annum equal to: (i) the higher of (A) the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the Intercontinental Exchange Benchmark Administration Ltd. (or such other Person that takes over administration of such rate) LIBOR Rate, as published on the Reuters Screen LIBOR01 for deposits in Dollars (or such other comparable page as may, as determined by the Administrative Agent from time to time, replace such page for the purpose of displaying such rates) for a period equal to such Interest Period; *provided* that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the Interpolated Rate, for a period equal in length to the Interest Period of the Borrowing, and (B) 1.00%; divided by (ii) a percentage equal to 100% minus the then stated maximum rate (expressed as a percentage) of all reserve requirements (including any marginal, emergency, supplemental, special or other reserves required by applicable law) applicable to any member bank of the Federal Reserve System in respect of eurocurrency funding or liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D).

"LIBOR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"License Subsidiary" means any Wholly Owned Subsidiary of the Borrower (or of a Subsidiary of the Borrower) formed solely for the purpose of holding FCC Licenses.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (other than an operating lease) (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, any promissory notes evidencing Term Loans hereunder, the Collateral Agreements, the Orders and any other instruments or documents

delivered or to be delivered from time to time pursuant to this Agreement, as the same may be supplemented and amended from time to time in accordance with their respective terms.

"Loans" means the Term Loans.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, liabilities, operations, condition (financial or otherwise) or operating results of the Credit Parties taken as a whole other than as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Cases, (b) the ability of any Credit Party to perform any of its respective obligations under this Agreement or any other Loan Document to which it is or will be a party or (c) the rights of or benefits available to the Lenders under this Agreement and the other Loan Documents.

"Material Contract" means any contract or other arrangement to which any Credit Party is a party for which breach, nonperformance, failure to comply with, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"Material FCC Licenses" means an FCC License the loss of which could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than under the Loan Documents) of any one or more of any Credit Party or any Subsidiary in an aggregate principal amount exceeding $2,500,000. For purposes of determining Material Indebtedness, the "principal amount" in respect of any Hedging Agreement at any time shall be considered the termination value of such Hedging Agreement at such time.

"Maturity Date" means the earliest of (a) the Stated Maturity Date, (b) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to Bankruptcy Code Section 363; (c) the Consummation Date, (d) the date of acceleration of the Loans and the termination of the Commitments with respect to the Term Facility pursuant to Section 8.2 and (e) 35 days after the date of entry of the Interim Order (or such later date as agreed to by the Required Lenders), unless the Final Order has been entered by the Bankruptcy Court.

"Media Holdings" means LBI Media Holdings, Inc., a Delaware corporation, which is the sole shareholder of the Borrower and a Wholly Owned Subsidiary of Holdings.

"Monthly Date" means the last Business Day of each calendar month, commencing on November 30, 2018.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Payments" means,

(i)    with respect to any Casualty Event, the aggregate amount of cash proceeds of insurance, cash condemnation awards and other cash compensation received by the

Credit Parties in respect of such Casualty Event net of (A) legal, title, transfer and recording tax expenses, commissions, and fees and expenses directly related to such casualty event (including legal, accounting, brokerage, outside consultant and advisor, advertising and closing costs) incurred by the Credit Parties in connection therewith, (B) contractually required repayments of Indebtedness to the extent secured by a Lien on such property (that is expressly permitted by this Agreement) (x) that ranks senior in priority to the Lien securing the obligations of the Credit Parties under this Agreement or (y) and no Liens securing the obligations of the Credit Parties under this Agreement exist, in each case with respect to such property that is the subject of such Casualty Event, and, (C) any federal, state and local income and transfer or other taxes paid or payable by or any of the Credit Parties in respect of such Casualty Event;

(ii)     with respect to any Disposition, the aggregate amount of all cash payments received by any of the Credit Parties in connection with such Disposition directly or indirectly, whether at the time of such Disposition or after such Disposition under deferred payment arrangements or Investments entered into or received in connection with such Disposition; *provided* that

(A)     Net Cash Payments shall be net of (I) the amount of any legal, title, transfer and recording tax expenses, commissions and other fees and expenses (including legal, accounting, brokerage, outside consultant and advisor, advertising and closing costs) paid or payable by any of the Credit Parties in connection with such Disposition and (II) any federal, state and local income and transfer or other taxes paid or payable by any of the Credit Parties as a result of such Disposition; and

(B)     Net Cash Payments shall be net of any repayments by any of the Credit Parties of Indebtedness to the extent that (I) such Indebtedness is secured by a Lien on the property (that is expressly permitted by this Agreement) (x) that ranks senior in priority to the Lien securing the obligations of the Credit Parties under this Agreement or (y) and no Liens securing the obligations of the Credit Parties under this Agreement exist, in each case, with respect to such property that is the subject of such Disposition and (II) the transferee of (or holder of a Lien on) such property requires that such Indebtedness be repaid as a condition to the purchase of such property; and

(iii) with respect to any incurrence of Indebtedness (other than Indebtedness expressly permitted by Section 7.1), the aggregate amount of all cash proceeds received by any Credit Party therefrom.

"Note" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender.

"Obligations" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable (including post-petition interest,

prepayment premium and makewhole payments) under the documentation governing any Indebtedness.

"OFAC" has the meaning assigned to such term in Section 4.22.

"Orders" means, collectively, the Interim Order and the Final Order.

"Other Connection Taxes" means, with respect to the Administrative Agent, a Lender, or any other recipient of a payment hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Superpriority Claim" means a superpriority administrative expense claim against any of the Debtors (without the need to file any proof of claim) with priority over any and all claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code other than the Superpriority Claims described in Section 2.19.

"Other Taxes" means any and all present or future stamp, court or documentary taxes, intangible, recording, filing or similar taxes, or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery, performance or enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and the other Loan Documents, but excluding, for the avoidance of doubt, any Excluded Taxes.

"Outstanding Amount" means, as of any date, an amount equal to the aggregate Term Loan Exposure of all Lenders on such date.

"Participant" has the meaning assigned to such term in Section 2.17(g).

"Participant Register" has the meaning assigned to such term in Section 2.17(g).

"Patriot Act" has the meaning assigned to such term in Section 4.19.

"Pension Plan" means any Plan that is a defined benefit pension plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Permitted Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from Standard and Poor's Ratings Service or from Moody's Investors Service, Inc.;

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $250,000,000;

(d)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)    investments in money market mutual funds that are rated AAA by Standard & Poor's Rating Service; and

(f)    Cash Equivalents.

"Permitted Liens" has the meaning set forth in Section 7.2.

"Permitted Lines of Business" means the television and radio broadcast business, television and radio program production, rental of television, radio and related facilities and properties, outdoor advertising, the leasing or licensing of property or tower space, and general business services related to any of the foregoing and any business incident thereto.

"Permitted Variance" means any unfavorable Variance from the Budget with respect to either (i) total operating receipts to budgeted operating receipts or (ii) total operating disbursements to budgeted operating disbursements (but excluding, for the avoidance of doubt, restructuring and professional fees) for any applicable rolling four-week testing period of no more than 15%.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the introductory paragraph hereto.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA in which the Borrower or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA including but not limited to any Pension Plan or Multiemployer Plan.

"Pledge Agreement" means the Pledge Agreement dated as of the Closing Date, by and among the Credit Parties and the Administrative Agent, attached hereto as Exhibit C-1. The Pledge Agreement shall supplement, and shall not limit, the security interests granted pursuant to the Orders.

"Post-Default Rate" means, for Base Rate Loans, a rate per annum equal to the Adjusted Base Rate plus the Applicable Margin plus 2.50%, and, for LIBOR Loans, a rate per annum equal to the Adjusted LIBO Rate plus the Applicable Margin plus 2.50%.

"Pre-Petition First Lien Secured Parties" means the "Secured Parties" under and as defined in the Existing First Lien Indenture.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Indebtedness of any Debtor outstanding and unpaid on the date on which such Person becomes a Debtor, (ii) "critical or foreign vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims) or other prepetition claims against any Debtor.

"Pre-Petition Second Lien Secured Parties" means the "Secured Parties" under and as defined in the Existing Second Lien Indenture.

"Primed Liens" has the meaning specified in Section 2.19(a).

"Prime Rate" means the rate of interest which is identified as the "Prime Rate" and normally published in the Money Rates section of The Wall Street Journal (or, if such rate ceases to be so published, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent)); each change in the Prime Rate shall be effective from and including the date such change is announced as being effective.

"Principal Investors" has the meaning assigned to such term in the definition of "Change of Control" in this Agreement.

"Property" means any interest of any kind in property or assets, whether real, personal or mixed, and whether tangible or intangible.

"Proprietary Rights" has the meaning assigned to such term in Section 4.5(b).

"PTO" means the United States Patent and Trademark Office or any successor or substitute office in which filings are necessary or, in the reasonable opinion of the Administrative Agent, desirable in order to create or perfect Liens on any IP Collateral.

"Quarterly Financial Statements" means unaudited consolidated balance sheets and related consolidated statements of income or operations, shareholders' equity and cash flows of the Credit Parties for each fiscal quarter after December 31, 2017 ended at least 50 days before the Closing Date.

"Real Property Asset" means, at any time of determination, any fee ownership or leasehold interest then owned by any Credit Party in any real property.

"Register" has the meaning assigned to such term in Section 11.4(d).

"Registered Rights" has the meaning assigned to such term in Section 4.5(b).

"Regulation U" means Regulation U of the Board.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"Relocation" means with respect to any television Broadcast Station, (1) any transaction in which a 600 MHz Holder (or any other Person) offers consideration (which consideration consists of a different frequency or frequencies and/or other cash or non-cash consideration) to any Credit Party for the cessation of broadcasting on any of the existing analogue and/or digital frequencies of such Broadcast Station in order to accommodate the spectrum needs of such 600 MHz Holder, including the prevention of interference with such 600 MHz Holder's operations, and such Credit Party is not ordered or directly or indirectly required by the FCC or any other Governmental Authority to enter into such transaction, or (2) any transaction in which FCC or any other Governmental Authority orders or otherwise directly or indirectly requires any Credit Party to cease broadcasting on any of its existing analogue and/or digital frequencies in order to accommodate the spectrum needs of any 600 MHz Holder, including the prevention of interference with such 600 MHz Holder's operations, with or without any consideration. As used herein, "600 MHz Holder" means a holder of a 600 MHz license or construction permit.

"Required Lenders" means Lenders having Loans and unused Commitments representing in excess of 50% of the sum of the total Loans and unused Commitments.

"Restricted Junior Payment" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of, or other equity interests in, any Credit Party now or hereafter outstanding, except a dividend payable solely in shares of stock or interests of the same class, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of, or other equity interests in, any Credit Party now or hereafter outstanding, (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of, or other equity interests in, any Credit Party now or hereafter outstanding, (iv) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including economic or legal defeasance), sinking fund or similar payment or liquidated damages with respect to any Indebtedness of any Credit Party for borrowed money existing on the Closing Date, and (v) any payment made to any Affiliates of any Credit

Party in respect of management, consulting or other similar services provided to any Credit Party. Notwithstanding the foregoing, the following shall not be deemed to be Restricted Junior Payments: any payment to any director, officer or employee of any Credit Party consisting of salary, other compensation approved by the Bankruptcy Court (or otherwise reasonably acceptable to the Required Lenders) or reimbursement of expenses.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of November [  ], 2018 among the Borrower, the other Credit Parties thereto, HPS and the other parties thereto, as may be amended, supplemented or modified from time to time.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Same Day Funds" means immediately available funds.

"Secured Obligations" has the meaning set forth in the Security Agreement and the Pledge Agreement.

"Secured Parties" means the Lenders under this Agreement and the Administrative Agent.

"Security Agreement" means the Security Agreement dated as of the Closing Date by and among the Credit Parties and the Administrative Agent, attached hereto as Exhibit C-2.  The Security Agreement shall supplement, and shall not limit, the security interests granted pursuant to the Orders.

"Stated Maturity Date" means [  ], 2019[1]; provided, however, that, if such date is not a Business Day, the Stated Maturity Date shall be the next preceding Business Day.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D. LIBOR Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the ordinary voting power

---

[1]    NTD: to be the date that is 6 months after the Closing Date.

or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent. References herein to "Subsidiaries" shall, unless the context requires otherwise, be deemed to be references to Subsidiaries of the Borrower.

"Superpriority Claim" has the meaning specified in Section 2.19.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Commitment" means, with respect to each Lender, the commitment of such Lender to convert or make Term Loans. The initial maximum amount of each Lender's Term Loan Commitment is set forth on Schedule 2.1. The aggregate original amount of the Term Loan Commitments is equal to $38,000,000.

"Term Loan Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Term Loans.

"Term Loan" means a Loan converted or made pursuant to Section 2.1 that utilizes the Term Loan Commitment.

"Term Loan Notes" means any promissory notes, substantially in the form of Exhibit B, issued by the Borrower in favor of the Lenders.

"Test Date" means 5:00 PM New York City time on the third Business Day of the fifth week following the week during which the Petition Date occurs and no later than 5:00 PM New York City time on the third Business Day of each second calendar week thereafter.

"Total Voting Power" means, with respect to any Person, the total number of votes which holders of securities or other ownership interests having the ordinary power to vote, in the absence of contingencies but after giving effect to the exercise and/or conversion of all outstanding options, warrants, and other securities which by their terms are convertible into voting securities, are entitled to cast in the election of directors, general partners or managers of such Person.

"Transactions" means with respect to each Credit Party and Holding Company, (i) the execution, delivery and performance by the Borrower or such other Credit Party of the Loan Documents, and the documents related thereto, the borrowing of Loans and the use of the proceeds thereof, (ii) the creation of the Liens pursuant to the Collateral Agreements, the Interim Order and the Final Order; and (iii) all transactions contemplated by or relating to the foregoing.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Adjusted Base Rate.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"U.S. Dollars" or "$" refers to lawful money of the United States of America.

"Variance" has the meaning set forth in the definition of Budget Variance Report.

"Voluntary Relocation" means with respect to any television Broadcast Station, any Relocation described in clause (1) of the definition of the term Relocation.

"Wholly Owned Subsidiary" means, with respect to any Person at any date, any corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing 100% of the equity or ordinary voting power (other than directors' qualifying shares) or, in the case of a partnership, 100% of the general partnership interests are, as of such date, directly or indirectly owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

1.2     **Classification of Loans and Borrowings**.  For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "Base Rate Loan" or a "LIBOR Loan").  In similar fashion, Borrowings may be classified and referred to by Type.

1.3     **Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. References in Articles 6 and 7 in respect of the affirmative and negative covenants to be performed by the Credit Parties  shall be interpreted to mean, with respect to Article 6, that the Borrower will, and will cause each of the other Credit Parties  to, comply with such covenant, and, with respect to Article 7, that the Borrower will not, and will not permit any of the other Credit Parties  to, violate such covenant.

1.4    **Accounting Terms; GAAP**.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), the Administrative Agent and the Borrower shall negotiate in good faith to amend any such provision to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided, further, however,* regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

1.5    **Divisions**.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its capital stock, or other equity interests, at such time.

## ARTICLE 2

The Credits

2.1    **Term Loan Commitments and Term Loans**.  Subject to the terms and conditions set forth herein and in the Orders, each Lender severally agrees to make loans to the Borrower on any Business Day on or after the Closing Date and prior to the Maturity Date, in Dollars, in an aggregate amount not to exceed such Lender's Commitment.  Each such Borrowing shall consist of Loans made simultaneously by the Lenders in accordance with their respective Applicable Percentage of the aggregate Commitments; provided, that any Borrowing on the Closing Date shall be in an amount not to exceed $10,000,000 and each Borrowing thereafter shall be in an amount not less than $2,500,000 and shall not exceed a maximum amount of $5,000,000 (the maximum amount, the "Draw Cap"); *provided* that the Draw Cap shall not apply to any Borrowing after the Closing Date that is required to pay professional fees following the approval of interim or final fee applications to the Bankruptcy Court.  Loans repaid or prepaid may not be reborrowed and the Commitments are permanently reduced by the amount of any Borrowing.  Loans may be Base Rate Loans or LIBO Rate Loans, as further provided herein.

2.2    **[Reserved]**.

2.3    **Borrowings, Conversions and Continuations**.

(a)    Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of LIBO Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent by delivery of a written Committed Loan Notice, appropriately

completed and signed by a Financial Officer of the Borrower.  Each such notice must be received by the Administrative Agent not later than (i) 11:00 a.m. (New York City time) five (5) Business Days prior to the requested date of any Borrowing or continuation of LIBO Rate Loans or any conversion of Base Rate Loans to LIBO Rate Loans and (ii) 11:00 a.m. (New York City time) five (5) Business Days prior to the requested date of any Borrowing of Base Rate Loans or conversion of any LIBO Rate Loans to Base Rate Loans, *provided* that any Committed Loan Notice may be received by the Administrative Agent one (1) Business Day prior to the Closing Date with respect to the initial Borrowing of Loans.  Each conversion to or continuation of LIBO Rate Loans shall be in a minimum principal amount of $100,000, or a whole multiple of $250,000, in excess thereof in the case of Loans.  Each conversion to Base Rate Loans shall be in a minimum principal amount of $100,000 or a whole multiple of $250,000 in excess thereof.  Each written Committed Loan Notice shall specify:

> (i)     whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of LIBO Rate Loans,

> (ii)     the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day),

> (iii)     the principal amount of Loans to be borrowed, converted or continued, and

> (iv)     the Type of Loans to be borrowed or to which existing Loans are to be converted.

If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or fails to give a timely notice requesting a conversion or continuation, in each case with respect to Loans denominated in Dollars, then the applicable Loans denominated in Dollars shall be made as, or converted to, Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans.

(b)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share or other applicable share provided for under this Agreement of the Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation described in Section 2.02(a).  In the case of each Committed Loan Notice, each Lender shall make the amount of its Loans available to the Administrative Agent in Same Day Funds at the Administrative Agent's office not later than 3:00 p.m. New York time on the Business Day specified in the applicable Committed Loan Notice.  Except as otherwise provided in the following sentence, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)     Except as otherwise provided herein, a LIBO Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan unless the

Borrower pays the amount due, if any, under Section 3.05 in connection therewith.  During the existence of an Event of Default, the Administrative Agent or the Required Lenders may require that no Loans may be converted to or continued as LIBO Rate Loans.

(d)    The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for LIBO Rate Loans upon determination of such interest rate.  The determination of the LIBO Rate by the Administrative Agent shall be conclusive in the absence of manifest error.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Prime Rate used in determining the Base Rate promptly following the announcement of such change.

(e)    After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than five (5) Interest Periods in effect.

(f)    The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

2.4    **[Reserved]**.

2.5    **[Reserved]**.

2.6    **[Reserved]**.

2.7    **[Reserved]**.

2.8    **[Reserved]**.

2.9    **Mitigation Obligations; Replacement of Lenders**.

(a)    If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder, or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as the case may be, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender

- 26 -

and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 11.4), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment in its sole discretion); *provided* that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld or delayed, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

       2.10    **Repayment of Loans; Evidence of Debt**.

       (a)    Subject to the last paragraph of Section 8.2 and the Orders, upon the Maturity Date, the Administrative Agent and the Lenders shall be entitled to immediate payment of the Obligations under the Loan Documents without further application to or order of the Bankruptcy Court.

       (b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

       (c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

       (d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.10 shall be prima facie evidence of the existence and amounts of the obligations recorded therein absent manifest error; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

       (e)    If so requested by any Lender by written notice to the Borrower, the Borrower shall prepare, execute and deliver to such Lender, a Term Loan Note in the principal amount of such Lender's Term Loan Commitment.

2.11    **Prepayment of Loans**.

(a)    <u>Optional Prepayments</u>.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (other than LIBOR Loan breakage costs as provided in Section 2.16 and the applicable fees provided in Section 2.12), subject to prior notice in accordance with paragraph (d) of this Section 2.11 and provided that each such prepayment shall be in an amount that is at least equal to $500,000 or any greater multiple of $100,000 or any lesser amount remaining outstanding.  Each prepayment of Loans shall be applied in accordance with paragraph (c) of this Section 2.11.

(b)    <u>Mandatory Prepayments</u>.  The Borrower shall make prepayments of the Term Loans hereunder as follows:

(i)    <u>Sale of Assets</u>.  On the date of the consummation by any Credit Party of any Disposition in respect of which the Net Cash Proceeds received by any Credit Party exceed $500,000, the Borrower shall deliver to the Administrative Agent a statement certified by a Financial Officer of the Borrower, in form and detail reasonably satisfactory to the Administrative Agent setting forth the Net Cash Payments of such Disposition.  No later than three (3) Business Days after any such Disposition, the Borrower shall prepay the Loans in an amount equal to the lesser of (1) the Net Cash Payments in respect of such Disposition and (2) the Outstanding Amount as of such date.  Any prepayments made pursuant to this Section 2.11(b)(i) shall be made without premium or penalty (other than LIBOR Loan breakage costs as provided in Section 2.16 and the applicable fees provided in Section 2.12).

(ii)    <u>Proceeds of Casualty Events</u>.  On the date any Credit Party  shall receive Net Cash Payments in respect of insurance, condemnation awards or other compensation in respect of any Casualty Event affecting any property of any Credit Party in excess of $500,000 in the aggregate, the Borrower shall deliver to the Administrative Agent a statement certified by a Financial Officer of the Borrower, in form and detail reasonably satisfactory to the Administrative Agent setting forth the Net Cash Payments in respect of such Casualty Event.  No later than three (3) Business Days after any receipt of any Net Cash Payments in respect of any Casualty Event, the Borrower shall prepay the Loans in an amount equal to the lesser of (1) the Net Cash Payments in respect of such Casualty Event and (2) the Outstanding Amount as of such date.  Any prepayments made pursuant to this Section 2.11(b)(ii) shall be made without premium or penalty (other than LIBOR Loan breakage costs as provided in Section 2.16 and the applicable fees provided in Section 2.12).

(iii)    <u>Proceeds of Indebtedness</u>.  On the date of the incurrence by any Credit Party  of any Indebtedness (other than Indebtedness expressly permitted to be incurred under <u>Section 7.1</u>), the Borrower shall deliver to the Administrative Agent a statement certified by a Financial Officer, in form and detail reasonably satisfactory to the Required Lenders, of the estimated amount of the Net Cash Payments from such incurrence of such Indebtedness that will (on the date of such incurrence of  Indebtedness) be received by any Credit Party  and such Credit Party  will prepay the Loans hereunder, on the date of such incurrence of Indebtedness, in an aggregate amount equal to the lesser of (A) 100%

of the Net Cash Payments from such incurrence of Indebtedness received by such Credit Party and (B) the Outstanding Amount then in effect.

(c)     _Application_.  All prepayments made pursuant to clauses (a) and (b) of this Section shall be applied ratably among the Lenders in proportion to their then outstanding Loans.

(d)     _Notification of Prepayments_.  The Borrower shall notify the Administrative Agent by telephone (confirmed by e-mail) of any prepayment under Sections 2.11(a) not later than 1:00 p.m., New York time, three (3) Business Days before the date of prepayment, except that prepayments of Base Rate Loans pursuant to Section 2.11(a) may be made upon one Business Day's notice.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; _provided_ that a notice of voluntary prepayment delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied, _provided_ that the Borrower shall reimburse the Administrative Agent and the Lenders for any fees, costs or expenses (including any breakage costs) incurred as a result of Borrower's intention to voluntarily prepay Loans.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.

(e)     _Prepayments Accompanied by Interest_.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13 and payment of any fees, costs and expenses required by Section 2.12 or 2.16.

2.12     **Fees**.

(a)     The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its pro rata share of the Commitments on the Closing Date, as fee compensation for the funding of such Lender's Loans, an upfront fee  (the "Upfront Fee") in an amount equal to 2.50% of the aggregate principal amount of Commitments of such Lender as of the Closing Date before giving effect to the draw on that date.  The Upfront Fee shall be payable (or shall be netted against the Loans made by the Lenders) on the Closing Date.

(b)     The Borrower shall pay to the Administrative agent for the account of each Lender in accordance with its pro rata share of the Commitments, an unused commitment fee (the "Commitment Fee") equal to 0.50% per annum times the actual daily amount of undrawn Commitments (limited to the amount that is then available pursuant to the Interim Order or Final Order, as applicable).  The Commitment Fee shall be payable on the last Business Day of each month.

(c)     The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its pro rata share of the Loans and/or Commitments, as applicable, on the date of any payment or prepayment of any Loans (whether voluntary or mandatory, including as a result of acceleration or stated maturity or the termination of any Commitments (whether voluntary or mandatory, including as a result of acceleration or stated maturity, but other than as

a result of a Borrowing of Loans), an exit fee (the "Exit Fee") of 2.00% of the Loans paid or prepaid and/or the Commitments terminated, as applicable.

(d)     The Borrower shall pay to the Administrative Agent on the Closing Date an administrative agent fee in an amount of $50,000.

(e)     All fees payable hereunder shall be paid in cash on the dates due, in immediately available funds.  Fees paid shall not be refundable under any circumstances, absent manifest error in the determination thereof.

2.13   **Interest**.

(a)     The Loans comprising each Borrowing of Base Rate Loans shall bear interest at a rate per annum equal to the Adjusted Base Rate plus the Applicable Margin.

(b)     The Loans comprising each LIBOR Borrowing shall bear interest at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)     Notwithstanding the foregoing, all amounts which are not paid when due shall bear interest until paid in full at the Post-Default Rate.

(d)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; *provided* that (i) interest accrued at the Post-Default Rate shall be payable on demand, (ii) in the event of any repayment or prepayment of any LIBOR Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, (iii) in the event of any conversion of any LIBOR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion and (iv) all accrued interest on all Loans shall be payable upon the Maturity Date or the earlier termination of this Agreement in accordance with its terms.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Adjusted Base Rate at times when the Adjusted Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Adjusted Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(f)     Notwithstanding anything to the contrary set forth herein, the aggregate interest, fees and other amounts required to be paid by the Borrower to the Lenders or any Lender hereunder are hereby expressly limited so that in no contingency or event whatsoever whether by reason of acceleration of maturity of the Indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to the Lenders or any Lender for the use or the forbearance of the Indebtedness evidenced hereby exceed the maximum permissible under applicable law. If under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the other Loan Documents at the time of performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by applicable law then the obligation to be

fulfilled shall automatically be reduced to the limits of such validity and if under or from circumstances whatsoever the Lenders or any Lender should ever receive as interest any amount which would exceed the highest lawful rate, the amount of such interest that is excessive shall be applied to the reduction of the principal balance of the Indebtedness evidenced hereby and not to the payment of interest. This provision shall control every other provision of this Agreement and all provisions of every other Loan Document.

2.14    **Alternate Rate of Interest**.  If prior to the commencement of any Interest Period for a LIBOR Borrowing the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; then the Administrative Agent shall give notice thereof to the Borrower and the affected Lenders by telephone or e-mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and such Lenders that the circumstances giving rise to such notice no longer exist, such Borrowing shall be converted to a Borrowing of Base Rate Loans.

2.15    **Increased Costs**.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

(ii)    subject the Administrative Agent, any Lender or any other recipient of a payment hereunder to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition affecting this Agreement or LIBOR Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBOR Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender reasonably determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such

additional amount or amounts as will compensate such Lender, or such Lender's holding company, for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.15 shall be delivered to the Borrower and shall be conclusive so long as it reflects a reasonable basis for the calculation of the amounts set forth therein and does not contain any manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs or reductions incurred more than six months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; *provided further* that, if the Change in Law giving rise to such increased costs or reductions is (i) retroactive and (ii) occurred within such six-month period, then the six-month period referred to above may be extended to include the period of retroactive effect thereof, but in no event any period prior to the Closing Date.

2.16    **Break Funding Payments**.

(a)    In the event of (i) the payment of any principal of any LIBOR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (ii) the conversion of any LIBOR Loan other than on the last day of the Interest Period applicable thereto, (iii) the failure to borrow, convert, continue or prepay any LIBOR Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice is permitted to be revocable and is revoked in accordance herewith) or (iv) the assignment of any LIBOR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.9, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event; *provided* that if the occurrence of any event described in clause (iii) above shall occur solely as a result of any Lender's failure to make available such Lender's share of any LIBOR Borrowing, such Lender shall not be entitled to compensation under this Section 2.16(a) with respect to such event. Nothing in this Section 2.16 shall be deemed to relieve any Lender from its obligation to fulfill its Commitments to the extent required by this Agreement or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(b)    In the case of a LIBOR Loan, the loss to any Lender attributable to any such event shall be deemed to include an amount determined by such Lender to be equal to the excess, if any, of

(i)    the amount of interest that such Lender would pay for a deposit equal to the principal amount of such Loan for the period from the date of such payment, conversion, failure or assignment to the last day of the then current Interest Period for such Loan (or, in the case of a failure to borrow, convert or continue, the duration of the Interest

Period that would have resulted from such borrowing, conversion or continuation) if the interest rate payable on such deposit were equal to the Adjusted LIBO Rate for such Interest Period (or if such Lender does not accept deposits, then the Adjusted LIBO Rate for such Interest Period), <u>over</u>

   (ii) the amount of interest that such Lender would earn on such principal amount for such period if such Lender were to invest such principal amount for such period at the interest rate that would be bid by such Lender (or an Affiliate of such Lender) for U.S. Dollar deposits from other banks in the LIBOR market at the commencement of such period.

   (c) A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

   2.17 **Taxes**.

   (a) Any and all payments by or on account of any obligation of any Credit Party under any Loan Document shall be made free and clear of and without deduction for any Taxes; *provided* that if such Credit Party shall be required to deduct any Taxes from such payments, then (i) if such Taxes are Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.17) the Administrative Agent, any Lender, or any other recipient of a payment hereunder (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Credit Party shall make such deductions and (iii) the Credit Party shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

   (b) In addition, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law (to the extent not otherwise payable pursuant to Section 2.17(a)) or, at the option of the Administrative Agent, timely reimburse it for the payment of any Other Taxes.

   (c) Except to the extent already covered by Section 2.17(a), the Credit Parties shall jointly and severally indemnify the Administrative Agent, each Lender, and any other recipient of a payment hereunder, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) paid by the Administrative Agent, such Lender, or such recipient, as the case may be (and any penalties, interest and reasonable expenses arising therefrom or with respect thereto), whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, by the Administrative Agent on its own behalf or on behalf of a Lender or other recipient of a payment hereunder, shall be conclusive absent manifest error.  If any indemnified party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to Section 2.17(a) or this

Section 2.17(c)), it shall forthwith pay over such amount (but only to the extent of indemnity payments made or additional amounts paid under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund) to the Administrative Agent and such amount shall be (i) applied to prepay interest payable on the Term Loans, or to pay any other obligations of the Credit Parties then due hereunder or under any other Loan Document, or (ii) in the event all obligations hereunder and under all other Loan Documents have been indefeasibly paid in full, refunded to the Borrower.  Borrower, upon the request of any indemnified party, shall repay to such indemnified party the amount applied to prepay interest or any other obligations of the Credits Parties pursuant to clause (i) or paid over to the Borrower pursuant to clause (ii) of the immediately preceding sentence (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (c), in no event will the recipient of any indemnity payment hereunder be required to apply or pay any amount pursuant to this paragraph (c) the payment of which would place the indemnified party in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Credit Party or any other Person.

(d)      As soon as practicable after any payment of Taxes under this Section 2.17 by a Credit Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of any receipt issued by such Governmental Authority to the Borrower evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Required Lenders.

(e)      Any Lender that is a United States person (within the meaning of Section 7701(a)(30) of the Code) shall deliver to the Borrower (with a copy to the Administrative Agent), on or before the date on which such Lender becomes a party to this Agreement, at the time or times prescribed by applicable law and as otherwise reasonably requested by the Borrower or the Administrative Agent, two executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax.  Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of a jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall, to the extent it is legally entitled to do so, deliver to the Borrower (with a copy to the Administrative Agent), on or before the date on which such Foreign Lender becomes a party to this Agreement, at the time or times prescribed by applicable law and as otherwise reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate.

(f)      If a payment to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the

Administrative Agent such documentation reasonably requested by the Borrower (or the Administrative Agent) sufficient for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine that such Lender has complied with such applicable reporting requirements or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (f), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g)     Any Lender may, without the consent of or notice to the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 11.2(b) that affects such Participant. Subject to paragraph (g) of Section 11.4, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of Section 11.4. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(h)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 2.17(g) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (h).

(i)    Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(j)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 2.17 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

2.18    **Payments Generally: Pro Rata Treatment; Sharing of Set-Offs**.

(a)    The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or under Sections 2.15, 2.16 or 2.17, or otherwise) prior to 1:00 p.m., New York time, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at such of its offices in New York as shall be notified to the relevant parties from time to time, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 11.3 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof, and the Borrower shall have no liability in the event timely or correct distribution of such payments is not so made.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in U.S. Dollars.

(b)    If at any time funds are received by and available to the Administrative Agent (in its capacity as such) for application to the obligations of the Credit Parties under this Agreement:

(i)    such funds (other than funds specifically earmarked for payments made pursuant to Section 2.11 (which shall be applied as set forth in Section 2.11)) shall be distributed by the Administrative Agent in the following order:

(A)    first, to pay interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties,

(B)     second, to pay principal on the Loans then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties,

(C)     third, to other obligations of the Credit Parties under this Agreement, ratably among the parties entitled thereto in accordance with the amounts due to such parties, and

(D)     Fourth, to the Credit Parties, their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans (other than pursuant to Sections 2.15, 2.16 or 2.17), resulting in such Lender receiving payment of a greater proportion of the aggregate principal amount of its Loans and accrued interest thereon than the proportion of such amounts received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of the other Lenders to the extent necessary so that the benefit of such payments shall be shared by all the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to any Credit Party or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders entitled thereto (the "Applicable Recipient") hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may (but shall not have any obligation to), in reliance upon such assumption, distribute to the Applicable Recipient the amount due.  In such event, if the Borrower has not in fact made such payment, then each Applicable Recipient severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Applicable Recipient with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Effective Rate.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.18(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent

for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid.

(f)    Except to the extent otherwise provided herein: (i) each Borrowing of Loans from the Lenders under Section 2.1 shall be made from the Lenders; (ii) Loans shall be allocated pro rata among the Lenders according to the amounts of their Commitments (in the case of the making of Loans) or their Loans (in the case of conversions and continuations of Loans); (iii) each payment or prepayment by the Borrower of principal of Loans shall be made for the account of the Lenders pro rata in accordance with the respective unpaid principal amounts of the Loans held by such Lenders; and (iv) each payment by the Borrower of interest on Loans shall be made for the account of the Lenders pro rata in accordance with the amounts of interest on such Loans then due and payable to the Lenders.

2.19    **Priority and Liens; No Discharge**.

(a)    Each of the Credit Parties hereby covenants and agrees that upon the entry of an Interim Order (and when applicable, the Final Order) its obligations under this Agreement, including its obligations hereunder and under the Loan Documents and under the Collateral Agreements: (1) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed superpriority administrative expense claim in the Case of such Credit Party (the "Superpriority Claims") having a super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever, including, without limitation, the superpriority claims granted to the Pre-petition First Lien Secured Parties and Pre-Petition Second Lien Secured Parties under the Interim Order and the Final Order, and the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114, and any other provision of the Bankruptcy Code; (2) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on all of the property (whether tangible, intangible, real, personal or mixed) of such Credit Parties whether now existing or hereafter acquired, that is not subject to valid, perfected, non-voidable liens in existence at the time of commencement of the Cases or to valid, non-voidable liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code; (3) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable perfected junior Lien upon all property of such Credit Parties, whether now existing or hereafter acquired, that is subject to valid, perfected and non-voidable Liens in existence at the time of the commencement of the Cases or that is subject to valid Liens in existence at the time of the commencement of the Cases that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code; and (4) pursuant to Section 364(d)(l) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable perfected first priority senior priming Lien on all of the property of such Credit Parties that is subject to the existing liens (the "Primed Liens") which secure "Obligations" (as defined in the Existing First Lien Indenture) owing under the Existing First Lien Indenture and "Obligations" (as defined in the Existing Second Lien Indenture) owing under the Existing Second Lien Indenture, all of which Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior Liens to be granted to the Administrative Agent, which senior priming Liens in favor of the Administrative Agent shall also prime any Liens granted after the commencement of the Cases to provide adequate protection Liens in respect of

any of the Primed Liens under clauses (1) through (4) above, subject in each case to Carve-Out and as set forth in the Orders.

(b)    (i)    Each Credit Party hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Administrative Agent on behalf of and for the benefit of the Secured Parties in all of such Credit Party's Collateral, which includes, without limitation, all of such Credit Party's real property, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

(ii)    Further to Section 2.19(b)(i) and the Interim Order (and, when entered, the Final Order), to secure the full and timely payment and performance of the obligations of the Credit Parties under this Agreement, each Credit Party hereby MORTGAGES, GRANTS, BARGAINS, ASSIGNS, SELLS, CONVEYS and CONFIRMS, to the Administrative Agent, for the ratable benefit of the Secured Parties, the Real Property Assets (which, for the avoidance of doubt, shall include all of such Credit Party's right, title and interest now or hereafter acquired in and to (a) all improvements to the Real Property Assets now owned or hereafter acquired by such Credit Party, (b) all materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by such Credit Party and now or hereafter attached to, installed in or used in connection with the Real Property Assets, and all utilities whether or not situated in easements, and all equipment, inventory and other goods in which such Credit Party now has or hereafter acquires any rights or any power to transfer rights and that are or are to become fixtures (as defined in the UCC) related to the Real Property Assets, (c) all goods, accounts, inventory, general intangibles, instruments, documents, contract rights and chattel paper, in each case, with respect to the Real Property Assets, (d) all reserves, escrows or impounds and all deposit accounts maintained by such Credit Party with respect to the Real Property Assets, (e) all leases, licenses, concessions, occupancy agreements or other agreements (written or oral, now or at any time in effect), in each case, which grant to any Person a possessory interest in, or the right to use, all or any part of the Real Property Assets, together with all related security and other deposits, (f) all of the rents, revenues, royalties, income, proceeds, profits, accounts receivable, security and other types of deposits, and other benefits, in each case, paid or payable by parties to the leases for using, leasing, licensing possessing, operating from, residing in, selling or otherwise enjoying the Real Property Assets, (g) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership, in each case, of the Real Property Assets, (h) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing, (i) all property tax refunds payable with respect to the Real Property Assets, (j) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof, (k) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by such Credit Party as an insured party, and (l) all awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made to any Credit Party by any governmental authority pertaining to any

- 39 -

condemnation or other taking (or any purchase in lieu thereof) of all or any Real Property Assets), TO HAVE AND TO HOLD to the Administrative Agent, and such Credit Party does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets and interests unto the Administrative Agent.

(c)     All of the Liens described in this Section 2.19 shall be effective and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral, as set forth in the Interim Order.

(d)     The relative priorities of the Liens described in this Section 2.19 with respect to the Collateral of the Debtors shall be as set forth in the Interim Order (and, when entered, the Final Order).  All of the Liens described in this Section 2.19 shall be effective and perfected upon entry of the Interim Order.

(e)     Each of the Credit Parties agrees that to the extent that its obligations (other than contingent indemnification or reimbursement obligations not then due) under the Loan Documents have not been satisfied in full in cash, its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a plan of reorganization, and each of the Credit Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Orders and the Liens granted to the Administrative Agent and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a plan of reorganization.

2.20    **Payment of Obligations**.  Subject to the last paragraph of Section 8.02 and the Orders, upon the maturity (whether by acceleration or otherwise) of any of the obligations of the Credit Parties under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such obligations of the Credit Parties under this Agreement or any of the other Loan Documents without further application to or order of the Bankruptcy Court.

## ARTICLE 3

### Guarantee by Guarantors

3.1    **The Guarantee**.  Each Guarantor hereby jointly and severally guarantees to each Lender and the Administrative Agent and their respective successors and assigns the prompt payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of the principal of and interest on the Loans made by the Lenders to the Borrower, and all other amounts from time to time owing to the Lenders or the Administrative Agent by the Borrower hereunder or under any other Loan Document, and all other obligations of the Borrower to any Lender or Related Party hereunder, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "Guaranteed Obligations").  Each Guarantor hereby further agrees that if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, each Guarantor will

promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

3.2     **Obligations Unconditional**.  The obligations of each Guarantor under Section 3.1 are absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the other Loan Documents or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 3.2 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute and unconditional as described above:

(i)     at any time or from time to time, without notice to such Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)     any of the acts mentioned in any of the provisions hereof or of the other Loan Documents or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be modified, supplemented or amended in any respect, or any right hereunder or under the other Loan Documents or any other agreement or instrument referred to herein or therein shall be waived or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

(iv)     any lien or security interest granted to, or in favor of, the Administrative Agent or any Lender or Lenders as security for any of the Guaranteed Obligations shall fail to be perfected or any Collateral is released or otherwise compromised or liquidated for less than fair value.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, notice of acceleration, notice of intent to accelerate, protest and all notices whatsoever (except as expressly required hereby) and any requirement that the Administrative Agent or any Lender exhaust any right, power or remedy or proceed against the Borrower hereunder or under the other Loan Documents or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.

3.3     **Reinstatement**.  The obligations of each Guarantor under this Article 3 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by

any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each of the Guarantors agrees that it will indemnify the Administrative Agent and each Lender on demand for all reasonable costs and expenses (including reasonable fees and expenses of counsel) incurred by the Administrative Agent or any Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

3.4     **Subrogation**.   Until such time as the Guaranteed Obligations (including with respect to all "claims" (as defined in Section 101(5) of the Bankruptcy Code) against any Credit Party arising in connection with, or any Collateral securing the Guaranteed Obligations (including rights of subrogation (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) contribution, and the like) shall have been indefeasibly paid in full, each Guarantor hereby waives all rights of subrogation or contribution, whether arising by contract or operation of law (including any such right arising under the Bankruptcy Code) or otherwise by reason of any payment by it pursuant to the provisions of this Article 3.

3.5     **Remedies**.   Subject to the last paragraph of Section 8.2 and the Orders, each Guarantor agrees that, as between such Guarantor and the Lenders, the obligations of the Borrower hereunder may be declared to be forthwith due and payable as provided in Section 8.1 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.1) for purposes of Section 3.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by such Guarantor for purposes of Section 3.1.

3.6     **Continuing Guarantee**.   The guarantee in this Article 3 is a continuing irrevocable guarantee of payment and performance (and not of collection), and shall apply to all Guaranteed Obligations prior to the indefeasible payment in full of Borrower's obligations hereunder.   Each Guarantor waives any right to require that any resort be had by the Administrative Agent or any Lender to any security held for the payment of the Guaranteed Obligations or to any balance of any credit on the books of the Administrative Agent or any other Secured Party in favor of the Borrower or any other Person.

3.7     **Rights of Contribution**.   The Guarantors hereby agree, as between themselves, that if any Guarantor shall become an Excess Funding Guarantor (as defined below) by reason of the payment by such Guarantor of any Guaranteed Obligations, each other Guarantor shall, on demand of such Excess Funding Guarantor (but subject to the next sentence), pay to such Excess Funding Guarantor an amount equal to such Guarantor's Pro Rata Share (as defined below and determined, for this purpose, without reference to the properties, debts and liabilities of such Excess Funding Guarantor) of the Excess Payment (as defined below) in respect of such Guaranteed Obligations.   The payment obligation of a Guarantor to any Excess Funding Guarantor under this Section 3.7 shall be subordinate and subject in right of payment to the prior payment in full of the obligations of such Guarantor under the other provisions of this Article 3 and such

Excess Funding Guarantor shall not exercise any right or remedy with respect to such excess until payment and satisfaction in full of all of such obligations.

For purposes of this Section 3.7, (i) "Excess Funding Guarantor" means, in respect of any Guaranteed Obligations, a Guarantor that has paid an amount in excess of its Pro Rata Share of such Guaranteed Obligations, (ii) "Excess Payment" means, in respect of any Guaranteed Obligations, the amount paid by an Excess Funding Guarantor in excess of its Pro Rata Share of such Guaranteed Obligations and (iii) "Pro Rata Share" means, for any Guarantor, the ratio (expressed as a percentage) of (x) the amount by which the aggregate present fair saleable value of all properties of such Guarantor (excluding any shares of stock of, or ownership interest in, any other Guarantor) exceeds the amount of all the debts and liabilities of such Guarantor (including contingent, subordinated, unmatured and unliquidated liabilities, but excluding the obligations of such Guarantor hereunder and any obligations of any other Guarantor that have been Guaranteed by such Guarantor) to (y) the amount by which the aggregate fair saleable value of all properties of all of the Credit Parties exceeds the amount of all the debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities, but excluding the obligations of the Borrower and the Guarantors hereunder and under the other Loan Documents) of all of the Credit Parties, determined (A) with respect to any Guarantor that is a party hereto at the Closing Date, as of the Closing Date, and (B) with respect to any other Guarantor, as of the date such Guarantor becomes a Guarantor hereunder.

3.8    **General Limitation on Guarantee Obligations**.    In any action or proceeding involving any state or non-U.S. corporate law, or any state or Federal or non-U.S. bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 3.1 would otherwise, taking into account the provisions of Section 3.7, be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 3.1, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Lender, the Administrative Agent or other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

3.9    **Waivers**.    As used in this paragraph, any reference to "the principal" includes the Borrower, and any reference to "the creditor" includes the Administrative Agent and each of the Lenders.  In accordance with Section 2856 of the California Civil Code (a) each Guarantor waives any and all rights and defenses available to such Guarantor by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Civil Code, including without limitation any and all rights or defenses any Guarantor may have by reason of protection afforded to the principal with respect to any of the Guaranteed Obligations, or to any other guarantor of any of the Guaranteed Obligations with respect to any of such guarantor's obligations under its guaranty, in either case pursuant to the antideficiency or other laws of the State of California limiting or discharging the principal's indebtedness or such guarantor's obligations, including without limitation Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure; and (b) each Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a Guaranteed Obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the Code of Civil Procedure or otherwise; and even

though that election of remedies by the creditor, such as nonjudicial foreclosure with respect to security for an obligation of any other guarantor of any of the Guaranteed Obligations, has destroyed Guarantor's rights of contribution against such other guarantor.  No other provision of this guaranty shall be construed as limiting the generality of any of the covenants and waivers set forth in this paragraph.  As provided below, this Agreement shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York.  The foregoing waivers are included solely out of an abundance of caution, and do not affect or limit in any way the parties' choice of New York law to govern this Agreement and the Guaranteed Obligations.

## ARTICLE 4

### Representations and Warranties

Each of the Credit Parties represents and warrants to the Lenders and the Administrative Agent, as to itself and each other Credit Party  that:

4.1    **Organization; Powers**.  Each Credit Party  has been duly formed or organized and is validly existing under the laws of its jurisdiction of organization.  Each Credit Party  has all requisite organizational power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure to have such power or authority or to be so qualified, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

4.2    **Authorization; Enforceability**.  Subject to the entry of the Orders and subject to the terms thereof, the Transactions are within the organizational power and authority of each Credit Party to the extent such Credit Party is a party to the Loan Documents and have been duly authorized by all necessary organizational action on the part of such Credit Party to the extent such Credit Party is a party thereto.  Subject to the entry of the Orders and subject to the terms thereof, this Agreement, the Collateral Agreements and all other Loan Documents have been duly authorized, executed and delivered by each Credit Party, that is a party thereto and constitute legal, valid and binding obligations of such Credit Party enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.3    **Governmental Approvals; No Conflicts**.  Except as set forth on Schedule 4.3 and subject to the entry of the Orders and subject to the terms thereof, as of the Closing Date, the Transactions and the effectiveness of this Agreement (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, (b) other than such violations arising as a result of the commencement of the Cases and except as otherwise excused by order of the Bankruptcy Court, will not violate any applicable law, policy or regulation or the organizational documents of any Credit Party  that is a party to the Loan Documents or any order of any Governmental Authority, (c) other than such violations arising as a result of the commencement of the Cases and except as otherwise excused by order of the Bankruptcy Court, will not violate or result in a default under any material indenture, agreement or other instrument binding upon any Credit Party, or any assets, or give rise to a right thereunder to require any

payment to be made by any Credit Party, where any such violation or default or right to payment could reasonably be expected to result in a Material Adverse Effect, and (d) except for the Liens created by the Collateral Agreements and the Orders, will not result in the creation or imposition of any material Lien on any asset of any Credit Party. Except as set forth therein, all consents, approvals, registrations, filings and other actions required as set forth in such <u>Schedule 4.3</u> have been obtained on or before the Closing Date.

       4.4    **No Material Adverse Change, Financial Statements**.

       (a)    Since December 31, 2017, no event, change in the business, assets, operations or condition of the Credit Parties taken as a whole has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

       (b)    The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Credit Parties as of the dates thereof and their results of operations for the periods covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein, and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year end adjustments and the absence of footnotes.

       (c)    The initial DIP Budget delivered pursuant to Section 5.1(c) and each other DIP Budget delivered pursuant to Section 6.1 have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and are subject to material contingencies and assumptions, many of which are beyond the control of the Credit Parties, and actual results may vary materially from such forecasts.

       4.5    **Properties**.

       (a)    Each of the Credit Parties has good, sufficient and legal title to, or valid, subsisting and enforceable leasehold interests in, all its Property (excluding any Proprietary Rights) material to its business.

       (b)    As of the Closing Date, except as disclosed on <u>Schedule 4.5(b)</u>, each of the Credit Parties owns, or is licensed to use, all trademarks, service marks, trade names, copyrights, patents and other intellectual property, in each case, that are material to its business as currently conducted (including the call letters with respect to each Broadcast Station) (excluding rights related to software programs and copyrights with respect to the content of news and other programming broadcast or disseminated as part of the Permitted Lines of Business) (the "<u>Proprietary Rights</u>"), and, to the Credit Parties' knowledge, the use thereof by the Credit Parties in the conduct of their respective businesses as currently conducted does not infringe upon the intellectual property rights of any other Person. As of the Closing Date, all trademark applications and registrations, registered copyrights, patents and patent applications and domain names, in each case, which are owned by any Credit Party are listed on <u>Schedule 4.5(b)(ii)</u> (collectively "<u>Registered Rights</u>"). As of the Closing Date, except as set forth on <u>Schedule 4.5(b)(iii)</u>, all of the Registered Rights have been duly registered in, filed in or issued by the PTO, the United States Register of Copyrights, a domain name registrar or other corresponding offices of other

jurisdictions as identified on such schedule; and all of the material Registered Rights have been maintained and renewed in accordance with all applicable provisions of law and administrative regulations in the United States or in each such other jurisdiction, as applicable.

(c)    As of the Closing Date, Schedule 4.5(c) contains a true, accurate and complete list of (i) all owned Real Property Assets and (ii) all material leases, subleases or assignments of leases (together with all material amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Property Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment. As of the Closing Date, to the Credit Parties' knowledge except as specified in clause (ii) of Schedule 4.5(c), each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and, to the Credit Parties' knowledge, no material default has occurred and is continuing thereunder, and each such agreement constitutes the legal, valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

4.6    **Litigation and Environmental Matters**.

(a)    Except for the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority which have been filed against or, to the Credit Parties' knowledge, threatened against or affecting any Credit Party (i) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any of the Loan Documents or the transactions contemplated hereunder.

(b)    Except for (i) the Cases and (ii) the Disclosed Matters and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, none of the Credit Parties (i) has failed to comply with any applicable laws (including Environmental Law) or (ii) is subject to or in default with respect to any final judgments, writs, decrees, rules or regulations of any court or any Governmental Authority.

(c)    No Credit Party, any Subsidiary of a Credit Party nor any of their facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Liability, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. No Credit Party nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §9604) or any comparable state law the receipt of which could reasonably be expected to result in a Material Adverse Effect. There are and, to each of the Credit Parties' and their Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an environmental claim against any Credit Party or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any of its Subsidiaries nor, to any Credit Party's knowledge, any predecessor of the

Borrower or any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any facility, and none of the Borrower's or any of its Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent, except as carried out in compliance with Environmental Law or except as could not reasonably be expected to result in a Material Adverse Effect. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. No event or condition has occurred or is occurring with respect to the Borrower or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

4.7    **Compliance with Laws and Agreements**. Except as set forth on Schedule 4.7 and other than such violations arising as a result of the commencement of the Cases and except as otherwise excused by order of the Bankruptcy Court, each of the Credit Parties is in compliance with all laws, regulations, policies and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

4.8    **Investment and Holding Company Status**. No Credit Party is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended or (b) a "bank holding company" as defined in, or subject to regulation under, the Bank Holding Company Act of 1956, as amended.

4.9    **Taxes**. Except as set forth on Schedule 4.9:

(a)    Each of the Credit Parties has timely filed or caused to be filed all Tax returns and reports required to have been filed by or with respect to it and has timely paid or caused to be paid all Taxes required to have been paid by or with respect to it, except (i) Taxes that are being contested in good faith by appropriate proceedings and for which such Credit Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP or (ii) to the extent that the failure to do so could not reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

(b)    As of the Closing Date, no Tax return is under audit or examination by any Governmental Authority and no written notice of any audit or examination with respect to Taxes has been given or made by any Governmental Authority.

4.10    **ERISA**. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.

4.11    **Disclosure**. The information, reports, financial statements, exhibits and schedules furnished by or on behalf of the Credit Parties to the Administrative Agent or any Lender, both in connection with the negotiation, preparation or delivery of this Agreement and the other Loan

Documents or included herein or therein or delivered pursuant hereto or thereto, prepared by the Administrative Agent in reliance on such information, when taken as a whole do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading at the time made or delivered; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Credit Party represents only that it acted in good faith and utilized reasonable assumptions at the time made (based upon accounting principles consistent with the historical audited financial statements of the Credit Parties) and due care in the preparation of such information, report, financial statement, exhibit or schedule (it being understood that forecasts and projections by their nature are inherently uncertain, that actual results may differ significantly from the forecasted or projected results and that such differences may be material and no assurances are being given that the results reflected in the forecasts and projections will be achieved).

4.12    **Ownership and Capitalization**.  As of the Closing Date, the capital structure and ownership of the Credit Parties and the Holding Companies is correctly described in Schedule 4.12.  As of the Closing Date, the authorized, issued and outstanding capital stock of, and other equity interests in, each of the Credit Parties and the Holding Companies consists of the stock and interests described on Schedule 4.12, in each case all of which is duly and validly issued and outstanding, fully paid and nonassessable.  As of the Closing Date, except as set forth in Schedule 4.12, (x) there are no outstanding Equity Rights with respect to any Credit Party  and (y) there are no outstanding obligations of any Credit Party  to repurchase, redeem, or otherwise acquire any shares of capital stock of or other interests in any Credit Party  nor are there any outstanding obligations of any Credit Party  to make payments to any Person, such as "phantom stock" payments, where the amount thereof is calculated with reference to the Fair Market Value or equity value of any Credit Party.

4.13    **Subsidiaries**.  Except as disclosed in Schedule 4.12, (a) each Credit Party and its respective Subsidiaries owns, free and clear of Liens, and has the unencumbered right to vote, all outstanding ownership interests in each Person shown to be held by it in Schedule 4.12 (as so updated) except (i) those granted to secure the Existing First Lien Indenture and the Existing Second Lien Indenture and (ii) those created pursuant to the Orders, and (b) all of the issued and outstanding capital stock of each such Person organized as a corporation is validly issued, fully paid and nonassessable.

4.14    **Indebtedness, Liens and Agreements**.

(a)    As of the Closing Date, Schedule 4.14(a) is a complete and correct list of all Indebtedness (other than intercompany loans between or among the Credit Parties) to, or guarantee of any Indebtedness by, any Credit Party or Holding Company, and, to the extent specified therein, the aggregate principal or face amount outstanding or that may become outstanding with respect thereto is correctly described in Schedule 4.14(a).

(b)    As of the Closing Date, Schedule 4.14(b) is a complete and correct list of each Lien securing Indebtedness of any Credit Party  and covering any property of the Credit Parties, and the aggregate Indebtedness secured (or which may be secured) by such Liens in the

aggregate and the Property covered by each such Lien is correctly described in the appropriate part of Schedule 4.14(b).

(c)     As of the Closing Date, Schedule 4.14(c) is a complete and correct list of all Material Contracts.

(d)     As of the Closing Date, other than such violations arising as a result of the commencement of the Cases and except as otherwise excused by order of the Bankruptcy Court, all such Material Contracts are valid, subsisting, in full force and effect, are currently binding and after the Transactions occurring on or prior to such date will continue to be binding upon each Credit Party  that is a party thereto, except where the failure to be so valid, subsisting, in full force and effect or binding could not reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, other than such violations arising as a result of the commencement of the Cases and except as otherwise excused by order of the Bankruptcy Court,  the Credit Parties  are not in default under any such Material Contracts.   As of the Closing Date, the licenses and other agreements to which any Credit Party  is a party collectively entitle the Credit Parties  to use all Proprietary Rights material to the conduct of the business of the Credit Parties  as presently conducted and as proposed to be conducted after the Closing Date.

4.15     **Permits and Licenses**.

(a)     Each of the Credit Parties  has, and is in all respects in compliance with respect to, all licenses, permits, approvals and authorizations of Governmental Authorities necessary to conduct its business as presently conducted and to own or lease and operate its properties excluding FCC Licenses, except to the extent that could not reasonably be expected to result in a Material Adverse Effect.

(b)     As of the Closing Date, Schedule 4.15 is a complete and correct list of each Material FCC License granted or assigned to any Credit Party, including those under which the Credit Parties have the right to operate their respective television and radio broadcast stations covered thereby ("Broadcast Stations") (and includes, with respect to each such FCC License, the city of license and the call letters, frequency and expiration date thereof).  As of the Closing Date, the FCC Licenses listed on Schedule 4.15 with respect to any Broadcast Station owned or operated by the Credit Parties  include all material authorizations, licenses and permits issued by the FCC (other than auxiliary services licenses) that are required by the Communications Act or necessary for the operation of such Broadcast Station and conduct of the business of the Credit Parties  with respect to such Broadcast Station, as now conducted or proposed to be conducted.  Except as disclosed in Schedule 4.15(b) or as could not reasonably be expected to result in a Material Adverse Effect, the operation and ownership of each Broadcast Station by the Credit Parties complies with the Communications Act.  Except as disclosed in Schedule 4.15(b), as of the Closing Date, the FCC Licenses listed on Schedule 4.15 are validly issued and in full force and effect. Except as disclosed in Schedule 4.15(b), as of the Closing Date, other than such violations arising as a result of the commencement of the Cases and except as otherwise excused by order of the Bankruptcy Court, the Credit Parties  have fulfilled all of their obligations with respect thereto (including the filing of all registrations, applications, reports, and other documents as required by the FCC or other Governmental Authority), and have paid all fees and other amounts required to be paid by them under all applicable FCC Regulations, in each case, except where the failure to

do so would not result in termination, suspension or material diminution in scope of a Material FCC License.  Except as disclosed in Schedule 4.15(b), to the Borrower's knowledge, no rights of any Credit Party under any Material FCC License conflict with the valid rights of any other Person in any material respect.  Except as disclosed in Schedule 4.15(b), to the Borrower's knowledge, as of the Closing Date no event has occurred that would be reasonably likely to result in the revocation, termination or material adverse modification of any Material FCC License, or any FCC enforcement proceeding against the Borrower, any Subsidiary or any FCC License including any notice of violation, any notice of apparent liability for forfeiture or any forfeiture that could reasonably be expected to have a Material Adverse Effect, and none of the Credit Parties has any reason to believe that any Material FCC License will not be renewed in the ordinary course of business other than because of FCC policies affecting the industry generally.

(c)     Except as described on Schedule 4.15(c), as of the Closing Date, no Credit Party knows of any application currently pending before, or to be filed with, the FCC, the grant of which application would result in the authorization of a new or modified station whose authorized transmissions would materially and impermissibly interfere with any of the operations, signals, transmission or receptions of any Credit Party (as such impermissible interference is described in the FCC's rules, regulations and policies, including, without limitation, the FCC's rules relating to Receiver Induced Third Order Intermodulation Effect, Blanketing, Antenna Separation, Desired-to-Undesired Signal Ratios, and Prohibited Contour Overlap) so as to cause a Material Adverse Effect.

(d)     The Credit Parties have obtained and hold all authorizations required by the FCC for delivery of programming to foreign broadcast stations pursuant to Section 325(c) of the Communications Act to the extent required by their respective businesses and operations.  All of such authorizations are in effect, and, to the Credit Parties' knowledge, there is no reason to believe that any such authorization would not be renewed in the ordinary course.

(e)     The Credit Parties are in compliance with the provisions of Section 310(b) of the Communications Act relating to the interests of non-U.S. persons in broadcast licensees.

4.16     **Federal Reserve Regulations**.  No Credit Party is engaged principally or as one of its important activities in the business of extending credit for the purpose of purchasing or carrying margin stock (as defined in Regulation U of the Board).  The making of the Loans hereunder, the use of the proceeds thereof as contemplated hereby and the security arrangements contemplated by the Loan Documents will not violate or be inconsistent with any of the provisions of Regulation U, T or X of the Board of Governors of the Federal Reserve System.

4.17     **Labor and Employment Matters**.   Neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries, or to the best knowledge of the Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against the Borrower or any of its Subsidiaries or to the best knowledge of the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving the Borrower or any of its Subsidiaries, and (c) to the best knowledge of the Borrower, no union representation question

existing with respect to the employees of the Borrower or any of its Subsidiaries and, to the best knowledge of the Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

4.18    **Perfection and Priority of Security Interests**.  Subject to entry of the Interim Order (and the Final Order, as applicable) the Obligations shall have the status and priority set forth in Section 2.19 and, for the avoidance of doubt, are subject to the Carve-Out in all respects.

4.19    **Patriot Act**.  Each Credit Party  is in compliance, in all respects, with the (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act of 2001, Title III of Pub. L. 107-56 (signed into law October 26, 2001), the "Patriot Act").  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order corruptly to obtain, retain or direct business or obtain any other improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.20    **Valid Liens**.  The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents**.**

4.21    **Use of Proceeds**.  Subject to the Orders, the Borrower will use the proceeds of the Loans only for the following payments, and in the case of payments pursuant to clauses (a) and (b) below, subject to the DIP Budget and further subject to any Permitted Variance, for (a) working capital and general corporate purposes of the Credit Parties; (b) the payment of any adequate protection payments in accordance with the Orders, (c) professional fees and expenses of administering the Cases (including payments to parties benefiting from the Carve-Out and fees incurred prior to the Closing Date) and (d) other purposes (x) as expressly set forth in the Interim Order, the Final Order or the Budget or (y) as expressly approved by the Administrative Agent or the Required Lenders.

4.22    **Sanctioned Persons**.  None of the Credit Parties nor, to the knowledge of any Credit Party, any director, officer, agent, employee or Affiliate of any Credit Party or any Subsidiary is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and no Credit Party will directly or indirectly use the proceeds of any Loan or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

4.23    **Foreign Corrupt Practices Act**.  Each of the Credit Parties and, to the knowledge of any Credit Party, their respective directors, officers, agents, employees and any Person acting

for or on behalf of any Credit Party, has complied with, and will comply with, the U.S. Foreign Corrupt Practices Act, as amended from time to time (the "FCPA"), or any other applicable anti-bribery or anti-corruption law, and they have not made, offered, promised or authorized, and will not make, offer, promise or authorize, whether directly or indirectly, any payment, of anything of value to a Government Official while knowing or having a reasonable belief that all or some portion will be used for the purpose of: (a) influencing any act, decision or failure to act by a Government Official in his or her official capacity, (b) inducing a Government Official to use his or her influence with a government or instrumentality to affect any act or decision of such government or entity or (c) securing any other improper advantage, in each case in order corruptly to obtain, retain or direct business.

# ARTICLE 5

## Conditions

5.1    **Conditions to Effectiveness**.  The effectiveness of this Agreement on the Closing Date is subject only to satisfaction of the following conditions precedent (unless waived in accordance with Section 11.2):

(a)    Counterparts of Agreement.  The Administrative Agent shall have received from each party hereto:

(i)    executed counterparts of this Agreement;

(ii)    the Pledge Agreement, duly executed by each Credit Party party thereto;

(iii)    the Security Agreement, duly executed each Credit Party party thereto;

(iv)    properly completed financing statements in form appropriate for filing under the Uniform Commercial Code or in other appropriate filing offices of each jurisdiction that the Administrative Agent may deem reasonably necessary or desirable in order to perfect the Liens created under the Collateral Agreements;

(v)    (i) a copy of the certificate or articles of incorporation, including all amendments thereto, of such entity, certified as of a recent date by the Secretary of State of the jurisdiction of its organization, and certificates of good standing from such applicable Secretary of State, (ii) a certificate of an authorized signatory of such entity dated on or about the date of this Agreement and certifying (A) that attached thereto is a true and complete copy of the organizational or incorporation documents of such entity as in effect on the date of that certificate and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors or similar governing body of such entity authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and the borrowings to be made hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation or organization  of such entity have not

been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, and (D) as to the incumbency and specimen signature of each authorized signatory executing any Loan Document or any other document delivered in connection herewith on behalf of such entity; and (iii) a certificate of another authorized signatory as to the incumbency and specimen signature of the other authorized signatory executing the certificate pursuant to clause (ii) above;

(b)     [Reserved];

(c)     DIP Budget.  The Administrative Agent shall have received the DIP Budget for the period of thirteen weeks commencing with the week during which the Petition Date occurred in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(d)     Fees.  The Administrative Agent and the Lenders, as applicable shall have received all fees and expenses due to the Administrative Agent and the Lenders required to be paid on the Closing Date.

(e)     Patriot Act.   The Administrative Agent shall have received all documentation and other information required by regulatory authorities under applicable under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act.

(f)     Petition Date.  The Petition Date shall have occurred and each Credit Party shall be a debtor and debtor-in-possession.

(g)     Interim Order.   The Interim Order shall have been entered by the Bankruptcy Court and shall not have been vacated, reversed, modified, amended or stayed without the consent of the Required Lenders.

(h)     First Day Orders.  All "first day" orders intended to be entered on or prior to the date of entry of the Interim Order shall have been entered by the Bankruptcy Court, shall not have been modified, stayed or vacated (except with the consent of the Required Lenders) and shall be reasonably satisfactory in form and substance to the Required Lenders, it being understood that drafts approved by counsel to the Required Lenders prior to the Petition Date are satisfactory.

(i)     1106.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(j)     No Litigation.  There shall exist no action, suit, investigation, litigation or proceeding that is unstayed with respect to the Credit Parties pending or (to the knowledge of the Credit Parties) threatened in  any court or before any arbitrator or governmental instrumentality (other than the Cases) that (i)  involve any Loan Document or the transactions contemplated hereunder or (ii) could reasonably be expected to result in a Material Adverse Effect.

(k)     Outstanding Indebtedness.  On the Closing Date, after giving effect to the Transactions, neither the Borrower nor any of its Subsidiaries shall have any Indebtedness other

than (1) the Obligations, after giving effect to the Transactions, and (2) other Indebtedness expressly permitted to be incurred or outstanding under Section 7.1.

(l)      Counsel and Advisor fees.  The Borrower shall have paid all reasonable and documented out-of-pocket fees, charges and disbursements of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Orrick, Herrington & Sutcliffe LLP, Morrison & Foerster LLP, Ashby & Geddes, P.A., MoloLamken LLP, Evercore Group L.L.C. and one Delaware local counsel retained by the Lenders and the Administrative Agent (directly to such counsel if requested by the Lenders or Administrative Agent).

(m)      No Material Adverse Effect.  Since December 31, 2017, there shall not have been any event, occurrence, state of facts, circumstance, condition, effect or change that has had, or could be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

(n)      Audited Financial Statements.  The Administrative Agent shall have received a copy of the audited consolidated financial statements of the Credit Parties for the fiscal year of the Credit Parties ending December 31, 2017

(o)      Restructuring Support Agreement.  HPS and the Credit Parties shall have entered into a Restructuring Support Agreement, which shall be in full force and effect.

5.2    **Each Extension of Credit**.  The obligation of each Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions (each such event, a "Credit Event"):

(a)      Representations and Warranties.  The representations and warranties of each Credit Party set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (or in all respects if qualified by materiality) on and as of the date of such Borrowing, both before and after giving effect thereto and to the use of the proceeds thereof (or, if any such representation or warranty is expressly stated to have been made as of an earlier date, such representation or warranty shall have been true and correct in all material respects as of such earlier date).

(b)      No Defaults.  At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(c)      Orders. (A) With respect to any Borrowing made in excess of the amount of Loans authorized to be borrowed under the Interim Order, the Final Order shall have been entered by the Bankruptcy Court no later than 35 days following the Interim Order (or such later date as approved by the Required Lenders in their sole discretion) and (B) with respect to any Credit Event after the Closing Date, (x) at the time of such Credit Event the Interim Order and the Final Order, as applicable, shall be in full force and effect, and shall not have been terminated, vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any manner materially adverse to the Administrative Agent or the Lenders and (y) if either the Interim Order or the Final order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Credit Party of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(d)      Anti-Hoarding.  In the case of any Borrowing made after the Closing Date, the amount of unrestricted cash of the Credit Parties as of close of business on the Business Day preceding the date of delivery of the Committed Loan Notice shall be no higher than $5,000,000 and the Administrative Agent shall have received a certificate from a Financial Officer to that effect.

(e)      Fees and Expenses of Administrative Agent and Lenders.  All fees and expenses required to be paid to the Administrative Agent and the Lenders on or before the date of such Borrowing shall have been, or concurrently with the date of such Borrowing are being, paid, in each case, subject to any relevant procedures set forth in the Orders.

(f)      Counsel and Advisor Fees.  The Borrower shall have paid all reasonable and documented out-of-pocket fees, charges and disbursements of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Orrick, Herrington & Sutcliffe LLP, Morrison & Foerster LLP,  Ashby & Geddes, P.A., MoloLamken LLP, Evercore Group L.L.C. and any local counsel in any relevant jurisdiction retained by the Lenders and the Administrative Agent (directly to such counsel if requested by the Lenders or Administrative Agent).

(g)      Committed Loan Notice.   The Borrower shall have delivered to the Administrative Agent a Committed Loan Notice.

(h)      "Second Day" Pleadings.  In the case of any Borrowing made after the Closing Date, the Administrative Agent and the Lenders shall have received copies of the "second day" pleadings and orders (if any) on at least three (3) days' notice prior to filing, and the relief requested in such "second day" pleadings and orders (except for the retention applications of Weil, Gotshal & Manges LLP, Guggenheim Securities, LLC, Alvarez & Marsal North America, LLC and Richards, Layton & Finger, P.A.) shall be reasonably acceptable in form and substance to the Required Lenders.


Each Committed Loan Notice (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of LIBO Rate Loans) submitted by a Borrower after the Closing Date shall be deemed to be a representation and warranty that the conditions specified in Section 5.2(a), (b), (d), (e), and (f) have been satisfied on and as of the date of the applicable Borrowing.

## ARTICLE 6

## Affirmative Covenants

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each of the Credit Parties covenants and agrees with the Lenders that:

6.1    **Financial Statements and Other Information**.  The Credit Parties will furnish to the Administrative Agent:

(a)    commencing with the fiscal year ending December 31, 2018, as soon as available and in any event no later than 120 days after the end of each fiscal year of the Credit Parties:

(i)    consolidated statements of income and consolidated statements of retained earnings and cash flows of the Credit Parties  for such fiscal year and the related consolidated balance sheet of the Credit Parties  as at the end of such fiscal year, setting forth in each case in comparative form the corresponding consolidated figures for the preceding fiscal year, and

(ii)    an opinion of independent certified public accountants of recognized national standing (without any qualification or exception as to the scope of such audit) stating that said consolidated financial statements referred to in the preceding clause (i) fairly present in all material respects the consolidated financial condition and results of operations of the Credit Parties as at the end of, and for, such fiscal year in accordance with GAAP,

(b)    as soon as available and in any event within no later than 50 days (or 60 days with respect to the fiscal quarter ended September 30, 2018) after the end of each quarterly fiscal period (including the fourth fiscal period) of each fiscal year of the Credit Parties:

(i)    consolidated statements of income of the Credit Parties  for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related consolidated balance sheet of the Credit Parties  as at the end of such period, and

(ii)    a certificate of a Financial Officer of the Credit Parties, which certificate shall state that said consolidated financial statements referred to in the preceding clause (i) fairly present, in all material respects, the consolidated financial condition and results of operations of the Credit Parties in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments and the omission of footnotes);

(c)    as soon as available, but in any event within 30 days after the end of each calendar month (commencing with the calendar month ending November 30, 2018), a consolidated balance sheet of the Credit Parties  as at the end of such calendar month, and the related consolidated statements of income or operations, changes in shareholders' equity, and cash flows

for such calendar month and for the portion of the Credit Parties' fiscal year then ended (together with consolidating balance sheet and statement of income or operations of the Credit Parties), certified by a Financial Officer of the Credit Parties, which certificate shall state that said consolidated financial statements referred to immediately above in this clause (c) fairly present, in all material respects, the consolidated financial condition and results of operations of the Credit Parties in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments and the omission of footnotes);

(d)     (i) For each Test Date a Budget Variance Report as of the end of the immediately preceding rolling four-week period and (ii) every fourth week after the Petition Date (or, at the option of the Borrower, at any other time), a DIP Budget setting forth on a weekly basis for the next thirteen weeks (commencing with the immediately succeeding calendar week) an updated budget for such period; *provided* that the Required Lenders, in their sole discretion, shall have the right to approve any updates or amendments contained in any budget delivered pursuant to this clause (ii) by providing the Borrower specific notice thereof within four (4) Business Days after the delivery by the Borrower of such updates or amendments; provided, further, that, (x) to the extent the Required Lenders provide such approval within such period of four (4) Business Days, the updates to or amendments of the DIP Budget shall constitute the DIP Budget upon the expiration of such period of four (4) Business Days, and (y) to the extent the Required Lenders do not provide such approval notice within such period of four (4) Business Days, then the DIP Budget in effect prior thereto, without giving effect to such updates or amendments, shall continue to constitute the DIP Budget until otherwise agreed to among the Borrower and the Required Lenders;

(e)     [Reserved];

(f)     [Reserved];

(g)     [Reserved];

(h)     promptly after the request by the Administrative Agent or any Lender, all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act; and

(i)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Credit Party, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may reasonably request.

6.2     **Notices of Material Events**.    The Credit Parties, promptly upon obtaining knowledge thereof, will furnish to the Administrative Agent, and upon request from any Lender, such Lender, written notice of the following:

(a)     the occurrence of any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)     the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any arbitrator or Governmental Authority, against or affecting any Credit Party or other Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect;

(c)     any judgment or judgments for the payment of money in excess of $2,500,000 in the aggregate (regardless of insurance coverage), shall be rendered by one or more courts, administrative tribunals or other bodies having jurisdiction against any Credit Party;

(d)     the occurrence of any ERISA Event related to the Plan of any Credit Party or knowledge after due inquiry of any ERISA Event related to a Plan of any other ERISA Affiliate that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Credit Parties in an aggregate amount exceeding $2,500,000;

(e)     the receipt by any Credit Party from the FCC or any other Governmental Authority of (i) any order or notice of the FCC or any other Governmental Authority or any court of competent jurisdiction which designates any Material FCC License or any other material license, permit or authorization of the Credit Parties, or any application therefore, for a hearing, or which refuses renewal or extension of, or revokes, materially modifies, terminates or suspends any Material FCC License or other material license, permit or authorization now or hereafter held by any Credit Party, or (ii) any notice of any competing application filed with respect to any Material FCC License or other material license, permit or authorization now or hereafter held by any Credit Party, or any material citation, material notice of violation or material order to show cause issued by the FCC or any other Governmental Authority with respect to any Credit Party;

(f)     any development that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect;

(g)     [reserved]; and

(h)     (i) as soon as reasonably practicable in advance of filing with the Bankruptcy Court or delivering to any statutory committee appointed in the Cases or the U.S. Trustee, as the case may be, the Final Order and all other proposed orders and pleadings related to the Loans and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto and (ii) by the earlier of (A) two Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than promptly after being filed) on behalf of any of the Debtors with the Bankruptcy Court or (B) at the same time as such documents are provided by any of the Debtors to any statutory committee appointed in the Cases or the U.S. Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Credit Parties or any of their Subsidiaries or other Indebtedness of the Credit Parties or any request for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure.

Each notice delivered under this Section 6.2 (other than pursuant to Section 6.2(h)) shall be accompanied by a statement of a Financial Officer or other executive officer of the Credit Parties

setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

6.3     **Existence; Conduct of Business**.  Each of the Credit Parties will do or cause to be done all things necessary in the exercise of its reasonable business judgment to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits and franchises material to the conduct of the business of the Credit Parties  taken as a whole; *provided* that (i) the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution or any discontinuance or sale of such business expressly permitted under Section 7.4 and (ii) no Credit Party  shall be required to preserve any such right, franchise, license or permit if the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Lenders.

6.4     **Payment of Obligations**.

(a)     Each of the Credit Parties will pay its obligations, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Credit Party  has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

(b)     Subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with applicable law, each Credit Party  shall pay, or shall cause to be paid, all Taxes due and payable that are imposed on or with respect to it, except to the extent that such Taxes are being contested in good faith by appropriate proceedings and for which such Credit Party  has set aside on its books adequate reserves with respect thereto in accordance with GAAP.  In furtherance of the foregoing, and notwithstanding any other provision herein to the contrary, the Borrower shall, so long as it files income Tax returns with Holdings on a consolidated, combined, affiliated, unitary or similar basis, be entitled to make distributions to Holdings in an amount equal to the combined U.S. federal, state and local income Taxes that would be paid by Borrower, together with its Subsidiaries, on a stand-alone basis, up to $500,000.

6.5     **Maintenance of Properties; Insurance**.  Each of the Credit Parties will (a) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted (other than obsolete, worn out or surplus equipment), and (b) maintain insurance, with financially sound and reputable insurance companies, as may be required by law, and such other insurance in such amounts and against such risks as are customarily maintained by companies of established reputation engaged in the same or similar businesses operating in the same or similar locations, including business interruption insurance and media perils insurance, in each case, in such amounts (after giving effect to self-insurance) with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such companies. Without limiting the generality of the foregoing, the Credit Parties will maintain or cause to be maintained (or provide evidence reasonably acceptable to the Required Lenders that such insurance is not available at a reasonable cost) (i) replacement value property insurance on the Collateral under such policies of insurance and (ii) the earthquake coverage which exists as of the Closing Date for so long as such coverage is generally available at commercially reasonable rates.  No later than fifteen (15) days after the Closing Date, such policies of insurance

with respect to the Credit Parties shall (x) name the Administrative Agent as additional insured thereunder as its interest may appear and (y) in the case of each business interruption and property insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to the Required Lenders that names the Administrative Agent for the benefit of the Secured Parties as the loss payee thereunder and provides for at least 30 days' prior written notice to the Administrative Agent of any modifications or cancellation of such policy except that only 10 days' prior written notice shall be required for cancellation for non-payment of premium. Administrative Agent may (but shall not have any obligation to), upon the failure of the Credit Parties to do so in accordance with the Loan Documents, purchase insurance on any Collateral and pay for the repair, maintenance or preservation thereof, and each Credit Party agrees to reimburse the Administrative Agent within ten (10) Business Days after written demand for any payments or expenses incurred by the Administrative Agent or the other Lenders pursuant to the foregoing authorization and any unreimbursed amounts shall constitute obligations under this Agreement for all purposes hereof.

6.6    **Books and Records; Inspection Rights**.  Each of the Credit Parties will keep proper books of record and account in which full, true and correct entries are made of all material dealings and transactions in relation to its business and activities which fairly record such transactions in all material respects and activities consistent with past practice.  Each of the Credit Parties will permit any representatives designated by the Administrative Agent or any Lender upon reasonable notice and at reasonable times during normal business hours to visit and inspect its properties and financial records, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with the officers thereof and independent accountants therefor.  The Credit Parties, in consultation with the Administrative Agent, if requested by the Administrative Agent, will arrange for a meeting to be held at least once every year with the Lenders and the Administrative Agent hereunder at which the business and operations of the Credit Parties are discussed.

6.7    **Fiscal Year**.  None of the Credit Parties will change its fiscal year or the method of determining the last day of the first three fiscal quarters in each of its fiscal years without the prior written consent of the Administrative Agent.

6.8    **Compliance with Laws, Maintenance of FCC Licenses**.  Except as otherwise excused by the Bankruptcy Court, each of the Credit Parties will comply with (i) the Patriot Act and the FCPA, (ii) all other laws, rules, regulations and orders of any Governmental Authority (excluding all Environmental Laws which are addressed in Section 6.12) and (iii) the terms of all FCC Licenses, except, in the case of clause (ii) or clause (iii), where the failure to do so individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Each Credit Party will file or cause to be filed all necessary applications for renewal of, and shall preserve in full force and effect all, Material FCC Licenses; *provided, however*, that any failure to preserve any Material FCC License in full force and effect which results either from (x) a Relocation or (y) any asset sale or other Disposition expressly permitted hereunder shall not constitute a breach of this Section 6.8.

6.9    **Use of Proceeds**.  The proceeds of the Loans will be used only for the purposes set forth in Section 4.21.

6.10    **Certain Obligations Respecting Guarantors and Collateral Security**.

(a)    <u>Additional Subsidiaries</u>.  The formation or acquisition of any new direct or indirect Subsidiary after the Closing Date shall occur only with the consent of the Required Lenders.  Upon (x) any Subsidiary becoming a Debtor under the Cases or (y) in the event that any Credit Party shall form or acquire any new Subsidiary after the Closing Date, such Credit Party will cause such new Subsidiary, within ten Business Days after such formation or acquisition:

(i)    to execute and deliver to the Administrative Agent the following documents: (1) a counterpart to this Agreement (and thereby to become a party to this Agreement, as a "Guarantor" hereunder) and (2) a counterpart to the Pledge Agreement and a counterpart to the Security Agreement (and thereby to become a party to each such agreement);

(ii)    upon the request of the Administrative Agent, to take such action (including delivering such shares of stock and executing and delivering such UCC financing statements) as shall be necessary to create and perfect valid and enforceable Liens on all assets and property of such Subsidiary consistent with the provisions of the applicable Collateral Agreements; and (iii) to deliver such proof of organizational action, incumbency of officers and other documents as is consistent with those delivered by each Credit Party pursuant to Section 5.1 at the Closing Date or as the Administrative Agent shall have reasonably requested.

Any actions taken in respect of the Collateral pursuant to this Section 6.10(a) shall supplement, and shall not limit, the security interests granted pursuant to the Orders.

(b)    <u>Ownership of Subsidiaries</u>.  Subject to Section 7.4, no Credit Party shall sell, transfer or otherwise dispose of any shares of stock or other equity interests in any Subsidiary owned by it, nor issue or permit any Subsidiary, to issue, any shares of stock of any class or other equity interests whatsoever to any Person, except that any Credit Party  may issue stock or equity to another Credit Party; *provided* that such stock or equity is pledged to the Administrative Agent as set forth below. Subject to Section 7.4, each of the Credit Parties will cause each of its Subsidiaries to take such action from time to time as shall be necessary to ensure that the percentage of the equity capital of any class or character owned by such Credit Party in any Subsidiary on the Closing Date (or, in the case of any newly formed or newly acquired Subsidiary, on the date of formation or acquisition) is not at any time decreased, other than by reason of transfers to another Credit Party.  Upon the request of the Administrative Agent, in the event that any additional shares of stock or other equity interests shall be issued by any Credit Party  (other than issuance by the Borrower of its capital stock to any Holding Company), the respective holder of such shares of stock or other equity interests shall forthwith deliver to the Administrative Agent pursuant to the Pledge Agreement the certificates evidencing such shares of stock, accompanied by undated stock powers executed in blank, and shall take such other action as the Administrative Agent shall request to perfect the security interest created therein pursuant to such pledge agreement.  Any actions taken in respect of the Collateral pursuant to this Section 6.10(b) shall supplement, and shall not limit, the security interests granted pursuant to the Orders.

(c) _Further Assurance_. Each Credit Party will execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, mortgages, deeds of trust and control agreements) that may be required under applicable law, or that the Required Lenders or the Administrative Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority of the security interests created or intended to be created by the Loan Documents, the Interim Order or the Final Order. Without limiting the foregoing and the terms of the Security Documents, the Interim Order or the Final Order, upon the acquisition by any Credit Party after the Closing Date of any assets, including, but not limited to, any after-acquired owned real property, such Credit Party shall execute and deliver such mortgages, deeds of trust, security instruments, and financing statements, certificates and opinions of counsel (where applicable) as may be necessary to vest in the Administrative Agent, a perfected security interest in such after-acquired property and to have such after-acquired property added to the Collateral, and thereupon all provisions of this Agreement and the other Loan Documents relating to the Collateral shall be deemed to relate to such after-acquired property to the same extent and with the same force and effect, including the delivery of title insurance, surveys and opinions of counsel (where applicable) with respect to such after-acquired owned real property.

6.11 **ERISA**. Except where a failure to comply with any of the following, individually or in the aggregate, would not or could not reasonably be expected to result in a Material Adverse Effect, (i) to the extent applicable, the Credit Parties will maintain, and cause each ERISA Affiliate to maintain, each Plan of any Credit Party or any ERISA Affiliate in compliance with all applicable requirements of ERISA and of the Code and with all applicable rulings and regulations issued under the provisions of ERISA and of the Code and (ii) the Credit Parties will not and, to the extent they have the authority to do so, will not permit any of the ERISA Affiliates to (a) engage in any transaction with respect to any Plan which would subject any Credit Party to either a civil penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Code, (b) fail to make full payment when due of all amounts which, under the provisions of any Plan, any of the Credit Parties or any ERISA Affiliate is required to pay as contributions thereto, or permit to exist any accumulated funding deficiency (as such term is defined in Section 302 of ERISA and Section 412 of the Code), whether or not waived, with respect to any Pension Plan or (c) fail to make any payments to any Multiemployer Plan that any of the Credit Parties or any of the ERISA Affiliates may be required to make under any agreement relating to such Multiemployer Plan or any law pertaining thereto.

6.12 **Environmental Matters; Reporting**. The Credit Parties will observe and comply with, and cause each Affiliate to observe and comply with all Environmental Laws and other laws, rules, regulations and orders of any government or government agency relating to health, safety, pollution, hazardous materials or other environmental matters to the extent noncompliance, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. The Credit Parties will give the Administrative Agent prompt written notice of any violation as to any environmental matter by any Credit Party or Affiliate and of the commencement of any judicial or administrative proceeding relating to health, safety or environmental matters (a) in which an adverse result would have a material adverse effect on any operating permits, air emission permits, water discharge permits, hazardous waste permits or other permits held by any Credit Party or Affiliate which are material to the operations of such Credit Party or Affiliate, or (b) which could

reasonably be expected to have a Material Adverse Effect on such Credit Party or Affiliate to any Person or which will require a material expenditure by such Credit Party or Affiliate to cure any alleged problem or violation.

6.13    **[Reserved]**.

6.14    **Certain Case Milestones**.  The Credit Parties shall (unless waived or extended with the consent of the Required Lenders):

(a)    on the Petition Date, file a motion, in form and substance reasonably satisfactory to the Lenders, seeking approval of the Term Facility;

(b)    not later than five (5) Business Days after the Petition Date, obtain the entry of the Interim Order, approving the Term Facility on an interim basis, in form and substance satisfactory to the Lenders;

(c)    no later than 35 calendar days after the Petition Date, obtain the entry of the Final Order approving the Term Facility on a final basis, in form and substance satisfactory to the Required Lenders;

(d)    not later than 90 calendar days after the Petition Date, obtain the entry of an order approving a disclosure statement reasonably satisfactory to the Pre-Petition First Lien Secured Parties;

(e)    no later than 150 calendar days after the Petition Date, obtain the entry of an order confirming the Acceptable Plan of Reorganization (the "Confirmation Date");

(f)    no later than 180 calendar days after the Petition Date, the effective date of the Acceptable Plan of Reorganization shall have occurred.

6.15    **First and Second Day Orders**.  The Credit Parties shall cause all proposed "first day" orders, "second day" orders (except for the retention applications of Weil, Gotshal & Manges LLP, Guggenheim Securities, LLC, Alvarez & Marsal North America, LLC and Richards, Layton & Finger, P.A.) and all other material orders that (a) impair or impact the Lenders' rights under the Loan Documents or Orders, or (b) provide for the repayment of the Obligations, in each case, to be reasonably acceptable to the Required Lenders in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and expressly permitted by the terms of this Agreement.

## ARTICLE 7

## Negative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, the Credit Parties covenant and agree with the Administrative Agent and the Lenders that:

7.1    **Indebtedness**.  The Credit Parties and their Subsidiaries shall not create, incur, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness created under the Loan Documents;

(b)    Indebtedness existing on the Closing Date which is set forth in Schedule 7.1;

(c)    Unsecured Indebtedness of any Credit Party to any other Credit Party, to the extent permitted by Section 7.5;

(d)    [Reserved];

(e)    [Reserved];

(f)    [Reserved];

(g)    Indebtedness of the Credit Parties  (determined on a consolidated basis without duplication in accordance with GAAP) consisting of Capital Lease Obligations (x) of up to $2,000,000 in connection with a Relocation and (y) otherwise in an aggregate principal amount not to exceed $500,000;

(h)    Indebtedness of the Credit Parties  (i) under any Hedging Agreement entered into for bona fide hedging purposes of the Credit Parties or (ii) arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within 15 days after incurrence thereof;

(i)    Indebtedness of the Credit Parties  arising from guaranties of Indebtedness of any Credit Party expressly permitted under this Section;

(j)    agreements providing for indemnification, adjustment of purchase price or similar customary obligations, in each case incurred or assumed in connection with the acquisition or disposition of any business or assets expressly permitted by this Agreement;

(k)    Indebtedness constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business in an aggregate face amount not to exceed $2,000,000; *provided* that such obligations are reimbursed within 30 days following drawing or incurrence thereof;

(l)    Indebtedness under performance and surety bonds and completion guarantees and with respect to workers' compensation claims, in each case incurred in the ordinary course of business;

(m)    [Reserved];

(n)    [Reserved];

- 64 -

(o)    [Reserved];

(p)    [Reserved]; and

(q)    In addition to the foregoing, unsecured Indebtedness in an aggregate principal amount not exceeding $1,000,000 at any time outstanding.

7.2    **Liens**.  No Credit Party or Subsidiary will create, incur, assume or permit to exist any Lien in favor of any other Person on any Property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except (the following being called "Permitted Liens"):

(a)    Liens in favor of the Administrative Agent created pursuant to any Loan Document or created pursuant to any Order;

(b)    (i) Liens with respect to the Existing First Lien Indenture and Existing Second Lien Indenture and (ii) other Liens on any property or asset of any Credit Party or Subsidiary existing on the Closing Date and set forth in Schedule 7.2(b); *provided* that such Liens shall secure only those obligations which they secure on the Closing Date;

(c)    Liens for Taxes if the conditions set forth in Section 6.4(b) are satisfied or the obligations with respect to such Taxes are not yet due and payable;

(d)    landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens, and vendors' Liens imposed by statute or common law not securing the repayment of Indebtedness, arising in the ordinary course of business which are not overdue for a period of more than 60 days or which are being contested in good faith and by appropriate proceedings and Liens securing judgments (including pre-judgment attachments) but only to the extent of such judgment, for an amount and for a period not resulting in an Event of Default;

(e)    pledges or deposits under worker's compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers under insurance or self-insurance agreements, in each case, made in the ordinary course of business;

(f)    pledges and deposits to secure the performance of bids, tenders, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; *provided* that the sum of the aggregate amount of obligations secured thereby and the aggregate amount of such deposits and Liens shall not exceed $1,000,000 outstanding at any time, unless such amount is permitted for such period by the applicable DIP Budget;

(g)    zoning restrictions, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, easements, licenses, restrictions on the use of Property or minor imperfections in title thereto which, in the aggregate, are not material in amount, and which do not and will not materially interfere with the ordinary conduct of the business of any Credit Party;

(h)      Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, and (ii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking;

(i)       Liens on tangible property, including real or personal property, acquired, constructed or improved by any Credit Party; *provided* that (A) such Liens secure Indebtedness (including Capital Lease Obligations) expressly permitted by Section 7.1(g), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets, and (D) such security interests shall not apply to any other property or assets of any Credit Party or Subsidiary;

(j)       Liens securing reimbursement obligations with respect to letters of credit which encumber documents and other property relating to letters of credit and products and proceeds thereof, so long as the aggregate amount of such reimbursement obligations does not to exceed $2,000,000 at any time outstanding;

(k)      Uniform Commercial Code financing statement filings with respect to Property leased by the Credit Parties (other than Capital Lease Obligations);

(l)       Assignments of uncollectible accounts receivable to collection agencies in the ordinary course of business;

(m)     [Reserved];

(n)      any interest or title of a lessor or sublessor under any lease of real estate expressly permitted hereunder;

(o)      Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in the ordinary course of business and in connection with any letter of intent or purchase agreement expressly permitted hereunder;

(p)      licenses of patents, trademarks and other intellectual property rights granted by the Borrower or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of the Borrower or such Subsidiary;

(q)      [Reserved];

(r)       [Reserved];

(s)      customary Liens for the fees, costs and expenses of trustees and escrow agents pursuant to the indenture, escrow agreements and similar arrangements;

(t)       Liens in favor of customs and revenue authorities arising as a matter of law and in the ordinary course of business to secure payment of customs duties in connection with the importation of goods;

(u)    Liens on cash deposits to secure Indebtedness expressly permitted by Section 7.1(k); and

(v)    other Liens securing obligations in an aggregate amount not to exceed $500,000 at any time outstanding.

Notwithstanding the foregoing, no consensual Liens shall exist on equity interests that constitute Collateral other than pursuant to clause (a) or (b).

7.3    **Sale and Lease-Back Transactions**.    No Credit Party will enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred unless (a) the sale or transfer of such property is permitted by Section 7.4 and (b) any Capital Lease Obligations or Liens arising in connection therewith are permitted by Sections 7.1 and 7.2, as the case may be.

7.4    **Fundamental Changes; Asset Sales**.    No Credit Party will enter into any transaction of merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution) (other than in connection with an Acceptable Plan of Reorganization).  No Credit Party will effect any Disposition or Relocation or acquire any business or property from, or capital stock of, or other equity interests in, or be a party to any acquisition (including any Acquisition) of, any Person except for purchases by any Credit Party  of property to be used in the ordinary course of business, Investments  permitted hereunder, Capital Expenditures  expressly permitted hereunder, and Acquisitions expressly permitted hereunder.  No Credit Party will convey, sell, lease, transfer or otherwise dispose (including any Disposition) of, in one transaction or a series of transactions, any part of its business or property (including receivables and leasehold interests); *provided* that a Credit Party may (1) lease or sublease real property to the extent such lease or sublease would not materially interfere with the operation of the businesses of the Credit Parties and (2) enter into any sale, lease, transfer or other disposition described clauses (a) through (j) of the definition of Disposition. The Lenders and the Administrative Agent (as the case may be) at the Borrower's expense hereby agree to complete, execute and deliver to the Borrower, upon reasonable prior written notice to the Administrative Agent and upon provision by the Borrower of a draft of such instrument, any release or termination of security interest required to permit the applicable Credit Party conveying, selling, leasing, transferring or otherwise disposing of any part of its property pursuant to and in accordance with this Agreement to convey, sell, lease, transfer or otherwise dispose of such property free and clear of any Lien under the Collateral Agreements.

(a)    The Credit Parties shall be permitted to sell, lease or assign:

(i)    obsolete or worn-out property (including leasehold interests), tools or equipment no longer used or useful in its business,

(ii)    any inventory or other property sold or disposed of in the ordinary course of business and on ordinary business terms,

(iii)    interests in real property by lease entered into in the ordinary course of business,

(iv)    the surrender of waiver of contractual rights or the settlement, release or surrender of contracts or tort claims in the ordinary course of business,

(v)    Dispositions (including, without limitation, sale-leasebacks on customary terms); *provided* (1) the consideration received for such assets shall be in an amount at least equal to the Fair Market Value thereof (determined in good faith by the senior management of the Borrower) and (2) no less than 75% thereof shall be paid in cash or Cash Equivalents; provided further that the aggregate amount of Net Cash Payments received by the Credit Parties as consideration for Dispositions consummated pursuant to this clause (v) shall not exceed $1,000,000 in the aggregate; or

(vi)    any sales or other dispositions of assets that do not constitute a Disposition.

(b)    The Credit Parties shall be permitted to effect any Relocation, *provided* that the following conditions have been satisfied:

(i)    Such Voluntary Relocation shall not, as determined on the date of the consummation of such Voluntary Relocation, have a material adverse effect on the business, assets, operations or financial condition of the Credit Parties, taken as a whole;

(ii)    The Credit Parties shall give 30 days' prior written notice to the Administrative Agent of the proposed Relocation, which notice shall include a description of all material aspects of the Relocation including the consideration to be received by any Credit Party in connection therewith;

(iii)    To the extent any representation or warranty herein makes reference to one or more of the Schedules to this Agreement, the Credit Parties shall make revisions to such Schedules, in each case as of the date of the consummation of any Relocation and notwithstanding that such representation or warranty may expressly state that it is made as of an earlier date, reasonably acceptable to the Required Lenders, solely to take into account the consummation of such Relocation; and

(iv)    In connection with any Involuntary Relocation the Credit Parties shall use their best efforts to receive only cash consideration therefor.

7.5    **Investments; Hedging Agreements**.  No Credit Party will make or permit to remain outstanding any Investment, except in the case of any Credit Party:

(a)    Investments outstanding on the Closing Date and as set forth on <u>Schedule 4.12</u> or <u>4.14(a)</u> hereto;

(b)    advances, loans and extensions of credit to any director, officer or employee of a Credit Party, Investments by the Credit Parties in connection with the satisfaction of accounts

receivable or other Indebtedness due from a customer of a Credit Party or claims due and owing to the Credit Parties or otherwise for the benefit of the business of the Credit Parties; *provided* that the maximum aggregate principal amount of any Investments expressly permitted under this subsection (b) shall not exceed $50,000 in the aggregate (determined without regard to any (i) write-downs or write-offs of such Investments and (ii) returns on such Investments that are not made in cash);

(c)    Permitted Investments;

(d)    Investments (i) in any deferred payment obligations or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors or in satisfaction of judgments and (ii) resulting from deposits, prepayments and other credits to suppliers, or otherwise made in connection with workers compensation, utility, leases and similar deposits, in any case, made in the ordinary course of business;

(e)    extensions of trade credit in the ordinary course of business;

(f)    Investments constituting non-cash consideration received by the Borrower or any Subsidiary in connection with any Disposition (or other disposition not constituting a Disposition) otherwise expressly permitted hereunder;

(g)    Investments arising in connection with Hedging Agreements entered into in the ordinary course of business and for bona fide hedging purposes to hedge or mitigate risks to which any Credit Party is exposed in the conduct of its business or the management of its liabilities and not for speculation;

(h)    Checking and deposit accounts used in the ordinary course of business;

(i)    [Reserved];

(j)    the Borrower and its Subsidiaries may continue to own the Investments owned by them as of the Closing Date and described in Schedule 7.5 annexed hereto;

(k)    [Reserved];

(l)    the Credit Parties may accept promissory notes, debt or equity securities or other Investments as consideration in any Relocation, the aggregate amount of which received after the Petition Date shall not exceed $1,000,000; *provided*, that the Credit Parties may accept promissory notes, debt or equity securities or other Investments as consideration in an Involuntary Relocation in excess of such amount so long as the receipt of such excess Investments would not result in a Material Adverse Effect;

(m)    [Reserved]; and

(n)    Investments in the ordinary course of business consisting of endorsements for collection or deposit;

(o)    [Reserved]; and

(p)        additional Investments not referred to in any other clause of this Section 7.5, *provided* that (i) the aggregate amount of such Investments at any time outstanding made on or after the Closing Date (net of any returns of capital with respect thereto) shall not exceed $500,000 in the aggregate and (ii) at the time of making any such Investment, no Default shall have occurred or be continuing or would result therefrom.

Notwithstanding anything in the foregoing to the contrary, no Credit Party shall make Investments in Subsidiaries of the Borrower that are not Guarantors.

7.6        **Restricted Junior Payments and Prepayments of Indebtedness.**    Except as expressly permitted by the terms and conditions set forth in the Orders, and subject to Section 6.4(b), no Credit Party will declare or make any Restricted Junior Payment.  Except as expressly permitted by the terms and conditions set forth in the Orders or this Section 7.6, no Credit Party shall, directly or indirectly, repay, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any post-petition Indebtedness or any Indebtedness existing on the Petition Date, except, in the case of such Indebtedness in existence on the Petition Date, (a) as expressly provided for in any order entered by the Bankruptcy Court that is acceptable to the Required Lenders, (b) payments that are made substantially simultaneous with or following the termination of the Commitments and the repayment of the obligations in cash in full, and (c) Restricted Junior Payments and payments of other Indebtedness in an amount not to exceed $250,000.

7.7        **Transactions with Affiliates**.  Except as expressly permitted by this Agreement (including pursuant to any of the Sections of Articles 6 or 7), no Credit Party will directly or indirectly (a) make any Investment in an Affiliate; (b) transfer, sell, lease, assign or otherwise dispose of any property to an Affiliate; (c) merge into or consolidate with an Affiliate, or purchase or acquire property from an Affiliate; or (d) enter into any other transaction directly or indirectly with or for the benefit of an Affiliate (including guarantees and assumptions of obligations of an Affiliate), in each case for clauses (a) through (d), other than (x) in the ordinary course of such Credit Party's  business (other than in connection with an Acceptable Plan of Reorganization) and (y) on fair and reasonable terms no less favorable to such Credit Party  than those that might reasonably be obtained at the time from a Person who is not such an Affiliate; *provided* that the foregoing restriction shall not apply to the following:

(i)        any Affiliate who is an individual may serve as a director, officer, employee or consultant of any Credit Party, receive customary compensation for his or her services in such capacity and benefit from Investments to the extent specified in Section 7.5(b);

(ii)        the Credit Parties may engage in and continue the transactions with or for the benefit of Affiliates which are described in Schedule 7.7; *provided,* that with respect to any such transaction involving the payment by a Credit Party of consideration in excess of $100,000, the Credit Parties shall provide adequate documentary and other evidence reasonably satisfactory to the Required Lenders that the terms of such transaction satisfy the immediately preceding proviso;

(iii)    transactions with Affiliates authorized or approved pursuant to (x) the Interim Order, and, when applicable, the Final Order, or any "first day" order or (y) any other order entered by the Bankruptcy Court without the objection of the Administrative Agent; provided, for the avoidance of doubt, that such objection need not be filed with the Bankruptcy Court if communicated in writing to the Borrower; and

(iv)    any transaction between or among the Credit Parties.

7.8    **Restrictive Agreements**.  Other than pursuant to an order of the Bankruptcy Court or the Bankruptcy Code, no Credit Party will,  directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement (other than this Agreement)) that prohibits, restricts or imposes any condition upon (a) the ability of any Credit Party  to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or other equity interests or to make or repay loans or advances to any other Credit Party; *provided* that (i) the foregoing shall not apply to restrictions and conditions existing on the Closing Date identified on Schedule 7.8 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (ii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness expressly permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) the foregoing shall not apply to restrictions in agreements evidencing Indebtedness expressly permitted by Section 7.1(g) that impose restrictions on the property so acquired, and (iv) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

7.9    **[Reserved]**.

7.10    **Financial Covenant**.  As of any Test Date, the Borrower shall not permit any Variance to exist other than a Permitted Variance.

7.11    **Lines of Business; Restrictions on the Borrower**.  No Credit Party will engage to any substantial extent in any line or lines of business activity other than (i) the Permitted Lines of Business, and (ii) such other lines of business as may be consented to by the Required Lenders and the Administrative Agent.

7.12    **Other Indebtedness and Agreements**.   Permit (a) any waiver, supplement, modification, amendment, termination or release of any indenture, instrument or agreement pursuant to which any Material Indebtedness of any Credit Party or any of its Subsidiaries is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release would materially increase the obligations of the obligor or confer additional material rights on the holder of such Indebtedness in a manner adverse to the Lenders or (b) any waiver, supplement, modification or amendment of its certificate of incorporation, by-laws, operating, management or partnership agreement or other organizational documents, to the extent any such waiver, supplement, modification or amendment would be materially adverse to the Lenders.

7.13    **Subsidiaries**.

(a)     Create or acquire any new Subsidiary without the consent of the Administrative Agent and the Required Lenders.

(b)     Create, acquire or maintain any Subsidiary that is a Foreign Subsidiary.

7.14     **[Reserved]**.

7.15     **[Reserved]**.

7.16     **License Subsidiaries**.

(a)     Other than ancillary FCC Licenses owned by Empire Burbank (none of which are Material FCC Licenses), the Credit Parties will cause each FCC License which is owned or acquired by any Credit Party to be held in a License Subsidiary at all times.

(b)     The Credit Parties shall not allow any License Subsidiary to (i) own any right, franchise or other asset except for FCC Licenses transferred to it by a Credit Party and FCC Licenses acquired by it directly or (ii) engage in any business or make any Investment other than holding such FCC Licenses and activities incidental thereto; *provided* that nothing herein shall prohibit any License Subsidiary from (x) entering into and performing under management agreements in form reasonably acceptable to the Required Lenders with one or more Credit Parties pursuant to which such License Subsidiary licenses to such Credit Parties for royalty payments the FCC Licenses owned by such License Subsidiary and pursuant to which such Credit Parties agree to operate their stations in accordance with policies established by such License Subsidiary and in accordance with FCC Regulations and (y) engaging in business incidental thereto. The rights of each License Subsidiary and each operating Subsidiary under each such management agreement shall constitute Collateral and at the request of the Administrative Agent upon the occurrence and during the continuation of an Event of Default and upon the occurrence and during the continuance of any event allowing the License Subsidiary the authority to terminate such agreement, the License Subsidiary shall cause such termination to occur.

(c)     Notwithstanding the foregoing, no License Subsidiary shall be permitted, under any circumstances, to create, incur, assume or suffer to exist:

(i)     any Indebtedness (other than Indebtedness (x) under the Loan Documents or (y) existing on the Closing Date and set forth on Schedule 7.16);

(ii)     any Lien, other than Liens created under the Loan Documents or Liens expressly permitted pursuant to clauses (a), (b), (c), (d), (h), (p), (s) and (u) of Section 7.2; and

(iii)     any Guarantee (other than any Guarantee (x) under the Loan Documents or (y) existing on the Closing Date and set forth on Schedule 7.16).

## ARTICLE 8

### Events of Default

8.1    **Events of Default**.  Any of the following from and after the date hereof shall constitute an event of default (an "Event of Default"):

(a)    the Credit Parties shall fail to pay to the Administrative Agent or the Lenders (i) any principal of any Loan when the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration of such due or prepayment date, or otherwise or (ii) any interest on any Loan, any other amount payable by a Credit Party under any Loan Document or any fee payable by a Credit Party under any Loan Document (including the Exit Fee), in the case of this clause (ii), within three Business Days after the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration of such due or prepayment date, or otherwise;

(b)    any representation or warranty made or deemed made by or on behalf of any Credit Party in or in connection with this Agreement or any amendment or modification hereof or of any Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification hereof or of any Loan Document, shall prove to have been incorrect in any material respect when made, deemed made or furnished;

(c)    (i) any Credit Party (to the extent applicable) shall fail to observe or perform any covenant, condition or agreement contained in Sections 6.2(a), 6.3, 6.9, 6.13, 6.14 or 6.15 or in Article 7 or (ii) any Credit Party (to the extent applicable) shall fail to observe or perform any other covenant, condition or agreement contained in Article 6 and such failure described in this clause (ii) shall continue unremedied for a period of ten (10) days after the earlier of (x) knowledge thereof by any Credit Party and (y) notice thereof from the Administrative Agent (given at the request of any Lender) to the Borrower;

(d)    any Credit Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clauses (a), (b) or (c) of this Section) or any other Loan Document, and such failure shall continue unremedied for a period of 30 days after the earlier of (x) knowledge thereof by any Credit Party and (y) notice thereof from the Administrative Agent (given at the request of any Lender) to the Borrower;

(e)    (i) any Credit Party or any of their respective Subsidiaries shall default in any payment of principal or interest, regardless of the amount, due in respect of any Indebtedness in excess of $2,500,000 (other than the obligations under the Loan Documents) beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created, and whether or not such default has been waived by the holders of such Indebtedness; or (ii) breach or default by any Credit Party  with respect to any other term of (x) one or more items of such Indebtedness or (y) any loan agreement, mortgage, indenture or other agreement relating to such items(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee on behalf of such holder or holders), to cause, such Indebtedness to

become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; *provided* that this paragraph (e) shall not apply to any Indebtedness outstanding hereunder and any Indebtedness of any Debtor that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Debtor) unless such Indebtedness has been accelerated and the enforcement of remedies with respect to such Indebtedness shall not have been stayed by the commencement of the Cases;

(f)     [Reserved];

(g)     [Reserved];

(h)     [Reserved];

(i)     [Reserved];

(j)     one or more judgments shall be rendered against any Credit Party (which of the Credit Parties, arose post-petition) and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties or any Subsidiary to enforce any such judgment and such judgment either (i) is for the payment of money in an aggregate amount in excess of $2,500,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) or (ii) is for injunctive relief and could reasonably be expected to result in a Material Adverse Effect;

(k)     an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in (i) liability of the Borrower and its ERISA Affiliates in an aggregate amount exceeding $2,500,000 or (ii) a Material Adverse Effect;

(l)     any Change of Control shall have occurred;

(m)     any of the following shall occur: (i) any security interest purported to be created by the Orders or any Collateral Agreement shall cease to be, or shall be asserted by any Credit Party not to be, a valid, perfected, first priority security interest in the securities, assets or properties covered thereby; (ii) any Collateral Agreement is held in any judicial proceeding to be unenforceable or invalid in any material respect or ceases for any reason to be in full force and effect in any material respect, other than in accordance with the terms of the relevant Collateral Agreement and except solely as a result of any action taken or not taken by the Administrative Agent that was required to be taken or not taken by the Administrative Agent pursuant to the Collateral Agreements, (iii) except for expiration in accordance with its respective terms, any Order or Collateral Agreement shall for whatever reason be terminated, or shall cease to be in full force and effect; or (iv) the enforceability of any Order or Collateral Agreement shall be contested by any Credit Party;

(n)     (i) any Guarantee provided under Article III for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny that it has any further liability in connection with such Guarantee or (ii) any Credit Party shall assert

that the obligations of such Credit Party hereunder, under any other Loan Document or under the Orders or the Collateral Agreements shall be invalid or unenforceable;

(o)     [Reserved];

(p)     other than in connection with any Relocation, except any such Relocation which causes a Material Adverse Effect, any Credit Party shall (i) lose, fail to keep in force, suffer the termination, suspension or revocation of, or terminate or forfeit, any Material FCC License(s), or (ii) suffer any adverse amendment to any FCC License(s) if, in the case of this clause (ii), the same could reasonably be expected to result in a Material Adverse Effect; or

(q)     any Credit Party shall permit its on-the-air broadcast operations to be interrupted at any time for more than seven days, whether or not consecutive, during any period of ten consecutive days, if such interruption is likely to have a Material Adverse Effect (after giving effect to any applicable business interruption insurance) unless (and only so long as), substantially all damages, liabilities and other effects of such interruption of service (including any adverse effect on the Credit Parties' ability to perform its obligations under this Agreement) are fully covered by business interruption insurance;

(r)     Cases.

(i)     Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtors shall file a motion or other pleading seeking the dismissal of any of the Cases of the Debtors under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Required Lenders or (ii) a trustee under Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors and the order appointing such trustee or examiner shall not be reversed or vacated within (30) days after the entry thereof (or the Credit Parties shall have acquiesced to the entry of such order) unless consented to by the Required Lenders; or

(ii)     An application shall be filed by any Debtor for the approval of any Other Superpriority Claim, or an order of the Bankruptcy Court shall be entered granting any Other Superpriority Claim (other than with respect to (a) the Carve-Out in any of the Cases or (b) any application or order that provides for immediate indefeasible payment in full in cash of the obligations under the Loan Documents (other than contingent indemnification or reimbursement obligations not then due)) that is *pari passu* with or senior to the claims of the Administrative Agent and the Lenders against any Borrower or any other Credit Party hereunder or under any of the other Loan Documents, or there shall arise or otherwise be granted any such *pari passu* or senior Other Superpriority Claim, in each case other than Superpriority Claims or other than with respect to the Carve-Out and the Liens permitted to have such priority under the Loan Documents and the Orders, the Credit Parties shall create or incur, or the Bankruptcy Court enters an order granting, any Lien which is *pari passu* with or senior to any Liens under the Loan Documents or the adequate protection Liens granted under the Interim Order; or

(iii)    The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code (or equivalent) so as to (A) permit a third party to proceed on any assets of any of the Debtors which have a value in excess of $2,000,000 in the aggregate, (B) permit other actions that could reasonably be expected to have a Material Adverse Effect on the Debtors or their estates (taken as a whole) or (C) allow any material pre-petition litigation to continue with respect to such Debtor outside of the Bankruptcy Court; or

(iv)    The Bankruptcy Court shall enter an order in any of the Cases denying or terminating use of cash collateral by the Credit Parties;

(v)    (i) any sale of the equity interests of the Borrower or any of its Subsidiaries, or any Disposition of all or a material portion of all of the Collateral pursuant to sections 363 or 1129 of the Bankruptcy Code other than as permitted by the Interim Order or the Final Order, or (ii) the entry of any order by the Bankruptcy Court providing for the same, unless in the case of the foregoing clause (ii) only, such order provides that in connection and concurrently with such transaction, the proceeds of such sale shall be used to satisfy, in full and in cash, the obligations (other than contingent indemnification or reimbursement obligations not then due) under the Loan Documents;

(vi)    (A) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying (for a period of seven (7) days or more), vacating or otherwise amending, supplementing or modifying the Interim Order or Final Order, or any Credit Party shall apply for the authority to do so, in each case in a manner that is materially adverse to the Administrative Agent or the Lenders, without the prior written consent of the Administrative Agent and the Required Lenders; (B) an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Credit Parties and the Credit Parties shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Administrative Agent (with the consent of the Required Lenders); (C) the Interim Order (prior to the entry of the Final Order) or Final Order (at all times thereafter) shall cease to create a valid and perfected Lien on the Collateral with the priority required by the Orders or Collateral Arrangements or to be in full force and effect; (D) without the written consent of the Administrative Agent and the Required Lenders (not to be unreasonably withheld, conditioned or delated), the entry of an order in any of the Cases granting adequate protection to any other Person (other than the Pre-Petition First Lien Secured Parties and Pre-Petition Second Lien Secured Parties, as contemplated by the Orders); (E) an order shall have been entered by the Bankruptcy Court modifying the adequate protection obligations granted in any Order without the prior written consent of the Administrative Agent and the Required Lenders, (F) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the obligations under the Loan Documents, (G) any Credit Party shall file a motion or other request with the Bankruptcy Court seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not provide for termination of the Commitments and indefeasible payment in full in cash of the obligations (other than contingent indemnity obligations not then due) under the Loan Documents (without the prior consent of the Administrative Agent and the Required Lenders) or (H)

other than with respect to the Carve-Out, a final non-appealable order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders; or

(vii)    Except as permitted by the Orders or as otherwise agreed to by the Administrative Agent and the Required Lenders, any Debtor shall make any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with the "first day" orders of the Bankruptcy Court; or

(viii)    A plan of reorganization that is not an Acceptable Plan of Reorganization shall be (i) confirmed by any Person or (ii) confirmed or filed by any Credit Party in any of the Cases of the Debtors, or any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for termination of the Commitments and indefeasible payment in full in cash of the obligations under the Loan Documents and continuation of the Liens with respect thereto until the effectiveness thereof (other than contingent indemnity obligations not then due), or any of the Debtors shall seek confirmation of any such plan or entry of any such order; or

(ix)    Any Credit Party or other Subsidiary shall take any action in support of any matter set forth in paragraphs (i)-(viii) above or in support of any filing by any Person of a plan of reorganization that is not an Acceptable Plan of Reorganization or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal, in each case unless the Administrative Agent (with the consent of the Required Lenders) consents to such action; or

(x)    Any of the Credit Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Credit Party or by oral argument) any motion to, (1) disallow in whole or in part any of the obligations arising under this Agreement or any other Loan Document, (2) disallow in whole or in part any of the Indebtedness owed by the Credit Parties under the Existing First Lien Indenture Documents, (3) challenge the validity and enforceability of the Liens or security interests granted under any of the Loan Documents or in any Order in favor of the Administrative Agent, or (4) challenge the validity and enforceability of the Liens or security interests granted under the Existing Indenture First Lien Documents or in any Order in favor of the Existing First Lien Indenture Trustee or Existing First Lien Indenture Holders; or

(xi)    Termination or expiration of any exclusivity period for any Credit Party to file or solicit acceptances for a plan of reorganization; or

(xii)    Noncompliance by any Credit Party with the terms of the Interim Order or the Final Order.

8.2    **Remedies Upon Event of Default**.  Subject to the Orders, if any Event of Default occurs and is continuing, the Administrative Agent may and at the request of the Required Lenders, shall, take any or all of the following actions set forth in sub-sections (i) through (iii) hereof:

(i)    declare the unused commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(iii)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law (including the Orders); provided, that with respect to the enforcement of Liens or other remedies with respect to the Collateral of the Credit Parties under the proceeding clause (iii), the Administrative Agent shall provide the Borrower and the U.S. Trustee for the District of Delaware with five (5) Business Days' written notice prior to taking the action contemplated thereby (in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing).

Each Lender party hereto as of the Closing Date which is a lender under the Existing First Lien Indenture hereby irrevocably directs the Existing First Lien Indenture Trustee to comply with the terms of the Interim Order and the Final Order, as applicable, including paragraph 10 of the Interim Order and any corresponding provision in the Final Order.

## ARTICLE 9

### The Administrative Agent

9.1    **Appointment and Authorization**.

(a)    Each of the Lenders hereby irrevocably appoints the Administrative Agent as its administrative agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, including executing this Agreement and the other Loan Document and amendments, waivers and consents thereto, together with such actions and powers as are reasonably incidental thereto.

(b)    Each Lender authorizes and directs the Administrative Agent to enter into the Collateral Agreements and any amendments thereto. Any action taken by the Administrative Agent in accordance with the terms of this Agreement relating to the Collateral, and the exercise by the Administrative Agent of its powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Secured Parties.

9.2    **Administrative Agent's Rights as Lender**. The bank or other financial institution serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender hereunder as any other Lender (if such entity is a Lender hereunder) and may exercise the same as though it were not the Administrative Agent, and such institution and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with any

Credit Party or any Subsidiary or other Affiliate of any thereof as if it were not the Administrative Agent hereunder.

9.3    **Duties As Expressly Stated**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by this Agreement and the other Loan Documents that the Administrative Agent is required to exercise pursuant to a written direction from the Required Lenders, (c) except as expressly set forth herein and in the other Loan Documents, the Administrative Agent shall not have any duty to disclose, or shall be liable for the failure to disclose, any information relating to any Credit Party or any of their respective Subsidiaries that is communicated to or obtained by the financial institution serving as the Administrative Agent or any of its Affiliates or Approved Funds in any capacity, and (d) the Administrative Agent shall have no obligation whatsoever to any Lender or any other Person to investigate, confirm or assure that the Collateral exists or is owned by the Credit Parties or is cared for, protected or insured or has been encumbered, or that the Liens granted to the Administrative Agent under the Collateral Agreements or otherwise have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner, or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Administrative Agent in this Agreement or in any of the other Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Administrative Agent may act in any manner it may deem appropriate, in its discretion, exercised in good faith, and that the Administrative Agent shall have no duty or liability whatsoever to any Lender, except for any liability to a Lender as a result of any action or inaction by the Administrative Agent that is determined to constitute gross negligence or willful misconduct pursuant to a final, non-appealable order of a court of competent jurisdiction.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders or all of the Lenders if expressly required, or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall not be deemed to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in, or in connection with, this Agreement or the other Loan Documents, (ii) the contents of any certificate, report or other document delivered hereunder or under any of the other Loan Documents or in connection herewith of therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, the other Loan Documents or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or to inspect the properties, books or records of any Credit Party.  The Administrative Agent shall not be required to initiate or conduct any litigation or collection proceedings hereunder or under any other Loan Document; *provided, however*, that the Administrative Agent shall not be required to take any action which

exposes the Administrative Agent to personal liability or which is contrary to the Loan Documents or applicable law.

9.4    **Reliance By Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive written advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action (it being understood that this provision shall not release the Administrative Agent from performing any action with respect to the Borrower expressly required to be performed by it pursuant to the terms hereof) under this Agreement.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

9.5    **Action Through Sub-Agents**.  The Administrative Agent may perform any and all of its duties, and exercise its rights and powers, by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through its Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to its activities in connection with the syndication of the credit facilities provided for herein as well as activities of the Administrative Agent.

9.6    **Resignation of Administrative Agent and Appointment of Successor Administrative Agent**.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the prior written consent of the Borrower (which shall not be unreasonably withheld or delayed and shall not be required during the continuance of an Event of Default), to appoint a successor Administrative Agent, which shall be a bank with an office in Los Angeles, California or New York, New York, or an Affiliate of any such bank with an office in Los Angeles, California or New York, New York.  If no such successor Administrative Agent shall have been so appointed by the Required Lenders, with the consent of the Borrower and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; *provided* that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its

duties and obligations hereunder and under the other Loan Documents, and (2) all payments, communications and determinations provided hereunder to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders with the consent of the Borrower appoint a successor Administrative Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Administrative Agent, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph and except that the resigning Administrative Agent shall, at the expense of the Credit Parties, without representation, warranty or recourse, execute and deliver such documents, instruments and agreements as are reasonably necessary to effect an assignment of the rights and obligations of the retiring Administrative Agent to the successor Administrative Agent and deliver all Collateral then in its possession to the successor Administrative Agent).  Any resignation of the Administrative Agent shall not affect in any way the validity or perfection of the Liens under the Loan Documents.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 11.3 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

9.7    **Lenders' Independent Decisions**.    Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement and the other Loan Documents, any related agreement or any document furnished hereunder or thereunder. Except as explicitly provided herein, the Administrative Agent does not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before the first Event of Default or at any time thereafter.  The Administrative Agent shall not be deemed a trustee or other fiduciary on behalf of any party.  The Administrative Agent shall not be required to keep itself informed as to the performance or observance by the Borrower or any other Credit Party of any term or provision of this Agreement or any other Loan Document or to inspect the properties or books of the Borrower or any other Credit Party.

9.8    **Indemnification**.    Each Lender agrees to indemnify and hold harmless the Administrative Agent (to the extent not reimbursed under Section 11.3, but without limiting the obligations of the Borrower under Section 11.3), ratably in accordance with the aggregate principal amount of the respective Commitments of and/or Loans held by the Lenders (or, if all of the Commitments shall have been terminated or expired, ratably in accordance with the aggregate outstanding amount of the Loans held by the Lenders), for any and all liabilities (including

pursuant to any Environmental Law), obligations, losses, damages, penalties, actions, judgments, deficiencies, suits, costs, expenses (including reasonable attorney's fees) or disbursements of any kind and nature whatsoever that may be imposed on, incurred by or asserted against the Administrative Agent (including by any Lender) arising out of or by reason of any investigation in or in any way relating to or arising out of any Loan Document or any other documents contemplated by or referred to therein for any action taken or omitted to be taken by the Administrative Agent under or in respect of any of the Loan Documents or other such documents or the transactions contemplated thereby (including the costs and expenses that the Borrower is obligated to pay under Section 11.3, but excluding, unless a Default has occurred and is continuing, normal administrative costs and expenses incident to the performance of its agency duties hereunder) or the enforcement of any of the terms hereof or thereof or of any such other documents, including the Cases and all such costs in connection with any refinancing, restructuring or "work-out" of the Term Facility; *provided, however*, that no Lender shall be liable for any of the foregoing to the extent they are determined by a court of competent jurisdiction in a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of the party to be indemnified. Subject to any relevant procedure set forth in the Orders, all amounts due under this Section 9.8 or 11.3 shall be paid with (10) days of receipt by the Borrower of an invoice relating thereto.  The agreements set forth in this Section 9.8 shall survive the payment of all Loans and other obligations hereunder and shall be in addition to and not in lieu of any other indemnification agreements contained in any other Loan Document.

9.9    **Consents Under Other Loan Documents**.  Except as otherwise provided in this Agreement and the other Loan Documents, the Administrative Agent may, with the prior consent of the Required Lenders (but not otherwise), consent to any modification, supplement or waiver under any of the other Loan Documents.

## ARTICLE 10

## Special Provisions Governing Collateral

10.1    **Right to Enforce Agreement**.

(a)    The Administrative Agent shall have the exclusive right to manage, perform and enforce the terms of the Collateral Agreements with respect to the Collateral, to exercise and enforce all privileges and rights thereunder in respect of the Collateral according to its discretion exercised in good faith, including, without limitation, the exclusive right to administer, take or retake control or possession of any Collateral, to hold, prepare for sale, process, sell, lease, dispose of, or liquidate any Collateral, to foreclose or forbear from foreclosure in respect of any Collateral, seeking or not seeking relief from any stay against foreclosure or other remedies in any insolvency proceeding in respect of any Collateral and the acceptance of any Collateral in full or partial satisfaction of any indebtedness. Subject to Section 11.12, only the Administrative Agent, in accordance with the Loan Documents, shall have the right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of Collateral, in each case in connection with enforcement of foreclosure remedies under the Loan Documents.  Any costs and expenses or other amounts paid or to be paid by the Administrative Agent may be paid by the Lenders and shall constitute part of the Secured Obligations secured by the Collateral.

## ARTICLE 11

### Miscellaneous

11.1    **Notices**.    Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telephonic facsimile (fax), as follows:

    (a)    if to any Credit Party, to:

LBI Media, Inc.
1845 West Empire Avenue
Burbank, CA 91504,
Attention: Chief Financial Officer (fax no. (818) 558-4244),

with copies to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Ray Schrock, Damian Ridealgh
Email:  ray.schrock@weil.com; damian.ridealgh@weil.com

    (b)    if to the Administrative Agent, to:

HPS Investment Partners, LLC
40 West 57th Street, New York, NY 10019
Attention: Colbert Cannon, Daniel Zevnik
Email: Colbert.cannon@hpspartners.com; Daniel.zevnik@hpspartners.com

With copies to:
Paul, Weiss, Rifkind, Wharton & Garrison LLP
Attention: Paul Basta
Email: pbasta@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019

    (c)    if to any Lender, to it at its address (or fax number) set forth in its Administrative Questionnaire.

Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any

party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

11.2  **Waivers; Amendments**.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any Credit Party or Subsidiary therefrom shall in any event be effective unless the same shall be permitted by Section 11.2(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the written consent of the Required Lenders and the Administrative Agent; *provided* that no such agreement shall:

(i)    increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 5.2 or the waiver of any Default or Event of Default or mandatory prepayment shall not constitute an increase of any Commitment of any Lender);

(ii)    reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby;

(iii)    postpone the scheduled date of payment of the principal amount of any Loan other than mandatory prepayments of the Loans required under Section 2.11(b), or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, change the maturity date of any Loan, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby (it being understood that a waiver of any condition precedent set forth in Section 5.2 or the waiver of any Default or Event of Default or mandatory prepayment shall not constitute a change in the scheduled date of payment of any Commitment of any Lender);

(iv)    change Section 2.11(c) in a manner that would alter the application of prepayments thereunder, or change Section 2.18(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without in each case the written consent of each Lender;

(v)     change any of the provisions of this Section 11.2 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Document or make any determination or grant any consent hereunder or thereunder, without the written consent of each Lender;

(vi)     amend or modify the Superpriority Claim status of the Lenders under the Orders or under any Loan Document, or release all or substantially all of the Guarantors from their obligations in respect of its Guarantee under Article 3 or release all or substantially all of the Collateral (or terminate any Lien with respect thereto), except as expressly permitted in the Loan Documents, without the written consent of each Lender; or

(vii)     waive any of the conditions precedent specified in Section 5.1 without the consent of each Lender and the Administrative Agent; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of such Agent.

(c)     Waivers, amendments and modifications of Loan Documents are subject to the requirements specified in Section 11.2(b).

(d)     Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, guarantees, collateral security documents and related documents executed by Credit Parties in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local requirements of law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement or any other Loan Documents.

11.3     **Expenses; Indemnity; Damage Waiver**.

(a)     The Credit Parties jointly and severally agree to pay, or reimburse the Administrative Agent or the Lenders, as applicable, for paying, (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Lenders and their Affiliates, including the reasonable fees, charges and disbursements of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Orrick, Herrington & Sutcliffe LLP, Morrison & Foerster LLP, Ashby & Geddes, P.A., MoloLamken LLP, Evercore Group L.L.C. and any local counsel retained by the Lenders, in connection with the preparation of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out-of-pocket expenses incurred by the Administrative Agent which the Administrative Agent may incur in connection with (x) the administration of this Agreement and the Collateral Agreements, or (y) the custody or preservation of, the sale of, collection from, or other realization upon, any of the Collateral, (iii) all reasonable out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the reasonable fees, charges and disbursements of any counsel for the

Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 11.3, or in connection with the Loans made hereunder, including in connection with any insolvency proceeding, workout, restructuring or negotiations in respect thereof, and (iv) all Other Taxes levied by any Governmental Authority in respect of this Agreement or any of the other Loan Documents or any other document referred to herein or therein and all costs, expenses, taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Collateral Agreement or any other document referred to therein.

(b)     The Credit Parties jointly and severally agree to indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee and settlement costs, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, the other Loan Documents or any agreement or instrument contemplated hereby (excluding fees, charges and disbursements of counsel to the Lenders in connection with the execution and delivery by such Indemnitee of the Loan Documents), the performance or failure to perform by the parties hereto and thereto of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Credit Party or any of their Subsidiaries, or any Environmental Liability related in any way to any Credit Party or any of their Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing (including in connection with any insolvency proceeding), whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (as determined by a court of competent jurisdiction by final and nonappealable judgment to have) resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)     Subject to any relevant procedure set forth in the Orders, all amounts due under this Section 11.3 or 9.8 shall be paid with (10) days of receipt by the Borrower of an invoice relating thereto.  To the extent that the Credit Parties fail to pay any amount required to be paid by them to the Administrative Agent under paragraph (a) or (b) of this Section 11.3, each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, in its capacity as such.

(d)     To the extent permitted by applicable law, none of the Credit Parties shall assert, and each Credit Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, the other Loan

Documents or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)	All amounts due under this Section 11.3 shall be payable promptly after written demand therefor.

11.4	**Successors and Assigns**.

(a)	The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the Administrative Agent (and any attempted assignment or transfer by any Credit Party without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)	Any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that:

(i)	the Administrative Agent and, except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender or if an Event of Default has occurred, the Borrower, each must give its prior written consent to such assignment (which consent shall not be unreasonably withheld, delayed or conditioned), *provided* that Borrower's consent to an assignment shall be deemed to be given if the Administrative Agent has not received a written objection to such assignment within five (5) Business Days of Borrower's receipt of such request for consent;

(ii)	except in the case of an assignment to a Lender or an Affiliate of a Lender or Approved Fund with respect to a Lender or an assignment of the entire remaining amount of the assigning Lender's Loans or Commitment, the amount of the Loans or Commitment of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, unless the Borrower (unless an Event of Default has occurred) and the Administrative Agent otherwise consent; *provided* that simultaneous assignments to two or more Approved Funds which are Affiliates shall be deemed to be a single assignment for purposes of this clause (ii);

(iii)	the parties to each assignment (other than an assignment to a Lender, an Affiliate of a Lender or Approved Fund with respect to a Lender) shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 (which may be waived by Administrative Agent in its sole discretion), *provided* that in the case of contemporaneous assignments by a Lender to more than one Approved Fund with respect to a Lender managed by the same

investment adviser (which funds are not then Lenders), only a single such $3,500 fee shall be payable for all such contemporaneous assignments, and

(iv)    the assignee shall be an Eligible Assignee and shall deliver to the Administrative Agent an Administrative Questionnaire; *provided further* that any consent of the Borrower otherwise required under this paragraph shall not be required (i) if an Event of Default has occurred and is continuing, or (ii) in the event of an assignment to an existing Lender.

(c)    Upon acceptance and recording pursuant to paragraph (e) of this Section 11.4, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 11.3 with respect to matters described therein occurring or accruing prior to the effective date of any such Assignment and Acceptance). Notwithstanding anything therein to the contrary, no Approved Fund shall be entitled to receive any greater amount pursuant to Sections 2.15, 2.16 and 2.17 than the transferor Lender would have been entitled to receive in respect of the assignment effected by such transferor Lender had no assignment occurred. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with paragraph (b) of this Section 11.4 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(d)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at its offices in New York, New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the amount of the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive (absent manifest error), and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary (absent manifest error). The Register shall be available for inspection by the Borrower and any Lender or the Administrative Agent, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 11.4 and any written consent to such assignment required by paragraph (b) of this Section 11.4, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(f)        [Reserved].

(g)        A Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 2.17 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.17(e) as though it were a Lender.

(h)        Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any such pledge or assignment to a Federal Reserve Bank; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)        Anything in this Section 11.4 to the contrary notwithstanding, no Lender may assign or participate any interest in any Loan held by it hereunder to any Credit Party or any of its Affiliates or Subsidiaries without the prior consent of each Lender and the Administrative Agent.

(j)        A Lender may furnish any information concerning any Credit Party, Holding Company or Subsidiary in the possession of such Lender from time to time to assignees and participants (including prospective assignees and participants) subject, however, to and so long as the recipient agrees in writing to be bound by, the provisions of Section 11.13.  In addition, the Administrative Agent may furnish any information concerning any Credit Party or any of its Subsidiaries or Affiliates in the Administrative Agent's possession to any Affiliate of the Administrative Agent, subject, however, to the provisions of Section 11.13.

11.5    **Survival**.  All covenants, agreements, representations and warranties made by the Credit Parties and Subsidiaries herein and in the other Loan Documents, and in the certificates or other instruments delivered in connection with or pursuant to this Agreement and the other Loan Documents, shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect so long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement or the other Loan Documents is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.15, 2.16, 2.17 and 11.3 and Article 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

11.6    **Counterparts; Integration; References to Agreement; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto on different

counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent or its counsel and to certain other lenders constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Whenever there is a reference in any Collateral Agreement or UCC financing statement to the "Credit Agreement" to which the Administrative Agent, the Lenders and the Credit Parties are parties, such reference shall be deemed to be made to this Agreement among the parties hereto.  Except as provided in Section 5.1, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.  To the extent that any specific provision hereof is inconsistent with any of the Orders, the Interim Order and the Final Order shall control.

11.7    **Severability**.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

11.8    **Right of Setoff**.  Subject to the Orders and Section 2.18, if an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section 11.8 are in addition to any other rights and remedies (including other rights of setoff) that such Lender may have.

11.9    **GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS**.

(A)    THIS AGREEMENT AND ALL ISSUES ARISING WITH RESPECT HERETO, INCLUDING THE VALIDITY OR ENFORCEABILITY OF ANY AGREEMENT CONTAINED HEREIN AND THE ISSUE OF USURY WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREBY, SHALL BE CONSTRUED IN ALL RESPECTS IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(B)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF STATE OF NEW YORK AND OF

THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, SUCH NEW YORK COURT (OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT). EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY CREDIT PARTY OR SUBSIDIARY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(C)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION 11.9.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(D)    EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.1.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

11.10    **WAIVER OF JURY TRIAL; JUDICIAL REFERENCE**.

(a)    <u>JURY TRIAL WAIVER</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN

INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.10.

(b)    JUDICIAL REFERENCE.  The jury trial waiver set forth in clause (a) above and in the other Loan Documents shall continue to apply to the fullest extent now or hereafter permitted by applicable law.  THE CREDIT PARTIES, ADMINISTRATIVE AGENT AND LENDERS PREFER THAT ANY DISPUTE BETWEEN THEM BE RESOLVED IN LITIGATION SUBJECT TO A JURY TRIAL WAIVER AS SET FORTH IN CLAUSE (A) ABOVE.  IF, HOWEVER, UNDER THEN APPLICABLE LAW, A PRE-DISPUTE JURY TRIAL WAIVER OF THE TYPE PROVIDED FOR IN THE LOAN DOCUMENTS IS UNENFORCEABLE IN LITIGATION IF SUCH LITIGATION OCCURS IN CALIFORNIA (ALTHOUGH THE PARTIES DO NOT INTEND HEREBY TO WAIVE THEIR CONSENT TO JURISDICTION AND VENUE IN THE STATE OF NEW YORK), TO RESOLVE ANY DISPUTE, CLAIM, CAUSE OF ACTION OR CONTROVERSY UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EACH, A "CLAIM"), THEN, UPON THE WRITTEN REQUEST OF ANY PARTY TO SUCH LITIGATION, SUCH CLAIM, INCLUDING ANY AND ALL QUESTIONS OF LAW OR FACT RELATING THERETO, SHALL BE DETERMINED EXCLUSIVELY BY A JUDICIAL REFERENCE PROCEEDING. EXCEPT AS OTHERWISE PROVIDED IN THE PREVIOUS PARAGRAPH, VENUE FOR ANY SUCH REFERENCE PROCEEDING SHALL BE IN THE STATE OR FEDERAL COURT IN THE COUNTY OR DISTRICT WHERE VENUE IS APPROPRIATE UNDER APPLICABLE LAW (THE "COURT").  THE PARTIES SHALL SELECT A SINGLE NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE.  IF THE PARTIES CANNOT AGREE UPON A REFEREE, THE COURT SHALL APPOINT THE REFEREE.  THE REFEREE SHALL REPORT A STATEMENT OF DECISION TO THE COURT.  SUBJECT TO THE ORDERS, NOTHING IN THIS PARAGRAPH, HOWEVER, SHALL LIMIT THE RIGHT OF ANY PARTY AT ANY TIME TO EXERCISE SELF-HELP REMEDIES, FORECLOSE AGAINST COLLATERAL OR OBTAIN PROVISIONAL REMEDIES (INCLUDING, WITHOUT LIMITATION, REPLEVIN, INJUNCTIVE RELIEF, ATTACHMENT OR THE APPOINTMENT OF A RECEIVER).  THE PARTIES SHALL BEAR THE FEES AND EXPENSES OF THE REFEREE EQUALLY UNLESS THE REFEREE ORDERS OTHERWISE.  THE REFEREE ALSO SHALL DETERMINE ALL ISSUES RELATING TO THE APPLICABILITY, INTERPRETATION, AND ENFORCEABILITY OF THIS PARAGRAPH. THE PARTIES ACKNOWLEDGE THAT ANY CLAIM DETERMINED BY REFERENCE PURSUANT TO THIS PARAGRAPH SHALL NOT BE ADJUDICATED BY A JURY.

11.11    **Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

11.12    **Release of Collateral and Guarantees**.  The Administrative Agent and the Lenders (as the case may be) agree that if all of the capital stock of or other equity interests in, or any assets of, any Subsidiary that is owned by the Credit Parties is sold to any Person to the extent and as expressly permitted by the terms of this Agreement and the Collateral Agreements, or if any Subsidiary is merged or consolidated with or into any other Person to the extent and as expressly permitted by the terms of this Agreement and such Subsidiary is not the continuing or surviving corporation, the Administrative Agent shall, upon request of the Borrower (and upon the

receipt by the Administrative Agent of such evidence as the Administrative Agent or any Lender may reasonably request to establish that such sale, designation, merger or consolidation is expressly permitted by the terms of this Agreement), terminate the Guarantee of such Subsidiary under Article 3 and release the Lien created by the Collateral Agreements on any capital stock of or other equity interests in such Subsidiary and on any assets of such Subsidiary.

11.13   **Confidentiality**.  Each Lender agrees to keep confidential information obtained by it pursuant hereto and the other Loan Documents confidential in accordance with such Lender's customary practices and agrees that it will only use such information in connection with the transactions contemplated by this Agreement and not disclose any of such information other than (a) to such Lender's employees, representatives, directors, officers, accountants, attorneys, auditors (including any external auditors), agents, professional advisors, trustees or Affiliates who are advised of the confidential nature of such information, (b) to the extent such information presently is or hereafter becomes available to such Lender on a non-confidential basis from any source of such information that is in the public domain at the time of disclosure (so long as such information does not become publicly available as a result of a breach of this Section 11.13), (c) to the extent disclosure is required by law (including applicable securities law), regulation, subpoena or judicial order or process (*provided* that notice of such requirement or order shall be promptly furnished to the Borrower unless such notice is legally prohibited) or requested or required by bank, securities, insurance or investment company regulators or auditors or any administrative body or commission (including the Securities Valuation Office of the National Association of Insurance Commissioners) to whose jurisdiction such Lender or its Affiliates may be subject, (d) to any rating agency to the extent required in connection with any rating to be assigned to such Lender, (e) to assignees or participants or prospective assignees or participants who agree to be bound by the provisions of this Section 11.13, (f) to the extent required in connection with any litigation between any Credit Party and any Lender with respect to the Loans or this Agreement and the other Loan Documents or (g) with the Borrower's prior written consent.

11.14   **USA Patriot Act**.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act, and the Borrower agrees to provide such information from time to time to any Lender upon reasonable request.

(The next page is the signature page.)