# Exhibit C

**Bojmel Declaration**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------- x
*In re:*                                                       :
                                                               :    Chapter 11
                                                               :
**LBI MEDIA, INC.,** *et al.*,                                 :    Case No. 18– _____ (    )
                                                               :
Debtors.[1]                                                    :    (Joint Administration Requested)
                                                               :
------------------------------------------------------------- x

**DECLARATION OF RONEN BOJMEL
IN SUPPORT OF MOTION OF DEBTORS FOR (I) AUTHORITY
TO (A) OBTAIN POSTPETITION SENIOR SECURED FINANCING,
(B) USE CASH COLLATERAL, (C) GRANT ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES, (D) GRANT LIENS AND SUPERPRIORITY
CLAIMS, AND (E) MODIFY THE AUTOMATIC STAY, AND (II) RELATED RELIEF**

I, Ronen Bojmel, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.  I am a Senior Managing Director at Guggenheim Securities, LLC ("**Guggenheim Securities**"). Guggenheim Securities maintains its principal place of business at 330 Madison Avenue, New York, New York 10017. Guggenheim Securities is the proposed investment banker for the Debtors in these chapter 11 cases.

2.  I submit this declaration (the "**Declaration**") in support of the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Senior Secured Financing, (B) Use Cash*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LBI Media, Inc. (8901); Liberman Broadcasting, Inc. (8078); LBI Media Holdings, Inc. (4918); LBI Media Intermediate Holdings, Inc. (9635); Empire Burbank Studios LLC (4443); Liberman Broadcasting of California LLC (1156); LBI Radio License LLC (8905); Liberman Broadcasting of Houston LLC (6005); Liberman Broadcasting of Houston License LLC (6277); Liberman Television of Houston LLC (2887); KZJL License LLC (2880); Liberman Television LLC (8919); KRCA Television LLC (4579); KRCA License LLC (8917); Liberman Television of Dallas LLC (6163); Liberman Television of Dallas License LLC (1566); Liberman Broadcasting of Dallas LLC (6468); and Liberman Broadcasting of Dallas License LLC (6537). The Debtors' mailing address is 1845 West Empire Avenue, Burbank, California 91504.

*Collateral, (C) Grant Adequate Protection to Prepetition Secured Parties, (D) Grant Liens and Superpriority Claims, (E) Modify the Automatic Stay, and (II) Related Relief* (the "**Motion**").[2]

3. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, gained as a result of the May 13, 2018 engagement of Guggenheim Securities as the Debtors' investment banker with respect to certain specified transactions, as more fully described below, (ii) my review of relevant documents, (iii) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and/or (iv) my views based on my experience as a restructuring professional. If called to testify, I could and would testify to each of the facts set forth herein on that basis. I am not being compensated specifically for this testimony other than through payments received by Guggenheim Securities as a professional proposed to be retained by the Debtors as the Debtors' investment banker in these chapter 11 cases.

## Qualifications

4. Guggenheim Securities is a full-service investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring advice, across a broad range of industries. Guggenheim Securities and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings. Guggenheim Securities and its professionals are providing or have provided investment banking, financial advisory and other services in connection with the following recent cases, among others: *In re The NORDAM Group, Inc.*, 18-11699 (MFW) (Bankr. D. Del.); *In re Charming Charlie Holdings Inc.* 17-12906 (CSS) (Bankr. D. Del.); *In re Appvion, Inc.*, Case No. 17-12082

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

(KJC) (Bankr. D. Del.); *In re Payless Holdings LLC*, Case No. 17-42267 (Bankr. E.D. Mo.); *In re Limited Stores Co., LLC*, Case No. 17-10124 (KJC) (Bankr. D. Del.); *In re Essar Steel Minn. and ESML Holdings Inc.*, Case No. 16-11626 (BLS) (Bankr. D. Del.); *In re Juniper GTL LLC*, Case No. 16-31959 (Bankr. S.D. Tex.); *In re Pac. Sunwear of Cal., Inc.*, Case No. 16-10882 (LSS) (Bankr. D. Del.); *In re Hutcheson Med. Ctr., Inc.*, Case No. 14-42863 (Bankr. N.D. Ga.); *In re Cal Dive Int'l, Inc.*, Case No. 15-10458 (CSS) (Bankr. D. Del.); *In re SIGA Techs., Inc.*, Case No. 14-12623 (Bankr. S.D.N.Y.); and *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del.).

5.  I have been employed at Guggenheim Securities since October 2012 and prior to joining Guggenheim Securities, I was a Managing Director at Miller Buckfire & Co. for six years. Prior to joining Miller Buckfire & Co., I was a Vice President in the financial restructuring group at Dresdner Kleinwort Wasserstein and its predecessor, Wasserstein Perella. I have over two decades of experience handling complex financial and other restructuring matters for a variety of companies (distressed or otherwise, both in and out-of-court), in a wide spectrum of industries. My areas of expertise include, among other things, (i) advising on financial restructuring execution and strategies, (ii) analyzing business plans and related financial projections, (iii) liquidity management, and (iv) sizing, structuring, raising and executing all aspects of financing transactions. Specifically, I have considerable experience procuring, structuring, and negotiating debtor-in-possession financing facilities, and I am generally familiar with the market trends for such financings.

6.  On or around May 13, 2018, Guggenheim Securities was retained to act as the Debtors' investment banker with respect to certain specified transactions. Since that time, members of my team and I have worked closely with the Debtors' management and other

professionals in connection with the Debtors' analyses of their business affairs, assets and liabilities, financial position, contractual arrangements, and various strategic transactions. Pursuant to this work, the Guggenheim Securities team (including me) has become familiar with the Debtors' capital structure, liquidity needs, and business operations.

7.      Further, I have, among other things, assisted the Debtors in evaluating strategic transaction alternatives, participated in negotiations between the Debtors and their creditors, and assisted the Debtors in reviewing the terms, conditions, and the potential impact of various proposed transactions, including DIP Financing options.  Additionally, I have participated in numerous meetings with the Debtors' Restructuring Committee in order to, among other things, address the Debtors' need for, and access to, DIP Financing.

**The Debtors' Need for DIP Financing and the Use of Cash Collateral**

8.      The Debtors have advised that they require access to debtor-in-possession financing and the authority to use cash collateral to ensure that they have sufficient liquidity to operate their business and administer their estates.  I understand that the Debtors are entering chapter 11 with minimal cash on hand and that they believe that they will not generate sufficient cash to fund their ongoing operations and expenses attendant to these chapter 11 cases. I understand that it is also expected that the commencement of bankruptcy proceedings will increase the demands on LBI's liquidity due to, among other things, administrative costs and potential unforeseen impacts on its operations resulting from the filing.

9.      The Debtors believe that the DIP Facility will provide them with the liquidity needed to, among other things, pay their workforce and satisfy their other working capital and general corporate requirements, including critical payments to vendors, providers of essential copyrights, and on-air talent, many of which may be unfamiliar with the chapter 11 process.  Further, the Debtors believe that the DIP Facility will allow the Debtors to pursue

4

confirmation of their proposed chapter 11 plan and that, absent the ability to access the DIP Facility, even for a limited period of time, there is a substantial risk LBI will be unable to continue operating its businesses, resulting in a deterioration of value to the Debtors' estates.

## DIP Marketing Process

10. Leading up to the Petition Date, the Debtors, with the assistance of their professionals, explored potential sources of postpetition financing. At the outset of this process, the Debtors were cognizant of the challenges presented by their capital structure and the fact that substantially all of their assets are encumbered by liens granted in connection with LBI's obligations under the First Lien Indenture and Second Lien Indenture, such that any potential third-party investor would have to either provide unsecured financing, junior secured financing, or "prime" the Debtors' existing secured lenders' prepetition liens on their collateral. I also understand the Debtors were informed that HPS, holders of 100% of their First Lien Notes, would not consent to being primed by third-party DIP Financing, which would have made obtaining third-party DIP Financing impracticable.

11. Accordingly, the Debtors began discussions with HPS to provide DIP Financing. To ascertain whether a third-party may be willing to provide the Debtors with unsecured, junior secured, or priming DIP Financing on better terms, the Debtors, through their advisors, also launched a parallel marketing process. In particular, Guggenheim Securities, on behalf of the Debtors, solicited interest from eight potential third-party lenders, three of which executed non-disclosure agreements to evaluate the opportunity.[3] None of the third-parties were willing to provide DIP Financing on either an unsecured or junior secured basis. Ultimately, the

---

[3] Guggenheim Securities, on behalf of the Debtors, did not solicit a proposal from the Second Lien Noteholders. Please refer to the First Day Declaration for a detailed description of the Debtors' discussions with the Second Lien Noteholders prior to the Petition Date.

Debtors only received one third-party proposal that would seek to prime the Prepetition Secured Parties' prepetition liens on their collateral.

12. At the same time, the Debtors engaged in parallel-track good faith and arm's length negotiations with HPS over the terms of potential financing, resulting in HPS improving the terms of its initial proposal. The Debtors, with the aid of their advisors and under the direction of the Restructuring Committee, scrutinized the financing proposals received from HPS and the third-party financing source, taking into account the risk of costly and protracted litigation associated with third-party financing with respect to Cash Collateral and adequate protection. The Debtors also compared the amount, pricing, and fee structure of each proposed facility, and asked each party to improve on their terms.

13. After careful consideration of each proposal, the Restructuring Committee, in consultation with its advisors, determined that the DIP Facility proposed by HPS provided superior terms to the proposal from the third-party financing source. Specifically, the third-party proposal would have required the incurrence of more debt than under HPS' proposal on account of adequate protection payments to Prepetition Secured Parties, resulting in a higher quantum of fees and interest. Moreover, the third-party proposal carried significant litigation risk stemming from the non-consensual priming of the Prepetition Secured Parties and use of Cash Collateral. Accordingly, the Debtors determined that HPS' proposal was the best available option and entered into definitive documentation with HPS.

**The DIP Facility Was Negotiated in Good Faith and at Arm's Length**

14. I assisted the Debtors, together with their other advisors, with the negotiation of the terms and provisions of the DIP Facility. Initially, the DIP Lenders sent the Debtors a proposed term sheet outlining financing terms and the consensual use of Cash

Collateral. Over the course of multiple weeks, the Debtors and the DIP Lenders, with the assistance of their respective legal and financial advisors, negotiated the terms and provisions of the DIP Facility, including the DIP Budget. During that time, the parties exchanged multiple term sheets and mark-ups, with concessions being made by the DIP Lenders, including with respect to the interest rates and certain fees.

15. All negotiations between the Debtors and the DIP Lenders regarding the provision of the DIP Facility and the use of Cash Collateral, in my view, were conducted in good faith and on an arm's length basis, and were overseen by the Debtors' independent Restructuring Committee. These negotiations culminated in the agreed upon terms set forth in the proposed DIP Credit Agreement.

### The DIP Facility Is the Best Postpetition Financing Arrangement Presently Available to the Debtors

16. Based on my experience with debtor-in-possession financing transaction as well as my involvement in the marketing and negotiation of the various DIP financing alternatives available to the Debtors, I believe that the DIP Facility is the best financing option presently available to the Debtors under the circumstances.

17. *First*, though the DIP Facility primes the First Lien Noteholders' and Second Lien Noteholders' prepetition liens on the Common Collateral, such priming is being done on a consensual basis—the First Lien Noteholders have consented to such priming and are providing the DIP Facility. The third-party proposal received, moreover, was more expensive than the proposal provided by HPS due, in part, to additional adequate protection payments that would need to be funded in connection with a priming DIP Financing loan resulting in a higher quantum of fees and interest. Further, it is my understanding from the Debtors and their counsel that although the Second Lien Noteholders' interests in the DIP Collateral are being primed as

well, the Second Lien Noteholders are deemed to have consented pursuant to the Intercreditor Agreement. As a result, the DIP Facility will permit the Debtors to avoid potential costly and protracted litigation with respect to adequate protection and the use of Cash Collateral.

18. *Second*, the DIP Facility will provide the Debtors with the immediate access to capital, which the Debtors believe is necessary to consummate their marketing and plan process, and will provide them the financial flexibility required to effectively and efficiently administer these cases. Also, although there are milestones set forth in the DIP Facility, the Debtors do not believe that such milestones are burdensome to the Debtors' restructuring efforts. Further, the Debtors believe that the DIP Budget provides the flexibility needed for the Debtors to run their operations in the ordinary course.

19. *Finally*, I believe that the financial terms proposed under the DIP Facility are customary and usual terms for debtor-in-possession financings of this type. Specifically, the contemplated upfront fee, exit fee, unused commitment fee, interest rate, default rate, and other economic terms of the DIP Facility were all negotiated for at arm's length and are in aggregate generally consistent with the cost of debtor-in-possession financings in comparable circumstances.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: November 21, 2018

*/s/ Ronen Bojmel*
Ronen Bojmel
Senior Managing Director
Guggenheim Securities, LLC