## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------- x

*In re:*                                                 :          **Chapter 11**
                                                         :
                                                         :
**LBI MEDIA, INC.,** *et al.,*                           :          **Case No. 18– _____ (      )**
                                                         :
        **Debtors.**[1]                                :          **(Joint Administration Requested)**
                                                         :
-------------------------------------------------------- x

### DECLARATION OF BRIAN KEI IN SUPPORT OF THE
### DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Brian Kei, make this declaration under 28 U.S.C. § 1746:

### Background

1.      I am the Chief Financial Officer of LBI Media, Inc. ("**LBI Media**") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**", the "**Company**" or "**LBI**").  I have served in this role since June 2018.  I received a B.A. in Economics from Princeton University in 1999.  I have more than seventeen years of experience in the media industry, including more than fifteen years of experience in financial and strategic leadership roles.

2.      On the date hereof (the "**Petition Date**"), the Debtors commenced with this court (the "**Court**") voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with the Debtors' day-to-day

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LBI Media, Inc. (8901); Liberman Broadcasting, Inc. (8078); LBI Media Holdings, Inc. (4918); LBI Media Intermediate Holdings, Inc. (9635); Empire Burbank Studios LLC (4443); Liberman Broadcasting of California LLC (1156); LBI Radio License LLC (8905); Liberman Broadcasting of Houston LLC (6005); Liberman Broadcasting of Houston License LLC (6277); Liberman Television of Houston LLC (2887); KZJL License LLC (2880); Liberman Television LLC (8919); KRCA Television LLC (4579); KRCA License LLC (8917); Liberman Television of Dallas LLC (6163); Liberman Television of Dallas License LLC (1566); Liberman Broadcasting of Dallas LLC (6468); and Liberman Broadcasting of Dallas License LLC (6537).  The Debtors' mailing address is 1845 West Empire Avenue, Burbank, California 91504.

operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases (the "**Chapter 11 Cases**").

3.       I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the Chapter 11 Cases and in support of the motions and applications that the Debtors have filed with the Court, including the "first-day" pleadings (the "**First-Day Pleadings**").  Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, the Debtors' books and records, my review of relevant documents, information provided to me by the Debtors' employees and officers, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the television, radio and programming industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.       This Declaration is intended to provide a summary overview of the Debtors' businesses and the need for their restructuring pursuant to chapter 11 of the Bankruptcy Code.  Section I provides an overview of the Debtors' businesses.  Section II describes the Debtors' capital structure.   Section III describes the circumstances that precipitated the commencement of the Chapter 11 Cases.  Section IV provides a summary of the First Day Pleadings and the factual bases for the relief requested therein.

### Preliminary Statement

5.       LBI is the largest privately held, minority-owned Spanish-language broadcaster in the United States.  From its humble beginnings as a family-owned and operated business, LBI has expanded over the years into a national media company that owns or licenses twenty-seven (27) Spanish-language television stations and radio stations in the largest markets in the United States, as well as EstrellaTV, a Spanish-language television broadcast network, for

2

which LBI produces popular, original television programming from its studios in Burbank, California.  LBI has been a leader in the production and delivery of relevant and original content in Spanish-language broadcasting for nearly thirty (30) years, and its stations and programming serves some of the nation's largest media markets, including Los Angeles, New York City, Chicago, Miami, Houston, and Dallas, and reach millions of viewers and listeners.

6.      In recent years, the growing Hispanic population in the United States and expansion of LBI's EstrellaTV network have provided a significant growth opportunity for the Company.  However, the Debtors have faced the market pressures that have broadly affected U.S. television and radio broadcasters, including the 2008 recession and the diversion of advertising spend by companies to digital media.  Further, in spite of LBI's core operating strengths and growth potential, the Debtors are burdened by a substantial debt load and corresponding interest expense obligations, which has hampered LBI's financial performance, growth opportunities, and liquidity.  Accordingly, in recent years, LBI has proactively tried to address its balance sheet.

7.      In April 2018, LBI obtained a commitment from HPS Investment Partners, LLC ("**HPS**") to provide new first lien financing, which provided for, among other things, additional liquidity, an extension of the maturity of the Debtors' first lien debt, and the inclusion of a "make-whole" provision in the Debtors' first lien notes indenture.  An ad hoc group of the Debtors' second lien noteholders (the "**Junior Noteholder Group**") challenged the transaction, and, in particular, the make-whole, in New York state court.  After the state court denied the Junior Noteholder Group's demand to enjoin the transaction, LBI was able to successfully close on this financing in May 2018.

RLF1 20337073V.1

8.      Following the closing of the transaction, LBI sought to continue its growth efforts.  However, such efforts were weakened by the Junior Noteholder Group, which continued to litigate against the Company, its founder and CEO, and HPS, the Company's sole senior lender.  The Junior Noteholder Group commenced multiple lawsuits, and threatened several more, distracting management from operations.   These actions and threats not only hindered the Debtors' efforts to improve their operations, but certain actions, including seeking to enjoin the first lien financing, risked pushing LBI into a precipitous freefall bankruptcy.

9.      When coupled with the Debtors' tightening liquidity (which was exacerbated by the expense of the Junior Noteholder Group litigation), the Junior Noteholder Group's actions made it substantially more difficult for LBI to achieve the growth it had hoped for, and the Company determined that a comprehensive reorganization may be necessary.

10.      Understanding the need for transparency and independence in connection with any such reorganization process, in July 2018, Liberman Broadcasting, Inc. ("**LBI Parent**") and LBI Media each appointed a new experienced independent board member, Neal Goldman, and formed a committee of independent directors (the "**Restructuring Committee**") to lead and oversee their restructuring efforts.  The Restructuring Committee was empowered and granted the authority to, among other things: (i) consider, evaluate and, pursue and authorize a strategic transaction it deems to be in the best interests of the company, (ii) determine whether a strategic restructuring transaction should be pursued, (iii) oversee discussions with the company's stakeholders in respect of a strategic restructuring transaction, (iv) oversee the implementation and execution of a strategic restructuring transaction, and (v) take such other actions as it considers necessary or desirable in order to carry out its mandate.   Accordingly, the

Restructuring Committee is empowered to oversee the Debtors' prosecution of these chapter 11 cases.

11.     In pursuit of a strategic deleveraging transaction, LBI examined a variety of potential paths, including alternatives to restructure or refinance its debt (either in-court or out-of-court) to allow its operations to continue and realize its growth potential.  As part of the process, the Debtors worked closely with their experienced restructuring advisors at Weil, Gotshal & Manges LLP and Guggenheim Securities, LLC.  Further, in August 2018, Alvarez & Marsal North America, LLC was engaged to, among other things, support the Company and the Restructuring Committee in its efforts, act as independent advisor in respect of cash management and liquidity forecasting, and report directly to the board of directors and Restructuring Committee with respect to such matters.

12.     The Debtors' strategic efforts increased in recent months as coupon payments totaling $28 million due in November 2018 approached.  Led by the Restructuring Committee, in October 2018, LBI sought to engage with the principals and advisors to the Debtors' lenders, including the Junior Noteholder Group (notwithstanding the pending litigations), and HPS.  In doing so, the Debtors attempted to bring both parties to the table with the goal of developing a process to achieve a consensual, prearranged or pre-negotiated plan of reorganization that would achieve LBI's goals of (i) deleveraging the Company, (ii) resolving the dispute regarding the first lien financing and "make-whole" provision, and (iii) allowing LBI to re-focus on its broadcasting and production operations.

13.     In October 2018, the Debtors presented their long-range business plan to HPS and asked them to respond to restructuring proposals presented by the Debtors.  HPS quickly engaged.   At the same time, the Debtors sought to provide their business plan to and

RLF1 20337073V.1

engage with the Junior Noteholder Group in negotiations regarding potential in-court and out-of-court restructuring proposals that could be sponsored or otherwise supported by the Junior Noteholder Group.  The Debtors also solicited potential third-party investors to refinance the Debtors' Second Lien Notes.  However, (i) no third party expressed an interest in any potential refinancing of the Second Lien Notes prior to the Petition Date, and (ii) the Junior Noteholder Group determined not to engage with the Debtors, or even enter into a confidentiality agreement with the Debtors to allow for constructive restructuring discussions.[2]  Instead, the Junior Noteholder Group engaged in direct discussions with HPS regarding a potential settlement and dismissal of the state court litigation.  The Debtors were supportive of such negotiations as they believed a settlement was in the best interests of all stakeholders.  Unfortunately, the parties were unable to reach resolution prior to the Petition Date.

14.    Despite the absence of a global settlement among the Company's lenders, rather than continuing to waste resources in a litigation war of attrition, the Company focused on constructive restructuring discussions with HPS.  Substantial diligence and good-faith, arm's-length negotiations among the Debtors, HPS, and their respective advisors followed, resulting in LBI securing a commitment from HPS pursuant to that certain *Restructuring Support Agreement* dated as of November 20, 2018 ("**RSA**") annexed hereto as **Exhibit B** to provide debtor-in-possession financing and support a chapter 11 plan that will preserve the going-concern value of LBI's business, allow the Company to emerge from chapter 11 significantly de-levered, and protect the livelihoods of the hundreds of individuals who depend on LBI.

15.    The RSA provides that LBI and HPS will support the *Joint Plan of Reorganization of LBI Media, Inc., and its Affiliated Debtors* (the "**Plan**") being filed

---

[2] Rather, around the same time, one of the primary members of the Junior Noteholder Group delivered a letter to the Debtors threatening even further legal action.

contemporaneously herewith.  As a baseline, the Plan provides for, among other things, HPS to exchange their first lien notes for a majority equity interest in the reorganized company, as well as the provision of recoveries for other classes of creditors supporting the restructuring, including to the holders of second lien notes, ongoing trade claims, general unsecured claims, unsecured notes claims, and claims related to settlements with certain of the Debtors' key suppliers of intellectual property.

16.    The Plan also provides significant flexibility in that it allows the Debtors to either (i) seek out and consummate a superior proposal, or (ii) have their obligations under the first lien make-whole provision waived if the Junior Noteholder Group elects to refinance HPS's claims.  Importantly, the Plan and RSA allow the Debtors to pursue and consummate an alternative value-maximizing transaction without incurring any penalty or "break-up fee" to HPS.  The RSA also does not require the Debtors to take any actions or refrain from taking any actions to the extent that doing so would be inconsistent with their fiduciary duties.  In fact, the RSA allows the Debtors to both pursue and consummate an alternative transaction within the construct of the Plan, as well as pursue an alternative to the proposed Plan.

17.    The Plan and RSA allow the Debtors to run a marketing process for a period of up to seventy-five (75) days following the Petition Date.  Accordingly, starting immediately, LBI and its advisors intend to solicit interest and bids from potential strategic and financial investors (including the Junior Noteholder Group) to sponsor an alternative value-maximizing restructuring transaction.  Further, the Plan provides that the Junior Noteholder Group may obtain 100% of the equity interests in the reorganized Company to the extent it votes to accept the Plan and is willing to satisfy HPS's claims under the DIP Facility and First Lien Notes in full, without the need to satisfy the make-whole obligation.  Accordingly, the Plan and

RSA provide mechanisms that (i) ensure the Debtors consummate a transaction that maximizes the value of their estates, and (ii) take the make-whole provision off the table for the Junior Noteholder Group.  Throughout these chapter 11 cases, the Debtors will continue to engage with the Junior Noteholder Group and all of the Debtors' other key stakeholders that did not sign the RSA.

18.    The Debtors believe that conducting their Chapter 11 Cases on an expedited timeline is important to preserving and maximizing the going-concern value of their estates.  Accordingly, they intend to prosecute these Chapter 11 Cases in a measured, but efficient manner.  The terms of the Debtors' RSA and DIP Facility reflect that intention, through the inclusion of milestones.  The Debtors are also requesting that the Court set a plan confirmation schedule on the proposed timeline below:

|  | Debtors' Proposed Timeline | Applicable Milestone |
|---|---|---|
| File Plan and Disclosure Statement | November 21, 2018 | November 23, 2018 |
| First Day Hearing (Entry of Interim DIP Order) | November 27, 2018 | November 29, 2018 |
| Second Day Hearing (Entry of Final DIP Order) | December 17, 2018 | 35 days after entry of the interim DIP order |
| Disclosure Statement Hearing (Approval of Disclosure Statement ) | January 17, 2018 | February 19, 2019 |
| Bid Deadline | February 4, 2018 | N/A |
| Deadline for Debtors to Select Plan Transaction | February 14, 2019 | N/A |
| Confirmation Hearing (Confirmation of Chapter 11 Plan) | March 7, 2018 | April 20, 2019 |
| Effective Date of Plan | April/May 2019 | May 20, 2019 |

19.    Both the Debtors and HPS are aligned in their support of an efficient restructuring that minimizes the impact to the Company's operations, vendors, and workforce,

and allows LBI to emerge from chapter 11 positioned for growth and success.  The proposed timeline for these Chapter 11 Cases appropriately balances the Debtors' need to complete the Debtors' restructuring process quickly and run a thorough marketing process to obtain the highest or otherwise best bid for a strategic restructuring transaction and maximize value for the Debtors' estates for the benefit of all stakeholders.

### I.  Overview of LBI's Business

**A.     Formation and History**

20.     Headquartered in Burbank, California, LBI is a national television and radio broadcasting company that was co-founded in 1987 by Lenard Liberman, LBI's Chief Executive Officer (the "**CEO**"), and his father Jose Liberman, who immigrated to the United States from Mexico in 1946.  In 1988, LBI purchased two unprofitable radio stations and converted one into Orange County, California's first Spanish-language radio station.  LBI replicated this pattern across the country through the successful reformatting of over 20 radio stations to Spanish-language formats in order to serve the nation's growing Hispanic communities.  From its humble beginnings, over the past thirty years, LBI has grown into a nationwide broadcaster with stations in nearly all major Spanish-speaking markets in the United States, serving millions of listeners and viewers.



## B.    The Debtors' Current Business Operations

21.    LBI operates in three primary business segments – television station operations, radio station operations, and television network operations.  As a multi-platform media company, LBI primarily derives its revenue from the sale of advertising to local and national advertisers and national network advertisers airing on radio stations, television stations, and the EstrellaTV network.  These primary revenue streams are supplemented by, among other things, the sale of digital advertisements in connection with LBI's delivery of digital and streaming services and content, as well as revenue from affiliate fees and syndication sales.

22.    LBI generates the majority of its advertising sales through advertising agencies and direct solicitations of local businesses.  LBI offers companies the opportunity to advertise across multiple platforms and reach audiences both locally and nationally.   Its advertiser relationships are built on being an integral part of each market it serves, as well as its unique Spanish-language content that reaches an audience that is desired by advertisers.

10

23.     LBI centralizes the management of its overall executive, administrative and support functions, including sales, marketing, finance, legal, and human resources. LBI's primary expenditures are on programing spend, technical expenses, workforce compensation (including commissions paid to its local and national sales staff), marketing expenses, and general and administrative expenses. LBI's programming expenses for television mainly consist of costs related to the production and licensing of programming content for the EstrellaTV network and the production of local and national newscasts.

(i)     <u>Television Operations and Estrella TV Network</u>

24.    LBI owns and operates nine (9) television stations and licenses two (2) television stations in some of the largest markets in the United States – New York, Los Angeles, Chicago, Houston, Dallas-Fort Worth, Miami, San Diego, San Francisco, Phoenix, Denver and Philadelphia.  In addition, LBI operates television production facilities in Burbank, California that it uses to produce original, core programming for its owned and affiliated television stations and digital platforms, including popular news, reality, talk, variety, entertainment, gameshow, comedy, and drama programming.  LBI's network and owned stations primarily broadcast LBI-produced content, but also acquire the rights to broadcast certain third-party programs.  LBI

 

produces over fifty (50) hours of original television programming a week, including popular shows like *Noches con Platanito* (a popular nightly talk show) and *Tengo Talento, Mucho Talento* (a long-running talent competition show).

25.    LBI is also party to a number of affiliation agreements pursuant to which third-party television stations broadcast its EstrellaTV network programming.  Currently, the EstrellaTV network is broadcast by thirty-nine (39) network affiliated stations across the United States that collectively reach the majority of U.S. Hispanic television households.  Today,

12

EstrellaTV is broadcast in 210 markets nationwide, with partnerships of top cable and satellite providers (including Dish, DirecTV, Charter/Spectrum, AT&T, and Verizon).  EstrellaTV consistently performs strongly in the Nielsen ratings as compared to its competitors, and outperforms more widely-recognized competitors (such as Telemundo and Univision) during certain primetime slots in certain markets.

26.     LBI's television-related operations primarily generate revenue from (i) the direct sale of advertising spots on its owned television stations, (ii) advertising sold on the EstrellaTV network, and (iii) commissions earned on the sale of advertising on behalf of LBI's affiliate television stations.  Television operations also generate revenue from (a) licensing original programming to subscription video on demand providers such as Netflix, Hulu, Amazon, and Roku, and (b) advertising revenue from digital content streamed on mobile applications, as well as YouTube and Facebook.   In addition, the television segment promotes and produces the *Premios de la Radio*, an annual award show that celebrates the best in regional Mexican music and attracts many high profile celebrities in the Hispanic community.  In 2017, television operations generated approximately 64% of LBI's annual revenue (with revenue related to EstrellaTV representing approximately 40% of television revenue) and 44% of LBI's earnings.

(ii)     Radio Operations

27.     LBI owns sixteen (16) radio stations in the greater Los Angeles area, Houston, and Dallas-Fort Worth.  LBI also produces and broadcasts radio content for its radio stations, and syndicates certain programming to affiliate stations in thirty-two (32) markets.  LBI's radio properties include talk show and music platforms that cover an array of musical

13

genres that include regional Mexican, traditional mariachi, ranchera, pop, and oldies. LBI radio stations and affiliates reach approximately 9.6 million listeners monthly.

28.    LBI's radio operations primarily generate revenue from the sale of local and national advertising spots on its owned radio stations. Radio operations also generate revenue from (i) fees paid by affiliate stations to syndicate LBI's original radio show programming, (ii) advertising revenue from digital content, and (iii) the sale of airtime to brokered or infomercial customers that supply programming through local marketing agreements. In 2017, radio operations generated approximately 36% of LBI's annual revenue and 56% of LBI's earnings.

## C.    Recent Financial Performance and Results

29.    LBI's financial performance peaked in the mid-late 2000s. In 2006, LBI achieved adjusted EBITDA of approximately $48 million. Unfortunately, like many broadcasters, LBI was adversely impacted by the 2008 recession, such that by 2012, LBI's adjusted EBITDA had declined 61% from its 2006 high to approximately $19 million.

30.    In 2009, in the face of declining advertising revenues, leveraging its original television content, the Company launched its own national television network (EstrellaTV) and entered into affiliation agreements with third-party television stations, pursuant to which such stations pay to broadcast LBI's original content. In spite of new revenue streams created by EstrellaTV's launch, due to continued market challenges and the expenses associated with LBI's strategic investment in programming and distribution growth, LBI's earnings have stagnated in recent years. However, the Company believes it is at a key turning point where its investment in EstrellaTV, as well as other planned strategic initiatives, provide an opportunity for material earnings growth in the future. In fact, EstrellaTV has improved earnings by $13.7 million from 2015 to 2017.

14

31.     Despite LBI's potential, due in large part to the Company's overleveraged capital structure and significant interest expense, its financial performance has continued to suffer.  For the year ended December 31, 2017, the Debtors' audited consolidated financial statements reflect total revenues of approximately $127.8 million and a net profit of approximately $78 million (due to a one-time $92.3 million gain on the Spectrum Sale (as defined herein)).  For the quarter ended June 30, 2018, the Debtors' unaudited consolidated financial statements reflected total revenues of approximately $33.1 million and a net loss of approximately $8.8 million.    As of June 30, 2018, the Company's unaudited consolidated financial statements reflected assets totaling approximately $238.7 million and liabilities totaling approximately $532.9 million.

**D.     Leadership**

32.     In addition to myself, the Debtors' executive management team consists of the following individuals: (i) Lenard D. Liberman, President, Chief Executive Officer, (ii) Winter Horton, Chief Operating Officer, and (iii) Kim Zeldin, General Counsel.

33.     The members of the board of directors (the "**Board**") of LBI Parent are the following individuals: (i) José Liberman (Chairman), (ii) Lenard D. Liberman, (iii) Winter Horton, (iv) Neal Goldman, (v) Peter Connoy, and (vi) Rockard Delgadillo.  Each of Mr. Goldman, Mr. Connoy, and Mr. Delgadillo are independent members of the Board, and, as described above, Mr. Goldman and Mr. Connoy are members of the independent Restructuring Committee of the Boards of LBI Parent and LBI Media.

## II.  Debtors' Corporate and Capital Structure

**A.     Corporate Structure**

34.     Collectively, the Debtors consist of eighteen (18) entities formed under the laws of California and Delaware.  Substantially all of the Company's operations are undertaken

by LBI Media and its direct and indirect subsidiaries. LBI Parent wholly owns, directly or indirectly, each of the Debtors. LBI Parent is a privately-held company, with two classes of outstanding common stock. Lenard Liberman directly holds 99.35% of LBI Parent's Class A stock and 100% of its Class B stock, which has the effect of Mr. Liberman holding 99.75% of the economic interest and 99.96% of the voting interest in LBI Parent. The Company's organizational structure, as of the date hereof, is set forth on **Exhibit A** hereto.

## B.    Debt Structure[3]

35.    As of the Petition Date, in addition to any unpaid interest, fees, penalties, or premiums under their debt documents, the Debtors had outstanding funded debt obligations in the aggregate amount of approximately $530 million:

a)    10% Senior Secured Notes issued by LBI Media pursuant to the First Lien Indenture (as defined below) and currently maturing in 2023 (the "**First Lien Notes**", the holders of which are referred to as the "**First Lien Noteholders**") in the principal amount of $233 million;

b)    11½%/ 13½% PIK Toggle Second Priority Secured Notes due April 15, 2020 issued by LBI Media (the "**Second Lien Notes**", and the holders of such notes, the "**Second Lien Noteholders**") in the principal amount of $262 million;

---

[3] The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

16

c)    11% PIK Unsecured Senior Notes due April 30, 2022 issued by Intermediate HoldCo (the "**Intermediate HoldCo Unsecured Notes**", and the holders of such notes, the "**Intermediate HoldCo Unsecured Noteholders**") in the principal amount of $28 million; and

d)    11% Unsecured Senior Notes due April 30, 2017 issued by HoldCo (the "**HoldCo Unsecured Notes**", and the holders of such notes, the "**HoldCo Unsecured Noteholders**") in the principal amount of $7 million.

36.    <u>Secured First Lien Notes</u>.  Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**First Lien Indenture**"),[4] dated as of March 18, 2011, among LBI Media, as issuer, each of the guarantors named therein (each of LBI Media's direct and indirect subsidiaries, the "**Debtor Guarantors**"), and Wilmington Savings Fund Society, FSB, as indenture trustee (the "**First Lien Trustee**"). The obligations under the First Lien Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by first-priority liens (subject to certain permitted liens) over substantially all of the assets (other than certain excluded assets) of LBI Media and the Debtor Guarantors (the "**Common Collateral**").  As of the date hereof, the aggregate amount outstanding under the First Lien Indenture is $233 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

37.    <u>Secured Second Lien Notes</u>.  On December 23, 2014, certain of the Debtors supplemented that certain Indenture dated as of December 31, 2012 by and among LBI Media, as issuer, the Debtor Guarantors, and U.S. Bank National Association ("**U.S. Bank**"), as indenture trustee (the "**Second Lien Trustee**"), and entered into that certain Series II Indenture,

---

[4] The First Lien Indenture was supplemented by that certain supplemental indenture dated as of December 31, 2012, by that certain second supplemental indenture dated as of December 23, 2014, by that certain third supplemental indenture dated as of April 17, 2018, by that certain fourth supplemental indenture dated as of April 17, 2018, and by that *Fifth Supplemental Indenture* dated as of October 25, 2018.

RLF1 20337073V.1

among the same parties (collectively, as amended, modified, or otherwise supplemented from time to time, the "**Second Lien Indenture**"). The Second Lien Notes have accrued payment-in-kind interest since their issuance, and as of the date hereof, the aggregate amount outstanding under the Second Lien Indenture is approximately $262 million in principal amount, plus any unpaid interest, fees, or other amounts due thereunder. The Second Lien Notes are secured by the same Common Collateral as the First Lien Notes, and the Second Lien Noteholders have a second-priority interest in the Common Collateral.

38.    <u>Intercreditor Agreement</u>. The relative rights, positions, and priorities of the holders of the First Lien Notes and the Second Lien Notes (and their respective trustees) with respect to the Common Collateral are set forth in that certain *Amended and Restated Intercreditor Agreement*, dated as of December 23, 2014, by and among LBI Media, the Debtor Guarantors, Credit Suisse AG Cayman Islands Branch, in its capacity First Priority Lien Collateral Trustee, and U.S. Bank, in its capacity as Second Priority Collateral Agent (the "**Intercreditor Agreement**"). Pursuant to the Intercreditor Agreement, the First Lien Noteholders have a first-priority interest in the Common Collateral, while the Second Lien Noteholders have a second-priority interest in the Common Collateral. The Intercreditor Agreement provides, among other things, that (i) any lien on the Common Collateral securing any claim of the First Lien Noteholders shall have priority over and be senior in all respects and prior to any lien on the Common Collateral securing any claim of the Second Lien Noteholders, and (ii) until the discharge of the claims arising under the First Lien Indenture has occurred, the Common Collateral and all proceeds thereof shall first be applied by the First Lien Trustee to such claims, prior to applying any such proceeds to claims arising under the Second Lien Indenture.

39.    <u>Unsecured HoldCo and Intermediate HoldCo Notes</u>.    Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**Intermediate HoldCo Indenture**"), dated as August 4, 2017, by and among Intermediate HoldCo as issuer, HoldCo, as guarantor, and TMI Trust Company, as trustee, pursuant to which Intermediate HoldCo issued approximately $24.3 million of unsecured payment-in-kind notes.    As of the date hereof, the aggregate amount outstanding under the Intermediate HoldCo Indenture is approximately $28 million in principal amount, plus any unpaid interest, fees, or other amounts due thereunder.    Further, HoldCo is party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**HoldCo Indenture**"), dated as of December 31, 2012, by and among HoldCo, as issuer and U.S. Bank, as trustee, pursuant to which HoldCo issued the HoldCo Unsecured Notes.    As of the date hereof, the aggregate amount outstanding under the HoldCo Indenture is approximately $7 million in principal amount, plus any unpaid interest, fees, or other amounts due thereunder.

### III.  Events Leading to Commencement of Chapter 11 Cases

**A.    Challenging Market Leads to Overleveraged Capital Structure**

40.    The Debtors' core business remains strong, and from 2016 to 2017, the Company outpaced competitors with its ratings growth.    The Debtors continue to benefit from the growth of the EstrellaTV Network and the Debtors' original content.    However, notwithstanding their core operating strengths and growth potential, the Debtors have not been immunized from broader market challenges and pressures affecting U.S. television and radio broadcasters, including shifting viewer habits and reduced expenditures on traditional advertising.    Among other factors, the global economic downturn that began in 2008 resulted in a decline in advertising and marketing spending generally.    Certain categories of advertising spend have not returned, such as home mortgages.    Then, as the economy recovered, the Debtors'

19

industry faced new and intense competition from the rapidly-growing internet and digital advertising industry, both of which siphoned off the share of advertiser revenues allocated by agencies and brands to broadcast television and radio.

41.     Such market conditions forced the Debtors to incur substantial indebtedness in recent years to maintain and grow their operations.  The cost of servicing such debt has limited the Company's free-cash flow available for operations and capital expenditures. In 2017, the Debtors' cash interest expense totaled approximately $47 million, in comparison to adjusted EBITDA of $29 million – implying leverage of approximately 18x EBITDA.

**B.      Prepetition Initiatives**

(i)      Operational Initiatives

42.     In recent years, LBI has sought to increase its liquidity through continued improved operating performance and the growth of EstrellaTV.  While many competitor Spanish-language networks experienced a drop in ratings in recent years, EstrellaTV has grown its primetime audiences by 16% year-over-year from 2017-2018 with a corresponding 10% increase in revenue.   At the same time, LBI has engaged in cost-cutting measures to improve operational efficiencies, primarily by cutting programming expenses and utilizing existing popular content in lieu of producing new content.

(ii)     HoldCo Exchange and Repayment of Term Loan

43.     In 2017, the Company sought to proactively refinance or otherwise extend the maturity of its debt when necessary or appropriate to ease the Company's overall debt service obligations.  On April 28, 2017, the Company was able to extend the maturity of certain of its unsecured debt by entering into a note exchange agreement (as amended and restated on August 4, 2017)  with holders of approximately 80% of the HoldCo Notes pursuant to which, among other things, such noteholders agreed to exchange their outstanding HoldCo Notes maturing in

2017 for Intermediate HoldCo Notes maturing in 2022 (the "**HoldCo Exchange**"), giving the Company additional runway to repay the exchanged notes.[5]  Further, on or around July 25, 2017, following the sale of certain broadcast spectrum assets (the "**Spectrum Sale**"),[6] the Debtors repaid their then outstanding $50 million senior secured term loan in full using part of the Spectrum Proceeds.

(iv)    <u>Negotiations with Secured Lenders</u>

44.    In 2017 and 2018, LBI also engaged with groups of holders of its First Lien Notes and Second Lien Notes regarding a potential refinancing or restructuring of either or both tranches of debt.  Although the Debtors engaged in advanced negotiations with the Junior Noteholder Group regarding a potential restructuring transaction, in April 2018, the Debtors ultimately determined, in their business judgment, to instead consummate a financing under the First Lien Indenture in a transaction (the "**First Lien Financing Transaction**") with funds managed or controlled by HPS.  Among other things, the transaction resulted in HPS acquiring 100% of the First Lien Notes, the extension of the maturity of the First Lien Notes to 2023, and the provision to the Debtors of additional liquidity, which together offered LBI the opportunity to continue its operational improvements and attempt to grow into its existing capital structure.

(vi)    <u>Second Lien Noteholder Litigation</u>

45.    On April 25, 2018, the Junior Noteholder Group filed a complaint and accompanying preliminary injunction motion in state court to enjoin the closing of the First Lien

---

[5]  The only HoldCo Noteholder that did not elect to participate in the exchange was Caspian Capital L.P. ("**Caspian**").  All HoldCo Unsecured Notes following the HoldCo Exchange are owned exclusively by Caspian. The HoldCo Unsecured Notes matured on April 30, 2017, but the principal remains outstanding.

[6]  On March 29, 2016, the Federal Communications Commission ("**FCC**") commenced the first-ever "incentive auction," designed to repurpose spectrum – the invisible infrastructure historically used for television broadcasting but now also commonly used for mobile device communications.  LBI participated in the FCC incentive auction and sold control of its spectrum license relating to KRCA 62, an owned and operated television station in Riverside, California for $142.3 million (the "**Spectrum Proceeds**").

Financing Transaction, and a complaint (as amended) against LBI Media and its CEO asserting, among other things, breaches of the Second Lien Indenture.[7]  On May 16, 2018, the state court denied the preliminary injunction motion, and on May 17, 2018, the First Lien Financing Transaction closed.

46.     Following the closing, the Junior Noteholder Group continued to pursue its lawsuit against the Debtors and the CEO.  The parties engaged in mediation in June 2018, but no resolution was reached.  Notwithstanding the Company making an $11.5 million cash interest payment to the Second Lien Noteholders in July 2018, a subset of the Junior Noteholder Group brought a subsequent action against not only LBI Media and its CEO, but also HPS.[8]  Each action was stayed by the commencement of these chapter 11 cases.

(vii)    Re-Engagement with Stakeholders

47.     Given the continued expense and distraction to the Debtors' management of the lawsuits, as well as hostility from the Junior Noteholder Group, the Debtors recognized that their efforts to significantly improve their operating performance and continue to service their debt were at risk, and that a further refinancing or a restructuring of the Debtors' balance sheet might be necessary.  Accordingly, in July 2018, the Debtors formed the Restructuring Committee and immediately sought to reach a settlement with the Junior Noteholder Group that provided for a withdrawal of the litigation.  However, the Junior Noteholder Group did not respond to the Debtors' settlement offer, or propose any alternative restructuring or refinancing transaction. The Debtors, guided by the Restructuring Committee, also engaged in preliminary

---

[7] *See Caspian Select Credit Master Fund, Ltd., et al. v. LBI Media, Inc., et al.,* Index No. 652034/2018.

[8] *See Caspian Select Credit Master Fund, Ltd., et al. v. HPS Investment Partners, LLC, et al.,* Index No. 653685/2018.

discussions with HPS regarding a restructuring proposal that provided for the deleveraging of LBI's balance sheet.

48.    Engagement among the Debtors, HPS and the Junior Noteholder Group intensified in advance of November 15, 2018, when cash coupon payments totaling $28 million in the aggregate were due under the First Lien Indenture and Second Lien Indenture (the "**Coupon Payments**").  The Debtors did not have sufficient cash to satisfy the Coupon Payments, but instead utilized the grace period available under the relevant indentures, and continued engaging with HPS.

49.    As discussed in the preliminary statement, following near-constant negotiations with HPS, on the eve of the commencement of these Chapter 11 Cases, the Debtors and HPS executed the RSA, paving the way for the Debtors to emerge from chapter 11 protection with a substantially deleveraged balance sheet in order to position LBI for future growth.

## IV.  First Day Pleadings

50.    The Debtors intend to continue to operate their business in the ordinary course during the pendency of the Chapter 11 Cases.  It is imperative that the Debtors make a seamless transition into chapter 11 to preserve the reputation of their business and minimize any disruptions to the Debtors' operations.  Sales and operations must continue in the ordinary course of business to preserve the value of the business and implement the reorganization transactions contemplated by the Plan.

51.    Accordingly, contemporaneously herewith, the Debtors have filed First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and implement a value-maximizing restructuring of the Debtors' capital structure.

23

52.    The First Day Pleadings seek authority to, among other things, obtain postpetition financing, honor workforce-related wages and benefits obligations (including those to the Debtors' on-air talent), pay claims of certain vendors and suppliers critical to the Debtors' business operations, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible on account of the commencement of these Chapter 11 Cases.  I believe that the relief requested in the First Day Pleadings is necessary to give the Debtors an opportunity to work toward a successful restructuring that will inure to the benefit of all of their stakeholders.  The First Day Pleadings include the following:

i.    *Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases;*

ii.    *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Senior Secured Financing, (B) Use Cash Collateral, (C) Granting Adequate Protection to Prepetition Secured Parties, (D) Grant Liens and Superpriority Claims, (E) Modifying the Automatic Stay, and (II) Granting Related Relief;*

iii.    *Motion of Debtors for Entry of Interim and Final Orders for (I) Authority to (A) Continue Using Existing Cash Management System, Bank Accounts ,and Business Forms, (B) Implement Ordinary Course Changes to Cash Management System, (C) Continue Intercompany Transactions, (D) Provide Administrative Expense Priority for Postpetition Intercompany Claims, and (II) Granting Related Relief;*

iv.    *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Wages and Ordinary Course Expenses, (B) Pay and Honor Benefit Program Obligations, and (C) Continue Benefit Programs, and (II) Granting Related Relief;*

v.    *Motion of Debtors for Entry of Interim and Final Orders for (I) Authority to Pay or Honor Prepetition Claims of and Obligations to (A) On-Air Talent, and (B) Critical Vendors, and (II) Related Relief;*

vi.    *Motion of Debtors for Entry of Interim and Final Orders for Authority to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices, and (II) Pay and Honor Related Prepetition Obligations;*

24

vii.    *Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Taxes and Fees*;

viii.    *Motion of Debtors for Entry of Interim and Final Orders for (I) Authority to (A) Continue to Maintain Insurance Policies and Programs and (B) Honor All Prepetition Obligations With Respect Thereto, (II) Modification of the Automatic Stay With Respect to Workers' Compensation, and (III) Granting Related Relief;*

ix.    *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service, and (IV) Granting Related Relief; and*

x.    *Application of Debtors for Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent* Nunc Pro Tunc *to the Commencement Date*.

53.    Several of the First Day Pleadings request authority to pay certain prepetition claims against the Debtors.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  The Debtors will defer seeking additional relief to a subsequent "second day" hearing before the Court.

54.    I am familiar with the content and substance of each of the First Day Pleadings, and adopt the factual statements contained therein.  I believe approval of the relief sought in each of the First Day Pleadings is critical to the Debtors' ability to successfully implement their chapter 11 strategy, with minimal disruption to their business operations.

RLF1 20337073V.1

Obtaining the relief sought in the First Day Pleadings will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.

## Conclusion

55.    This declaration describes the factors that have precipitated the commencement of the Chapter 11 Cases and demonstrates the critical need for the Debtors to obtain the relief sought in the First Day Pleadings.

56.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  November 21, 2018
       Burbank, California

/s/ *Brian Kei*           
Brian Kei
Chief Financial Officer
LBI Media, Inc. and its Affiliates

RLF1 20337073V.1