**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>LBI Media, Inc., *et al.*,<br><br>　　　　　　　　　　　Debtors. [1] | Chapter 11<br><br>Case No. 18-12655 (CSS)<br>(Jointly Administered)<br><br>**Hearing Date: 1/16/19 @ 11:00 a.m.**<br>**Objections Due: 1/8/19 @ 4:00 p.m.**<br>　**(extended for TMI Trust Co.)**<br><br>**Re: Docket Nos. 43, 44, 45, 277, 278** |

**OBJECTION OF TMI TRUST COMPANY, AS TRUSTEE,**
**TO DEBTORS' PROPOSED DISCLOSURE STATEMENT**

TMI Trust Company, in its capacity as trustee for the holders of those certain 11% Senior

PIK Toggle Notes due April 30, 2022 described more fully below ("**TMI**"), submits this

objection to the *Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of*

*LBI Media, Inc. and its Affiliated Debtors* [Docket No. 278] (the "**Disclosure Statement**")[2] filed

in support of the *Amended Joint Chapter 11 Plan of Reorganization of LBI Media, Inc. and its*

*Affiliated Debtors* [Docket No. 277] (the "**Plan**"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.　　The Disclosure Statement should not be approved because it fails to provide

adequate information for the Debtors' unsecured creditors, including but not limited to the

unsecured creditors of LBI Media Holdings, Inc. ("**Holdco**") and of LBI Media Intermediate

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LBI Media, Inc. (8901); Liberman Broadcasting, Inc. (8078); LBI Media Holdings, Inc. (4918); LBI Media Intermediate Holdings, Inc. (9635); Empire Burbank Studios LLC (4443); Liberman Broadcasting of California LLC (1156); LBI Radio License LLC (8905); Liberman Broadcasting of Houston LLC (6005); Liberman Broadcasting of Houston License LLC (6277); Liberman Television of Houston LLC (2887); KZJL License LLC (2880); Liberman Television LLC (8919); KRCA Television LLC (4579); KRCA License LLC (8917); Liberman Television of Dallas LLC (6163); Liberman Television of Dallas License LLC (1566); Liberman Broadcasting of Dallas LLC (6468); and Liberman Broadcasting of Dallas License LLC (6537). The Debtors' mailing address is 1845 West Empire Avenue, Burbank, California 91504.

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Disclosure Statement.

1

Holdings, Inc. ("**Intermediate Holdco**"), with respect to the Debtors' financial condition, the existence and amount of potential Administrative Claims, the existence and validity of potential Intercompany Claims, the nature of the investigation into potential D&O claims and the releases proposed under the Plan, the assets potentially available at Holdco and Intermediate Holdco for distribution to their creditors, and the impact of an Alternative Transaction on potential distributions to unsecured creditors.  The Debtors have failed to provide not just adequate information, but any information, with respect to many of these issues.

2.        The Debtors have also failed to explain the rationale for proceeding with the Disclosure Statement at this point and under the requested schedule when so many significant events are imminent:  The First Lien Notes Refinance Option will be exercised by or expire on January 17, the general bar date is January 22, and bids are due in the Debtors' marketing process on February 4.  In addition, the UCC's investigation is ongoing and is scheduled to conclude on March 4.  The Debtors have significant availability under the DIP and are generating positive net operating cash flow, and have until April 20 for confirmation and May 20 for emergence under their RSA.  There is no melting ice cube to warrant sending such a deficient Disclosure Statement and Plan out for voting (particularly on the proposed schedule, which seeks a voting deadline before the end of the UCC's investigation period and the confirmation hearing only three days after).  Rather, the passing of these milestones will clarify how these cases will progress and potentially address the deficiencies in the Disclosure Statement.

3.        Further, the Plan is not confirmable for at least some of the Debtors without acceptance by Class 6, which is comprised solely of claims relating to the unsecured notes issued by Intermediate Holdco for which TMI is trustee.  In particular, Class 6 is the only class at Intermediate Holdco, and it is doubtful that there will be an accepting impaired class at Holdco

without Class 6.  The Disclosure Statement does not provide Class 6 adequate information, however, to make an informed judgment on its treatment under the Plan.  In addition, the proposed cross-class cross-debtor deathtrap for Class 5 and Class 6 claims cannot be approved. At a minimum, the Disclosure Statement should be amended to discuss the impact on related Debtors if the Plan for Intermediate Holdco and/or the Plan for Holdco is not confirmed.

4.    The Debtors began these cases on November 21, 2018 and filed a plan and disclosure statement just two days later on November 23, 2018.  While that plan and disclosure statement were facially deficient (without limitation, by providing distributions of "[•]" for multiple classes, seeking a cross-class cross-debtor deathtrap, having no liquidation analysis but on its face providing certain creditors with less than in a chapter 7 liquidation, and having essentially no relevant valuation or financial information), it is to be expected that the first version of a plan and disclosure statement may require some refinement after filing.  However, many of these deficiencies remain uncorrected in the Plan and Disclosure Statement, which the Debtors finally filed on Friday, January 4, 2019 at approximately 10:30 p.m. ET, under a looming objection deadline of Monday, January 7, 2019 at 4:00 p.m. ET.  TMI looks forward to working with the Debtors to resolve the issues below and pursue a consensual confirmation.

## FACTUAL BACKGROUND

5.    On November 21, 2018, each of the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in this Court.  The Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    On November 23, 2018, the Debtors filed a proposed plan of reorganization [Docket No. 43] and disclosure statement [Docket No. 44], and a related motion [Docket No. 45] (the "**Motion**").

7.    On December 18, 2018, each of the Debtors filed their schedules and statements of financial affairs (collectively, "**Schedules**").

8.    On Friday, January 4, 2019, the Debtors filed the Plan and Disclosure Statement. TMI subsequently received from the Debtors a 24-hour extension of the objection deadline.

9.    TMI serves as the trustee for the 11% Senior PIK Toggle Notes due April 30, 2022 (the "**Intermediate Notes**") issued by Intermediate Holdco, and guaranteed by Holdco, under that certain indenture dated as of August 4, 2017, as supplemented by that certain supplemental indenture dated as of November 13, 2017 (collectively, the "**Indenture**").  Claims relating to the Indenture are the only claims in Class 6 of the Plan and exist against Intermediate Holdco as issuer and Holdco as guarantor.

## ARGUMENT

10.    The Bankruptcy Code requires that disclosure statements contain "adequate information" regarding the proposed plan.  11 U.S.C. § 1125(b).  This requires "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records…that would enable [] a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  In addition, adequate information requires "factual support for any opinions contained [in the disclosure statement] since opinions alone do not provide the parties voting on the plan with sufficient information upon which to formulate decisions."  10 Collier on Bankruptcy ¶ 1125.02[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016).

11.    The burden is on the plan proponent to prove that a disclosure statement is adequate.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012).  "[D]isclosure requirements are crucial to effective functioning of the federal bankruptcy system.  Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in

determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).  Here, the Debtors have not met their burden of proving that the Disclosure Statement contains adequate information for general unsecured creditors to make an informed judgment as to whether to accept or reject the Plan.

**A.  The Disclosure Statement Does Not Provide Adequate Information Concerning the Financial Condition of the Debtors.**

12.     Although it is apparent that the Debtors are of the opinion that there is no value for creditors beyond the first lien debt, such an opinion appears to be aligned with the personal interests of insiders in connection with pending litigation, and nothing in the Disclosure Statement permits unsecured creditors to form an informed view on the matter.  Apart from several short paragraphs with a general description of the Debtors' business and regulatory environment, the Disclosure Statement provides no other discussion of the Debtors' business or operations and provides no projections or other financial statements.  *See, e.g.,* Disclosure Statement at 11-12.  Rather, the complete extent of the financial information provided by the Disclosure Statement is:  (i) the gross revenue amount and net profit/loss amount for the consolidated Debtors for FY17 and 3Q18; (ii) the unaudited total balance sheet assets amount and liabilities amount for the consolidated Debtors as of 9/30/18, and (iii) the year-over-year improvement in primetime audiences and earnings for EstrellaTV from 2017 to 2018.  *See* Disclosure Statement at 12, 17.  These data points do not permit unsecured creditors to make informed judgments on their treatment under the Plan.

13.     In addition to this lack of disclosure regarding the Debtors' ongoing and projected operations, the Debtors also do not provide adequate information regarding the value of other assets currently on hand.  For example, while the Schedules for LBI Media identify certain

litigation claims with "Undetermined" value, the Disclosure Statement provides no discussion of the existence or potential value of such claims. *See, e.g.* Docket No. 206 at 34. Similarly, while the Schedules for LBI Media identify multiple insurance policies in which the Debtors have interests, including multiple D&O policies, the Disclosure Statement provides no information regarding the potential coverage or limits of such policies that might be at issue in litigation already pending against persons potentially covered that might now be asserted for the benefit of the estates. *See, e.g.* Docket No. 206 at 33. Instead, the Disclosure Statement simply asserts in a single sentence that, based on then-available information, a 2-person committee concluded that it would be in the best interests of the Debtors collectively and their stakeholders to pursue the Plan and grant the requested releases (and apparently without consideration for such releases). *See* Disclosure Statement at 21. This does not provide unsecured creditors with adequate information regarding such potential assets.

14.    Instead of providing creditors with information regarding existing or projected assets or operations, the Debtors appear to be relying on their ongoing marketing process or the soon-to-expire offer by the first liens to be bought out by the second liens as some sort of evidence of value. But the mere existence of a marketing process (which has not been subjected to any scrutiny by the Court and which will not even be completed until less than a week before the proposed voting deadline and confirmation objection deadline) does not constitute evidence of value or otherwise provide adequate information to unsecured creditors for disclosure statement purposes. Nor does the mere fact that junior lien debtholders may decline to pay out at par all senior lien debt (whether or not acquired at discounted values) constitute adequate information to unsecured creditors of value for disclosure statement purposes.

**B.  The Disclosure Statement Does Not Provide Adequate Information
Concerning the Holdco Administrative Claims.**

15.     The Disclosure Statement provides no information regarding the amount of Administrative Claims that may be incurred, either for the Debtors generally or for Holdco or Intermediate Holdco.  While this may have been acceptable under the initial plan formulation, the Plan and Disclosure Statement have been amended in a manner that suggests that the Debtors will pursue payment of Administrative Claims against Holdco or Intermediate Holdco (if any) from the assets of these entities that would otherwise have been available to satisfy their prepetition unsecured claims.  *Compare, e.g.*, Plan § 2.1 *with* Docket No. 43 § 2.1.

16.     As Holdco and Intermediate Holdco seem to have few assets and no operations, it may be reasonable to conclude that there will be few if any actual, necessary costs and expenses of preserving their estates.  However, the unsecured prepetition creditors of these Debtors are entitled to know how their distributions may be impacted by such Administrative Claims. Accordingly, the Disclosure Statement should be amended to provide estimates of such Administrative Claims and to explain the circumstances of such claims.

17.     In addition, the Debtors have revised the Plan to provide that any postpetition claim against HoldCo held by another Debtor may be satisfied from the HoldCo Cash (unless both Class 5 and Class 6 accept the Plan).  Plan §§ 1.96, 4.10(b)(ii).  As an initial matter, any such claim should be paid from estate assets only if it is an administrative expense.  To the extent that any other postpetition claims may be satisfied in this manner, the unsecured prepetition creditors of these Debtors are entitled to know how their distributions may be impacted by such postpetition claims, and the Disclosure Statement should be amended to provide such estimates and explain the circumstances of such claims.

**C.  The Disclosure Statement Does Not Provide Adequate Information
Concerning the Intercompany Claims.**

18.     In the Disclosure Statement, Class 10 (Intercompany Claims) is identified as

"Unimpaired" with an approximate allowed amount of $80.0 million,[3] all to be "adjusted,

Reinstated, or discharged, to the extent determined to be appropriate by the Reorganized

Debtors," and with certain Intercompany Claims potentially receiving distributions from the

HoldCo Cash.  *See, e.g.,* Disclosure Statement at 35.

19.     As the Plan and Disclosure Statement are silent on the application of such

proceeds, it appears that any distributions made from Debtor assets on account of Intercompany

Claims will inure not for the benefit of prepetition creditors but rather for the benefit of the

Reorganized Debtors and/or the new equity interests therein.  For example, to the extent that a

distribution from the Holdco Cash is made on account of the Holdco Intercompany Claim held

by Intermediate Holdco, the Plan seems to contemplate that the Reorganized Debtors will retain

such proceeds.  The Disclosure Statement (and Plan) should be amended to clarify that any such

proceeds will be applied for the benefit of prepetition creditors in accordance with the

Bankruptcy Code priority scheme.

**D.  The Disclosure Statement Does Not Provide Adequate Information
Concerning the LBI Media Receivable from Holdco.**

20.     The Schedules for Holdco identify an intercompany receivable owing to LBI

Media in the amount of $53.7 million.  Docket No. 210, at 33.  This claim is critical for

evaluating potential distributions to Class 5 and Class 6, as well as the best interests test.

However, there are numerous issues to be disclosed and considered in connection with this

alleged receivable, including but not limited to that it is not recorded as an asset on any Debtor's

---

[3] In the initial disclosure statement, this class was identified with an approximate allowed amount as "N/A," with
such amount being "primarily based on the Debtors' books and records."  Docket No. 44, at 5 fn.3, 9.

balance sheet, has been outstanding for years without being paid down, may not have any related documentation beyond accounting book entries, and purports to represent a loan to an entity with essentially no assets or cash flow.  It is well established that bankruptcy courts have the power to look through the form of a transaction to its substance when determining the true nature of claims against a debtor's estate.  Under the circumstances here, the recharacterization of this "receivable" as an distribution to equity or other subordination of this claim may be appropriate, and TMI reserves all of its related rights with respect thereto.  The Disclosure Statement should be amended to provide additional information on this alleged receivable sufficient for Class 6 creditors and other creditors of Holdco to make an informed judgment regarding its validity and potential impact on distributions.

**E.  The Disclosure Statement Does Not Provide Adequate Information Concerning the Investigations and Releases.**

21.     The Disclosure Statement briefly discusses the appointment of a new independent director, Mr. Goldman, to the boards of LBI Media and LBI Parent on July 2, 2018; the investigation of certain claims by Mr. Goldman "in his capacity as a director of LBI Media"; and the conclusion "based upon information available" that the Plan releases (apparently, without consideration) are in the best interests of the Debtors collectively and their stakeholders.  *See* Disclosure Statement at 21.  The Plan releases are broad and apply to, among others, all of the Debtors' current and former directors, officers, employees, and shareholders.  *See, e.g.*, Plan §§ 1.138, 10.6.

22.     However, Mr. Goldman is not a director of Holdco or of Intermediate Holdco. The Disclosure Statement should be amended to disclose whether any investigation by an independent director or committee was conducted with respect to the proposed releases of any director and officer claims held by the Holdco or Intermediate Holdco estates.

23.     In addition, although Mr. Goldman is a director of LBI Parent, it cannot be determined from the Disclosure Statement whether any such claims held by LBI Parent were investigated.  Similarly, it cannot be determined from the Disclosure Statement whether any such claims held by any LBI Media subsidiary were investigated.  The Disclosure Statement should also be amended to disclose such information.

24.     Notably, the Disclosure Statement does not even disclose, let alone discuss, the existence of the investigation being conducted by the UCC into potential causes of action, including but not limited to the pending pre-petition litigation, for the benefit of unsecured creditors and the proposed Plan releases.

### F.  The Disclosure Statement Does Not Provide Adequate Information Concerning Other Assets and Liabilities.

25.     The Schedules also identify various possible sources of value for Holdco and Intermediate Holdco for which unsecured creditors have not been provided adequate information.  As an initial matter, the Schedules identify various insurance policies in which Holdco and Intermediate Holdco have interests of "Undetermined" value.  *See, e.g.,* Docket No. 210, at 28; Docket No. 212, at 27.  The Disclosure Statement provides no information regarding potential refundable premiums or the potential coverage or limits of such policies that might be at issue in litigation already pending against persons potentially covered that might now be asserted for the benefit of the estates.

26.     The Schedules also identify a pending litigation claim in which Holdco is a plaintiff against Applied Underwriters and other defendants with "Undetermined" value for Holdco, and a real property lease of Holdco with "Undetermined" value for Holdco, but again

creditors have been provided no information regarding the potential value of these assets.[4] Docket No. 210, at 29.

27.    The Schedules also identify various contingent and unliquidated general unsecured claims against Holdco by current or former insiders.  To the extent that such claims are or may be validly asserted against Holdco, Class 6 creditors lack adequate information to determine how such claims may impact the amount or timing of potential distributions of Holdco Cash to Class 6.

28.    Further, the Disclosure Statement (and Schedules) do not discuss potential avoidance actions that may be available for the benefit of the Holdco and Intermediate Holdco estates.  As funds appear to be disbursed from these entities from time to time, the Disclosure Statement should provide creditors with such information.

29.    All such information is necessary for creditors to make an informed judgment regarding the Plan.

**G.  The Disclosure Statement Does Not Provide Adequate Information Regarding the Risk That Accepting Impaired Classes Will Not Exist for all Debtors.**

30.    The Schedules identify just two non-insider unsecured claims against Intermediate Holdco.  Docket No. 212, at 31.  One of these claims is held by TMI for its fees and expenses under the Indenture, and the other is for the Intermediate Notes issued pursuant to the Indenture.  *Id.*  Both of these claims are in Class 6, which consists only of claims relating to the Intermediate Notes.  As Intermediate Holdco has no other liabilities, there are no other classes of prepetition claims for this Debtor.

---

[4] The Schedules for LBI Parent identify other assets, including but not limited to 138 executory contracts and unexpired leases, that may not be subject to the first lien or second lien claims.  *See, e.g.,* Docket 208 (Schedule G).

31.     The Schedules identify 9 unsecured claims against Holdco.[5]  Docket No. 210 at 33-34.  These claims fall into either Class 5 (for certain unsecured notes issued by Holdco), Class 6 (for the Holdco guarantee of the Intermediate Notes) or Class 9 (general unsecured claims). There appears to be only 1 non-insider claim that may be entitled to vote in Class 9.[6]

32.     As set forth above, the Debtors have not provided adequate information for Class 6 to make an informed judgment on its treatment under the Plan.  Without acceptance by Class 6, there does not appear to be an accepting impaired class for Intermediate Holdco, and the existence of such a class for Holdco seems equally in doubt.[7]

33.     Accordingly, the Disclosure Statement should be amended to discuss the potential impact on the Plan and on other Debtors if there is no accepting impaired class for Intermediate Holdco and/or Holdco, and/or to disclose additional information regarding the proposed releases and potential assets of Intermediate Holdco and Holdco as discussed above.

## H.  The Disclosure Statement Does Not Provide Adequate Information Concerning the Alternative Transaction.

34.     As noted above, the Plan contemplates a reorganization transaction or an Alternative Transaction, which must satisfy the first lien debt claims in full, "otherwise generally provides better recoveries to holders of Claims" than the proposed reorganization transaction, and "in the Debtors' business judgment, is otherwise superior" to the proposed reorganization transaction.  Disclosure Statement at 1; Plan § 1.4.  Generally, in an Alternative Transaction, unsecured creditors will receive recoveries from the Alternative Transaction Recovery Pool,

---

[5] While not identified on the Schedules, TMI also has a claim against Holdco as the guarantor under the Indenture for its related fees and expenses.

[6] This is a contingent unliquidated claim for litigation indemnification.  Docket No. 210, at 33.  For the avoidance of doubt, TMI reserves its rights with respect to such claim.

[7] For the avoidance of doubt, TMI reserves its rights with respect to the classification of the general unsecured claims against Holdco relating to the Intermediate Notes separately from other general unsecured claims.

which is created after satisfaction of the first lien and second lien claims and "shall be appropriately allocated among the Debtors' Estates."  Plan § 1.5.

35.    As noted above, the nature of the Alternative Transaction (if any) and associated treatment of creditor claims will not be known before February 4, 2019 (and possibly no earlier than February 14, 2019).  It is possible that the Alternative Transaction will provide materially worse treatment to Class 6 (or any other affected class, such as Class 5, Class 7, Class 8 or Class 9) on an individual class basis while otherwise generally providing better recoveries to other classes and satisfying the "Alternative Transaction" criteria.  To the extent that the Plan and Disclosure Statement are not amended to require that an Alternative Transaction result in equal or superior treatment for all such classes as compared to the potential reorganization transaction, the Disclosure Statement should be amended to clearly notify unsecured creditors of the risk that their treatment (even if voting to accept the Plan) may be materially worse than projected in the event that the Restructuring Committee elects to pursue an Alternative Transaction.[8]  In addition, the contemplated or potential methods for allocation of the Alternative Transaction Recovery Pool should be appropriately described by the Disclosure Statement.

**I.    The Disclosure Statement Does Not Provide Adequate Information to Justify the Plan Process Timeline.**

36.    Several highly significant events for these cases are either imminent or will occur shortly:  The First Lien Notes Refinance Option will be exercised by or expire on January 17; the general bar date is January 22; and bids are due on the Debtors' marketing process on February 4.  In addition, the UCC's investigation is ongoing and is scheduled to conclude on March 4.  As described in the DIP budget, the Debtors have significant availability under the DIP and are

---

[8] Under the Plan, the Restructuring Committee will "elect" whether to proceed with an Alternative Transaction. Plan §§ 5.4, 5.5.  As noted above, the Restructuring Committee consists of 2 persons, 1 of whom (Mr. Goldman) does not appear to be a director or officer of, or otherwise have fiduciary duties to, any Debtor except for LBI Media and LBI Parent.

generating significant positive net operating cash flow for the period ending February 5, 2019. *See, e.g.,* Docket No. 137, at 5.  The Debtors have until April 20 for confirmation and May 20 for emergence under their RSA.  Disclosure Statement at 4.

37.     The Debtors have not explained, let alone satisfied their burden to establish, why it is in the best interests of the estates to proceed with the Disclosure Statement at this time and on the schedule proposed in the Motion – among other things, this schedule seeks to set the voting deadline well before the end of the UCC's investigation period and the confirmation hearing only three days after.  Unsecured creditors will be better positioned to make an informed judgment on the Plan by adjusting the process timeline to allow creditors to be informed by the Debtors of the results of these events.

**J.  The Disclosure Statement Should Not Be Approved Because the Deathtrap Is Not Permissible.**

38.     While many courts have upheld "deathtrap" provisions in chapter 11 plans, this generally occurs on an individual class basis where that class will receive some particular treatment if voting to accept the plan or some other, less-favorable treatment if voting to reject the plan.  *See, e.g., In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (finding no prohibition against different plan treatment for a class depending on its vote).

39.     In contrast to such situations, the Plan proposes treatment for Class 6 (the claims for the Intermediate Notes against Intermediate Holdco or against Holdco) that depends on the vote of Class 5 (the claims against Holdco for notes issued by Holdco).  As an initial matter, the Disclosure Statement does not estimate the distributions to Class 5 or to Class 6 under the proposed treatment options, and should be amended to provide such information.  Even more importantly, this deathtrap deprives Class 6 of the ability to make an informed decision with its vote with respect to both the Plan for Intermediate Holdco and the Plan for Holdco because its

distributions will be dependent on the vote of Class 5.  *See, e.g., In re MCorp Fin., Inc.*, 137 B.R. 219 (Bankr. S.D. Tex. 1992) (rejecting a plan making class distributions contingent on acceptance by another class).  Accordingly, the Plan's proposed treatment of Class 6 discriminates unfairly, is not fair and equitable and should not be approved.

40.    While such considerations are generally addressed at a confirmation hearing, it is well-established that a disclosure statement should not be approved "where a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable." *Am. Capital*, 688 F.3d at 154 (citations and internal quotations omitted).  The use of estate assets to proceed with solicitation and a confirmation hearing for the Plan in its present state is not warranted.

## <u>RESERVATION OF RIGHTS</u>

TMI continues to analyze the Disclosure Statement and Plan and reserves all of its rights to supplement this objection in advance of or in connection with the hearing to consider approval of the Disclosure Statement.  For the avoidance of doubt, TMI reserves the right to object to confirmation of the Plan or any other plan on any grounds whatsoever, regardless of whether addressed herein.

*[ remainder of page intentionally left blank ]*

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, TMI requests that the Court deny approval of the Disclosure Statement in its present state and grant such other and further relief to TMI as is just and proper.

Dated: January 8, 2019

MACAULEY LLC


   /s/ Thomas G. Macauley
Thomas G. Macauley (No. 3411)
300 Delaware Avenue, Suite 1018
Wilmington, DE 19801
Telephone: (302) 656-0100
Facsimile: (302) 654-4362

- and -

THOMPSON HINE LLP
David S. Forsh
335 Madison Avenue, 12th Floor
New York, NY  10017
Telephone:  (212) 344-5680
Facsimile:  (212) 344-6101
Email: david.forsh@thompsonhine.com

*Counsel to TMI Trust Company, as Trustee*

4840-7406-1957.9

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 8, 2019, a true and correct copy of the foregoing was sent

by electronic mail to:

Office of the U.S. Trustee for
the District of Delaware
844 King Street
Suite 2207, Lockbox 35
Wilmington, Delaware 19801
Attn: David L. Buchbinder, Esq.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Roy C. Schrock, P.C.
          Garrett A. Fail, Esq.

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Daniel J. DeFranceschi, Esq.
          Zachary I. Shapiro, Esq.

Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Attn: Jonathan I. Levine, Esq.

Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, Delaware 19801
Attn: William P. Bowden, Esq.

Locke Lord LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Attn: Juliane M. Dziobak, Esq.

Wilkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn: Rachel Strickland, Esq.

Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn: Paul M. Basta, Esq.
          Jeffrey D. Saferstein, Esq.
          Sarah Harnett, Esq.

Maslon LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Attn: Brian J. Klein, Esq.

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, Delaware 19899
Attn: Matthew B. McGuire, Esq.

_____/s/ Thomas G. Macauley_____
Thomas G. Macauley