### UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE

------------------------------------------------------------X

In re:                                                    :
                                                          :        **Chapter 11**
      **LBI MEDIA, INC.,** *et al.*                      :
                                                          :        **Case No. 18-12655 (CSS)**
      **Debtors.**[1]                                     :
                                                          :
------------------------------------------------------------X

CASPIAN SELECT CREDIT MASTER FUND,          :        **ADVERSARY COMPLAINT**
LTD., CASPIAN SOLITUDE MASTER FUND,         :
L.P., SUPER CASPIAN CAYMAN FUND             :
LIMITED, CASPIAN HLSC1, LLC, CASPIAN SC     :
HOLDINGS, L.P., CASPIAN FOCUSED             :
OPPORTUNITIES FUND, L.P., MARINER LDC,      :
BLACKSTONE DIVERSIFIED MULTI                :
STRATEGY FUND, BLACKSTONE                   :
ALTERNATIVE MULTI-STRATEGY SUB              :
FUND IV L.L.C.,[2] LATIGO ULTRA MASTER      :
FUND, LTD., CROWN MANAGED ACCOUNTS          :
SPC ACTING FOR AND ON BEHALF OF             :
CROWN/LATIGO SEGREGATED PORTFOLIO,          :
ARCHVIEW FUND L.P., ARCHVIEW MASTER         :
FUND LTD, ARCHVIEW ERISA MASTER             :
FUND LTD., ARCHVIEW CREDIT                  :
OPPORTUNITIES FUND I L.P., YORK CREDIT      :

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LBI Media, Inc. (8901); Liberman Broadcasting, Inc. (8078); LBI Media Holdings, Inc. (4918); LBI Media Intermediate Holdings, Inc. (9635); Empire Burbank Studios LLC (4443); Liberman Broadcasting of California LLC (1156); LBI Radio License LLC (8905); Liberman Broadcasting of Houston LLC (6005); Liberman Broadcasting of Houston License LLC (6277); Liberman Television of Houston LLC (2887); KZJL License LLC (2880); Liberman Television LLC (8919); KRCA Television LLC (4579); KRCA License LLC (8917); Liberman Television of Dallas LLC (6163); Liberman Television of Dallas License LLC (1566); Liberman Broadcasting of Dallas LLC (6468); and Liberman Broadcasting of Dallas License LLC (6537). The Debtors' mailing address is 1845 West Empire Avenue, Burbank, California 91504.

[2]     Plaintiffs Blackstone Diversified Multi Strategy Fund and Blackstone Alternative Multi-Strategy Sub Fund IV L.L.C. are participants in this matter through positions held in accounts managed on a discretionary basis by Caspian Capital LP, which also manages Plaintiffs Caspian Select Credit Master Fund, Ltd., Caspian Solitude Master Fund, L.P., Super Caspian Cayman Fund Limited, Caspian HLSC1, LLC, Caspian SC Holding, L.P., Caspian Focused Opportunities Fund, L.P., and Mariner LDC.

OPPORTUNITIES FUND, L.P., YORK GLOBAL  :
CREDIT INCOME MASTER FUND, L.P.,  :
YORK CREDIT OPPORTUNITIES  :
INVESTMENTS MASTER FUND, L.P., EXUMA  :
CAPITAL, L.P., RIVA RIDGE RECOVERY  :
FUND LLC, KILDONAN CASTLE GLOBAL  :
CREDIT OPPORTUNITY MASTER FUND,  :
LTD., and KILDONAN QUEBEC FUND LTD.,  :
                                        :
                                        :
                Plaintiffs,  :
                                        :
        -against-  :
                                          :
                                        :
LBI MEDIA, INC., LENARD LIBERMAN,  :
JOSE LIBERMAN, WINTER HORTON,  :
ROCKARD DELGADILLO, PETER CONNOY,  :
NEAL GOLDMAN, and HPS INVESTMENT  :
PARTNERS, LLC,  :
                                        :
               Defendants.  :
                                        :
--------------------------------------------------------------X

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................... 1

THE PARTIES.................................................................................................... 6

JURISDICTION AND VENUE ........................................................................... 11

STATEMENT OF FACTS ................................................................................... 11

      A.      LBI's Violation of the Indentures Precipitates the Ongoing Conflict with the Second Lien Noteholders .................................................................... 14

      B.      Liberman, the Director Defendants, and HPS Engage in Secret Negotiations to Enrich Themselves at LBI's Expense and to Ensure the Second Lien Noteholders Are Never Repaid ....................................... 20

      C.      Liberman, the Director Defendants, and HPS, as They Carry Out Their Fraud, Attempt to Delay the Second Lien Noteholders from Enforcing Their Rights ............................................................................................ 27

      D.      LBI Voluntarily Dismisses the California Action to Avoid the Disclosure of Defendants' Fraud in the Course of Discovery, and Delay by Another Method ............................................................................... 29

      E.      The Second Lien Noteholders Discover Defendants' Real Motive for Delaying Negotiations ........................................................................ 34

      F.      Defendants' Fraudulent Scheme Becomes Evident to the Second Lien Noteholders ...................................................................................... 36

      G.      Liberman and the Director Defendants' Self-Interest in Their Deal with HPS Is Readily Apparent ................................................................... 40

      H.      Plaintiffs Seek Injunctive Relief against LBI and Liberman, which the New York Supreme Court Denies on the Basis of Liberman's False and Misleading Testimony that the Transaction with HPS Would Obviate the Need for LBI to File for Bankruptcy ................................................. 42

      I.      A Subset of Plaintiffs Seek Relief against LBI, Liberman and, for the First Time, HPS............................................................................................ 46

      J.      LBI Files its Inevitable Chapter 11 Bankruptcy Proceedings............................. 47

FIRST CAUSE OF ACTION ............................................................................. 48

SECOND CAUSE OF ACTION ......................................................................... 49

THIRD CAUSE OF ACTION ............................................................................ 51

FOURTH CAUSE OF ACTION ........................................................................ 52

FIFTH CAUSE OF ACTION ................................................................................................... 53

SIXTH CAUSE OF ACTION ................................................................................................... 55

SEVENTH CAUSE OF ACTION ............................................................................................. 56

The Plaintiff Group of Noteholders ("Plaintiffs"), a subset of holders (the "Noteholder Group") of the 11½%/13½% PIK Toggle Second Priority secured Subordinated Notes due 2020, Series II (the "Second Lien Notes") issued by LBI Media, Inc. ("LBI" or the "Company"; collectively with its affiliated debtors and debtors in possession, the "Debtors"), by and through its undersigned counsel, against Defendants LBI, HPS Investment Partners, LLC ("HPS"), Lenard Liberman ("Liberman"), Jose Liberman ("J. Liberman"), Winter Horton, Rockard Delgadillo, Peter Connoy, and Neal Goldman, hereby brings this Adversary Proceeding Complaint.  Plaintiffs allege on personal knowledge as to their own acts and deeds, and otherwise on information and belief, as follows:

## NATURE OF THE ACTION

1.      This action arises out of a deceptive scheme perpetrated by Defendants LBI; the Company's President, Chief Executive Officer, controlling shareholder, and director, Liberman; its remaining directors, J. Liberman, Horton, Delgadillo, Connoy, and Goldman (collectively, the "Director Defendants"); and HPS, to prevent Plaintiffs from recovering about $129.5 million to which they are contractually and otherwise entitled as creditors of LBI.

2.      Plaintiffs hold a majority of the Second Lien Notes (defined *infra* ¶ 49.b) issued by LBI in connection with a 2014 debt exchange which was done as part of an ongoing effort by the Noteholder Group to help turn around the Debtors' business.  Prior to that time, various members of the Noteholder Group, including Plaintiffs, had provided rescue financing to LBI in furtherance of the Debtors' turnaround efforts.  The 2014 debt exchange was intended to serve as bridge financing until the sale of certain assets by LBI in an FCC spectrum auction, the proceeds of which could be used to reduce LBI's debt and thereby regularize the capital structure.  In this regard, the second lien indenture expressly required that the proceeds of any such sale be used to

1

retire the company's first lien debt and not for any other purpose.  Indenture dated as of

December 23, 2014, by and among LBI Media, Inc., the guarantors party thereto, and U.S. Bank

National Association as trustee (the "Second Lien Indenture") § 4.10(b)(ii).  As detailed below,

after the sale by LBI of the spectrum assets, LBI violated this core contractual restriction and

otherwise set about to disadvantage and disenfranchise the holders of the Second Lien Notes

("Second Lien Noteholders").

3.      Specifically, in the months leading up to the Company's inevitable bankruptcy,

and while LBI was insolvent, Defendants wrongfully diverted funds to preferred creditors and

company insiders, thereby eliminating Plaintiffs' ability to recover on their notes and precluded

Plaintiffs, as holders of LBI's "fulcrum's securities," from receiving the 100% ownership stake

in the reorganized debtor to which they would otherwise have been entitled.

4.      Defendants' wrongful conduct unfolded in three steps.  First, in or around

September 2017, LBI flagrantly and unambiguously breached the terms of the Second Lien

Indenture when it used the proceeds of the spectrum asset sale for a prohibited purpose.  In July

2017, the Company received approximately $92.3 million in proceeds from the sale of spectrum

assets.  The Second Lien Indenture specifically and expressly required that all net proceeds from

this sale be used to repay debt, starting with LBI's first lien debt, within 60 days of its "receipt"

of those proceeds.  Doing so would have reduced LBI's overall indebtedness and permitted a

relatively straightforward restructuring that involved refinancing any remaining first lien debt

and equitizing the second lien debt.  LBI intentionally failed to comply with its obligations and,

over the objections of the Noteholder Group, used the proceeds on non-authorized, prohibited

purposes.

2

5.    Second, even after this willful breach by LBI, the Noteholder Group attempted to negotiate an acceptable resolution with LBI.  Multiple term sheets were exchanged over the course of the fall and winter of 2017 and the first quarter of 2018, all of which contemplated the exchange of the Second Lien Notes for substantially all of the equity of LBI.  The negotiations ultimately broke down over Liberman's insistence that he be awarded an outsized equity position totaling up to 25% and the Noteholder Group exercised its rights under the Second Lien Indenture by declaring a notice of default for failure to properly apply the proceeds of the spectrum asset sale to debt repayment.  After the passage of the cure period and upon a notice of acceleration, approximately $260 million became immediately due and payable to the Second Lien Noteholders.  LBI has made no payment to the Second Lien Noteholders on this obligation.

6.    In order to forestall the commencement of an involuntary proceeding, LBI brought litigation against the Noteholder Group in California state court in February 2018, seeking, among other things, a declaration it had more than the 60 day period specified in the Second Lien Indenture to apply the proceeds of the spectrum asset sale to the repayment of debt. Of course, LBI had already spent the money; the litigation was merely a delay tactic and eventually LBI withdrew the case subject to entering into a forbearance agreement with the Noteholder Group (the "Forbearance Agreement"), which (i) mandated the Noteholder Group and LBI to "meet and negotiate in good faith regarding the terms of a restructuring during the Forbearance Period;" and (ii) required the Noteholder Group and LBI to "forbear, whether directly or indirectly, from taking any action of any kind …. [that would] alter or otherwise change the Parties' rights with regard to enforcement of the Company Debt….."

7.    LBI then promptly proceeded to breach the Forbearance Agreement by failing to negotiate with the Noteholder Group in good faith and, instead, secretly negotiating a transaction

3

with HPS – a third party hedge fund – that would eventually and fundamentally "alter or otherwise change the Parties' rights with regard to enforcement of the Company Debt."

8.    <u>Third</u>, at the direction of Liberman and the Director Defendants, LBI agreed to and executed a restructuring transaction with HPS, which achieved no economic benefit for LBI and in fact pushed it deeper into insolvency, but which deprived the Noteholder Group of their economic rights and allowed Mr. Liberman to retain control of LBI.  For its part, HPS was paid millions of dollars in fees, received a guarantee of an $87 million make whole, received a broad indemnity from LBI, and had its attorney's fees covered both for the transactions and for any resulting litigation or investigation.

9.    In particular, Defendants executed the HPS transaction as follows:

a.  On or around February 9, 2018, Liberman and the Director Defendants would add an $87 million "make whole" penalty to the Company's First Lien Notes (defined *infra* ¶ 49.a), which would be triggered upon any acceleration of the second lien debt or the commencement of a bankruptcy proceeding;

b.  On or around April 11, 2018, Liberman and the Director Defendants caused LBI to pay HPS over $9 million in fees for HPS to secretly purchase $165 million of the Company's publicly traded First Lien Notes, enough to reach the 75% stake required to amend the First Lien Indenture (defined *infra* ¶ 49.a);

c.  On April 11, 2018, HPS purchased the First Lien Notes at 101 (above-par), knowing that they would soon be worth nearly 40% more due to the "make whole" penalty;

d.  On April 17, 2018, HPS and LBI, via Liberman and the Director Defendants, amended the First Lien Indenture to render the 25% of First Lien Notes owned by other parties, including certain of the Plaintiffs, subject to a mandatory call;

e.  On April 17, 2018, HPS and LBI, via Liberman and the Director Defendants, also amended the First Lien Indenture to insert the $87 million "make whole" penalty, which was triggered immediately, and;

f.  On April 17, 2018, LBI, via Liberman and the Director Defendants, invoked the mandatory call and funded it by immediately issuing new notes to HPS.

10.    At the close of the mandatory call:

   a.    HPS exclusively owned the Company's first lien debt;

   b.    The first lien debt's value had effectively increased from $220 million to $307 million;

   c.    Due to combination of additional debt and the misuse of corporate assets, the first lien debt had become the Company's "fulcrum" securities in its inevitable bankruptcy (whereas the second lien debt previously had been); and

   d.    Liberman and J. Liberman were assured that they would continue to have management roles and outsized equity in the Company (as reorganized), without facing challenges from Plaintiffs who would be wiped out in the bankruptcy. The other Director Defendants approved because they were beholden to Liberman and hoped to retain their positions.

11.    The HPS transaction did not confer any meaningful benefit on LBI. Indeed, the Company received virtually no additional working capital in exchange for the over $90 million it committed to HPS in the form of the "make whole" penalty and other fees, costs, and benefits.

12.    Defendants' overall scheme harmed Plaintiffs in multiple ways, including: (i) diverting millions of dollars to pay fees and indemnities to third parties like HPS, which bought the Company's debt at prices several percent higher than the Company itself could have paid; (ii) giving HPS a "make whole" penalty that – if enforceable – added $87 million to the Company's debt; and (iii) rendering the first lien debt the Company's "fulcrum securities" whereas the second lien debt had previously held that position. Absent relief from this Court, the Second Lien Noteholders therefore have a smaller chance of ever being repaid or receiving a material amount of equity in a reorganized LBI.

5

13.     Plaintiffs thus bring this action to recover damages for Defendants' breach of

contracts and wrongful conduct, and to obtain equitable subordination of HPS's claims and

interests to those of Plaintiffs.[3]

## **THE PARTIES**

14.     Plaintiff Caspian Select Credit Master Fund, Ltd. is a Cayman Islands exempted

limited company with its principal place of business at c/o Caspian Capital LP, 10 East 53rd

Street, New York, NY 10022.

15.     Plaintiff Caspian Solitude Master Fund, L.P. is a Delaware limited partnership

with its principal place of business at c/o Caspian Capital LP, 10 East 53rd Street, New York,

NY 10022.

16.     Plaintiff Super Caspian Cayman Fund Limited is a Cayman Islands limited

company with its principal place of business at c/o Caspian Capital LP, 10 East 53rd Street, New

York, NY 10022.

17.     Plaintiff Caspian HLSC1, LLC is a Delaware limited liability company with its

principal place of business at 10 East 53rd Street, New York, NY 10022.

18.     Plaintiff Caspian SC Holdings, L.P. is a Delaware limited partnership with its

principal place of business at c/o Caspian Capital LP, 10 East 53rd Street, New York, NY 10022.

---

[3]     Plaintiffs anticipate making a demand on the debtor-in possession to file a
colorable claim of avoidance that would benefit the bankruptcy.  In the event that Plaintiffs'
demand is refused, Plaintiffs plan to amend the Complaint to include an avoidance cause of
action.  *In re Cybergenics Corp.*, 226 F.3d 237, 240 n. 3 (3d Cir. 2000) (citing *In re Gibson Grp.,
Inc.*, 66 F.3d 1436, 1438 (6th Cir. 1995)).

19.     Plaintiff Caspian Focused Opportunities Fund, L.P. is a Delaware limited partnership with its principal place of business at c/o Caspian Capital LP, 10 East 53rd Street, New York, NY 10022.

20.     Plaintiff Mariner LDC is a Cayman Islands limited company with its principal place of business at c/o Caspian Capital LP, 10 East 53rd Street, New York, NY 10022.

21.     Plaintiff Blackstone Diversified Multi Strategy Fund, a sub-fund of Blackstone Alternative Investment Funds Plc, is an Irish investment company incorporated with limited liability, with its principal place of business at c/o Caspian Capital LP, 10 East 53rd Street, New York, NY 10022.[4]

22.     Plaintiff Blackstone Alternative Multi-Strategy Sub Fund IV L.L.C., a wholly owned subsidiary of Blackstone Alternative Multi-Strategy Fund, a series of Blackstone Alternative Investment Funds, is a Delaware limited liability company with its principal place of business at c/o Caspian Capital LP, 10 East 53rd Street, New York, New York 10022.[5]

23.     Plaintiff Latigo Ultra Master Fund, Ltd. is an exempted company incorporated in the Cayman Islands with its principal place of business at 450 Park Avenue, Suite 1200, New York, New York 10022.

24.     Plaintiff Crown Managed Accounts SPC acting for and on behalf of Crown/Latigo Segregated Portfolio is an exempted company incorporated in the Cayman Islands

---

[4]     Plaintiffs Blackstone Diversified Multi Strategy Fund and Blackstone Alternative Multi-Strategy Sub Fund IV L.L.C. are participants in this matter through positions held in accounts managed on a discretionary basis by Caspian Capital LP, which also manages Plaintiffs Caspian Select Credit Master Fund, Ltd., Caspian Solitude Master Fund, L.P., Super Caspian Cayman Fund Limited, Caspian HLSC1, LLC, Caspian SC Holding, L.P., Caspian Focused Opportunities Fund, L.P., and Mariner LDC.

[5]     *Id.*

with its principal place of business at 450 Park Avenue, Suite 1200, New York, New York 10022.

25.    Plaintiff Archview Fund LP is a Delaware limited partnership with its principal place of business at 750 Washington Blvd., Stamford, CT, 06901.

26.    Plaintiff Archview Master Fund Ltd is a Cayman Islands corporation with its principal place of business at 750 Washington Blvd., Stamford, CT, 06901.

27.    Plaintiff Archview ERISA Master Fund Ltd. is a Cayman Islands corporation with its principal place of business at 750 Washington Blvd., Stamford, CT, 06901.

28.    Plaintiff Archview Credit Opportunities Fund I L.P. is a Cayman Islands limited partnership with its principal place of business at 750 Washington Blvd., Stamford, CT, 06901.

29.    Plaintiff York Credit Opportunities Fund, L.P. is a Delaware limited partnership with its principal place of business at 767 5th Ave, 17th floor, New York, NY 10153.

30.    Plaintiff York Global Credit Income Master Fund, L.P. is a Cayman Islands limited partnership with its principal place of business at 767 5th Ave, 17th floor, New York, NY 10153.

31.    Plaintiff York Credit Opportunities Investments Master Fund, L.P. is a Cayman Islands limited partnership with its principal place of business at 767 5th Ave, 17th floor, New York, NY 10153.

32.    Plaintiff Exuma Capital, L.P. is a Cayman Islands limited partnership with its principal place of business at 767 5th Ave, 17th floor, New York, NY 10153.

33.    Plaintiff Riva Ridge Recovery Fund LLC is a Delaware limited liability company with its principal place of business at 55 Fifth Ave. 18th Floor, New York, NY 10003.

8

34.     Plaintiff Kildonan Castle Global Credit Opportunity Master Fund, Ltd. is a Cayman Islands corporation with its principal place of business in the Cayman Islands.

35.     Plaintiff Kildonan Quebec Fund Ltd. is a Cayman Islands corporation with its principal place of business in the Cayman Islands.

36.     Defendant LBI Media, Inc. is a California corporation with its principal place of business at 1845 West Empire Avenue, Burbank, CA 91504.  LBI is an indirect wholly owned subsidiary of LBI Media Holdings, Inc. ("Holdco"), a Delaware corporation, and is a holding company with substantially no assets, operations or cash flows other than its investment in its subsidiaries and intercompany loans.

37.     Defendant Lenard Liberman is a director of LBI and serves as its President and CEO.  His place of business is at 1845 West Empire Avenue, Burbank, CA 91504.

38.     Defendant Jose Liberman is a director of LBI and serves as Chairman of the Board of Directors, and is Defendant Liberman's father.  Lenard and Jose Liberman co-founded Defendant LBI, and Jose Liberman has served alongside his son on its board since 1987.  Upon information and belief, Lenard and Jose Liberman, personally and through their affiliates, control over 90% of the voting interests of LBI and thus have the power to nominate the other directors.  As Liberman's father, Jose Liberman stood to gain personally from equity given to Liberman in LBI, as well as his future entrenchment in management.  His place of business is at 1845 West Empire Avenue, Burbank, CA 91504.

39.     Defendant Winter Horton is a director and the Chief Operating Officer of LBI and has a long-standing relationship with the Libermans, having been employed by them and LBI since 1997.  (Horton, along with Liberman, are collectively referred to herein as the "Officer Defendants").  Upon information and belief, Horton was nominated or appointed to the board of

9

LBI by the Libermans.  He also manages the sales and operations of the Estrella TV Network, a subsidiary of LBI that was created by Lenard Liberman in 2009.  Based on public filings, as of December 31, 2006, a predecessor in interest to Defendant LBI, which had also been controlled Liberman and his father, had loaned an aggregate amount of $690,000 to Horton for his personal use.  During the year 2006, Defendant Horton did not repay any principal or interest on that loan, and at least one personal-use loan made by the Company to Defendant Horton did not bear interest and did not have a maturity date.  Because Defendant Horton thus relied on Defendants Lenard and Jose Liberman for his personal finances and continued employment, he was unable to exercise impartial judgment over Liberman's actions.  His place of business is at 1845 West Empire Avenue, Burbank, CA 91504.

40.     Defendant Rockard J. Delgadillo is a director of LBI.  Upon information and belief, he was nominated to that position by Defendants Jose and Lenard Liberman.  Defendant Delgadillo is the former City Attorney for the City of Los Angeles City and sought the office of Attorney General of California.  During his campaigns for office, he has received campaign donations from both LBI and from Jose Liberman in his personal capacity, as well as Esther Liberman, who upon information and belief is Liberman's mother and Jose Liberman's wife.  His place of business is at 633 West 5th Street, Suite 3200, Los Angeles, CA 80071.

41.     Defendant Peter Connoy is a director of LBI.  Upon information and belief, he was nominated to that position by Defendants Jose and Lenard Liberman.  His place of business is at 221 Main Street, PO Box 113, Seal Beach, CA 90740.

42.     Defendant Neal Goldman is a director of LBI.

43.     Defendant HPS Investment Partners, LLC is a Delaware limited liability company with its principal place of business at 40 West 57th Street, 33rd Floor, New York, NY 10019.

10

## JURISDICTION AND VENUE

44.     The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334(b) and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a civil proceeding arising under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, or arising in or related to cases under Title 11, namely *In re LBI Media, Inc., et al.*, currently pending before this Court.  The Noteholder Group's claim for equitable subordination for the claims and interests of HPS to the claims and interests of the Noteholder Group arises under 11 U.S.C. § 510(c).  The remainder of the state law claims set forth herein are related to the Bankruptcy Case within the meaning of 28 U.S.C. § 1334(b).

45.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157.

46.     Plaintiffs consent to the entry of final orders or judgments pursuant Fed. R. Bankr. P. 7008.

47.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409 because LBI has a Chapter 11 action pending in this district and this adversary proceeding arises under Title 11 or is related to LBI's Chapter 11 case.

## STATEMENT OF FACTS

48.     LBI is a Spanish-language media company headquartered in Burbank, California.  While LBI is privately held, it has issued hundreds of millions of dollars of debt that is publicly traded by investors, including by private funds managed and advised by Caspian Capital LP

11

("Caspian"), York Capital Management Global Advisors, LLC and its affiliates ("York"), and HPS.

49.    Prior to its transaction with HPS, LBI and its affiliates issued nearly $500 million in debt:

   a. *First*, LBI issued $220 million in 10% Senior Secured Notes due 2019 (the "First Lien Notes").  LBI issued the First Lien Notes pursuant to an Indenture, dated as of March 18, 2011, as supplemented by the Supplemental Indenture dated as of December 31, 2012, and by the Second Supplemental Indenture dated as of December 23, 2014, by and among LBI Media, Inc., the guarantors party thereto, and U.S. Bank National Association, as trustee (the "First Lien Indenture").

   b. *Second*, LBI has $259 million in principal amount outstanding in 11½%/13½% PIK Toggle Second Priority Secured Subordinated Notes due 2020, Series II (the "Second Lien Notes") issued pursuant to the Second Lien Indenture.  Pursuant to Sections 13.01 through 13.13 of the Second Lien Indenture, the Second Lien Notes are subordinated in right of payment to all existing and future senior debt of LBI, including the First Lien Notes.  The Second Lien Notes were accelerated and not paid prior to November 21, 2018, when LBI filed for Chapter 11 bankruptcy.

   c. *Third*, Holdco has issued $5.6 million in 11% Senior Notes due 2017 (the "Holdco Notes") pursuant to an Indenture dated as of December 31, 2012, by and among LBI Media Holdings, Inc. and U.S. Bank National Association as trustee (the "Holdco Indenture").  Such notes matured on April 30, 2017, but have not been repaid.

12

     d.   *Fourth*, Holdco has issued Intermediate Holdco Notes due 2022 after it exchanged $24.3 million of Holdco Senior Notes in August 2017.

50.    LBI has been a distressed company for years, and the Company's creditors have agreed on multiple occasions to restructure its above-referenced debt to stave off a bankruptcy filing, which was ultimately unavoidable.  For example, funds managed by Caspian have provided financing to the Company since as early as 2011.  Throughout that time, Caspian has endeavored to help LBI return to its pre-financial crisis success, but the Company's management continued to take on more debt than it could afford.

51.    LBI's Chapter 11 filing is only further confirmation of what has long been the case – the Company has been, for some time now, insolvent and unable to pay its obligations as they become due.  For example, on June 28, 2017, LBI agreed to pay for the legal expenses of the Second Lien Noteholders to negotiate a reorganization because LBI knew that reorganization was necessary, and that getting the Second Lien Noteholders to agree was key.  LBI's audited financial statements for fiscal year 2017, published March 28, 2018, indicated that the Company had a shareholder deficit of $279.8 million as of December 31, 2017.  The audited financial statements also indicated that the Company's interest expense exceeded its adjusted earnings before interest, debt, taxes, and amortization ("EBIDTA") by approximately $22.2 million in 2017.  The Company's projections for the period from January 1, 2018 through March 31, 2020 also indicated that cash interest expense would exceed Adjusted EBITDA.

52.    On May 1, 2017, the LBI Holdco notes matured and LBI did not pay or take any actions to address it.  On March 1, 2018, legal advisors for certain of the Plaintiffs sent a letter to LBI Holdco providing notice pursuant to Section 6.02 of the Holdco Indenture that an Event of Default had occurred and was continuing under the Holdco Indenture.  Specifically, the letter

stated that an Event of Default occurred under Section 6.01(b) of the Holdco Indenture because of LBI Holdco's failure to make payment in full on the outstanding principal and accrued interest on the Holdco Notes on May 1, 2017.  The letter demanded immediate payment of $6,391,543.77, which represents the indebtedness under the Holdco Notes, plus accrued interest and fees as of March 1, 2018.  LBI sent a response letter asserting that the Plaintiffs were not technically direct holders of the Notes.  Plaintiffs responded by having the trustee send a virtually identical letter.  The Holdco Notes remain fully mature and are owing.

53.     In the last five years, Plaintiffs purchased both First Lien Notes and Second Lien Notes in reliance on the Indentures governing these debt offerings, which include restrictions on the Company's ability to use the proceeds of certain asset sales in order to ensure that the Company would reduce its debt.

**A.     LBI's Violation of the Indentures Precipitates the Ongoing Conflict with the Second Lien Noteholders**

54.     Certain members of the Noteholder Group, including funds managed by Caspian and York, participated in the initial issue of second lien notes in 2011.  The purpose of the financing was to help the Company recover after the financial crisis.

55.     At the end of 2014, the Company's debt balance was approximately $490 million, which gave rise to more than $30 million in annual interest expense, which was approximately the same amount as the Company's annual EBIDTA.  The Company needed additional operating capital, and reached out to certain of the Second Lien Noteholders to refinance.

56.     At that time, the Federal Communications Commission ("FCC") had announced an "incentive auction" designed to repurpose broadcast television spectrum for new use beginning in 2016.  Pursuant to the incentive auction, broadcasters could bid to relinquish certain

14

of their spectrum rights in exchange for a share in the proceeds from an auction of the repurposed spectrum. LBI told its creditors that it expected to receive hundreds of millions in proceeds for its unwanted spectrum, and that it could use those proceeds to pay down most of the Company's debt.

57.    Certain members of the Noteholder Group gave LBI a $50 million bridge loan to enable the Company to survive until the incentive auction. They also provided the Company rescue financing under the new Second Lien Indenture, contracted for LBI to use the auction proceeds to de-lever the Company, and expected LBI to fix the capital structure and execute an out-of-court reorganization. As these negotiations went on, an officer, a director, and a series of outside advisors resigned in growing recognition that the Company had no intention of honoring its contractual obligations or fiduciary duties to the Noteholder Group.

58.    Throughout 2016 and early 2017, LBI participated in the incentive auction. As part of that auction, LBI sold control of the spectrum license relating to KRCA 62, a television station in Riverside, California ("Spectrum Asset Sale").

59.    As carefully negotiated between the parties, the Second Lien Indenture required LBI to use the proceeds from the Spectrum Asset Sale to pay down its debt within 60 days of receipt of the proceeds. In other words, except for limited uses not available here, the Indenture bars the Company from using the proceeds of such a sale for any other purpose, including funding operations or new acquisitions, until its debt is paid down. And because the First Lien Indenture prohibits the proceeds from being used to pay down junior debt prior to repayment, the Company was obligated to use such proceeds to repay the First Lien Notes.

60.    On July 21, 2017, LBI received approximately $92.3 million in net proceeds from the Spectrum Asset Sale. LBI applied $50.8 million of the proceeds received to the repayment of

principal and interest of its then outstanding first lien term loan, which was required under the term loan's credit agreement and the indenture. Thus, the remaining proceeds from the Spectrum Asset Sale totaled approximately $42.5 million.

61.     Shortly thereafter, the Company issued its quarterly report for the six months ended June 30, 2017, in which it disclosed that it was holding $25 million of the proceeds from the Spectrum Asset Sale that it would use to invest in new property.

62.     Upon learning of LBI's intention to violate the Second Lien Indenture, Plaintiffs' representatives contacted LBI's then-counsel, Latham & Watkins LLP ("Latham"), stating that the proceeds from the Spectrum Asset Sale constitute a "Net Proceeds from Spectrum Asset Sales" as defined in the Second Lien Indenture and therefore could only be applied to repay senior debt, unless otherwise consented to by the Second Lien Noteholders.

63.     Latham, who was fully familiar with the Second Lien Indenture's terms and the parties' intent, responded a short while later, indicating the Company understood and agreed with the Second Lien Noteholders' reading of the Second Lien Indenture:  LBI could not use the sale proceeds for such a transaction exchange without the Second Lien Noteholders' consent.

64.     In July 2017, Blima Tuller, LBI's last permanent CFO, resigned.  Upon information and belief, she resigned because she was not comfortable with LBI management's and the Director Defendants' decision to violate the Second Lien Indenture.  LBI was without a permanent CFO from that time until they hired Brian Kei in 2018.

65.     On September 19, 2017, when the 60-day period for the application of the Spectrum Asset Proceeds under the Second Lien Indenture had expired, the Noteholder Group (including Plaintiffs), who own over 75% of the Second Lien Notes sent a letter to LBI notifying the Company that it was not in compliance with Section 4.10(b)(ii) of the Second Lien Indenture.

16

The letter also warned the Company that, if any portion of the Spectrum Asset Proceeds were used in contravention of the Second Lien Indenture or otherwise utilized by the Company absent an agreement with the Noteholder Group, the Noteholder Group intended to "hold the Company, its Board of Directors and the Company's officers liable" and reserved all of their rights.  The Noteholder Group also reminded the Company that the Noteholder Group and its legal and financial advisors had been engaged in diligence and discussions with the Company and its advisors for months with a view toward entering into a transaction to address the Company's financial condition, and expressly stated that the Noteholder Group remained committed to engaging in those discussions.

66.     As part of these discussions, the Company drafted term sheets in which it proposed giving a substantial amount of equity to the Noteholder Group, demonstrating that Liberman and the other directors recognized that the Company was insolvent and needed to be reorganized.

67.     On or around the same time, Latham resigned as LBI's counsel.  Following that, Kirkland & Ellis LLP ("Kirkland") was hired.

68.     LBI and the Noteholder Group engaged in several months of negotiations during which Liberman made a series of proposals on behalf of LBI that shared two central demands: his continued role as CEO of LBI, and demands of high compensation in the form of equity stakes of 22-25 percent.  Liberman, in turn, had the support of the Director Defendants, because they hoped that if Liberman retained control, they could keep their positions on LBI's Board and all corresponding privileges (such as the "privilege" to secure interest and maturity-free loans from the Company, *see supra* ¶ 39).  Due to their significant personal and financial relationships with Liberman, a majority of the Board was beholden to, or controlled by, Liberman, such that

17

they were either incapable of, or failed to, act in good faith and exercise their impartial and independent judgment as directors. *See supra* ¶¶ 38-42.

69.     Notwithstanding the fact the Second Lien Noteholders believed they would receive all of the equity in the Company should it declare bankruptcy, the Noteholder Group agreed to continue working with LBI on reaching terms for a consensual restructuring (including providing some equity to Liberman in a restructured LBI, even though he was not legally entitled to it, in order to achieve consensus).

70.     On December 20, 2017, after exchanging numerous proposals, Liberman, on behalf of LBI, sent a counterproposal that acknowledged that the Company had to restructure pursuant to Chapter 11 proceedings.

71.     Within two days, however, despite informing a group of the Second Lien Noteholders that the Company would need to reorganize, Liberman and the Director Defendants decided to cause LBI to purchase a television station in Miami for $11 million (the "Miami Acquisition") without informing the Second Lien Noteholders or obtaining their consent.

72.     On the same day, Michael Solow, a bankruptcy attorney and one of LBI's independent directors resigned.  Upon information and belief, he resigned due to his disagreements with LBI's decision to breach the Second Lien Indenture through making the Miami Acquisition and the plan to defraud the Second Lien Noteholders.

73.     On January 3, 2018, after months of negotiation and with no prospect of resolution in sight, the members of the Noteholder Group exercised their right under the Second Lien Indenture and sent a notice of default to LBI for failing to apply the Spectrum Asset Sale proceeds in accordance with the Indenture (the "Default Notice").

74.    Pursuant to Section 6.01(d) of the Second Lien Indenture, such default would result in an "Event of Default" if not cured in thirty days.  A default under the Second Lien Indenture would also lead to a cross-default of the First Lien Notes.

75.    The very next day, on January 4, 2018, LBI announced the Miami Acquisition.

76.    The signing of this transaction without the Noteholder Group's consent came as a complete surprise for three reasons:

a.    *First*, the Second Lien Indenture prohibited this transaction, which LBI and its advisors had acknowledged when confronted about it in the fall of 2017.  In fact, LBI's attorneys acknowledged the Company could not consummate the Miami Acquisition without the Noteholder Group's consent and said that the Company had every intention of adhering to the Second Lien Indenture.

b.    *Second*, LBI was insolvent and did not even have funds to finance its existing operations.

c.    *Third,* there was no sound financial basis to acquire additional assets that were not immediately accretive.

77.    Despite reassuring certain of the Second Lien Noteholders that it would not proceed without their consent, LBI had secretly forged ahead with negotiating the terms of the Miami Acquisition and signing an agreement with a third party that committed the proceeds from the Spectrum Asset Sale for a purpose other than repayment of debt.

78.    In addition, despite telling a group of the Second Lien Noteholders LBI was committed to an imminent plan of reorganization that involved using the proceeds from the Spectrum Asset Sale to pay down the Company's First Lien Notes, then refinancing the first lien debt that remained and exchanging equity for the Second Lien Notes, LBI instead proceeded to

use the tens of millions of proceeds from the Spectrum Asset Sale that remained following the Miami Acquisition to fund operations and postpone its inevitable reorganization.

79.    On January 10, 2018, the Noteholder Group sent a letter to LBI's Board stating that Liberman and the members of the LBI Board were breaching their fiduciary duties to creditors by having failed, among other things, to: (1) obtain the consent of the Second Lien Noteholders for the Miami Acquisition; (2) explain whether the purchase price was reasonable; (3) inform the Noteholder Group as to what level of support and commitment would be required for the acquired Miami television station to operate at a profit; and (4) explain the impact of the transaction on LBI as a whole.  The Noteholder Group further advised LBI and its Board that such actions violated the Second Lien Indenture.

**B.    Liberman, the Director Defendants, and HPS Engage in Secret Negotiations to Enrich Themselves at LBI's Expense and to Ensure the Second Lien Noteholders Are Never Repaid**

80.    On January 19, 2018, LBI's Board held a meeting at which the Noteholder Group's letters were discussed.  At the meeting, Liberman expressed his belief that the Noteholder Group was "undervaluing management's importance to the business."

81.    At that same meeting, Kent Savagian of Moelis & Company ("Moelis"), LBI's financial advisor, stated that they were reaching out to potential lenders to refinance the First Lien Notes in a way that "would eliminate the cross ownership of the Company's first lien bonds and second lien bonds" in order to circumvent the "difficult negotiating tactics" employed by the Noteholder Group.

82.    As evidenced by his statements in the January 19, 2018 Board meeting, Liberman understood that the Second Lien Noteholders would not agree to reorganize LBI's capital

20

structure in a way that would permit him to retain the substantial equity interest and role as CEO that he desired.

83.     Liberman also understood that even in the unlikely event they were able to agree on an allocation of equity, the Second Lien Noteholders would not allow him to manage LBI without significant oversight and scrutiny, which Liberman wished to avoid.

84.     Liberman and his agents therefore began discreetly reaching out to financial institutions to discuss ways to refinance LBI's first lien debt in a manner that would ensure the Second Lien Noteholders would not control the company or be repaid once the Company is restructured.  LBI's management and Liberman sought to devise a plan that would hinder the Second Lien Noteholders' ability to receive any material equity in the Company because he knew that they would not allow him to keep the level of control he wanted upon reorganization. While the First Lien could be refinanced given its liquidity position, equity was the only currency LBI had to give the Second Lien Noteholders.

85.     Liberman and the Director Defendants sought a counterparty that would be willing to keep Liberman and the Director Defendants in power, or, at a minimum, a counterparty that had not made the decision to remove Liberman.  The Director Defendants and Liberman were willing to offer a substantial upside to increase the likelihood of that result if they could together concoct a way to divest the Second Lien Noteholders of any role in the Company's inevitable reorganization.  The Director Defendants and Liberman were thus incentivized to act in the best interests of their potential counterparty in order to retain their power, rather than act in the best interests of the Company's stakeholders, including its creditors.

86.     On February 6, 2018, Savagian advised Liberman that HPS would submit a final proposal by February 9, 2018, and that they could close the deal within three to four weeks.  At

21

this time, Liberman, the Director Defendants, and HPS entered into a secret agreement to allow

them all to gain at the expense of the Company's existing creditors, and in particular the Second

Lien Noteholders, by pursuing an independent deal.

87.    On February 8, 2018, the Noteholder Group sent a letter to LBI declaring that,

given the Company's failure to cure the event of default within the period specified by the

Second Lien Indenture, the Second Lien Notes were due and payable and demanding immediate

payment in whole of the outstanding principal amount of the Second Lien Notes, together with

all accrued interest thereon, all fees, and other obligations under the applicable documents.

88.    On February 9, 2018, Colbert Cannon, Managing Director of HPS, sent Moelis an

engagement letter and term sheets to memorialize HPS and LBI's secret agreement.  Upon

information and belief, as part of this secret agreement, Liberman and the Director Defendants

agreed to provide HPS with regular communications about LBI's financial performance,

financial information, restructuring plans, and information about negotiations with other

creditors.  Other creditors did not receive the same treatment, as Defendants concealed HPS's

negotiations with LBI from the Company's other creditors.

89.    Liberman, the Director Defendants, and HPS conspired as follows to ensure that

HPS could purchase the First Lien Notes and become the sole holder of those notes:

a. LBI and HPS agreed to a "no shop" provision, which provided that the Company

would not share HPS's proposed terms with others, including the Second Lien

Noteholders;

b. HPS agreed to purchase $165 million of First Lien Notes at prices above the face

value of the notes and the price LBI itself would have paid in the market from

third parties as the first step in acquiring the unilateral right to amend the First

22

Lien Indenture;

c.   LBI and HPS agreed to amend the First Lien indenture (the Third Supplemental Indenture) and effectively bifurcate the First Lien Notes into two groups of lenders, one group subject to a mandatory call at par by LBI and a second group (HPS) that could elect not to participate in the mandatory call;

d.   LBI and HPS also agreed to modify the First Lien indenture to insert a "make whole" penalty (the Fourth Supplemental Indenture), which specified that upon an event of default, such as LBI defaulting on any of its notes (which it already had) and the First Lien Noteholders issuing a notice thereof or declaring bankruptcy, HPS (as First Lien Noteholder) would be entitled not only to all outstanding principal, but also the net present value of unpaid interest payments for the entire remaining term of the loan; and

e.   As the final step in the scheme, (i) LBI invoked its right to exercise the mandatory call option in the First Lien Indenture to force the other First Lien Noteholders (who could not opt out of the mandatory call) to sell their holdings at par to LBI and (ii) HPS agreed concurrently to fund LBI's repurchase of the remaining First Lien Notes (through the issuance of additional First Lien Notes), making HPS the sole First Lien Noteholder.

90.   By design, the "make whole" penalty (if valid) increased the potential value of holding First Lien Notes by approximately $87 million.  Even though there was no expectation this debt could ever be paid in view of LBI's insolvency, it would nonetheless alter the Company's capital structure in a fundamental way, empowering the First Lien Noteholders at the expense of more subordinate creditors.

91.     HPS was the only entity that was aware the penalty would be put in place, and therefore only HPS had the opportunity to trade upon this information prior to the transaction's public disclosure.

92.     On February 12, 2018, LBI held a board meeting.  Savagian reported that HPS and another lender made similar financing offers, but that "the pricing of the HPS offer was slightly more favorable."  In fact, Moelis told the other potential lender that LBI had opted to work "on a 2L solution and that we should hold off our work at least for now."

93.     At this time, LBI was not undertaking any discussions with the Second Lien Noteholders, because it had already agreed with HPS to execute the scheme to defraud the Second Lien Noteholders.

94.     Liberman and the Director Defendants provided HPS with material non-public information about LBI and the plans to refinance it so that HPS could purchase the First Lien Notes on favorable terms and Liberman and HPS could enrich themselves at the expense of the Company's legacy creditors.  LBI's disclosure of non-public information to HPS prevented a true arms-length relationship between the entities from forming.

95.     On February 13, 2018, HPS and LBI entered into an engagement letter to "refinance" the first lien debt.  Despite the fact they called this a financing transaction, the transaction provided no meaningful liquidity and involved an insolvent company taking on a substantial amount of additional debt for nothing in return.

96.     HPS, by all intents and purposes, was an insider of LBI.  HPS, despite not previously being one of the Company's creditors, was granted Board observer rights that long-time creditors such as Plaintiffs never had.  Liberman and the Director Defendants disclosed material non-public information to HPS; LBI gave HPS access to its undisclosed financial

24

information; LBI executed a contract with HPS allowing HPS to trade on material non-public information belonging to LBI; LBI gave HPS information about its management decisions and the decisions of its Board that were not shared with other creditors; and Liberman, the Director Defendants, and HPS shared the same financial incentives in defrauding the Second Lien Noteholders.  At one point, after Liberman expressed displeasure at then-interim CFO Rick Baran's performance to Horton, Horton suggested asking HPS for recommendations for a replacement.

97.    There was no legitimate purpose behind the transaction and LBI did not receive reasonably equivalent value for the "make whole" penalty or the other fees and indemnities it paid.  The purported benefits of the transaction are entirely illusory:

a.    No Meaningful Liquidity: the transaction provided LBI with less than $3 million in additional liquidity after taking account of various transaction-related fees, while the transaction actually increased the principal amount of debt outstanding under the First Lien Notes by $13 million (plus tens of millions more through the "make whole").

b.    No Genuine Extension of Maturity:  The transaction nominally appeared to extend the maturity of the First Lien Notes from April 15, 2019, to 2023.  In reality, the First Lien Notes would become due in March 2020, less than a year after their original maturity date unless the Second Lien Notes were refinanced or prepaid by that time (which had virtually no chance of happening).  That is, of course, if the First Lien Notes were not immediately accelerated by virtue of a cross-default with the Second Lien Notes.  As discussed above, the Second Lien Notes were already in default and accelerated, and, therefore, the First Lien Notes

could have become immediately due and owing as soon as the transaction closed.

    c.   Increased Interest Expense:  While the interest rate expense under the pre-transaction First Lien Indenture was fixed at 10% per annum, the rate under the post-transaction First Lien Indenture was variable and expected to climb to almost 10.5% by March 2019, resulting in $1.7 million in additional interest expense.

    d.   Guaranteed "Make Whole" Penalty:  The new First Lien Indenture also required LBI to pay a "make whole" penalty to HPS that could be worth up to $87.5 million, triggerable upon either a bankruptcy filing or acceleration of the Second Lien Notes.  While make whole provisions are hardly out of the norm where an issuer is solvent, the make whole could already be triggered at the time the First Lien Financing Transaction was consummated by virtue of the defaulting and acceleration of the Second Lien Notes.  LBI also rejected an alternative financing proposal that did not require any make whole payment and presented financially superior terms.  And leaving aside the financing terms available from the Second Lien Noteholders, cheaper financing was available even elsewhere.

98.    Kirkland, LBI's own counsel on the transaction, declined to offer any opinion as to whether the transaction constituted a fraudulent conveyance or would be subject to equitable subordination in bankruptcy.

99.    The transaction resulted in LBI's receipt of almost no value, let alone reasonably equivalent value, and amounted to a fraudulent transfer of value to HPS, which was intended to compensate HPS, in part, for its willingness to participate in the scheme.

26

C.     **Liberman, the Director Defendants, and HPS, as They Carry Out Their Fraud, Attempt to Delay the Second Lien Noteholders from Enforcing Their Rights**

100.     As reported by Savagian on February 6, 2018, HPS needed about three to four weeks to close the transaction.  Accordingly, Liberman and the Director Defendants together with HPS devised a scheme to delay Plaintiffs from enforcing their rights, and thereby to give themselves enough time to finalize the terms of their own transaction.

101.     This plan entailed LBI filing a frivolous lawsuit and then exploiting the Second Lien Noteholders' good faith attempts to negotiate a resolution, who were unaware that the Company, together with Liberman, the Director Defendants, and HPS, was perpetrating an outright fraud against them.  LBI's purpose in filing the litigation was only to create a bona fide dispute to prevent an involuntary bankruptcy.

102.     On February 16, 2018, LBI filed a sham complaint against the Noteholder Group and the Trustee in the Superior Court for the State of California (the "California Action").

103.     The California Action sought a declaration pursuant to California Code of Civil Procedure § 1060, et seq. that the members of the Noteholder Group were not "Holders" under the Second Lien Indenture and that LBI was not in default of the Second Lien Indenture.

104.     The California Action was nothing more than a manufactured dispute over whether the Second Lien Notes were immediately due and payable (which they were), which was designed to delay the Second Lien Noteholders' enforcement of their rights long enough to finalize negotiations with HPS and for HPS to secure the necessary internal approvals and financing to do the deal.

105.     The lawsuit was plainly frivolous, and LBI admitted as much.  In a call between LBI's representatives and a member of the Noteholder Group, LBI's representatives said that the

27

California Action was a "Hail Mary pass." LBI initiated the California Action to forestall a restructuring that was unavoidable given LBI's financial condition until after LBI's management, Liberman, and HPS could execute on their plan, at which time the Second Lien Noteholders would have no leverage in the negotiations unless and until the "make whole" penalty was deemed legally unenforceable.

106.    On February 27, 2018, shortly after filing the California action, HPS and LBI representatives held an "all hands call" to discuss next steps.

107.    On March 6, 2018, Cannon reported to Liberman that HPS was on track to close the deal, and apologized that "legal took a little longer than I had hoped."

108.    On March 7, 2018, Liberman scheduled a March 15, 2018 meeting with Adam S. Cohen, Managing Partner of Caspian Capital LP, to discuss the Second Lien Notes. That same day, Savagian notified Cannon that Liberman would meet with Cohen. Cannon and Liberman agreed to meet an hour prior to Liberman's meeting with Cohen.

109.    Upon information and belief, Liberman shared information about the Noteholder Group's positions with Cannon during that meeting, and together they discussed a strategy for further delaying any action by the Noteholder Group to enforce their rights.

110.    On March 8, 2018, Liberman and Cannon exchanged emails wherein Cannon explained that he had lawyers "working around the clock" because the structure of the fraudulent scheme was "not as simple as drafting up a new credit agreement." Liberman replied, "I understand this deal has some complexities and it is understandable that folks would want to be thoughtful." Those complexities, of course, involved an attempt to paper over their fraudulent transaction to make it appear legitimate.

111.    Despite the California Action being wholly without merit, the Noteholder Group – ignorant of the scheme being perpetrated against them – was determined to try and reach a consensual restructuring of LBI and avoid the further depletion of Company assets that would necessarily result from litigation.

**D.      LBI Voluntarily Dismisses the California Action to Avoid the Disclosure of Defendants' Fraud in the Course of Discovery, and Delay by Another Method**

112.    Less than one month after filing the California Action, LBI, Liberman, and HPS decided to shut it down before the Second Lien Noteholders filed counterclaims and obtained discovery that might reveal the details of their scheme.  By that point, the California Action had served its purpose by giving LBI and HPS more than three weeks in which they had made substantial progress toward a final agreement, and securing both the necessary approvals internally as well as the necessary financing.

113.    Upon information and belief, Liberman, the Director Defendants, and HPS agreed the best course of action was to exploit the Second Lien Noteholders' desire to enter into further negotiations with LBI, which would provide them with additional time without the cost of litigation and the risk their plot might be uncovered.

114.    To that end, LBI and Plaintiffs entered into a forbearance agreement on March 12, 2018 (the "Forbearance Agreement"), whereby LBI agreed to dismiss the California Action without prejudice and the Company and the Second Lien Noteholders agreed to revive their negotiations concerning the restructuring of the Company's capital structure and indebtedness.  Defendants even agreed, in Section 1.04 of the Forbearance Agreement, to "pay the outstanding invoices of" the legal and financial advisors of the Noteholder Group both in connection with defending the California Action and "thereafter" as they come due.  Defendants

29

paid the amount that was owed up to that point under the June 28, 2017 agreement, but have failed to make payments on invoices that have accrued since March 12, 2018.  As part of the Forbearance Agreement, LBI also agreed to pay certain delinquent fees it owed to Plaintiffs from the negotiations between Plaintiffs and the Company over the prior months.

115.    Importantly, LBI and the Noteholder Group agreed to forbear from exercising any legal rights or remedies while the Forbearance Agreement remained in effect to allow the parties to continue negotiations from March 12, 2018 through April 9, 2018 (the "Forbearance Period"). Because any further transactions or depletion of LBI assets could harm the ability of the Noteholder Group to recover on their Second Lien Notes, the parties agreed that they would "forbear, whether directly or indirectly, from taking any action of any kind including (but not limited to): . . . (c) alter or otherwise change the Parties' rights with regard to enforcement of the Company Debt . . . ."

116.    Liberman and the Director Defendants made this agreement knowing full well that LBI's compliance with the agreement was impossible given that, at least as early as February 13, 2018 (a month prior), LBI had already agreed with HPS to a secret scheme to refinance the Company's debt in a manner designed to effectively strip Plaintiffs and the other Second Lien Noteholders of all or most of the value of their holdings.

117.    In addition, Section 1.05 of the Forbearance Agreement specifically provided that LBI and the Noteholder Group "shall meet and negotiate in good faith regarding the terms of a Restructuring during the Forbearance Period."  LBI never had any intentions of negotiating with the Second Lien Noteholders in good faith or honoring the other terms of the Forbearance Agreement, as indicated by it already having a "no shop" agreement in place with HPS, which prevented LBI from ever even sharing the terms it was discussing with HPS.

30

118.    On March 15, 2018, just three days after agreeing to negotiate in good faith, HPS and LBI extended their "no shop" agreement to March 30, 2018.  That same day, the Noteholder Group made their first offer to LBI.  As part of this offer, the Noteholder Group asked to see any competing proposal, which LBI refused to provide because it was not interested in receiving the best offer for the Company.

119.    Despite its contractual obligations, LBI made no effort at negotiation until March 27, 2018 – more than two weeks after the Forbearance Agreement was executed, and approximately halfway through the Forbearance Period.

120.    When LBI's proposal finally did arrive, it was economically unreasonable and, like the proposals LBI had made previously, sought 25% of equity for Liberman personally – an excessive and unwarranted amount.

121.    In clear acknowledgement that the Noteholder Group had neither consented to nor was informed about the Miami Acquisition before its announcement, the proposal also required that the Noteholder Group "agree" post hoc to the Miami Acquisition, which already had been consummated just two days following the dismissal of the California Action.

122.    Upon information and belief, HPS was aware of the terms LBI intended to demand from the Second Lien Noteholders and consented to their transmission, with the understanding that LBI had no intent of reaching any agreement with the Second Lien Noteholders.

123.    Despite the unexplained delay in getting the proposal, the Noteholder Group responded to the Company's proposal within two days, on March 29, 2018.

31

124.    On April 2, 2018, LBI and HPS once again extended their "no shop" agreement to April 13, 2018.  At this point, they were also exchanging draft revisions to the First Lien Indenture that contemplated LBI's inevitable bankruptcy.

125.    On April 3, 2018, LBI responded with a proposal in which LBI's terms barely changed from the previous proposal.

126.    On April 5, 2018, Liberman informed the Noteholder Group that he would be traveling with his family and would not be available to consider any proposals until April 9, 2018, the day the Forbearance Period was scheduled to end.  In fact, Liberman was busy finalizing the last steps of his and HPS's fraud.

127.    On April 5, 2018, Liberman reached out to Ronen Bojmel, Senior Managing Director and Head of Restructuring at Guggenheim Securities, LLC ("Guggenheim"), another financial advisor.  They spoke on the phone about Liberman's fraudulent scheme, and after their discussion, Bomjel suggested in an email that "2nds may be crammed down with zero" in a bankruptcy.  Liberman asked Bomjel to seek further advice on the matter.

128.    On April 7, 2018, Cannon and Savagian worked to finalize negotiations with First Lien Noteholders that did not own Second Lien Notes.  Savagian reported to Liberman that the First Lien Noteholders "have been pushing for a premium to par of 104," and that Cannon "offered them 101 to get it done."  Liberman asked why LBI could not just call the notes at par. Savagian replied, "Colbert [Cannon] is going out of his pocket as the direct buy at close is to help them from a bankruptcy perspective."  That is, Savagian and Cannon determined that their transaction would have a higher chance of surviving a legal challenge, such as this one, if it appeared that Cannon and HPS purchased the notes on their own.

129.     As Cannon negotiated this purchase, he was in possession of material nonpublic information that the value of the First Lien Notes was going to be significantly inflated by the "make whole" penalty, and was reassured that there would be no consequences because LBI had agreed to indemnify HPS for the purchase.

130.     In addition, Cannon, Liberman, and other participants of the fraudulent scheme acknowledged LBI was insolvent and would have to file for bankruptcy even if LBI and HPS were successful in executing the transaction.

131.     On Sunday, April 8, 2018, LBI held another Board meeting, where Savagian reported that HPS had successfully negotiated the purchase of First Lien Notes at 101 above par.

132.     After the board meeting, Liberman, Connoy, and Cannon met separately.  Upon information and belief, Liberman and Cannon instructed Connoy to not participate in the final board meeting to approve the transaction so that he could later form part of a purportedly "independent" committee to undermine any legal effort to unwind the transaction.

133.     On April 11, 2018, LBI's Board approved the HPS transaction.  Of the four Board members who voted to approve it, two were Liberman and his father, who stood to materially benefit from the fraud by retaining their control over the Company.  Liberman was guaranteed a position on the Board of the reorganized LBI, and Debtor's bankruptcy plan followed through. *See* Dkt. 43 § 5.14(a) (stating that "New Board shall consist of . . . the Chief Executive Officer"); *id.* at § 1.26 (defining "Chief Executive Officer" as Liberman).  Horton and Delgadillo for their part, stood to benefit through guarantees of continued employment on the Board.  *Id.* § 5.16(a) ("the Debtors shall assume the Key Employee Agreements").  Connoy was not present, even though the meeting was held by telephone.

**E.    The Second Lien Noteholders Discover Defendants' Real Motive for Delaying Negotiations**

134.    On or about April 12, 2018, the real reason for LBI's delay became clear: Plaintiffs learned that LBI – through Liberman and the Director Defendants – had been separately negotiating in secret with HPS regarding the refinancing of its First Lien Notes.

135.    Once the Noteholder Group learned that LBI had been negotiating with HPS, the Noteholder Group repeatedly asked LBI to provide them with the proposal offered by HPS to determine if the Noteholder Group could offer LBI a deal on the same or better terms, without a "make whole" penalty.  Liberman and the Director Defendants refused despite their fiduciary duties to the Second Lien Noteholders to avoid actions that dissipate corporate assets that might otherwise be used to pay their claims.

136.    In other words, far from negotiating in good faith with the Noteholder Group or being available during the Forbearance Period, LBI was in fact working with HPS to consummate a refinancing of the Company's first lien debt that was designed to destroy any ability of the Second Lien Noteholders to recover on LBI's debt or obtain equity in LBI.

137.    The fact that LBI was negotiating a refinancing of the First Lien Notes came as a complete surprise to the Noteholder Group given LBI's obligation in the Forbearance Agreement to negotiate in good faith.

138.    On or after April 12, 2018, the Noteholder Group asked for more information regarding the potential terms, both because they were owners of the First Lien Notes and because they were willing to make an alternative, competitive proposal depending on the potential terms.

139.    Despite months of negotiating and multiple proposals, at no time did Liberman, the Director Defendants, or LBI propose any form of restructuring that contemplated a change to

34

its first lien debt.  Nor, it turns out, was LBI in discussions with any holders of the First Lien

Notes to do so.

140.    The fact that LBI was in secret negotiations with HPS also explains why, on

April 9, 2018, the day the forbearance was to end, the Noteholder Group received a proposal

from Liberman that was materially worse for the Noteholder Group than LBI's April 3 proposal.

Not only did LBI's April 9 proposal demand more equity value for Liberman than the April 3

proposal had demanded, it was coupled with an entirely new demand that the Noteholder Group

provide the Company with $70 million in additional cash.

141.    Liberman's upward revision, while refusing to share the other proposal LBI

reportedly received, revealed that he was not negotiating on LBI's behalf in good faith.  Rather,

his goal was to prolong negotiations with the Second Lien Noteholders until the end of the

Forbearance Period and then execute the transaction with HPS.

142.    Upon information and belief, not only was HPS aware and supportive of LBI's

conduct vis-à-vis the Second Lien Noteholders throughout the Forbearance Period, but HPS

knowingly facilitated LBI's breach of the Forbearance Agreement's terms as part of the

fraudulent scheme.

143.    As is typical in agreements between companies and their creditors, the

Forbearance Agreement contained a provision that required the Company to make a public

disclosure of all material non-public information exchanged between LBI and the Noteholder.

144.    LBI attempted to use this process to create a false and misleading public record of

what had occurred.  LBI proposed to disclose only the Second Lien Noteholder's proposal and

LBI's counterproposal, as opposed to the entire sequence of events.  LBI agreed begrudgingly to

disclose the complete negotiating history only upon the Noteholder Group's insistence that it do so.

**F.    Defendants' Fraudulent Scheme Becomes Evident to the Second Lien Noteholders**

145.    Around this time, Plaintiffs became aware of rumors that LBI was seeking to refinance the First Lien notes.  Plaintiffs' representatives reached out to the Company to offer a deal with $60 million in new money using the same financing terms as the then-existing First Lien Indenture (which did not have a "make whole" penalty).  Unbeknownst to Plaintiffs, the Company shared the offer with HPS, who told Liberman and the Director Defendants to refuse it.

146.    The first step in Defendants' fraudulent scheme first became apparent on April 11, 2018, when Plaintiffs observed a substantial purchase of approximately $165 million of First Lien Notes, which was equivalent to 75% of the First Lien Notes.

147.    Plaintiffs were still unaware of the identity of the buyer or the terms of any transaction, because LBI's management and HPS actively concealed and refused to disclose any details to them.

148.    Plaintiffs discovered the price paid for the First Lien Notes was $101, i.e., above par value.

149.    The only reason why HPS was willing to pay above-market prices for these notes was because it received a 2% fee as part of the underlying transaction and because the transaction included the fraudulent "make whole" penalty designed to make the First Lien Notes (rather than the Second Lien Notes) the fulcrum securities.

150.    On April 16, 2018, Bojmel, the financial advisor who suggested "cram[ing] down" the Second Lien Noteholders "with zero," emailed LBI's General Counsel, stating "I caught up with Lenard earlier. Can you talk real quick re law firms?"

151.    Around this time, seemingly uncomfortable with the decisions of Liberman and the Director Defendants, who were breaching their fiduciary duties and causing LBI to breach its contractual obligations, Moelis and Kirkland resigned as LBI's financial advisor and external counsel.  LBI replaced them with Guggenheim and Weil, Gotshal & Manges LLP, respectively.

152.    It was only on April 17, 2018, days after the Forbearance Period expired, that the Company disclosed that it had entered into an agreement with HPS to restructure its first lien debt.

153.    Although the announcement of this HPS transaction came just days after the Forbearance Period expired, Liberman and the Director Defendants were acting throughout the Forbearance Period to engineer a transaction that would do exactly what the Forbearance Agreement prohibited: "alter or otherwise change the Parties' rights with regard to enforcement of the Company Debt."

154.    On April 12, 2018, Cannon called Cohen, to make an introduction and to discuss working on a restructuring of LBI, demonstrating that HPS knew the Company was insolvent and needed to be restructured.  It also demonstrated that Cannon acknowledged that LBI's transaction with HPS would not stave off a bankruptcy or allow LBI to service its existing debts.

155.    At this time, the Second Lien Noteholders still did not know the specifics of the HPS transaction, including as regards (i) LBI's agreement to pay millions of dollars to HPS and its outside advisors and (ii) the "make whole" penalty and the fact that the Company received grossly insufficient value in return for it.  The Second Lien Noteholders understood the

transaction to mean that HPS would simply provide new capital and refinance the First Lien Notes under its existing structures.  They had no idea that Liberman was actually increasing the Company's debt rather than deleveraging.

156.    It was also around this time that Plaintiffs first discovered that, even though several of them still owned First Lien Notes, Defendants had agreed to amend the First Lien Indenture and compel the remaining First Lien Noteholders to sell their notes at a price that was lower than the price paid by HPS in the April trade, and below the market-value of the notes had the remaining First Lien Noteholders been permitted to participate in the refinancing on the same terms as HPS, and that was not reflective of the inclusion of the $87 million make whole (if allowed), which was known to HPS but not other holders.

157.    Under the terms of the First Lien Indenture, LBI may elect to redeem the First Lien Notes upon 30 days' notice to the holders of the First Lien Notes.  Because there was previously no mechanism for the Company to choose exactly which First Lien Notes would be redeemed or for any individual holder of First Lien Notes to decline the redemption of their First Lien Notes, on April 17, 2018, LBI and Wilmington Savings Fund Society, FSB (the "First Lien Trustee"), as successor Trustee, entered into a Third Supplemental Indenture to the First Lien Indenture (the "Third Supplemental Indenture").  Because of HPS's purchase of 75% of the outstanding First Lien Notes, execution of this indenture required only HPS's consent.

158.    To be sure that HPS would be the only holder of first lien debt, the transaction documents also restricted transfers of the first lien debt to certain parties listed on a schedule of disqualified investors.  Through this mechanism, LBI's management ensured that its preferred counterparty (HPS) would remain in place.

159.    The Third Supplemental Indenture amended the First Lien Indenture to allow holders of First Lien Notes who held such notes legally to decline redemption by sending a written notice to the Company.  As planned, the notice of redemption was provided to holders on April 17, 2018, and the only holder of First Lien Notes that was permitted to decline the redemption was HPS.  Thus, following the redemption on April 17, 2018, HPS became the only remaining holder of First Lien Notes.

160.    On April 17, 2018, LBI, HPS (now a 100% holder), and the First Lien Trustee entered into a Fourth Supplemental Indenture to the First Lien Indenture (the "Fourth Supplemental Indenture").  The "make whole" penalty is contained in Section 5.07(d) of the First Lien Indenture, as supplemented by the Fourth Supplemental Indenture.

161.    That section provides that if, before May 16, 2022, the First Lien Notes are accelerated (whether as a result of an event of default, by operation of law, or otherwise), or if the First Lien Notes are affected in any way by a bankruptcy proceeding, then LBI must pay to the holders—*i.e.*, HPS—an "Applicable Premium."

162.    Section 1.01 defines "Applicable Premium" as:

> "the present value at such date of all required interest payments due (or that would have been due) on such [First Lien] Note through May 16, 2022 (excluding accrued but unpaid interest to the applicable date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points."

163.    LBI, Liberman's, and the Director Defendants' agreement to these terms was particularly problematic given that Second Lien Noteholders had already sent an acceleration notice in February 2018 and it was therefore certain that LBI would be obligated to pay the Applicable Premium.

164.    Indeed, the "make whole" penalty was triggered immediately upon the amendments to the indentures coming into effect, because the Second Lien Notes were in default and had been accelerated.  LBI, LBI's creditors, and HPS were all aware that this Chapter 11 filing for LBI was inevitable, and that this filing would trigger the "make whole" penalty.  That inevitability was obvious at the time based on: (i) the Company's own financial outlook; (ii) the fact that the Second Lien Notes were due and owing, well before the maturity date of the restructured First Lien Notes; and (iii) the failure and apparent inability of LBI Holdco, LBI's corporate parent, to pay the Holdco Notes that had already fully matured and were owing.  The "make whole" penalty was thus not a contingency, but a certainty.

165.    The "make whole" penalty (if enforceable, which Plaintiffs dispute) will cost LBI (and the Noteholder Group) up to $87 million or more and would make the First Lien Notes the fulcrum securities.  The fulcrum was also shifted by the Miami purchase, payment of fees from the "make whole," and squandering of Spectrum proceeds.

166.    LBI did not receive anything of commensurate value for the "make whole" penalty, and there was no legitimate business purpose for its inclusion in HPS's deal with LBI.

## G.    Liberman and the Director Defendants' Self-Interest in Their Deal with HPS Is Readily Apparent

167.    Upon information and belief, the only possible explanation for the HPS agreement is that Liberman, the Director Defendants and HPS intend for (i) Liberman and J. Liberman to personally benefit (or retain the opportunity to benefit) from the transaction; (ii) the Libermans to be entitled to (or retain the opportunity to negotiate to receive) a significant share of the equity in the reorganized LBI following its exit from its Chapter 11 proceeding; (iii) Liberman to maintain

40

control of the Company; and (iv) HPS to secure a windfall profit—all to the detriment of LBI and the Second Lien Noteholders.

168.    LBI's deal with HPS did not resolve any of the Company's financial problems and was not intended to help LBI avoid its inevitable bankruptcy. Instead, the HPS transaction was intended to cement the Director Defendants' position in the Company, make it more likely that all or a substantial portion of the debt owed to the Second Lien Noteholders would be erased, and ensure HPS would own the Company following its emergency from bankruptcy.

169.    The Company received a total of $13 million in additional cash from its deal with HPS. That $13 million was used chiefly to fund transaction fees to Moelis and other parties, and the Company had only $3 million of the $13 million remaining. Factoring in the $87 million "make whole" penalty and the need for an outsized DIP budget that allowed for significant litigation expenditures, the transaction with HPS deepened the Company's insolvency by tens of millions of dollars. That deepening insolvency was, in fact, the very objective of the scheme, as it was necessary (assuming the "make whole" is enforceable, which Plaintiffs dispute) to divest the Second Lien Noteholders of equity in a reorganized company.

170.    Moreover, the transaction's purported extension of the maturity date of the First Lien Notes to May 16, 2022 was an illusory benefit. The preexisting event of default under the Second Lien Indenture triggered a cross-default and right to accelerate under the First Lien Indenture. LBI's management and HPS knew when entering the transaction that this reorganization was inevitable.

171.    The only beneficiaries of the deal between LBI and HPS were Liberman, the Director Defendants, and HPS. HPS received a "make whole" penalty worth $87 million, a broad and unlimited indemnity from the Company, a good rate of interest on invested capital,

and advisory fees from its investors on the invested capital of $233 million.  Liberman and

J. Liberman, for their part, received the right to retain operational control of a company in which

he had no equity interest as an economic matter.

> **H.  Plaintiffs Seek Injunctive Relief against LBI and Liberman, which the New York Supreme Court Denies on the Basis of Liberman's False and Misleading Testimony that the Transaction with HPS Would Obviate the Need for LBI to File for Bankruptcy**

172.    On April 20, 2018, at the Noteholder Group's direction, the Second Lien Trustee

sent a letter to LBI declaring an Event of Default pursuant to Section 6.01(d) of the Second Lien

Indenture and exercising its right to accelerate the Notes and declare them immediately due and

payable to obviate LBI's technical arguments.

173.    On April 25, 2018, Plaintiffs filed a Complaint against LBI and Liberman in the

Commercial Division of the Supreme Court of the State of New York in the County of New

York (the "First New York Action").

174.    The First New York Action was brought by 75% of the Second Lien Noteholders.

They sought preliminary and permanent injunctions preventing LBI and Liberman from taking

any further steps to consummate and effect the transaction.  Plaintiffs alleged that LBI breached

the Forbearance Agreement; that Liberman breached his fiduciary duties to the Noteholder

Group and the Company; and that Liberman tortiously interfered with the Forbearance

Agreement between the Noteholder Group and the Company.

175.    On May 9, 2018, Liberman submitted an affidavit in opposition to the injunction

stating that "the board believes that the HPS transaction, therefore, will provide the Company

with an opportunity to avoid a bankruptcy filing.  Indeed, the HPS transaction would provide the

Company with sufficient liquidity to manage operations through maturity of the Second Priority

Notes in 2020."

176.    In this same affidavit, Liberman falsely asserted that the transaction would

provide LBI with $13 million in "working capital," despite knowing that the true amount after

fees to HPS and its advisors was just $3 million.

177.    On May 9, 2018, Savagian made similar and false assertions in a separate

affidavit, asserting that the HPS transaction would result in $13 million of "new money" despite

knowing the vast majority of these funds would be used to pay back HPS and advisors (including

Moelis, Savagian's firm) in connection with the transaction.  Savagian raised this as a purported

benefit of the HPS transaction over the Noteholder Group proposal, while also admitting that the

Noteholder Group had been open to providing $20 million in "new money" during negotiations.

178.    The court held hearings on May 14, 2018 and May 16, 2018 to hear the parties'

arguments and testimony on the preliminary injunction.  At the May 14, 2018 hearing, Justice

Scarpulla stated, "The question is why do this deal; right? . . . I would like to know myself";

"The timing [of the deal] is very troubling"; "I do not see how that could possibly be a deal that

is worth doing"; and "I don't think a $90 million make whole is in most deals."  At the end of the

May 14, 2018 hearing, the court asked the Company to present testimony that LBI would not file

for bankruptcy, and that there would be no irreparable harm if that testimony were credible.

179.    On May 16, 2018, Liberman testified that he had "no intention of filing for

bankruptcy."

180.    This testimony was false as Liberman, since at least February 2018, had been

negotiating a restructuring with HPS that contemplated a bankruptcy filing and hired

Guggenheim for the specific purpose of assisting with a cramdown remedy in bankruptcy to get

43

rid of the Second Lien Noteholders.  Even before that, Liberman had been in ongoing

negotiations with the Second Lien Noteholders about a reorganization that involved equitizing a

portion of the Company's liability to the Second Lien Noteholders pursuant to a bankruptcy

filing.

181.    At that hearing, Liberman also testified that the financial prospects of LBI were

strong: "Our business has been improving with an improving economy."

182.    Contrary to these representations, Liberman, the Director Defendants, and HPS

recognized the Company's bankruptcy was only a matter of time.  This is borne out by the

documents quoted above and their conversations with certain of the Second Lien Noteholders

before and after the HPS transaction was consummated.  It is also confirmed by the fact that

LBI's bankruptcy counsel was sitting in Court and watching as Liberman testified.

183.    The only extrinsic support for Liberman's testimony were fanciful liquidity

projections created by the Company and its advisors that assumed 8-10% revenue growth year-

over-year per quarter.  Liberman knew the projections were never going to materialize because,

throughout early 2018, he received frequent sales updates from all of LBI's radio and TV

stations showing that they were losing their largest advertisers (down $4.4 million from 2015 to

2017) and were, at best, barely up 1% in Q1 2018 over Q1 2017.

184.    As the Noteholder Group's financial advisor explained in an affidavit, "the

forward-looking financial information provided by the Company indicates that the Company will

exhaust its cash resources as early as October 2018," and that "the Company would fully deplete

its post-Transaction cash balance in the fourth quarter of 2018."  LBI did not dispute this, and it

turned out to be correct.

185.    At the same hearing, LBI's then-CFO, Rick Baran, also testified about the Company projections.  When asked whether the HPS transaction would allow the Company to "make its upcoming interest payments to at least the end of the year," Baran replied that, "[i]f the deal closes tomorrow . . . we are very confident we will be able to complete the year successfully."

186.    When questioned about the projected growth rates of 10% year-over-year and how those projections compared to actual results in the first quarter of 2018, Baran admitted that LBI's "actual performance . . . was a little bit behind 2017 performance," and that there was "not a growth of 10 percent."

187.    Thus, Liberman was aware even as he told the New York court that he would "grow[] revenue" that, far from growing 10%, LBI was actually underperforming its 2017 figures and that his testimony depended on unrealistic projections.

188.    On May 16, 2018, the court denied the plaintiffs' motion for a preliminary injunction, finding that while there were serious questions surrounding the legitimacy of the transaction, there was no risk of imminent harm to the plaintiffs because the court "accept[ed] testimony today from witnesses that there is no intent to put the company into bankruptcy."

189.    Despite this testimony, LBI was not able to make the May 2018 interest payment to the Second Lien Noteholders, which it paid only after the expiration of the entire grace period, and also missed the October 2018 interest payment.

I.      **A Subset of Plaintiffs Seek Relief against LBI, Liberman and, for the First Time, HPS**

190.    Since the May 18, 2018 ruling, the court asked LBI on a number of occasions to ensure that HPS participates in mediation discussions.  HPS, which is not a party in the First New York Action, declined to participate in any of these discussions.

191.    Therefore, on July 24, 2018, a subset of Plaintiffs filed a second action against HPS, LBI and Liberman in the Commercial Division of the Supreme Court of the State of New York in the County of New York (the "Second New York Action").

192.    Plaintiffs in the Second New York Action seek relief against HPS, LBI, and Liberman for fraudulent conveyance, civil conspiracy, and deepening insolvency.  Those plaintiffs assert a separate claim against LBI and Liberman for fraud based on concealment.  Those plaintiffs also assert separate claims against only HPS for aiding and abetting the breach of fiduciary duties, aiding and abetting fraud based on concealment, and tortious interference with contract.

193.    On September 17, 2018, Defendants and Liberman filed their respective motions to dismiss arguing the Second New York Action fails to state a claim pursuant to N.Y. CPLR 3211(a)(7).  The court has not yet ruled on the pending motions.

194.    On the eve of bankruptcy, and only *after* Plaintiffs had commenced legal proceedings in New York, LBI's board attempted to retroactively immunize Liberman and the other Directors by having appointed a new independent director, Neal Goldman, who was purportedly tasked with reviewing whether to bring "certain potential claims and estate causes of action . . . , including those related to the issues raised in the State Court Litigation."  Dkt. 44 at 20.  Together with Connoy (who had been a director of the Company when it approved the HPS

46

transaction), Goldman formed an "independent" restructuring committee to oversee the "investigation." *Id.* Upon information and belief, the investigation was a sham and served as the final step to completing LBI, Liberman, and HPS's fraud against the Second Lien Noteholders.

195.    Even had the investigation been legitimate, the restructuring committee was not "independent." This is because Connoy had at least one personal meeting with Cannon throughout negotiations, *see supra* ¶ 132, where, upon information and belief, he was instructed not to attend the final approval meeting and he adhered to those wishes. Even if he did not participate in the Board's vote to support the HPS transaction, Connoy was involved in the Board's decision to enter into the transaction and discussed it, and that in and of itself renders him a facilitator.

**J.    LBI Files its Inevitable Chapter 11 Bankruptcy Proceedings**

196.    On November 21, 2018, LBI filed for Chapter 11 bankruptcy protection in this Court. The Company has thus far refused to apply to extend its automatic bankruptcy stay to its non-debtor co-defendants in the First and Second New York Actions.

197.    To date, the Company has unreasonably failed to seek to unwind the fraudulent transaction with HPS, even though doing so would eliminate the $87 million "make whole" penalty and an additional $13 million in first lien debt to pay back the Company's other creditors.

198.    Despite stating under oath that LBI would lower costs and increase revenue, Liberman did no such thing. Less than six months since his testimony, having made only one additional coupon payment on the second lien debt—which LBI made late, after the grace period, only after the New York Supreme Court expressed dismay when, during a conference, LBI indicated it may not make the payment—LBI filed for bankruptcy.

47

# FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT – SECOND LIEN INDENTURE)
### (Against LBI)

199.    Plaintiffs hereby reallege and incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

200.    The Second Lien Indenture is a valid and enforceable contract between Plaintiffs and LBI.

201.    Plaintiffs have performed their obligations under the Second Lien Indenture.

202.    When the FCC announced its broadcast television spectrum "incentive auction" in March 2016, LBI was near insolvency.  LBI saw the auction as an opportunity to pay down some of its debt, but it did not have the liquidity to continue operations until the time of the sale.

203.    Accordingly, Plaintiffs negotiated a bridge loan to LBI to enable the Company to continue operating until the auction.  Key to this financing was LBI's contractual promise in the Second Lien Indenture to use the proceeds from the Spectrum Asset Sale to pay down the Company's first lien debt and de-lever the capital structure.

204.    The Second Lien Indenture barred the Company from using the proceeds of the sale for any other purpose, including funding operations or new acquisitions.  LBI breached the Second Lien Indenture when it failed to apply approximately $42.5 million received from the Spectrum Asset sale towards paying down its first lien debt.

205.    Latham, LBI's then-counsel, told the Noteholder Group that LBI was required to use the proceeds to pay down the first lien debt.  Around the same time that LBI violated the Indenture, both Latham and then-CFO Blima Tuller resigned.

206.    Because of this breach, the Company paid down approximately $42.5 million less of its first lien debt than it would have under the Indenture.  Even if the Company's interpretation

of the Indenture is correct (that it required payment within one year and 60 days rather than 60 days), LBI did not make the required payment on time.  The HPS transaction did not satisfy the Indenture because the Indenture specifically required proceeds from a Spectrum Asset Sale to be applied to reduce the Company's debt – not for the Company to take on *more* debt to make that payment.

207.    Because the Company's debts exceed its assets, LBI's breach of the Second Lien Indenture has reduced LBI's ability to repay the Noteholder Group and other Second Lien Noteholders.

208.    As a direct and proximate result of LBI's breach of the Second Lien Indenture, Plaintiffs have suffered damages in an amount to be determined at trial.

<u>**SECOND CAUSE OF ACTION**</u>
**(BREACH OF CONTRACT – FORBEARANCE AGREEMENT)**
**(Against LBI)**

209.    Plaintiffs hereby reallege and incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

210.    The Forbearance Agreement is a valid and enforceable contract between Plaintiffs and LBI.

211.    Plaintiffs have performed their obligations under the Forbearance Agreement.

212.    Section 1.05 of the Forbearance Agreement obligated Plaintiffs and LBI to "meet and negotiate in good faith regarding the terms of a Restructuring during the Forbearance Period."

213.    Defendant LBI breached its obligations under Section 1.05 of the Forbearance Agreement.  At no point while the Forbearance Agreement was in effect did LBI negotiate in good faith with the Noteholder Group.  LBI unreasonably delayed even beginning negotiations –

49

indeed, LBI waited more than two weeks to do so.  When it finally did make a proposal, LBI's

offer was so unrealistic that it could not possibly have been made in good faith.

214.    Defendant LBI also breached Section 1.05 of the Forbearance Agreement by

entering into a "no shop" agreement with HPS, without Plaintiffs' knowledge, before the end of

the Forbearance Period.  By doing so, on information and belief, LBI pledged to another party

that it would not share that party's proposed terms for a restructuring with Plaintiffs, despite the

fact that LBI was under a continuing obligation to negotiate with Plaintiffs in good faith.  It is

not possible that LBI could have performed its obligation to negotiate with Plaintiffs in good

faith when LBI had, in fact, explicitly agreed *not* to share critical information with Plaintiffs.

215.    Defendant LBI also breached Section 1.05 of the Forbearance Agreement by

refusing to provide Plaintiffs with any information about the terms of HPS's proposal or the

agreement it entered into with HPS during the Forbearance Period.

216.    Section 1.01(c) of the Forbearance Agreement requires that LBI "forbear …

whether directly or indirectly, from taking any action of any kind" that would "alter or otherwise

change the Parties' rights with regard to enforcement of the Company Debt."

217.    LBI breached Section 1.01(c) of the Forbearance Agreement, including by

negotiating a deal with HPS that does, in fact, change Plaintiffs' rights with regard to

enforcement of the "Company Debt."  By virtue of the deal entered into by LBI and HPS, to the

extent enforceable and allowable in a bankruptcy, Plaintiffs' share of equity in a restructured LBI

will be substantially reduced.

218.    Section 1.04 of the Forbearance Agreement requires that LBI shall pay the

outstanding invoices of the Noteholder Group's legal and financial advisors and shall pay

additional invoices for such firms in accordance with the Advisor Engagement Letters.

219.     LBI has breached Section 1.05 of the Forbearance Agreement.  To date, over

$250,000 has been invoiced to LBI that LBI has failed to pay, and LBI is obligated on additional

amounts that have not yet been invoiced.

220.     As a direct and proximate result of LBI's breach of the Forbearance Agreement,

Plaintiffs have suffered damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (EQUITABLE SUBORDINATION)
### 11 U.S.C. § 510(c)
### (Against HPS)

221.     Plaintiffs hereby reallege and incorporate by reference each and every allegation

in the preceding paragraphs as though fully set forth herein.

222.     HPS engaged in inequitable conduct to Plaintiffs.  HPS owed a fiduciary duty to

each of the Plaintiffs when it acquired material non-public information related to LBI.

Moreover, HPS is a non-statutory insider of LBI because it received regular communications

about financial performance, restructuring plans, and negotiations with other creditors that was

not available to others; it advised LBI on financial affairs; and it entered into the secret

agreement with LBI's management that caused the Company to take on more debt than it could

repay.

223.     HPS has acted inequitably and breached its fiduciary duties to Plaintiffs by

conspiring with Liberman, the Director Defendants, and LBI to remove all value from the

Second Lien Notes.

224.     HPS's inequitable conduct has resulted in injury to Plaintiffs and conferred an

unfair advantage on HPS, because HPS received millions in fees and the benefit of a fraudulent

$87 million "make whole" penalty.

51

225.    Plaintiffs suffered particularized harm as a result of HPS's conduct, because HPS

targeted Plaintiffs by acting in concert with LBI and Liberman to ensure the Noteholder Group

did not obtain control of the reorganized debtor.  No other class or group of creditors was

similarly targeted.

226.    Equitably subordinating HPS's claims and interests is not inconsistent with the

provisions of Title 11 because the equitable subordination requested is in response to HPS's

specific inequitable conduct towards the Noteholder Group.

227.    Accordingly, pursuant to 11 U.S.C. § 510(c), any claim or interest of HPS with

respect to the Debtor's estate should be equitably subordinated to the claims and interests of

Plaintiffs.

**FOURTH CAUSE OF ACTION**
**(BREACH OF FIDUCIARY DUTY)**
**(Against Liberman and the Director Defendants)**

228.    Plaintiffs hereby reallege and incorporate by reference each and every allegation

in the preceding paragraphs as though fully set forth herein.

229.    At all relevant times, LBI was insolvent and its officers and directors owed

fiduciary duties to the First and Second Lien Noteholders to maintain the value of the Company

in trust for the benefit of its stakeholders, including its creditors, and to avoid any actions that

divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors'

claims, including acts that involve self-dealing or the preferential treatment of creditors.

230.    Liberman and the Director Defendants breached their fiduciary duties, including

by (i) causing LBI to breach the Second Lien Indenture and Forbearance Agreement in

furtherance of their own self-interest; (ii) causing LBI to enter into the HPS transaction out of

their own self-interest and with the purpose and effect of disenfranchising Plaintiffs and

52

delaying, hindering, and defrauding Plaintiffs in their efforts to recover on the second lien debt;

(iii) providing HPS insider Company information and conspiring to cause LBI to enter into the

HPS transaction, which was intended to benefit HPS – another creditor – at Plaintiffs' expense;

and (iv) intentionally concealing from Plaintiffs the material facts surrounding their efforts to

negotiate and execute on the HPS transaction in order to prevent Plaintiffs from asserting their

rights against Defendants.

231.    The Director Defendants agreed to the HPS transaction because it furthered

Liberman's, the Director Defendants', and HPS's interests, at Plaintiffs' expense.

232.    The business judgment rule does not apply because Liberman and the Director

Defendants were conflicted and acted in bad faith.

233.    Goldman also breached his fiduciary duties by conducting an "investigation" with

a predetermined result in order to purportedly clear the other directors of any wrongdoing

234.    As a result of Liberman's and the Director Defendants' breaches of fiduciary

duties, Plaintiffs have been uniquely harmed as compared to other creditors, including HPS.

235.    As a direct and proximate result of Liberman's and the Director Defendants'

breaches of fiduciary duties, Plaintiffs have suffered damages in an amount to be determined at

trial.

## FIFTH CAUSE OF ACTION
### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY)
### (Against HPS)

236.    Plaintiffs hereby reallege and incorporate by reference each and every allegation

in the preceding paragraphs as though fully set forth herein.

237.    At all relevant times, LBI was insolvent and its officers and directors owed

fiduciary duties to the First and Second Lien Noteholders to maintain the value of the Company

in trust for the benefit of its stakeholders, including its creditors, and to avoid any actions that divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors' claims, including acts that involve self-dealing or the preferential treatment of creditors.

238.    Liberman and the Director Defendants breached those fiduciary duties, including by (i) causing LBI to breach the Second Lien Indenture and Forbearance Agreement in furtherance of their own self-interest; (ii) causing LBI to enter into the HPS transaction out of their own self-interest and with the purpose and effect of disenfranchising Plaintiffs and delaying, hindering, and defrauding Plaintiffs in their efforts to recover on the second lien debt; (iii) providing HPS insider Company information and conspiring to cause LBI to enter into the HPS transaction, which was intended to benefit HPS – another creditor – at Plaintiffs' expense; and (iv) intentionally concealing from Plaintiffs the material facts surrounding their efforts to negotiate and execute on the HPS transaction in order to prevent Plaintiffs from asserting their rights against Defendants.

239.    The Director Defendants agreed to the HPS transaction because it furthered Liberman's, the Director Defendants', and HPS's interests, at Plaintiffs' expense.

240.    The business judgment rule does not apply because Liberman and the Director Defendants were conflicted and acted in bad faith.

241.    Goldman also breached his fiduciary duties by conducting an "investigation" with a predetermined result in order to purportedly clear the other directors of any wrongdoing.

242.    As a result of Liberman's and the Director Defendants' breaches of fiduciary duties, Plaintiffs have been uniquely harmed as compared to other creditors, including HPS.

243.    HPS was aware of Liberman's and the Director Defendants' breach of their fiduciary duties to Plaintiffs.

54

244.     HPS provided substantial assistance to Liberman and the Director Defendants, including by purchasing the First Lien Notes in return for a payment and "make whole" penalty. HPS also conspired with Liberman and the Director Defendants to cause LBI to reject an alternative, superior restructuring transaction with the Second Lien Noteholders.

245.     As a direct and proximate result of HPS aiding and abetting Liberman's and the Director Defendants' breaches of fiduciary duties, Plaintiffs have suffered damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH CONTRACT)
### (Against Liberman and the Director Defendants)

246.     Plaintiffs hereby reallege and incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

247.     The Second Lien Indenture is a valid and enforceable contract between LBI and Plaintiffs.

248.     At all relevant times, Liberman and the Director Defendants were aware of the Second Lien Indenture and its terms.

249.     Liberman and the Director Defendants, motivated by their self-interest, acted intentionally to induce LBI to breach the Second Lien Indenture or to disrupt the parties' contractual relationship, including by electing not to apply the Spectrum Asset Sale proceeds in the required manner and instead using the proceeds to pay for operational expenses and the Miami Acquisition.

250.     LBI breached the Second Lien Indenture, including by failing to apply Spectrum Asset Sale proceeds to pay down the Company's first lien debt.

55

251.    As a direct and proximate result of Liberman's, and the Director Defendants' tortious interference with the Second Lien Indenture, Plaintiffs have suffered damages in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH CONTRACT)
### (Against HPS, Liberman, and the Director Defendants)

252.    Plaintiffs hereby reallege and incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

253.    The Forbearance Agreement is also a valid and enforceable contract between LBI and Plaintiffs.

254.    HPS, Liberman, and the Director Defendants were aware of the Forbearance Agreement and its terms.

255.    HPS intentionally acted to induce LBI's breach of the Forbearance Agreement or otherwise to disrupt the parties' contractual relationship, including by:  (i) purchasing 75% of the First Lien Notes while in possession of non-public information about the company and its plans; (ii) requesting a "no shop" agreement with LBI during negotiations despite its knowledge of LBI's obligation to negotiate in good faith with the Second Lien holders; and (iii) upon information and belief, promising Liberman a continued role in the Company and outsized equity in return for a "make whole" penalty.

256.    Liberman and the Director Defendants, motivated by their self-interest, intentionally acted to induce LBI's breach of the Forbearance Agreement or otherwise to disrupt the parties' contractual relationship, including by conducting and directing LBI's negotiations with the Noteholder Group and orchestrating the fraudulent scheme with HPS.

257.    Because of HPS's, Liberman's, and the Director Defendants' tortious interference with the Forbearance Agreements, Plaintiffs were unable to reach a restructuring agreement with LBI to preserve the value of their Second Lien Notes.

258.    As a direct and proximate result of HPS's, Liberman's, and the Director Defendants' tortious interference with the Forbearance Agreement, Plaintiffs have suffered damages in an amount to be determined at trial.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right, to the extent permitted under the Bankruptcy Code, the Federal Rules of Civil Bankruptcy Procedure, or by agreement, to assert any claims relating to the subject matter of this action or otherwise relating to the Debtor and its estate against any third party.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. For compensatory damages in an amount to be proven at trial, plus pre and post-judgment interest on that amount as permitted by law;

2. Declaring that Defendant LBI has orchestrated fraudulent transfers and avoiding such transfers;

3. Ordering the equitable subordination of HPS's claims and interests with respect to the Debtor's estate to the claims and interests of Plaintiffs;

4. For attorneys' fees and costs; and

5. For such other further relief as the Court may deem just and proper.

Dated:  January 14, 2019                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP


By: */s/ Andrew R. Remming*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 N. Market St., 16th Floor
PO Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

Robin A. Henry (rhenry@bsfllp.com)
Marc Ayala (mayala@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone:  (914) 749-8200
Facsimile:  (914) 749-8300

Jaime D. Sneider (jsneider@bsfllp.com)
Mario O. Gazzola (mgazzola@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

*Attorneys for Plaintiffs*