## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x

In re:                          :

                                :          **Chapter 11**

                                :

**LBI MEDIA, INC.,** *et al.*    :          **Case No. 18–12655 (CSS)**

                                :

Debtors.[1]                     :          **(Jointly Administered)**

                                :

                                :          Objection Deadline:  Feb. 13, 2019 at 4:00 p.m. (ET)

                                :          Hearing Date:  Feb. 25, 2019 at 10:00 a.m. (ET)

-------------------------------------------------------x

## DEBTORS' MOTION PURSUANT TO
## 11 U.S.C. §§ 362 AND 105 TO ENFORCE THE AUTOMATIC STAY

LBI Media, Inc. ("**LBI Media**") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or "**LBI**"), hereby move for an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), enforcing the automatic stay against the ad hoc group of second lien noteholders appearing in these cases (the "**Junior Noteholder Group**") and U.S. Bank National Association, in its capacity as indenture trustee under the Second Lien Indenture (the "**Second Lien Trustee**", and collectively with the Junior Noteholder Group, the "**Junior Notes Parties**"), and respectfully represent as follows:[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LBI Media, Inc. (8901); Liberman Broadcasting, Inc. (8078); LBI Media Holdings, Inc. (4918); LBI Media Intermediate Holdings, Inc. (9635); Empire Burbank Studios LLC (4443); Liberman Broadcasting of California LLC (1156); LBI Radio License LLC (8905); Liberman Broadcasting of Houston LLC (6005); Liberman Broadcasting of Houston License LLC (6277); Liberman Television of Houston LLC (2887); KZJL License LLC (2880); Liberman Television LLC (8919); KRCA Television LLC (4579); KRCA License LLC (8917); Liberman Television of Dallas LLC (6163); Liberman Television of Dallas License LLC (1566); Liberman Broadcasting of Dallas LLC (6468); and Liberman Broadcasting of Dallas License LLC (6537).  The Debtors' mailing address is 1845 West Empire Avenue, Burbank, California 91504.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Disclosure Statement, the Derivative Standing Motion, or the Intercreditor Agreement (each as defined herein), as applicable.

## Preliminary Statement

1.      The Junior Notes Parties are bound by an Intercreditor Agreement that restricts their ability to interfere with the Debtors' prosecution of these Chapter 11 Cases.    The Intercreditor Agreement was entered into between sophisticated parties and it represents a valuable property right that belongs to the Debtors' estates and is intended to foster the efficient and reliable administration of restructuring proceedings.    Any breach of the Debtors' contract rights under the Intercreditor Agreement is a violation of the automatic stay.    Yet, since LBI filed for chapter 11 protection, the Junior Notes Parties have repeatedly violated the Intercreditor Agreement and informed the Court and parties in interest of their intention to continue to do so.[3]

2.      The Debtors have met and conferred with the Junior Noteholder Group regarding discovery.    As stated at the disclosure statement hearing, the Debtors intend to enforce their contractual rights under the Intercreditor Agreement.    Accordingly, as previewed, the Debtors file this Motion to enforce those rights and propose two alternative procedural paths forward for the Debtors, the Junior Noteholder Group, the official committee of unsecured creditors (the "**Creditors' Committee**"), and other stakeholders in these Chapter 11 Cases at the direction of the Court: (1) the Court could conduct a hearing to enforce the Intercreditor Agreement and the automatic stay now and avoid costly litigation with the Junior Noteholder Group; or (2) have this Motion heard as a *motion in limine* before the Confirmation Hearing or as part of the Confirmation Hearing.    The Debtors are amenable to proceeding in either fashion, but wish for the record to be clear on their intent:  if the Court chooses the latter procedural path, the Debtors wish to put the Junior Noteholder Group on formal notice that the Debtors intend to seek all

---

[3] The Junior Notes Parties have implied that they are not bound by the Intercreditor Agreement.  Notwithstanding that such position is meritless, unless and until the Junior Notes Parties ask and obtain a holding from the Court that they are not so bound, the Junior Notes Parties do not have the ability to violate the Debtors' property rights.  All such rights have been expressly reserved in all pleadings in the Chapter 11 Cases filed or agreed to by the Debtors.

available remedies should they prevail, including the contractual right to recover attorneys' costs and fees, as well as punitive damages.[4]

3.  The Junior Noteholder Group purchased and holds *junior debt*.  Indeed, since long before the commencement of these Chapter 11 Cases, and since it made its decision to invest in the Debtors, the Junior Noteholder Group has been well aware that, pursuant to the Second Lien Notes Indenture and the Intercreditor Agreement, the Second Lien Notes it acquired are subordinate to the First Lien Notes in all respects.  Notably, the Second Lien Notes Indenture and the Intercreditor Agreement were dated and agreed to in 2014, over three (3) years before the May 2018 financing.  The Second Lien Notes Indenture provides for payment and lien subordination of the Second Lien Notes, and the Intercreditor Agreement unequivocally also prohibits the Junior Notes Parties from taking specific actions that disrupt the orderly process of this bankruptcy proceeding or that seek to alter their position as junior noteholders *vis a vis* the First Lien Noteholders, including: (i) objecting to any use of cash collateral or debtor-in-possession financing ("**DIP Financing**"); (ii) seeking relief from the automatic stay; (iii) challenging any claim by the First Lien Noteholders for a make-whole; (iv) challenging the validity, perfection, priority, extent or enforceability of the liens securing the First Lien Noteholders' claims; (v) commencing litigation in respect of the Second Lien Notes Claims; and (vi) raising certain prohibited objections to the Plan and Disclosure Statement.

4.  In their effort to undermine and derail LBI's restructuring process, the Junior Notes Parties have chosen to blatantly disregard the binding Intercreditor Agreement and the automatic stay.  The state court actions filed prior to the commencement of these Chapter 11 Cases were brought in violation of the Intercreditor Agreement's prohibition on initiating

---

[4] *See* 11 U.S.C. § 362(k).

proceedings in respect of the Second Lien Note Claims.  Thereafter, during the first month of the Chapter 11 Cases, the Junior Noteholder Group violated the Intercreditor Agreement on multiple occasions, including by objecting to the Debtors' DIP Financing and by seeking relief from the automatic stay.

5.      More recently, the Junior Noteholder Group commenced an adversary proceeding[5] (the "**Adversary Proceeding**") asserting claims premised on the same set of facts as in the New York state court prior to the Petition Date.  Although the Junior Noteholder Group labels the claims asserted in the Adversary Complaint as "direct," a number of these claims are, in fact, derivative claims that belong to the Debtors' estates and the pursuit of which is prohibited by the automatic stay, including claims for breach of fiduciary duty.  Further, the Adversary Proceeding violates the Intercreditor Agreement because it is a proceeding in respect of the Second Lien Notes Claims, challenges the make-whole, and seeks equitable subordination of the First Lien Notes Claims.

6.      On the same day that it filed the Adversary Complaint, the Junior Noteholder Group filed a motion seeking standing to pursue in this Court certain additional causes of action it previously asserted in state court [D.I. 334] (the "**Derivative Standing Motion**").  Certain of the claims that the Junior Noteholder Group seeks to pursue derivatively – including claims challenging the First Lien Noteholders' make-whole – are unequivocally prohibited by the Intercreditor Agreement.

7.      All indications are that the Junior Noteholder Group does not intend to honor the Intercreditor Agreement going forward.  The Junior Noteholder Group has made it clear that it plans to object to confirmation of the Debtors' Plan.  Hindering confirmation of the Plan, which

---

[5] *See In re Caspian Select Credit Master Fund, Ltd. v. LBI Media, Inc.*, Adv. Proc. No. 19-50007-CSS (Bankr. D. Del. Jan. 15, 2019), D.I. 1 (the "**Adversary Complaint**").

contemplates the disposition of the First Lien Noteholders' collateral, is a violation of the Intercreditor Agreement.

8.      The Junior Noteholder Group's *modus operandi* is clear:  it is trying to cause these Chapter 11 Cases to devolve into a costly and protracted litigation war of attrition.  This approach is value destructive and benefits no one, including the Junior Noteholder Group.  Moreover, the Debtors have incurred – and will continue to incur – significant and unnecessary costs responding to actions taken by the Junior Notes Parties, and stand to bear the burden of the First Lien Noteholders' defense costs.

9.      The Confirmation Hearing is scheduled for March 25, 2019.  The Debtors are targeting a second quarter emergence from chapter 11 on a timeline that is supported by Creditors' Committee and certain of the Debtors' largest creditors.  The Court should not permit the Junior Notes Parties to create chaos – in violation of both their own bargained-for agreement and the Bankruptcy Code – to derail the Debtors' progress.

10.      The Junior Noteholder Group represented to the Court that it will seek significant discovery in connection with Plan confirmation, the Derivative Standing Motion, and the Adversary Complaint.[6]  Broad discovery efforts by the Junior Noteholder Group are already underway.  However, the Intercreditor Agreement presents a threshold issue with respect to the permissibility of confirmation objections and prosecution of the Derivative Standing Motion and Adversary Proceeding.  A ruling on the Motion in advance of the Confirmation Hearing will enable the Court and the parties to narrow the scope of issues to be considered at the

---

[6] *See* Hr'g Tr., Jan. 16, 2019 (the "**DS Hearing Transcript**") at 29:18-20 (MS. STRICKLAND: "My guess is we'll need to go later, not earlier, because we are going to have a lot of witnesses and a lot of discovery"); 42:21-23 (MS. STRICKLAND: "Your Honor, I assume with respect to just the discovery component of it, it's going to entail broad third-party discovery.").

Confirmation Hearing and the discovery attendant thereto, reducing the parties' collective costs.[7]
Moreover, the Intercreditor Agreement obligates the members of the Junior Noteholder Group to reimburse the First Lien Noteholders for attorneys' fees incurred in connection with actions taken in violation of the Intercreditor Agreement.  Accordingly, the Debtors reserve all rights to seek reimbursement for such costs, as well as damages for the Debtors' attorneys' fees from the Junior Noteholder Group incurred in connection therewith.

## Jurisdiction and Venue

11.    The Court has jurisdiction over the Debtors, their estates, and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.  By appearing in these Chapter 11 Cases, the Junior Noteholder Group has submitted to the jurisdiction of this Court.

12.    On December 30, 2018, the Junior Noteholder Group stipulated and agreed to consent to this Court's jurisdiction "over any claim against all or any members of the Junior Noteholder Group in connection with any actions related to the Intercreditor Agreement" [D.I. 265] (the "**Stipulation**").  The Stipulation was so-ordered by the Court on January 2, 2019 [D.I. 270].

---

[7] On January 23, 2019, the Junior Noteholder Group served the Debtors with an overreaching request for document production [D.I. 361], which demands production of documents and communications covering over 140 topics.  The Junior Noteholder Group subsequently demanded depositions from the Debtors, their officers and directors, and their advisors [D.I. 398-400, 402-405, 407], as well as broad demands for the production of documents from the Debtors' current and former officers and directors [D.I. 361, 362, 363, 364, 385, 386, 388] and current and former advisors [D.I. 387, 389, 390], as well as HPS and its advisors [D.I. 361, 394] and other third parties [D.I. 382, 395, 396].  The cost and burden of complying with even a portion of the Junior Noteholder Group's demands will be substantial and costly to the Debtors' estate.  A ruling on the Motion in advance of the Confirmation Hearing has the potential to drastically reduce the costs and burdens associated with the Junior Noteholder Group's overbearing discovery requests, and will benefit parties in interest in addition to the Debtors, and promote judicial economy.

13.    Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order on this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**Background**

A.    **Case Background**

14.    On November 21, 2018 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On December 6, 2018 the United States Trustee for the District of Delaware appointed the Creditors' Committee [D.I. No. 133].  No trustee or examiner has been appointed in these Chapter 11 Cases.

15.    The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

16.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Brian Kei in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [D.I. 13] (the "**First Day Declaration**") and the Disclosure Statement (as defined below).

17.    On January 15, 2019, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization of LBI Media, Inc. and Its Affiliated Debtors* [D.I. 325] (the "**Plan**") and the accompanying disclosure statement [D.I. 326] (the "**Disclosure Statement**").  On January 9, 2019, the Junior Noteholder Group [D.I. 293] and Second Lien Trustee [D.I. 291] objected to the

7

approval of the Disclosure Statement (the "**Disclosure Statement Objections**").  By order dated January 22, 2019, the Court approved the Disclosure Statement [D.I. 360].  Having obtained approval of the Disclosure Statement, the Debtors are working diligently towards an expeditious emergence from chapter 11.  The Confirmation Hearing is scheduled to commence on March 25, 2019.

18.     On January 15, 2019, the Junior Noteholder Group commenced the Adversary Proceeding and filed the Derivative Standing Motion attaching a proposed amended complaint asserting, among other things, fraudulent transfer claims against the Debtors, Lenard Liberman (co-founder and CEO of LBI) ("**Liberman**") and HPS.  The Court scheduled the Derivative Standing Motion to be heard at the Confirmation Hearing.  The Court also ordered the Debtors and the Junior Noteholder Group to meet and confer (the "**Meet and Confer**") on a discovery and litigation timeline for the Confirmation Hearing and the Derivative Standing Motion.  The Meet and Confer was held on January 21, 2019, at which the Debtors notified the Junior Noteholder Group that they would be filing this Motion and seeking the Court's direction regarding appropriate scheduling for the Motion.

**B.      The First Lien Notes and the Second Lien Notes**

19.     Certain of the Debtors are party to that certain First Lien Indenture, dated as of March 18, 2011, among LBI Media, as issuer, the Debtor Guarantors, and Wilmington Savings Fund Society, FSB, as indenture trustee.  *See* First Day Declaration ¶ 36.  Pursuant to the First Lien Notes Indenture, LBI Media issued the First Lien Notes, of which $233 million in principal amount, plus interest, fees, premiums, or other amounts due thereunder, was outstanding as of the Petition Date.

20.     The same Debtors are party to that certain Second Lien Indenture among LBI Media, as issuer, the Debtor Guarantors, and the Second Lien Trustee, dated as of December 23,

8

2014.  *See* First Day Declaration ¶ 37.  Pursuant to the Second Lien Notes Indenture, the Debtors issued the Second Lien Notes, of which approximately $262 million in principal amount, plus interest, fees, premiums, or other amounts due thereunder, was outstanding as of the Petition Date.

21.     Both the First Lien Notes and the Second Lien Notes are secured by liens over substantially all of the assets of LBI Media and the Debtor Guarantors (the "**Common Collateral**").  *Id.* ¶ 36.  The First Lien Notes, however, are secured by first-priority liens (subject to certain permitted liens) over the Common Collateral.  *Id.* ¶ 36.  The Second Lien Notes are junior to the First Lien Notes, and are secured by second-priority liens (subject to certain permitted liens) over the Common Collateral.  *Id.* ¶ 37.  Pursuant to the Second Lien Notes Indenture, the Second Lien Notes are subordinated in right of payment to the prior payment in full of all Senior Debt (as defined in the Second Lien Notes Indenture), including, without limitation, the First Lien Notes.  *See* Intercreditor Agreement § 13.01.

## C.     The Intercreditor Agreement

22.     The relative rights of the parties and the priorities of the First Lien Noteholders and the Second Lien Noteholders (and their respective trustees) with respect to the Common Collateral are set forth in that certain Amended and Restated Intercreditor Agreement, dated as of December 23, 2014, by and among LBI Media, the Debtor Guarantors, Credit Suisse AG Cayman Islands Branch, in its capacity First Priority Lien Collateral Trustee, and U.S. Bank, in its capacity as Second Priority Collateral Agent (as amended, restated, or supplemented, the "**Intercreditor Agreement**").  A copy of the Intercreditor Agreement is annexed hereto as **Exhibit B**.

23.     The Debtors are party to, and have the ability to enforce, the Intercreditor Agreement.  *See* Intercreditor Agreement at 1.  By its terms, the Intercreditor Agreement is

enforceable in these Chapter 11 Cases to the same extent that it was enforceable prepetition under applicable non-bankruptcy law.  *See* 11 U.S.C. § 510(a); *see also* Intercreditor Agreement § 8.2 ("the provisions of [the Intercreditor Agreement] are intended to be and shall be enforceable as a 'subordination agreement' within the meaning of Section 510(a) of the Bankruptcy Code").

24.    Pursuant to the Second Lien Notes Indenture, the Junior Noteholder Group, as purported holders of Second Lien Notes, are bound by the terms of the Intercreditor Agreement:

> ***Each Holder of Notes, by its acceptance thereof, consents and agrees to the terms of the Security Documents and the Priority Lien Intercreditor Agreement*** (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms and authorizes and directs the Trustee to enter into the Priority Lien Intercreditor Agreement and the other Security Documents and to perform its respective obligations and exercise its respective rights thereunder in accordance therewith.

Second Lien Notes Indentures § 10.03 (emphasis added).[8]

25.    The Intercreditor Agreement provides for a series of bargained-for rights and obligations in favor of the Debtors' estates.   The Intercreditor Agreement prospectively minimized the burden on the Debtors' estates by limiting the issues or matters which the Junior Notes Parties might challenge in a chapter 11 proceeding.   To that end, the Intercreditor Agreement prohibits the Junior Notes Parties from taking certain actions with respect to the Common Collateral and the First Lien Notes.   Subsections (a) – (f) discuss specific provisions of the Intercreditor Agreement that are directly relevant to this Motion.

---

[8] A copy of the Second Lien Notes Indenture is annexed hereto as **Exhibit C**.

(a)    **Restriction on Seeking Relief from Automatic Stay.**    First, the
Intercreditor Agreement prohibits the Junior Notes Parties from seeking relief from the automatic
stay in respect of the Debtors' assets that constitute Common Collateral:

> Until the Discharge of First Priority Claims has occurred,
> each Subordinated Lien Debt Representative, on behalf of
> itself and each applicable Subordinated Lien Secured Party,
> agrees not to seek relief from the automatic stay or any
> other stay in any Insolvency or Liquidation Proceeding in
> respect of any assets of any Grantor that constitute First
> Priority Lien Collateral without the prior written consent of
> the First Priority Lien Collateral Trustee and the holders of
> a majority of the First Priority Claims.

Intercreditor Agreement § 6.2.

(b)    **Restriction on Objecting to First Lien Notes Claims.**    Second, the
Intercreditor Agreement prohibits the Junior Notes Parties from objecting to any claims made by
the First Lien Noteholders for certain amounts owed under the First Lien Notes, including any
prepayment premium, penalty, or make-whole amount:

> None of the Subordinated Lien Debt Representatives or any
> other Subordinated Lien Secured Party shall oppose or seek
> to challenge any claim by the First Priority Lien Collateral
> Trustee or any other First Priority Lien Secured Party for
> allowance in any Insolvency or Liquidation Proceeding of
> First Priority Lien Obligations consisting of post-petition
> interest, fees or expenses, including, without limitation, any
> prepayment premium or penalty or make-whole amount.

*Id.* § 6.7(a).

(c)    **Restriction on Contesting First Lien Notes Claims**.    Third, the
Intercreditor Agreement prohibits the Junior Notes Parties from contesting the validity or
enforceability of the First Lien Noteholders' first priority lien on the Common Collateral,
including in a bankruptcy proceeding:

> Each Subordinated Lien Debt Representative for itself and
> on behalf of each applicable Subordinated Lien Secured

11

Party . . . agrees that ***it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, perfection, priority, extent or enforceability of (a) a Lien securing any First Priority Claims*** held (or purported to be held) by or on behalf of the First Priority Lien Collateral Trustee or any of the First Priority Lien Holders or any agent or trustee therefor in any First Priority Lien Collateral or (b) a Lien securing any Subordinated Lien Claims held (or purported to be held) by or on behalf of any Subordinated Lien Secured Party in the Common Collateral, as the case may be . . . .

*Id.* § 2.2(a) (emphasis added).

(d)      **<u>Restriction on Objecting to DIP Financing or Adequate Protection.</u>**

Fourth, the Intercreditor Agreement prohibits the Junior Notes Parties from objecting to the Debtors' debtor-in-possession financing provided by the First Lien Noteholders, including to the use of cash collateral, or to the subordination of junior liens to such financing:

If the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding, then each Subordinated Lien Debt Representative, on behalf of itself and each applicable Subordinated Lien Secured Party, agrees that: (a) if the First Priority Lien Collateral Trustee and/or the First Priority Lien Secured Parties shall desire to permit the use of cash collateral or to permit the Company or any other Grantor to obtain financing (including on a priming basis) under Section 363 or Section 364 of the Bankruptcy Code or any similar provision in any Bankruptcy Law ("DIP Financing"), whether from the First Priority Lien Secured Parties or any other third party (including, but not limited to, any such financing (x) which represents an advance by some or all of the First Priority Lien Secured Parties following repayment of amounts of First Priority Lien Obligations with cash collateral or (y) the proceeds of which are used, in whole or in part, to repay First Priority Lien Obligations owed to some or all of the First Priority Lien Secured Parties), ***it will not object to and will not otherwise contest such use of cash collateral or DIP Financing*** and will not request adequate protection or any other relief in connection therewith . . . .

12

*Id.* § 6.1(a) (emphasis added).  The Intercreditor Agreement also prohibits the Junior Notes Parties from objecting to the Debtors' provision of adequate protection to the First Lien Noteholders:

> Each Subordinated Lien Debt Representative, on behalf of itself and each applicable Subordinated Lien Secured Party, agrees that **none of them shall oppose or otherwise contest** (or support any other Person contesting) (a) **any request by the First Priority Lien Collateral Trustee or the First Priority Lien Holders for adequate protection** . . . .

*Id.* § 6.3(a) (emphasis added).

(e)    **Restriction on Objections to the Plan and Disclosure Statement**.  Fifth, the Intercreditor Agreement restricts the Junior Noteholder Group's ability to object to the Plan and Disclosure Statement.  Among other things, the Intercreditor Agreement prohibits the Junior Notes Parties from: (i) hindering the First Lien Noteholders' disposition of Common Collateral or objecting to the manner by which the First Lien Noteholders seek to enforce First Lien Notes Claims (*id.* § 3.1(c)(i)-(ii)); (ii) asserting a valuation as to the Common Collateral (*id.* § 3.2); (iii) objecting to any request for judicial relief made by the First Lien Noteholders relating to enforcement of their lien on the Common Collateral (*id.* § 6.1(e)); or (iv) supporting an alternative plan of reorganization (*id.* § 6.6(b)) (collectively, the "**Prohibited Plan Objections**"). In fact, the Intercreditor Agreement is clear that the sole right of the Junior Notes Parties in a chapter 11 proceeding is, until the discharge of the First Lien Notes Claims, to "hold a junior Lien on the Common Collateral." *Id.* § 3.1(b).

(f)    **Restriction on Commencing Proceedings Related to Second Lien Notes Claims.**  Sixth, the Intercreditor Agreement prohibits the Junior Notes Parties from commencing any proceeding in respect of the Second Lien Notes Claims:

> Each Subordinated Lien Debt Representative, on behalf of itself and each applicable Subordinated Lien Secured Party,

13

agrees that, unless and until the Discharge of First Priority Claims has occurred, ***it will not commence, or join with any Person*** (other than the First Priority Lien Holders and the First Priority Lien Collateral Trustee upon the request thereof) ***in commencing***, ***any*** enforcement, collection, execution, levy or foreclosure action or ***proceeding*** with respect to any Lien held by it in the Common Collateral under any of the applicable Subordinated Lien Debt Documents or otherwise ***in respect of the applicable Subordinated Lien Claims***.

*Id.* § 3.2 (emphasis added).

26.     Critically, pursuant to the Intercreditor Agreement, if the Junior Noteholder Group takes any action that is "prohibited by, or otherwise inconsistent with, any provision" thereof, each member of the Junior Noteholder Group is individually liable for and must pay any reasonable attorneys' fees, costs and expenses incurred by any of the First Lien Noteholders that arise out of or relate to such actions. *See id.* § 8.21. Likewise, if the Second Lien Trustee takes any action in violation of the Intercreditor Agreement it is liable for such fees and expenses. To the extent such fees and expenses are not paid, they are borne by the Debtors' estates because, pursuant to the Intercreditor Agreement, they are treated as First Lien Notes Claims. *See id.*

27.     The actions that the Junior Notes Parties have already taken have caused the Debtors, as well as the First Lien Noteholders, to expend substantial resources. And the actions that the Junior Notes Parties have stated that they intend to take will cause the Debtors to incur significant fees, costs and expenses, particularly in relation to the size of the Debtors' business. Any costs that the Debtors incur in responding to actions taken by the Junior Notes Parties that are prohibited by the Intercreditor Agreement are unwarranted and unnecessary and must be borne by the Junior Notes Parties.

RLF1 20736157v.1

**D.     The Junior Noteholder Group Breached the Intercreditor Agreement on Multiple Occasions During the Initial Stages of the Chapter 11 Cases**

28.     The Junior Noteholder Group, which holds Second Lien Notes and is therefore subject to the terms of the Intercreditor Agreement, as well as the Second Lien Trustee, have ignored the clear and express provisions of the Intercreditor Agreement.

29.     On November 26, 2018, on the eve of the Debtors' first day hearing (the "**First Day Hearing**"), the Junior Noteholder Group filed an objection to the Debtors' DIP Financing, in clear violation of the Intercreditor Agreement [D.I. 71] (the "**DIP Objection**").    *See* Intercreditor Agreement § 6.1(a).  The Second Lien Trustee joined the DIP Objection [D.I. 77]. Subsequently, at the First Day Hearing, the Junior Noteholder Group objected to terms of the Debtors' DIP Financing as well as the Debtors' provision of adequate protection to the First Lien Noteholders.[9]

30.     On December 10, 2018, the Junior Noteholder Group filed the *Motion of the Ad Hoc Group of Noteholders Pursuant to Section 362 of the Bankruptcy Code for Relief from the Automatic Stay* [D.I. 141] (the "**Stay Relief Motion**").  In the Stay Relief Motion, the Junior Noteholder Group sought authorization from this Court to pursue claims regarding LBI's assets – the First Lien Noteholders' collateral.  The Junior Noteholder Group's filing of the Stay Relief Motion was itself a violation of the automatic stay because, as discussed above, the Intercreditor Agreement prohibits the Junior Noteholder Group from seeking relief from the automatic stay in respect of the First Lien Noteholders' collateral without the written consent of the First Lien Indenture collateral trustee.  *See* Intercreditor Agreement § 6.2.

---

[9] *See* Nov. 27, 2018 Hr'g Tr. at 48  (MS. STRICKLAND:  The only other thing that I would note regarding fees, while it's embedded within the DIP does not actually relate to DIP financing at all, and that is that there are a litany of professionals that are getting paid as part of a requirement under this financing, some of whom have had to our knowledge no role whatsoever in the restructuring or the DIP . . . So we would ask that with respect to fees not related to the preparation of the restructuring and the DIP, that those things, at a minimum, information be provided about who's getting paid on account of what and that that awaits the final hearing, as well as this exit fee also awaits the final hearing and the proration that Mr. Buchbinder suggested as well, Your Honor).

**E.      The Derivative Standing Motion and Adversary Proceeding Violate the Intercreditor Agreement and the Automatic Stay**

31.      In the Stay Relief Motion, the Junior Noteholder Group sought stay relief to proceed with the claims that it had filed in New York state court against both HPS and Liberman, either through an adversary proceeding in this Court or by continuing to litigate those claims in state court.  *See* Stay Relief Motion at ¶ 4.  The Junior Noteholder Group subsequently filed the Derivative Standing Motion, seeking authority to prosecute claims belonging to the Debtors' estates.

32.      The claims that are the subject of the Derivative Standing Motion, including claims for fraudulent conveyance and breach of fiduciary duty – which were previously asserted in the state court – are related to a May 2018 transaction, through which the Debtors obtained first-lien financing from HPS (the "**May 2018 Financing**").  Given that the claims are based upon the Junior Noteholder Group's status as creditors and are plainly "in respect of" the Second Lien Notes, the prosecution of these claims also violates the Intercreditor Agreement.  *See* Intercreditor Agreement § 3.2.  Moreover, the claims that the Junior Noteholder Group seeks to bring expressly and directly challenge the First Lien Noteholders' claim to the make-whole (the "**Make-whole**") agreed to as part of the May 2018 Financing.  *See, e.g.,* Derivative Standing Motion ¶ 81 ("The Debtors are entitled to avoid the obligations due to HPS from the 'make whole' penalty in the First Lien amendment"); ¶ 120 ("the derivative claims carry the prospect of recovering in excess of a hundred million dollars for the estate by eliminating the 'make whole'").  As discussed above, the Intercreditor Agreement prohibits the Junior Noteholder Group from commencing litigation with respect to the Second Lien Notes and from challenging the First Lien Noteholders' Make-whole.  *See* Intercreditor Agreement §§ 6.2, 6.7.  The

16

continued prosecution of these claims violates the Intercreditor Agreement and, therefore, the automatic stay.

33.     The Junior Noteholder Group also seeks to assert a claim for equitable subordination against HPS.  *See, e.g.*, Derivative Standing Motion, Ex. B (the "**Proposed Amended Complaint**") ¶¶ 240-46.  An action for equitable subordination amounts to an express and direct challenge to the priority of the First Lien Noteholders' liens and claims and plainly violates the Intercreditor Agreement and, therefore, the automatic stay.  *See* Intercreditor Agreement §§ 2.2, 6.7.

34.     Like the filing of the Derivative Standing Motion, the Junior Noteholder Group's commencement of the Adversary Proceeding violated the Intercreditor Agreement and the automatic stay.  Setting aside the Intercreditor Agreement, the Adversary Complaint violates the automatic stay because it asserts causes of action that belong to the Debtors' estates, including claims against the Director Defendants (as defined in the Adversary Complaint) for breach of fiduciary duty and claims against HPS for aiding and abetting the alleged breach.  *See* Adversary Complaint ¶¶ 228-45.

35.     Moreover, the Adversary Complaint asserts claims against LBI Media for breach of the Second Lien Notes Indenture and the Forbearance Agreement (as defined in the Adversary Complaint).  *See* Adversary Complaint ¶¶ 199-220.  It also asserts claims against Liberman and the Director Defendants for tortious interference with the Second Lien Notes Indenture.  *Id.* ¶¶ 246-51.  As an initial matter, the breach of contract claims against LBI Media are prepetition general unsecured claims for monetary damages that may not be prosecuted absent relief from the automatic stay and are not the proper subject of an adversary proceeding.  *See Healy/Mellon–Stuart Co. v. Coastal Group, Inc. (In re Coastal Group, Inc.)*, 100 B.R. 177, 178 (Bankr. D. Del.

1989) ("[creditor] has a claim based on a state-law contract. Its complaint falls squarely within the category of cases which would be filed in state court had there been no bankruptcy. It is the typical case which cannot be filed subsequent to a bankruptcy filing absent relief from stay for cause"); *In re TSC Glob., LLC*, No. 12-10505 (KG), 2013 WL 6502168, at *3 (Bankr. D. Del. June 26, 2013) (claim for monetary damages arising from prepetition conduct is not the proper subject of an adversary proceeding). Further, the claim for LBI Media's alleged failure to apply asset sale proceeds as purportedly required by the Second Lien Notes Indenture amounts to a "proceeding" with respect to the Second Lien Notes, and is, therefore, prohibited by the Intercreditor Agreement. *See* Intercreditor Agreement §3.2. Additionally, the Adversary Complaint challenges the Make-whole and seeks equitable subordination, both in the violation of the Intercreditor Agreement and the automatic stay. *See*, e.g., Adversary Complaint at ¶¶ 11, 97, 224, 244 (alleging that "HPS's inequitable conduct has resulted in injury to Plaintiffs and conferred an unfair advantage on HPS, because HPS received millions in fees and the benefit of a fraudulent $87 million 'make whole' penalty").

36.     Statements made by the Junior Noteholder Group in its filings with the Court evidence the Junior Noteholder Group's intent to continue breaching the Intercreditor Agreement. The Junior Noteholder Group plans to contest confirmation of the Plan. *See* DS Hearing Transcript at 40:15-20 (MS. STRICKLAND: "The very issues that are going to be litigated in connection with the contested confirmation very much overlap . . ."). As discussed above, the assertion of any Prohibited Plan Objection violates the Intercreditor Agreement and the automatic stay. *See id.* §§ 3.1(c), 3.2, 6.1, 6.6(b).

37.     Given that the Junior Notes Parties have already willfully violated the automatic stay on numerous occasions and have made their intentions known that they will continue to do

so, the Junior Notes Parties have given the Debtors no choice but to request that the Court enforce the automatic stay.  The Debtors are targeting emergence from chapter 11 in the second quarter of 2019, in accordance with the milestones set forth in the Restructuring Support Agreement and DIP Credit Agreement.  The Junior Noteholder Group's continued litigation in violation of the automatic stay serves no purpose other than to delay the Debtors' reorganization efforts and significantly increase expense to the Debtors' estates to the detriment of all creditors. Adjudicating this Motion will serve to narrow the scope of issues to be litigated in connection with Plan confirmation and the Derivative Standing Motion, foster judicial economy, and save the Debtors the significant expense associated with unnecessary litigation, for benefit of all of the Debtors' stakeholders.  Moreover, if the Court decides to hear this Motion at or prior to the Confirmation Hearing, the Adversary Proceeding should be stayed, at a minimum, until the Court adjudicates the Motion.

## **Relief Requested**

38.    By this Motion, the Debtors respectfully request either (a) entry of the an order, pursuant to sections 105(a) and 362(a) of the Bankruptcy Code, enforcing the automatic stay by prohibiting the Junior Notes Parties from taking any action in violation of the Intercreditor Agreement, including, among other things, (i) prosecuting the Derivative Standing Motion or the Adversary Complaint, or pursuing claims or other actions that are property of the Debtors' estates or proposed to be released by the Plan, (ii) seeking equitable subordination of, or challenging the validity of, the First Lien Noteholders' liens and claims, (iii) objecting to the Plan, directly or indirectly, to the extent such action or objection includes or constitutes a Prohibited Plan Objection, and (iv) obtaining discovery in connection with any of the foregoing, or (b) entry of an order pursuant to section 105(a) of the Bankruptcy Code, Rule 9017 of the Bankruptcy Rules, and Rules 401, 402, 403 and 702 of the Federal Rules of Evidence precluding

the Junior Noteholder Group from presenting evidence contesting matters prohibited by the Intercreditor Agreement and the automatic stay.

### **Basis for Relief Requested**

39.     The automatic stay is "an injunction that arises by operation of law immediately upon the commencement of the bankruptcy case." *In re Cont'l Airlines*, 134 F.3d 536, 539 n.5 (3d Cir. 1998).  It is "automatic" because it operates "irrespective of whether the parties to the proceedings stayed are aware that a petition has been filed." *Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991).  "The legislative history to section 362 [of the Bankruptcy Code] and our jurisprudence leave no doubt that the scope of the automatic stay is broad." *In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 637 (3d Cir. 1998); *see also In re Prudential Lines, Inc.*, 119 B.R. 430, 432 (S.D.N.Y. 1990) (automatic stay bars "any action which would inevitably have an adverse impact on the property of the . . . estate." (internal quotation omitted)).  Pursuant to section 105(a) of the Bankruptcy Code, a bankruptcy court also "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  "Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out the provisions of the Bankruptcy Code." *In re Cont'l Airlines*, 203 F.3d 203, 211 (3d Cir. 2000).

40.     Section 362(a)(3) of the Bankruptcy Code provides that "a petition filed . . . operates as a stay, applicable to all entities, of— . . . (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  Pursuant to section 541(a) of the Bankruptcy Code, "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).  When a "creditor's continued exercise of

control over the [debtor's] property prevent[s] the debtor from continuing his business with all his available assets" the automatic stay is violated. *In re Knaus*, 889 F.2d 773, 775 (8th Cir. 1989). Similarly, contract rights are property of the Debtors' estates, and a counterparty's failure to perform its contractual obligations constitutes a violation of the automatic stay. *See Broadstripe, LLC v. Nat'l Cable Television Coop. (In re Broadstripe, LLC)*, 402 B.R. 646, 657 (Bankr. D. Del. Mar. 9, 2009) ("By refusing to perform its obligations under the Member Agreement, NCTC is interfering with Broadstripe's property rights under the Member Agreement and acting in violation of the automatic stay."); *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("[c]ourts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay."). Causes of action are also property of the bankruptcy estate. *See Emoral, Inc. v. Diacetyl (In re Emoral, Inc.)*, 740 F.3d 875, 879 (3d Cir. 2014).

A.    **Breaches of the Intercreditor Agreement Constitute Violations of the Automatic Stay**

41.    The Intercreditor Agreement is enforceable in these Chapter 11 Cases by its terms pursuant to section 510(a) of the Bankruptcy Code. *See* 11 U.S.C. 510(a); *see also In re PWS Holding Corp.*, 228 F.3d 224, 243 (3d Cir. 2000) (recognizing that an intercreditor agreement is a subordination agreement and is enforceable pursuant to section 510(a) of the Bankruptcy Code). Intercreditor agreements are enforceable in bankruptcy proceedings to preclude a party from raising arguments and objections that are prohibited by the plain language of the agreement. *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 598 (Bankr. S.D.N.Y. 2009) (language of intercreditor agreement was "plain and purposeful" in "explicitly prohibit[ing]" a second lienholder from objecting to the debtor's plan of reorganization and that such creditor lacked standing to raise arguments and objections inconsistent with its rights and obligations

21

under the intercreditor agreement).    Recently, this Court re-affirmed the enforceability of intercreditor agreements in chapter 11 cases.  *See In re La Paloma Generating Co.*, Case No. 16-12700 (CSS) (Bankr. D. Del. Dec. 27, 2018) [D.I. 1274] (finding that sophisticated parties negotiated and entered into an intercreditor agreement with the intention to subordinate second lien lenders to the liens of first lien lenders, and requiring that first lien claims receive payment in full prior to payment of the second lien claim).

42.    The Debtors are party to the Intercreditor Agreement.    Among other things, the Intercreditor Agreement ensures that the priorities of the Debtors' outstanding debt obligations are maintained, including after the commencement of bankruptcy cases.  It prevents the Junior Notes Parties from taking certain actions that disrupt the Debtors' restructuring process, which is precisely what the Junior Notes Parties have already done and have made clear they intend to continue to do.    Breaches of the Intercreditor Agreement, which is property of the Debtors' estate, constitute a violation of the automatic stay.  *See Enron*, 300 B.R. at 212.  Public policy dictates that the Debtors should be entitled to rely on the terms of the Intercreditor Agreement, including its priority scheme and various restrictions as the Debtors seek to implement their restructuring.    *See Ion Media,* 419 B.R. at 595 ("Giving effect to the plain language of the Intercreditor Agreement in this manner also reinforces general principles of public policy. Affirming the legal efficacy of unambiguous intercreditor agreements leads to more predictable and efficient commercial outcomes and minimizes the potential for wasteful and vexatious litigation.").

43.    As discussed above, the Junior Notes Parties have blatantly violated – and threaten to continue to violate – the Intercreditor Agreement and the automatic stay by (i) seeking to assert causes of action that belong to the Debtors' estates, (ii) seeking derivative

standing to prosecute the claims that they had previously tried to bring in state court, which include a challenge to the Make-whole, and are otherwise on account of their status as junior creditors, (iii) challenging the priority or validity of the First Lien Notes through a claim for equitable subordination or otherwise, and (iv) asserting Prohibited Plan Objections.  *See* Intercreditor Agreement §§ 2.2, 3.2, 6.7.  In addition to violating the Intercreditor Agreement, the Derivative Standing Motion, the Adversary Complaint, and the litigation attendant thereto will acutely and adversely impact the Debtors, as it will unnecessarily delay the confirmation process, and add significant incremental cost along the way to the detriment of all of the Debtors' other creditors.

**B.     The Junior Noteholder Group's Assertion of Derivative Claims Violates the Automatic Stay**

44.     Under California law, as under Delaware law, it is well established that breach of fiduciary duty claims are derivative, because "a shareholder cannot bring a direct action for damages against management on a theory their alleged wrongdoing decreased the value of his or her stock."  *Schuster v. Gardner*, 127 Cal. App. 4th 305, 312 (Cal. Ct. App. 2005) (quotation marks omitted).  Instead, "the corporation itself must bring such an action, or a derivative suit may be brought on the corporation's behalf."  *Id.*; *see also id.* at 312-15 (breach of fiduciary duty was a derivative claim that shareholder lacked standing to pursue directly).[10] *See also Zomolosky v. Kullman*, 640 F. App'x 212, 216 (3d Cir. 2016) (under Delaware corporate law the decision to commence (or abstain from commencing) litigation for breach of fiduciary duties belongs to the corporation).

45.     In bankruptcy, the law is equally clear:  A creditor's claim for breach of fiduciary duty or aiding and abetting a breach, like the claims against Liberman, the Director Defendants,

---

[10] The Junior Noteholder Group agrees that California law governs the breach of fiduciary duty claims.  *See* Derivative Standing Motion at 29 n.4.

23

and HPS in the Adversary Proceeding, is derivative because any harm suffered by the creditor is incidental to the alleged injury to the debtor resulting from the breach. *See CAMOFI Master LDC v. Associated Third Party Adm'rs,* 2018 WL 839134, at *3-6 (a creditor's claim for breach of fiduciary duty is a derivative claim because "[d]issipation of corporate assets is an injury to the corporation, and any accompanying injury to creditors is incidental to the corporation's injury."); *see also, e.g., N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 94 (Del. 2007) (creditors of a corporation "either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against the corporation's directors"); *JMO Wind Down, Inc.*, 2018 WL 1792185, at *8 (Bankr. D. Del. Apr. 13, 2018) ("any breach of fiduciary duty harms the corporation as well as all of the shareholders together; they do not impact or harm [individual shareholder] alone"); *In re RNI Wind Down*, 348 B.R. at 293 (Sontchi, J.) ("Upon the filing of a bankruptcy petition . . . any claims for injury to the debtor from actionable wrongs committed by the debtor's officers and director become property of the estate under 11 U.S.C. § 541 and the right to bring a derivative action asserting such claims vests exclusively to the trustee").

46.    In the Proposed Amended Complaint, the Junior Noteholder Group acknowledged the derivative nature of the breach of fiduciary duty claims, alleging that Liberman and the Director Defendants owed a duty to LBI as a whole, and that the breach of that duty harmed the Debtors, as well as all of the stakeholders together. *See, e.g.*, Proposed Amended Complaint ¶ 228 (defendants breached duty "to maintain the value of the Company in trust for the benefit of its stakeholders, including its creditors"); ¶ 97 ("LBI did not receive reasonably equivalent value for the "make whole penalty"); ¶ 258 ("Liberman and the Director Defendants acted in their own

self-interest and against the best interests of the Company by voting on and approving the HPS

transaction").

47.    Despite this acknowledgement, the Junior Noteholder Group attempts to assert

direct claims for breach of fiduciary duty on the same operative set of facts by baldly asserting

that "[p]laintiffs have been uniquely harmed as compared to other creditors, including HPS." *Id.*

¶ 253.  Direct and derivative claims, however, are "mutually exclusive," because "the right of

action and recovery belong[] either to the shareholders (direct action) or to the corporation

(derivative action)." *CAMOFI*, 2018 WL 839134 at *3 (quoting *Schuster*, 127 Cal. App. 4th at

312).  The Junior Noteholder Group's injury is indirect because it stems from an alleged

reduction in LBI's assets available to repay LBI's loan.  The size and priority of that loan relative

to those of other creditors is irrelevant.  Nor does it matter that the Junior Noteholder Group

alleges that another creditor benefitted from the purported breach of fiduciary duty.  The only

question is whether the alleged direct injury is "incidental to the corporation's injury." *Schuster*,

127 Cal. App. 4th at 312.  Here, the answer is clearly yes: but for the alleged dissipation of LBI's

assets, and the ensuing harm to *the corporation*, the Junior Noteholder Group would have no

injury to allege.  Given that the breach of fiduciary duty claims are derivative, they are property

of the estate and the assertion thereof by the Junior Noteholder Group is a violation of the

automatic stay.

48.    Accordingly, for the reasons set forth herein, the Debtors request entry of the

Proposed Order enforcing the automatic stay.

**C.    The Intercreditor Agreement Precludes the Junior Noteholder Group from
Presenting Evidence Contesting Matters Prohibited by the Intercreditor Agreement**

49.    To the extent the Court determines it is appropriate to consider the Motion at or

just prior to the Confirmation Hearing as a *motion in limine*, pursuant to the Federal Rules of

Evidence and the Bankruptcy Rules, the Junior Noteholder Group should not be permitted to introduce evidence related to objections or arguments that are prohibited by the Intercreditor Agreement.  Specifically, under the Federal Rules of Evidence, made applicable to these proceedings by Bankruptcy Rule 9017, a bankruptcy court has the discretion to exclude evidence that is not relevant to a fact in issue in the case.  Fed. R. Evid. 401, 402.  In addition, even if relevant, a bankruptcy court has the discretion under FRE 403 to exclude evidence if "its probative value is substantially outweighed . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Evidence that purportedly supports arguments and objections that are prohibited by the Intercreditor Agreement is both irrelevant and will unduly delay the Confirmation Hearing.  Accordingly, the Court should not permit the Junior Noteholder Group to introduce evidence and raise arguments at the Confirmation Hearing that are inconsistent with many of its obligations under the Intercreditor Agreement.

### Reservation of Rights

50.     The Debtors reserve all of their rights, claims, defenses, and remedies, including, without limitation, their rights to amend, modify, or supplement this Motion, to seek discovery, and introduce any evidence in any hearing with respect to this Motion.  Further, the Debtors reserve all claims, causes of action, damages, rights, remedies, and/or defenses in connection with the Junior Notes Parties' violation of the Intercreditor Agreement and any other actions taken by the Junior Notes Parties in violation of the automatic stay.  The Debtors reserve all rights to respond, if necessary, to the Derivative Standing Motion and the Adversary Complaint.

### Notice

51.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel for the DIP Agent, the DIP Lenders, and the

26

Consenting First Lien Noteholders; (iii) counsel to the First Lien Trustee; (iv) counsel to the Collateral Trustee for the First Lien Notes; (v) counsel to the ad hoc group of Second Lien Noteholders; (vi) counsel to the Indenture and Collateral Trustee for the Second Lien Notes; (vii) Trustee for the Intermediate HoldCo Notes; (viii) Trustee for the HoldCo Notes; (ix) counsel to the HoldCo Noteholders; (x) counsel to the Creditors' Committee; (xi) the Securities and Exchange Commission; (xii) the Internal Revenue Service; (xiii) the United States Attorney's Office for the District of Delaware; and (xiv) any other party that has requested notice pursuant to Bankruptcy Rule 2002.

## **No Previous Request**

52.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as the Court may deem proper.

Dated: January 30, 2019        **RICHARDS, LAYTON & FINGER, P.A.**
      Wilmington, Delaware

/s/ *Brendan J. Schlauch*
Daniel J. DeFranceschi (No. 2732)
Marcos A. Ramos (No. 4450)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
Megan E. Kenney (No. 6426)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Theodore E. Tsekerides
Garrett A. Fail
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*