## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| LBI Media, Inc., *et al.*, | : | Case No. 18-12655 (CSS) |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |
|  | : |  |
|  | : | **Re: D.I. 696** |

-------------------------------------------------------x

### THE AD HOC GROUP OF NOTEHOLDERS'[2] OBJECTION TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. § 1121(d) FOR ENTRY OF AN ORDER (I) EXTENDING THEIR EXCLUSIVE PERIODS AND (II) GRANTING RELATED RELIEF

Certain holders (the "Noteholders") of the 11½%/13½% PIK Toggle Second Priority Secured Subordinated Notes due 2020, Series II (the "Second Lien Notes") issued by LBI Media, Inc. ("LBI" or the "Company"; collectively with its affiliated debtors and debtors in possession, the "Debtors"), by and through their undersigned counsel, submit this objection (the "Objection") to the *Motion of Debtors Pursuant to 11 U.S.C. § 1121(d) For Entry of an Order (I)*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LBI Media, Inc. (8901); Liberman Broadcasting, Inc. (8078); LBI Media Holdings, Inc. (4918); LBI Media Intermediate Holdings, Inc. (9635); Empire Burbank Studios LLC (4443); Liberman Broadcasting of California LLC (1156); LBI Radio License LLC (8905); Liberman Broadcasting of Houston LLC (6005); Liberman Broadcasting of Houston License LLC (6277); Liberman Television of Houston LLC (2887); KZJL License LLC (2880); Liberman Television LLC (8919); KRCA Television LLC (4579); KRCA License LLC (8917); Liberman Television of Dallas LLC (6163); Liberman Television of Dallas License LLC (1566); Liberman Broadcasting of Dallas LLC (6468); and Liberman Broadcasting of Dallas License LLC (6537). The Debtors' mailing address is 1845 West Empire Avenue, Burbank, California 91504.

[2]   The Ad Hoc Group of Noteholders consist of Caspian Select Credit Master Fund, Ltd., Blackstone Diversified Multi Strategy Fund, Blackstone Alternative Multi-Strategy Sub Fund IV L.L.C., Caspian Solitude Master Fund, L.P., Super Caspian Cayman Fund Limited, Caspian HLSC1, LLC, Caspian SC Holdings, L.P., Caspian Focused Opportunities Fund, L.P., Mariner LDC, Latigo Ultra Master Fund, Ltd., Crown Managed Accounts SPC acting for and on behalf of Crown/Latigo Segregated Portfolio, Archview Fund L.P., Archview Master Fund Ltd., Archview ERISA Master Fund Ltd., Archview Credit Opportunities Fund I L.P., York Credit Opportunities Fund, L.P., York Global Credit Income Master Fund, L.P., York Credit Opportunities Investments Master Fund, L.P., Exuma Capital, L.P., and Riva Ridge Recovery Fund LLC. Blackstone Diversified Multi Strategy Fund and Blackstone Alternative Multi-Strategy Sub Fund IV L.L.C. are participants in this matter through positions held in accounts managed on a discretionary basis by Caspian Capital LP, which also manages Caspian Select Credit Master Fund, Ltd., Caspian Solitude Master Fund, L.P., Super Caspian Cayman Fund Limited, Caspian HLSC1, LLC, Caspian SC Holding, L.P., Caspian Focused Opportunities Fund, L.P., and Mariner LDC.

*Extending Their Exclusive Periods and (II) Granting Related Relief* [Dkt. No. 696] (the "Motion").  In support of this Objection, the Noteholders respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    The Motion should be denied because the Debtors have failed to meet their burden of showing "good cause" to extend exclusivity.  The Debtors should not be permitted to put forward one flawed plan after another, all while continuing to erode value and diminish the Noteholders' prospects of recovery.  Terminating exclusivity would allow the Noteholders and other parties in interest to propose alternatives that are actually viable before it is too late.

2.    The day before this Objection was filed the Debtors announced their intention to amend the Plan, effectively conceding what the Noteholders have been saying from the outset of these cases—that the capital structure implied by the Plan[3] was predicated on a fraudulent transaction in violation of the LBI's directors' fiduciary duties.  Now, after expending more than a year's worth of LBI's EBITDA fighting the Noteholders and denying this fraud, the Debtors propose to "fix" the Plan by reducing HPS's claim to pre-transaction levels, but still provide no meaningful additional recovery to the Noteholders.

3.    This is too little, too late.  Had the Debtors complied with their fiduciary obligations from the start, the first lien debt would have been refinanced or bought out by the Noteholders in full, no meaningful DIP would have been required, and the Company today would be finishing a restructuring where the Noteholders would own the equity of the Company.  Instead, the Debtors remain bent on pursuing a modified Plan that guarantees continued litigation for no reason other than to protect the interests of HPS, the "preferred partner" that Mr.

---

[3]    "Plan" refers to the Debtors' *Modified Second Amended Joint Chapter 11 Plan of Reorganization of LBI Media, Inc. and its Affiliated Debtors* [Dkt. No. 621].

Liberman hoped would entrench existing management.  The Noteholders believe the Plan, even with the proposed modifications, is unconfirmable.

4.      Allowing the Debtors continued exclusivity will only further deplete estate resources and disadvantage the Noteholders.  Every day that the Debtors incur new fees and borrow more money from HPS to fund its fight against the Noteholders,[4] they further the same improper purpose as the HPS transaction—to move value away from the Noteholders.

5.      Terminating exclusivity will allow the Noteholders and other stakeholders to introduce and pursue viable alternatives free from the Debtors' and HPS's agenda.  The Noteholders have made several alternative proposals in the last three months, including (i) a proposal that reinstates first lien debt with the Noteholders providing exit financing for the business going forward, and (ii) a $220 million cash purchase of HPS's first lien position.  The Debtors did not meaningfully consider these proposals.  Given the Debtors' refusal to consider alternatives that benefit the Noteholders – the rightful economic owners of LBI – ending exclusivity is necessary to promote a value-maximizing resolution.

6.      For these reasons and those set forth more fully below, the Noteholders object to the Debtors' requested extension of exclusivity.

## BACKGROUND

A.      The Proposed Plan of Reorganization

7.      On the Petition Date, the Debtors filed the initial version of the Plan as part of their first day filings.  Two days later, on November 23, 2018, the Debtors filed another version of the Plan that removed customary carve-outs from the release provisions for claims stemming from fraud and willful misconduct.  Subsequent amendments were made to the Plan on January 4, 2019, February 2, 2019 and March 8, 2019 leading to the current Plan.  On April 8, 2019, at a

---

[4]      The Debtors also announced at yesterday's status conference that they will be seeking an extension of the DIP financing as well as additional borrowing under the DIP facility.

status conference with the Court in respect of the Plan confirmation hearings, the Debtors announced that they will be amending the Plan in the near term.

8.      The Plan provides the following key recoveries:

- HPS Investment Partners, LLC ("HPS") originally was to have an allowed claim under the Plan of $327 million on account of its First Lien Notes.  For its claim, HPS was to receive either 100% or 95% of the equity of the reorganized Debtors depending on whether the Second Lien Noteholders voted to reject the Plan. The Debtors recently stated that HPS's total claim, including its claims under the DIP financing, will be reduced to approximately $271 million.

- The holders of the Second Lien Notes were to receive nothing if they vote to reject the Plan (which they have), or 5% of the equity of the reorganized Debtors if they voted to accept the Plan and release the Debtors, their directors and officers including Mr. Liberman, and HPS from all liability.  The Debtors have stated that this "death trap" may be removed in their amendment.

- Ongoing unsecured trade creditors, whose claims are estimated as being between $0.8 and $1.4 million, will share $623,000 in cash plus a "Critical Vendor Excess Amount" of up to $897,000, resulting in recoveries of 100%, or close to 100%, of the amount of their unsecured claims.

- Holders of other general unsecured claims, estimated to be $1.5 million, will receive their pro rata share of $1.1 million in cash.  Rejection damages claims and insider indemnification claims (the amounts of which are not disclosed by the Debtors) will not share in this $1.1 million, but will receive a separate payment in cash at the same percentage recovery as the other general unsecured claimants.  This means that general unsecured claimants will likely receive close to a full recovery of their claims.

- Holders of the notes issued by LBI Media Holdings, Inc. ("HoldCo"), which matured and remained unpaid since April 2017, will share on a *pari passu* basis the cash assets of HoldCo with (i) holders of notes issued by a separate entity, LBI Media Intermediate Holdings, Inc., (ii) purported intercompany claims held by Intermediate HoldCo against HoldCo, and (iii) HoldCo general unsecured claims.  In return for the Intermediate HoldCo noteholders' support of the Plan, the Debtors agreed to not only give them a pro rata share of the HoldCo owned cash, but also   the share of such cash that is being allocated to Intermediate HoldCo on account of intercompany claims.  In other words, the Debtors bought off the Intermediate HoldCo noteholders by allowing them to "double dip" on the HoldCo cash to the detriment of the HoldCo noteholder (who just so happens to be one of the Noteholders).

9.      If confirmed, the Plan will provide broad releases and exculpation of the Debtors, the reorganized Debtors, HPS, and all of the Debtors' current and former directors, officers, employees, and shareholders.   These releases are not only for claims and causes of action relating to the Plan, but also, among other things, claims related to "the purchase, sale or rescission of the purchase or sale of any Security of the Debtors" (*i.e.*, HPS's purchases of publicly-traded First Lien Notes), "the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan" (*i.e.*, the HPS transaction), "the business or contractual arrangements between any Debtor and any Released Party" (*i.e.*, the deals made between the Debtors, HPS and Liberman), and "the Prepetition Actions or any of the transactions that are the subject of the Prepetition Actions" (*i.e.*, the Noteholders' state court actions against the Debtors, Lenard Liberman and HPS).  Plan, § 10.6.  In other words, the Plan contains the broadest releases possible of any claims for fraudulent transfer, securities fraud, and breach of fiduciary duty.

10.      As set forth in greater detail in the Noteholders' objection to the confirmation of the Plan, dated March 24, 2019 [D.I. 661] (the "Plan Objection," which is incorporated herein by reference), the Noteholders submit that the Plan cannot be confirmed for various reasons. Among other defects, the Plan was proposed in bad faith and seeks to validate the actual and constructive fraudulent HPS transaction,[5] the Plan unfairly discriminates against the Noteholders

---

[5]     The Debtors' independent director has already testified at the confirmation hearing that the make-whole instituted by the pre-petition HPS transaction was a "creative feature and strategy" that put pressure on the Noteholders and set them up to get nothing.

> BY MR. LOFT:
> Q. The make-whole provision in your testimony was a creative feature and strategy?
> A. It was.
> Q. And you've been in this business for over 25 years investing in distressed companies, right?
> A. I have.
> Q. You've seen a lot of transactions in relation to distressed companies, right?
> A. Correct.

and violates the absolute priority rule by improperly "gifting" nearly full recoveries to unsecured creditors other than the Noteholders, and the Plan provides for improper releases to Mr. Liberman, the directors and HPS in order to immunize them against claims related to their fraudulent conduct.

11.     On March 25, 2019, the Plan confirmation hearing commenced, and it remains ongoing.

      B.     <u>The Exclusivity Motion</u>

12.     On March 19, 2019, the Debtors filed the Motion seeking to extend their exclusive right to file a plan through and including July 19, 2019, and their exclusive right to solicit acceptances thereof through September 17, 2019.

<b><u>OBJECTION</u></b>

13.     Section 1121 of the Bankruptcy Code limits the period during which a debtor has the exclusive right to file a plan of reorganization.  *See* 11 U.S.C. § 1121(b).  Section 1121(d) of the Bankruptcy Code permits a Court to extend this exclusive period "for cause."  11 U.S.C. § 1121(d)(1).  The exclusivity period is meant to afford the debtor the opportunity to negotiate the settlement of its debts by proposing and soliciting support for a plan of reorganization without interference of competing plans from other parties in interest.  *Geriatrics Nursing Home v. First*

---

Q. You thought the make-whole was a fairly creative feature and strategy to put in place, didn't you?
A. I did.
Q. You thought it put pressure on the second lien noteholders to do a refinancing, right?
A. I did.
Q. You thought that it would prevent the second lien noteholders from putting the company into default, didn't you?
A. I did.
Q. Because if they did, they might get nothing, right?
A. It protected the company, correct.

No. 18-12655 Hr'g Tr. 409:10-25 and 410:1-4, Mar. 26, 2019.

*Fid. Bank, N.A. (In re Geriatrics Nursing Home)*, 187 B.R. 128, 131 (D.N.J. 1995) (citing legislative history).

14.     However, the Debtors do not have a right or presumption in favor of receiving an extension of their exclusivity period.  Rather, it is well settled that the Debtors have the burden to prove that "good cause" exists for granting an extension beyond the statutory period.  *See In re Newark Airport/Hotel L.P.*, 156 B.R. 444, 451 (Bankr. D.N.J. 1993), *aff'd* 155 B.R. 93 (D.N.J. 1993) ("Since the debtor seeks the extension, the burden is on it to demonstrate the existence of good cause"); *see also In re Borders Group, Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011) (citation omitted) (explaining that "[t]he burden of proving cause to reduce or increase exclusivity is on the moving party").  To meet this burden, the Debtors must produce evidence to demonstrate that sufficient cause exists to justify such an extension.  *In re Borders Group, Inc.*, 460 B.R. at 821 ("For the moving party to meet its burden [to extend exclusivity] it must produce affirmative evidence to support a finding of cause." (citation omitted)); *In re Curry Corp.*, 148 B.R. 754, 755 (Bankr. S.D.N.Y. 1992) ("A debtor has the burden of proving that cause exists" (citations omitted)).  They have not done so.

15.     The Bankruptcy Code does not define what constitutes "cause" to warrant an extension of the Debtors' exclusive period.  Courts consider the following factors when evaluating whether cause exists for an extension: (i) the size and complexity of the case; (ii) the existence of good faith progress towards developing a plan of reorganization; (iii) whether the debtor seeks to extend exclusivity to pressure creditors to accede to the debtor's demands; (iv) the existence of an unresolved contingency; (v) the fact that the debtor is paying its bills as they become due; (vi) whether the debtor has sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (vii) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (viii) whether the debtor has made progress in

negotiations with its creditors; and (ix) the amount of time which has elapsed in the case. *See In re Adelphia Commcn's Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002).

16.    "[T]he primary consideration for the court in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward, and that this 'is a practical call that can override a mere toting up of the factors.'"  *Id*. at 590 (Bankr. S.D.N.Y. 2006) (quoting *Dow Corning*, 208 B.R. at 670).  In other words, "the test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case.  Certainly practical considerations, or other considerations in the interest of justice, could override, in certain cases, the result after analysis of the nine factors."  *Id*.

17.    The Debtors have not shown that "good cause" exists to extend exclusivity here. First, an extension of exclusivity will not "move the case forward."  The Debtors have had their Plan on file since the Petition Date and have pursued confirmation of such Plan at breakneck speed while trying to delay and silence the Noteholders from opposing the Plan.  Then, in the middle of the confirmation hearing, they concede the central issue in dispute for the last year – that the prepetition HPS transaction was a fraudulent transfer – after forcing the parties to spend tens of millions of dollars in fees to establish that issue.  The Debtors should not be rewarded with a four month extension of exclusivity for this wasteful, value-destructive exercise.  *See, e.g.*, *In re R.G. Pharm., Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) (holding that the debtor failed to establish cause to extend exclusivity because of a "breakdown of negotiations between the debtor and the objecting creditors" and because the debtor failed to show that extension was "likely to significantly improve the progress of the case").  It is inconsistent with exclusivity to

allow a debtor and its plan sponsor to use as a sword the incurrence of DIP financing to pay fees resulting from a conscious decision to try to ratify a fraudulent plan.

18.     The Debtors should also not be granted an extension of exclusivity because they will undoubtedly use such extension to continue to try to pressure the Noteholders and gain negotiating leverage.   Exclusivity should not "make creditors the hostages of Chapter 11 debtors" or be employed "as a tactical device to put pressure on creditors to yield to a plan that they might consider unsatisfactory."  *In re Curry Corp.*, 148 B.R. 754, 755-56 (Bankr. S.D.N.Y. 1992).   Yet, granting of exclusivity here would do just that.   The HPS transaction had the potential to shift the fulcrum security from the Noteholders to HPS.   No. 18-12655 Hr'g Tr. (Mar. 26, 2019) 408:10-13 ("Q. The make-whole as it existed in that transaction had the potential to push the second lien securities out of the money, didn't it?  A. Yes.").   An extension of the Debtors' exclusive periods will allow the Debtors and HPS to further erode the value of the Company in an attempt to push the fulcrum back to HPS.

19.     For the same reasons, the Debtors should not be granted an extension of their exclusive periods because they have not exhibited good faith progress towards developing a viable plan.  The Plan itself is proof enough that the Debtors are unable to pursue a plan that maximizes value and provides a viable path to rehabilitation.  *See, e.g., Cont'l Cas. Co. v. Burns & Roe Enters. (In re Burns & Roe Enters.)*, Nos.  05-2529 (KSH), 05-4125 (KSH), 2005 U.S. Dist. LEXIS 26247, at *14-15 (D.N.J. Nov. 2, 2005) ("[T]he legislative history is clear that the point of exclusivity is to promote an environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated.") (citations and internal quotation marks omitted).

20.     With the inevitable failure of the Plan, the time has come for other stakeholders to find value-maximizing and viable alternatives.   Despite the Debtors' repeated false assertions

that the Noteholders have failed to engage, the Noteholders seek to find a consensual path forward. Indeed, the Noteholders continue to try to find alternative, and realistic, ways to settle these cases with the Debtors and HPS. Denying the Debtors' request to extend exclusivity would promote viable alternatives from the Noteholders and other parties in interest. *See In re Pliant Corp.*, No. 09-10443 (MFW) [Dkt No. 498] (Bankr. D. Del. Feb. 11, 2009) (terminating exclusivity after junior creditors developed a higher value alternative plan than the one the debtors and senior creditors sought to confirm).

## **<u>RESERVATION OF RIGHTS</u>**

21.     The Noteholders respectfully reserve all of their rights and remedies, including, without limitation, to seek a termination of the Debtors' exclusive periods at a subsequent date.

## **<u>CONCLUSION</u>**

WHEREFORE, for the foregoing reasons, the Noteholders respectfully request that the Court deny the relief requested in the Motion and grant such other relief as the Court deems just and proper.

Dated:  April 9, 2019
          Wilmington, Delaware

By: _*Paige N. Topper*_____
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market St., 16th Floor
PO Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Attorneys for the Noteholder Group*

Duane L. Loft (dloft@bsfllp.com)
Jaime D. Sneider (jsneider@bsfllp.com)
Mario O. Gazzola (mgazzola@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

*Attorneys for a subset of the Noteholder Group*